**LOEB & LOEB LLP**
Schuyler G. Carroll
Daniel B. Besikof
Noah Weingarten
345 Park Avenue
New York, NY 10154
Tel: (212) 407-4000
Fax: (212) 407-4990
Email: scarroll@loeb.com
        dbesikof@loeb.com
        nweingarten@loeb.com

*Proposed Counsel to the Debtors*
*and Debtors-in-Possession*

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| | ) | Chapter 11 |
| | ) | |
| | ) | Case No. 19-45422 |
| | ) | Case No. 19-45423 |
| In re: | ) | Case No. 19-45424 |
| | ) | Case No. 19-45425 |
| Absolut Facilities Management, LLC, *et al*. | ) | Case No. 19-45426 |
| | ) | Case No. 19-45427 |
| Debtors.[1] | ) | Case No. 19-45428 |
| | ) | Case No. 19-45429 |
| | ) | |
| | ) | (Joint Administration Requested) |
| | ) | |

## DECLARATION OF MICHAEL WYSE IN SUPPORT OF
## DEBTORS' CHAPTER 11 PETITION AND FIRST DAY MOTIONS

I, Michael Wyse, hereby declare under penalty of perjury:

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are: Absolut Facilities Management, LLC (1412); Absolut Center for Nursing and Rehabilitation at Allegany, LLC (7875); Absolut Center for Nursing and Rehabilitation at Aurora Park, LLC (8266); Absolut Center for Nursing and Rehabilitation at Gasport, LLC (8080); Absolut at Orchard Brooke, (1641); Absolut Center for Nursing and Rehabilitation at Orchard Park, LLC (8300); Absolut Center for Nursing and Rehabilitation at Three Rivers, LLC (8133); and Absolut Center for Nursing and Rehabilitation at Westfield, LLC (7924).

18147146

1.　　I am over the age of 18 and am authorized to submit this Declaration on behalf of the Debtors.  If called upon to testify, I could and would testify competently to the facts set forth in this Declaration.

2.　　I am the Chief Restructuring Officer ("**CRO**") of Absolut Facilities Management, LLC, doing business as Absolut Care LLC, ("**AFM**"), a New York limited liability company with an office located in Roslyn Heights, New York, and of each of the other above-captioned debtors and debtors-in-possession (collectively, with AFM, the "**Debtors**").

3.　　I am knowledgeable and familiar with the Debtors' day-to-day operations, business and financial affairs, books and records, and the circumstances leading to the commencement of these chapter 11 cases (the "**Chapter 11 Cases**").  Except as otherwise indicated herein, the facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, information provided to me by employees of the Debtors or the Debtors' advisors, or my opinion, which itself would be based on my experience, knowledge, and information concerning the Debtors' operations. If called upon to testify, I would testify competently to the facts set forth in this Declaration.

4.　　Since 2015, I have served as Managing Partner of Wyse Advisors, LLC, a boutique firm focused on distress / special situations.  I have more than 20 years professional and restructuring experience, across all industries and all sizes, providing expertise in business development, strategic advisory, turnaround management, capital raises and solution facilitation. I have been involved in numerous public and private situations, both domestic and internationally.  I have served as CRO and sat on numerous Boards of financially distressed companies.

I.    **THE DEBTOR'S STRUCTURE AND BUSINESS AND THE REASONS FOR FILING THESE CHAPTER 11 CASES**

A.    **Business Operations**

5.    The Debtors operate six skilled nursing facilities and one assisted living facility in the state of New York (the "**Senior Care Facilities**"), employing approximately 975 people throughout New York state.  The Senior Care Facilities provide long-term care and rehabilitative services to many senior patients.  In particular, the Senior Care Facilities provide hospice, dementia care, medical needs, as well as short- and long-term rehabilitation care. The Senior Care Facilities gross approximately $83 million of annual revenue.  The facilities provide excellent services to their patients, obtaining a 97% satisfaction rate for their rehabilitation services.

B.    **Corporate Structure**

6.    AFM is a New York limited liability company formed in 2006.  AFM is the manager of the Senior Care Facilities.  The Debtors' principal, Israel Sherman, owns 100% of AFM.  AFM owns 54% of each of the Debtors other than AFM.  In addition, as reflected on the organizational chart attached hereto as Exhibit A, AFM also owns 54% of certain additional non-Debtor entities (the "**Non-Debtor Entities**").  The Non-Debtor Entities are in the executory period with respect to a contract for sale of all of their assets to third parties in connection with a planned divestiture transaction that began in March 2018.  The consummation of the asset transfers from the Non-Debtor Entities remains subject only to approval by the New York State Department of Health.  While approval is pending, the third party acquirers are operating the Non-Debtor Entities as executives, subject to control of AFM, through a series of agreements.

7.    Debtor Absolut Center for Nursing and Rehabilitation at Allegany, LLC is a New York limited liability company formed in 2005, which owns and operates the Debtors' skilled nursing facility located in Allegany, New York (the "**Allegany Facility**").  The Allegany Facility

has 37 beds and employs approximately 56 people.  Its annual revenues for fiscal year 2018 were $3,873,589.95 and for 2017 were $3,760,727.76.

8.       Debtor Absolut Center for Nursing and Rehabilitation at Aurora Park, LLC is a New York limited liability company formed in 2005, which owns and operates the Debtors' skilled nursing facility in Aurora Park, New York (the "**Aurora Park Facility**").  The Aurora Park Facility has 320 beds and employs approximately 331 people.  Its annual revenues for fiscal year 2018 were $29,768,922.47 and for 2017 were $30,769,494.38.

9.       Debtor Absolut Center for Nursing and Rehabilitation at Gasport, LLC is a New York limited liability company formed in 2005, which owns and operates the Debtors' skilled nursing facility in Gasport, New York (the "**Gasport Facility**").  The Gasport Facility has 83 beds and employs approximately 92 people.   Its annual revenues for fiscal year 2018 were $7,225,754.79 and for 2017 were $7,287,582.45.

10.       Debtor Absolut at Orchard Brooke, LLC is a New York limited liability company formed in 2005, which owns and operates the Debtors' sole adult assisted living facility, which is located in Orchard Park, New York (the "**Orchard Brooke Facility**").  The Orchard Brooke facility has 80 beds and employs approximately 19 people.  Its annual revenues for fiscal year 2018 were $2,118,740.63 and for 2017 were $2,020,297.85.

11.       Debtor Absolut Center for Nursing and Rehabilitation at Orchard Park, LLC is a New York limited liability company formed in 2005, which owns and operates the Debtors' skilled nursing facility in Orchard Park, New York (the "**Orchard Park Facility**").  The Orchard Park Facility has 202 beds and employs approximately 234 people.  Its annual revenues for fiscal year 2018 were $18,102,790.61 and for 2017 were $18,583,140.48.

12.     Debtor Absolut Center for Nursing and Rehabilitation at Three Rivers, LLC is a New York limited liability company formed in 2005, which owns and operates the Debtors' skilled nursing facility in Painted Post, New York (the "**Three Rivers Facility**").   The Three Rivers Facility has 120 beds and employs approximately 119 people.  Its annual revenues for fiscal year 2018 were $11,717,771.98 and for 2017 were $11,371,069.23.

13.     Finally, Debtor Absolut Center for Nursing and Rehabilitation at Westfield, LLC is a New York limited liability company formed in 2005, which owns and operates the Debtors' skilled nursing facility in Westfield, New York (the "**Westfield Facility**").   The Westfield Facility has 120 beds and employs approximately 124 people.  Its annual revenues for fiscal year 2018 were $10,320,872.93 and for 2017 were $10,446,382.34.

14.     Each of the Debtors other than AFM is owned 54% by AFM, 45% by Israel Sherman and 1% by Samuel Sherman.  As a result of Israel Sherman's 100% ownership of AFM, Israel Sherman owns, directly or indirectly, 99% of the equity in each of the Debtors other than AFM.

15.     In addition, Israel Sherman owns 100% of the membership interests of Billit Accounting & Information Technology, LLC ("**Billit**").  Billit is not a Debtor in these Chapter 11 Cases, but it does provide substantial back-office support for the Debtors and other nursing and senior care facilities, including both facilities affiliated with Israel Sherman and members of his family and unaffiliated facilities.  The Debtors do not pay a percentage based management fee. The Debtors do, however, pay salaries and other expenses incurred by Billit in connection with its services for the Debtors, including Israel Sherman's salary.

16.     As noted above, an organizational chart illustrating the foregoing is attached hereto as <u>Exhibit A</u>.

### C.    Capital Structure and Debt

17.    The Debtors' capital structure is reasonably simple.  They have no public debt.  Rather, their obligations are broken down into three general categories:  (i) obligations to Capital Finance Group Inc. ("**CF**"), the Debtors' secured lender, under two revolving credit facilities; (ii) trade debt to the Debtors' landlord, vendors, employees, taxing authorities and others; and (iii) potential tort litigation, including substantial obligations in respect of deductibles under the Debtors' liability insurance policies related thereto.  These three categories of indebtedness are described below.

#### 1.    *Secured Debt*

18.    As of the Petition Date, certain Debtors are parties to financing arrangements with Capital Finance, LLC, as successor-in-interest to Capital Funding Group, Inc. (the "**Pre-Petition Lender**").  Specifically, Absolut Center for Nursing and Rehabilitation at Aurora Park, LLC; Absolut Center for Nursing and Rehabilitation at Orchard Park, LLC; Absolut Center for Nursing and Rehabilitation at Allegany, LLC; Absolut Center for Nursing and Rehabilitation at Three Rivers, LLC; Absolut Center for Nursing and Rehabilitation at Gasport, LLC; and certain Non-Debtor Entities (collectively, the "**HUD Borrowers**")[2] are party to that certain Credit and Security Agreement dated as of May 22, 2009 among the HUD Borrowers and the Pre-Petition Lender (as amended, the "**HUD Prepetition Loan Agreement**") in the maximum outstanding principal amount of $5.8 million.  As of the Petition Date, the HUD Borrowers owe approximately $5 million to the Pre-Petition Lender under the HUD Prepetition Loan Agreement.  The HUD

---

[2] The non-Debtor HUD Borrowers are:  Absolut Center for Nursing and Rehabilitation at Dunkirk, LLC; Absolut Center for Nursing and Rehabilitation at Eden, LLC; Absolut Center for Nursing and Rehabilitation at Endicott, LLC; and Absolut Center for Nursing and Rehabilitation at Houghton, LLC.

Borrowers' obligations under the HUD Prepetition Loan Agreements are secured by liens on substantially all of the personal property of the HUD Borrowers.

19.    Additionally, Absolut Facilities Management, LLC and Absolut Nursing and Rehabilitation Center of Westfield, LLC (collectively, the "**Non-HUD Borrowers**") are parties to that certain Credit and Security Agreement dated as of May 22, 2009 among the Non-HUD Borrowers and the Pre-Petition Lender (as amended, the "**Non-HUD Prepetition Loan Agreement**") in the maximum outstanding principal amount of $920.000.  As of the Petition Date, the Non-HUD Borrowers owe approximately $700,000 to the Pre-Petition Lender under the Non-HUD Prepetition Loan Agreement.  The HUD Borrowers' obligations under the Non-HUD Prepetition Loan Agreements are secured by liens on substantially all of the personal property of the HUD Borrowers.

20.    In addition, the Debtors' pharmacist, Specialty Rx Inc. ("**SpecialtyRx**"), has asserted a lien, through the filing of UCC financing statements, against the Debtors in respect of their indebtedness to SpecialtyRx, which SpecialtyRx asserts is in the amount of not less than $2,570,862.58.  The Debtors are evaluating this recently-filed lien and reserve all rights with respect thereto.

### 2.    *Unsecured Debt*

21.    The Debtors also have substantial additional unsecured indebtedness.  Specifically, the Debtors are obligated to their trade creditors in the approximately $10,446,113.76.  The Debtors landlords – affiliates of the Arba Group ("the "**Landlords**") – assert that the Debtors owe prepetition indebtedness in respect of unpaid rent in the amount of approximately $2,979,000, plus certain fees, costs, expenses and other charges.  The Debtors dispute their obligation to pay these

amounts to the Landlords.[3]  The Debtors also owe approximately $4.05 million in prepetition taxes, including approximately $1.9 million in New York State and federal payroll taxes and related penalties (which are disputed), as well as approximately $2,161,000 in assessments under the Health Receipts Cash Assessment Program implemented by the New York State Department of Health.  Additionally, the Debtors are obligated to related parties in respect of loans they made to the Debtors in the total amount of approximately $8.4 million to fund capital improvements to the Senior Care Facilities and other costs associated with the Debtors' businesses.  Finally, the Debtors are obligated to certain litigants in respect of tort liability.

## II.      THE EVENTS LEADING TO THE CHAPTER 11 FILINGS

22.      There were several events that led to the Debtors' commencing these Chapter 11 Cases.  First, the Debtors' pay an exceedingly high amount of rent for their seven Senior Care Facilities at rates that are well above market rates for such facilities.  In total, the Debtors pay approximately $11 million per year to their landlords – affiliates of the Arba Group – well above the market rate for comparable facilities.  That crushing rent burden has made the Debtors' business, in its current footprint, unsustainable.  Not only has the high rent burden put a stranglehold on the Debtors' cash flow, it is impeding the Debtors' ability to invest in the improvement of their facilities.  Facility improvements are critically important, however, to ensuring that the Senior Facilities remain competitive, in an increasingly competitive market, and to ensure that Medicare and Medicaid Reimbursement rates are maximized.  The Debtors have been able only to make limited facility improvements, including a significant $4 million capital

---

[3] Certain of the Landlords have filed UCC financing statements against certain of the Debtors, however the Debtors do not believe that the liens asserted by such Landlords, to the extent valid, attach to any material assets of the Debtors.  The Debtors are currently evaluating these purported liens and reserve all rights in respect thereto.

improvement to the Aurora Park Facility.  The Debtors filed these cases to restructure or eliminate these burdensome leasehold obligations.  The high rent burden has caused increasing strain on the Debtors' cash flow rates as reimbursement rates have fallen in recent years, while the rents have not decreased.

23.     Second, the overwhelming majority of the Debtors' income derives from Medicare and Medicaid reimbursement payments, since the vast majority of the Debtors' patients rely on Medicare and Medicaid to pay the Debtors for their services.  However, in recent years, there has been increasing lag in the amount of time it takes to process Medicare and Medicaid reimbursement payments and to receive payment of those amounts from Medicare and Medicaid.

24.     The Medicare and Medicaid payments are paid by the federal government to the state government, and the disbursements are handled on a county level.  That process has slowed significantly, in a way that is highly prejudicial to the Debtors and their stakeholders.  By way of example, certain of the Debtors' larger facilities are in Erie County.  The Erie county agency that processes and approves Medicare and Medicaid claims previously employed fourteen people in that job.  That agency now employs just three people to do the same work.  While historically reimbursement payments would be received by the Debtors in just a matter of weeks, the Debtors now routinely wait many months, and sometimes years to for approval (and resulting payment) to be received.  Until approval, the Debtors do not receive any payment, but the Debtors do have to incur substantial expenses associated with treating, feeding, and housing their patients, in addition to funding the Debtors' payroll and operating expenses.  Worse yet, the Prepetition Lender restricts advances on aged accounts receivables.  Because of the increasingly long lag time for collection from Medicare and Medicaid, the Debtors' availability on their financing facilities is restricted, placing a substantial burden on their cash flow and operations.

25.     Third, even if the Medicare and Medicaid payments were made timely, the amount of the reimbursements is not keeping up with the cost of living.  The resulting effective decline in reimbursement rates places further pressure on the Debtors' cash flow, particularly since the leases for the Senior Care Facilities were entered into a time when reimbursement rates were higher.

26.     Fourth, the senior healthcare market is an extremely competitive market.  The patients in the Senior Care Facilities were primarily born during the Great Depression, a period of time when the birth rate in this country was quite low.  During the Baby Boom, just a few years later, the birth rate was approximately twice as high.  The Debtors expect that there will be a significantly larger number of seniors in need of senior care facilities in the coming years, but for now, supply outpaces demand.  The job market is extremely tight, which has resulted in a corresponding increase to labor costs.  The Debtors' businesses require employees to work around the clock, 24-hours a day, 7-days a week, and simply cannot afford any gaps in coverage.  The Debtors must pay significant overtime costs just to fill shifts.

27.     Finally, despite that the Department of Health has not raised concerns about the Debtors' patient care, dozens of tort litigations have been asserted against the Debtors by their patients and former patients.  These actions are pending and are largely in their infancies, but the Debtors have substantial deductibles under their liability policies that have placed the burden for defense and payment of claims largely on the Debtors' backs.  The Debtors seek the protections of the Bankruptcy Code, in part, to obtain a breathing spell from these litigations and to attempt to resolve them in an efficient manner.

28.     In light of all these developments, the Debtors determined that reorganizing under chapter 11 was the best alternative available to the Debtors to ensure uninterrupted top-flight care for their patients and to maximize their value for all stakeholders.

III.    **PROPOSED STRATEGY TO EMERGE FROM CHAPTER 11**

29.    The Debtors intend to use these Chapter 11 Cases to evaluated their leases and other obligations and, to the extent possible, restructure them in a way that will afford the Debtors an opportunity to emerge from bankruptcy, with all of their Senior Care Facilities intact, as a going concern.  If that proves to be impossible, the Debtors will explore other strategic alternatives to ensure uninterrupted care for their patients and to maximize value for their stakeholders.

IV.    **EVIDENTIARY SUPPORT FOR FIRST DAY MOTIONS**

30.    Contemporaneously with the filing of this Declaration, the Debtors have filed a number of first day motions (each, a "**First Day Motion**" and, collectively, the "**First Day Motions**"),[4] seeking relief that the Debtors believe is necessary to enable them to efficiently administer their estates with minimal disruption and loss of value during these Chapter 11 Cases. The Debtors request that the relief requested in each of the first day motions be granted as critical elements in ensuring the maximization of value of the Debtors' estate.

31.    The First Day Motions are as follows:

a)    *Motion for Order Authorizing and Directing Joint Administration and Use of Consolidated Caption* (the "**Joint Administration Motion**") [Docket No. 2];

b)    *Debtors' Emergency Motion to (I) File A Consolidated List of Creditors, (II) File A Consolidated List of the Thirty Largest Unsecured Creditors, (III) Redact Certain Personal Identification Information of Individual Creditors and Current and Former Employees; and (IV) Mail Initial Notices* (the "**Consolidated Creditors' List Motion**") [Docket No. 7];

c)    *Debtors' Emergency Motion (I) for Authority to File Under Seal Separate Schedule F and Matrix Containing Patient Information, (II) to Authorize Certain Procedures to Maintain the Confidentiality of Patient Information, (III) to Modify Notice to Patients, and (IV) for Relief from Required Form of Mailing Matrix with Regard to Separate Matrix* (the "**Patient Procedures Motion**") [Docket No. 8];

---

[4] Capitalized terms used but not defined in the discussion of a particular First Day Motion, shall have the meaning ascribed in such First Day Motion.

d) *Debtors' Motion for An Order Extending Time for Debtors to File their Schedules of Assets and Liabilities and Statements of Financial Affairs* (the "**Extension Motion**") [Docket No. 6];

e) *Debtors' Motion for Order (A) Establishing Bar Date for Filing Proofs of Claim, Including Requests for Payment Under Section 503(B)(9) of the Bankruptcy Code; and (B) Approving Form and Manner of Notice of Bar Date* (the "**Bar Date Motion**") [Docket No. 9];

f) *Debtors' Emergency Motion for Interim and Final Orders (I) Authorizing the Debtors to (A) Continue Using their Cash Management System and (B) Maintain Existing Bank Accounts and Business Forms; (II) Waiving Certain Deposit Guidelines and (III) Granting Related Relief* (the "**Cash Management Motion**") [Docket No. 10];

g) *Debtors' Emergency Motion for Entry of Interim and Final Orders Authorizing the Debtors to Pay Certain Prepetition Claims of Critical Vendors* (the "**Critical Vendors Motion**") [Docket No. 11];

h) *Motion for Entry of An Order (I) Authorizing the Debtors to (A) Continue Insurance Coverage Entered Into Prepetition, (B) Pay and Satisfy Prepetition Obligations Related thereto, Including Broker Fees and Premium Financing Obligations; and (II) Granting Related Relief* (the "**Insurance Motion**") [Docket No. 12];

i) *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing Postpetition Financing; (II) Granting Liens and Superpriority Claims to Postpetition Lender; and (III) Scheduling Final Hearing* (the "**DIP/Cash Collateral Motion**") [Docket No. 4];

j) *Debtors' Emergency Motion for Interim and Final Orders (I) Authorizing, But Not Directing, Debtors to (A) Pay and Honor Prepetition Employee Obligations, and (B) Maintain and Continue Certain Compensation and Benefit Programs Postpetition; and (II) Granting Related Relief* (the "**Wage Motion**") [Docket No. 13];

k)  *Debtors' Motion for Interim and Final Orders (I) Authorizing Payment of Certain Prepetition Taxes and Assessments and (II) Directing Financial Institutions to Honor and Process Related Checks and Transfers* (the "**Tax Motion**") [Docket No. 14]; and

l)  *Debtors' Emergency Motion for Order Under 11 U.S.C. §§ 105(A) and 366 (I) Prohibiting Utility Companies from Altering or Discontinuing Service on Account of Prepetition Invoices, (II) Approving Deposit Account As Adequate Assurance of Payment, and (III) Establishing Procedures for Resolving Requests By Utility Companies for Additional Assurance of Payment* (the "**Utilities Motion**") [Docket No. 5].

I believe that the relief requested in the First Day Motions is necessary to allow the Debtors to operate with minimal disruption during the pendency of these Chapter 11 Cases. I have reviewed each of the First Day Motions discussed below, and the facts set forth in each First Day Motion are true and correct to the best of my knowledge and belief.

A.    <u>Joint Administration Motion</u>

32.    The Debtors' intended restructuring in these cases may involve claims and/or interests asserted against more than one Debtor. Further, the management of all of the Debtors consists of the same individuals. In light of these and other factors, I anticipate that each of the Debtors will seek similar or closely-related relief from this Court during the Chapter 11 Cases. I also believe that most parties-in-interest will desire to receive information about the companies generally during these Chapter 11 Cases, rather than just the information concerning one of the Debtors.

33.    I am informed that joint administration of the Debtors' cases will greatly facilitate the filing of pleadings in these cases, helping the Debtors and other parties-in-interest to avoid unnecessary effort in filing duplicate (or nearly duplicate) pleadings in each case separately. Instead, I understand that joint administration will permit a filing in just one of the cases to address issues in each of the Chapter 11 Cases. Such a procedure would not only be more efficient, but

will assist the Court and all parties-in-interest in achieving and maintaining a "global" view of matters involving the companies.  Especially because I understand that joint administration does not affect the substantive rights of the Debtors, their estates or any other parties-in-interest, I can see only benefits – and likely great savings of judicial resources and Debtor and stakeholder time and money – realized from this relief.

### B.     Consolidated Creditors' List Motion

34.    As set forth in the Consolidated Creditors' List Motion, the Debtors request that the Court enter an Order, substantially in the form attached to the motion, authorizing, but not requiring the Debtors to (a) prepare a consolidated list of creditors; (b) file a consolidated list of the 30 largest unsecured creditors; (c) redact certain personal identification information of individual creditors and current and former employees; and (d) mail initial notices.

35.    Although I understand the list of creditors is usually filed on a debtor-by-debtor basis, here, the preparation of separate lists of creditors for each Debtor would be expensive, time consuming, administratively burdensome, and of little incremental benefit.  Further, because a large number of creditors may be shared between the Debtors, the Debtors request authority to file a single, consolidated list of their 30 largest general unsecured creditors (the "**Top 30 List**").  The Top 30 List will help alleviate administrative burdens, costs, and the possibility of duplicative service.  Finally, the Debtors respectfully submit that cause exists to authorize the Debtors to redact address information of individual creditors—a number of whom are the Debtors' employees— from the Creditor Matrix because such information could be used to perpetrate identity theft.

Additionally, through the Debtors' proposed noticing and balloting agent, the Debtors propose to serve the Notice of Commencement, on all parties entitled to notice of commencement of the Chapter 11 Cases.  Service of the single Notice of Commencement will not only avoid

confusion among creditors, but will prevent the Debtors' estates from incurring unnecessary costs associated with serving multiple notices to the parties listed on the Debtors' voluminous creditor matrix.

       **C.**      **Extension Motion**

36.      By the Extension Motion, Debtors seek entry of an order extending the deadline by which the Debtors must file their schedules of assets and liabilities, schedules of current income and expenditures, schedules of executory contracts and unexpired leases, and statements of financial affairs (collectively, the "**Schedules and Statements**") by 28 days, for a total of 42 days from the Petition Date, without prejudice to the Debtors' ability to request additional extensions for cause shown.

37.      The time leading up to the filing of the Chapter 11 Cases has been stressful for the Debtors' management and the operation of the business.  While I understand that providing complete information on the Debtors, as required by bankruptcy law and rules, is important, and the Debtors' management desires to provide such information, I am also certain that stabilizing the Debtors' business in the immediate post-filing period will help preserve and maximize value of these estates.

38.      For these reasons, I believe that the Court should grant the Debtors' Extension Motion.  With extra time to prepare the Schedules and Statements, the Debtors' management will not only have the best ability to assure the greatest possible accuracy and completeness of the information that is provided, but we will also have the additional "breathing room" to address any challenges to operations that the bankruptcy filings trigger.  Thus, additional time will help us to preserve value in the Debtors.

39.     Granting the Extension Motion will not, however, prejudice any creditors or other parties-in-interest.  I understand that the additional time that the Debtors are requesting to file Schedules and Statements is typical of such requests, as often granted by this Court.  In addition, I can assure the Court that the Debtors are prepared to respond to any appropriate information requests that the Debtors may receive from any parties-in-interest in the meantime, should there be urgency to receive such information before it would become available in the Debtors' Schedules and Statements.

### D.     Patient Procedures Motion

40.      By the Patient Procedures Motion, the Debtors seek entry of an order (i) authorizing the Debtors to file under seal a separate Schedule F and matrix containing all patients with known or suspected claims (the "**Patient Matrix**" and "**Supplemental Schedule F**," respectively) as well as any other references to Patients in any other filing, (ii) authorizing certain procedures to maintain the confidentiality of patient information, (iii) modifying notice to patients, and (iv) granting relief from required form of mailing matrix with regard to the Patient Matrix.

41.     As detailed herein, the Debtors operate the Facilities.  The Facilities provide long-term care and rehabilitative services to many patients (the "**Patients**").  In the ordinary course of their business, the Debtors have access to and receive "protected health information" and data relating to Patients, which the Debtors are required to confidentially maintain pursuant to HIPAA. Notwithstanding, some of these Patients could potentially hold actual or contingent claims against the Debtors' estates, and as such, under the Bankruptcy Code, the Debtors have a duty to list all such creditors on the Debtors' mailing matrices and bankruptcy schedules.

42.     In an effort to comply with both federal statutes, the Debtors propose certain procedures in the Patient Procedures Motion to maintain Patient confidentiality during the

pendency of these Chapter 11 Cases, including through the Patient Matrix and Supplemental Schedule F. The Patient Matrix will list all Patients going back to at least March 10, 2017.[5] The Supplemental Schedule F will list any Patient with a known or suspected claim against the Debtors. The Debtors will make an unredacted copy of the Supplemental Schedule F and Patient Matrix as well as any other filing referencing a Patient and filed under seal available to (a) the Court and to the United States Trustee upon request; and (b) any other party-in-interest only after this Court has entered an order, after notice and a hearing, authorizing the Debtors to do so.

43.    By the Patient Procedures Motion, the Debtors also seek authorization to omit any reference to Patients from any certificate of service not filed under seal. When the Debtors serve any paper upon any person listed on the Patient Matrix and on Schedule F, the Debtors will note in the respective certificate of service that the parties served include persons listed on the Patient Matrix. Notwithstanding the foregoing, if the Patient Procedures Motion is granted, the Debtors shall not be required (but may elect) to file under seal any references in any of their Schedules or other filings containing any reference to litigations commenced by or against Patients, since the existence of and parties to such litigations are already in the public domain.

44.    I believe that the relief requested in the Patient Procedures Motion appropriately balances the need to maintain confidential patient information under HIPAA with the need for adequate disclosure under the Bankruptcy Code.

45.    Separately, by the Patient Procedures Motion, the Debtors also seek the Court's authorization to provide notice to all Patients via publication in the local newspapers, as set forth in the Publication Notice attached to the Patient Procedures Motion as <u>Exhibit A</u> (the "**Publication**

---

[5] The Debtors propose to include only Patients treated on or after March 10, 2017 on the Patient Matrix because the statute of limitations for medical malpractice in New York is two years and six months from the date of the act forming the basis for a medical malpractice claim. *See* N.Y. C.P.L.R. 214-A.

**Notice**").  The Debtors intend to provide written notice to all Patients that hold known claims against the Debtors on the Supplemental Schedule F.  However, it would be extremely costly for the Debtors to provide formal, written, ongoing notice to every single one of the approximately 10,000 Patients from just approximately the last three years that do not hold known claims against the Debtors.  In addition, many of the Patients who are no longer being treated by the Debtors have likely moved or otherwise reside at an address other than the address in the Debtors' records.  Accordingly, the Debtors seek authorization by the Patient Procedures Motion to provide notice to the Patients not listed on the Supplemental schedule F by publication.

46.    I believe that notice by publication to all Patients is an entirely appropriate and adequate means of providing notice.  The Publication Notice includes the date that the petitions were filed, the case numbers, the location of the Court, the Claims Agent's website, and will include other relevant information as it becomes available, such as the deadline to file a proof of claim in the Chapter 11 Cases.  Additionally, the Debtors' Claims Agent's website will assist Patients in gathering whatever information about the case is relevant to them.  Moreover, the Debtors will publish the Publication Notice in each of the Buffalo News and the Orchard Park Sun for a term of two consecutive days.  Given that the Facilities serve primarily patients in western New York, the Debtors submit that the proposed notice by publication in those newspapers is reasonably calculated under the circumstances to provide notice to Patients of the Debtors.

## E.    Bar Date Motion

47.    By the Bar Date Motion, the Debtors seek entry of an order (i) establishing deadlines for filing proofs of claim, including requests for payment under section 503(b)(9) of the Bankruptcy Code (collectively, the "**Bar Dates**"), and (ii) approving the form and manner of the notice of bar date (the "**Bar Date Notice**").  I believe the Bar Dates requested in the Bar Date

Motion will provide the Debtors' creditors with sufficient time to assert any claims against the Debtors and that the Bar Date Notice will provide sufficient notice regarding the procedures for doing so.

### F.    Cash Management Motion

48.    By the Cash Management Motion, the Debtors request entry of interim and final orders, (a) authorizing, but not directing, the Debtors to (i) maintain and continue using the Cash Management System (as hereinafter defined) to the extent described therein and honor certain prepetition obligations related thereto and (ii) maintain existing bank accounts as described therein and continue using existing checks, business forms, and records; (b) granting the Debtors a waiver of certain bank account and related requirements of (i) the United States Trustee for the Eastern District of New York (the "**U.S. Trustee**") set forth in the *Operating Guidelines and Reporting Requirements for Debtors in Possession and Trustees* (the "**Guidelines**") and (ii) Bankruptcy Code section 345, in each case to the extent such requirements are inconsistent with any action taken by the Debtors in accordance with any order granting the Cash Management Motion or any other order entered in the Debtors' bankruptcy cases; and (c) granting related relief.

### 1.    The Debtors' Cash Management System

49.    The Debtors' cash management system (the "**Cash Management System**") consists of approximately 31 bank accounts that are maintained with CFG Community Bank ("**CFG**"), Community Bank, N.A. ("**Community Bank**") and M&T Bank ("**M&T**").    The Debtors also maintain approximately 28 additional patient trust and other trust accounts (the "**Trust Accounts**") with CFG, Community Bank, M&T, Key Bank N.A. ("**Key**" and collectively with CFG, Community Bank and M&T, the "**Banks**"), and Direct Deposit Management Service

("**DDMS**").[6]  All of the Debtors' accounts maintained with the Banks are insured by the Federal Deposit Insurance Corporation ("**FDIC**").  DDMS is not a bank, but it does affiliate with banks and, upon information and belief, maintains all accounts in an FDIC ensured depository.  A list of the Debtors' bank accounts that form the Cash Management System, as well as a list of the Trust Accounts, are set forth on **Exhibit 1** to the Interim Order (each a "**Debtor Account**" and collectively, the **"Debtor Accounts"**).

50.     The Debtors utilize the well-established and efficient mechanisms of the Cash Management System for the collection, concentration, management, and disbursement of funds used in their business activities.  The Cash Management System is comparable to centralized cash management systems used by similarly situated companies to manage the cash of operating units in a cost-effective, efficient manner.  The Debtors use the Cash Management System in the ordinary course of business to collect, transfer, and disburse funds generated from their business activities and to facilitate cash monitoring, forecasting, and reporting.

51.     The Debtors maintain daily oversight over the Cash Management System and implement cash management controls for processing and releasing funds.  Additionally, the Debtors regularly reconcile their books and records to ensure that all transfers have appropriate authorizations and accounting.  With the assistance of their advisors, the Debtors have implemented internal procedures to control or prohibit payments on prepetition debts without the prior approval of this Court and the Debtors' management.

---

[6] DDMS is a direct deposit management service operated through National Datacare Corporation which is used to manage resident funds.  Please refer to the following link to the company website for additional information: https://www.nationaldatacare.com/products/resident-fund-management-service/

> a.    **The Debtors' Depository, Collection, Operating and Payroll/Payable Accounts.**

52.    The Debtors' Accounts are composed of the following:

- Depository Accounts:  The Debtors maintain three lockbox depository accounts for each of the operating Debtor facilities, other than for the Orchard Brooke facility, which is addressed separately (the "**Depository Accounts**").  All of the Debtors' receipts (other than relating to Orchard Brooke) are deposited into the applicable Debtor's Depository Accounts. One of the three Depository Accounts for each facility is maintained at M&T, and the other two are maintained at CFG. Of the two CFG Depository Accounts, one is used to receive payments from governmental payors (*e.g.*, Medicare and Medicaid), and the other is used to receive private payments.  Historically, the Debtors used the Depository Accounts at M&T as their sole Depository Accounts.  More recently, the Debtors have opened the CFG Depository Accounts.  The M&T Depository Accounts are used primarily to receive payments from payors that have not yet redirected payment to the CFG Depository Accounts.

- Collection Accounts:  The Debtors also maintain four lockbox accounts used as collection or concentration accounts (the "**Collection Accounts**") in the name of Debtor Absolut Facilities Management, LLC ("**AFM**").  Two of the Collection Accounts are maintained at M&T, and the other two are maintained at CFG.  All of the funds deposited in the Depository Accounts maintained at M&T are swept on a daily basis by Capital Finance Group.  Likewise, all of the funds deposited into the Depository Accounts at CFG are swept into the CFG Collection Accounts on a daily basis.  At each of M&T and CFG, AFM maintains one HUD Collection Account, into which all of the receipts for the Debtors' facilities other than Westfield and Orchard Brooke are swept.  AFM also maintains one non-HUD Collection account at each of those institutions, into which the Westfield receipts are swept.  All of the funds swept into the Collection Accounts are swept on a daily basis by Capital Finance Group, the Debtors' prepetition receivables lender. All cash paid to any of the Debtors other than Orchard Brooke and AFM ultimately is swept by Capital Finance Group.

- Operating Accounts:  AFM further maintains two operating accounts – one HUD and one non-HUD – at M&T (the "**Operating Accounts**").  The Operating Accounts are funded by draws under the Debtors' receivables credit facilities with CFG.  In addition, all receipts from Orchard Brooke and AFM are deposited directly into the non-HUD Operating Account.  The Operating Accounts fund the Debtors' obligations.

- Payroll Accounts/Payable Accounts:  Finally, AFM maintains one HUD and one non-HUD payroll and one HUD and one non-HUD accounts payable accounts at M&T (the "**Payroll/Payable Accounts**").  The Payroll/Payable Accounts are used to fund the Debtors' payroll and accounts payable.  The Payroll/Payable Accounts are "zero balance" accounts, meaning that no amounts are maintained in those

accounts.  Rather, as checks and wire transfers clear from the Payroll/Payable Accounts, an equivalent sum of money is transferred from the corresponding HUD or non-HUD Operating Account to fund that check or wire.

53.     Because the Debtors accept Medicare and Medicaid payments, the Bank Accounts are subject to certain restrictions.  Specifically, anti-assignment rules require Medicare and Medicaid payments to be made only to a bank account that is under the sole control of the healthcare provider, and any governmental payments must be made into a lockbox account.  If Medicare or Medicaid receivables were assigned to another account, such assignment could violate the anti-assignment rules and result in the termination of the provider agreement.

54.     As of and after the Petition Date, the Collection Accounts will no longer be used, as there will be no further sweeps by CFG and no further borrowing under the CFG credit facilities. Accordingly, the Debtors intend to have all funds deposited into the Depository Accounts swept on a daily basis to the Operating Accounts, which, as noted above, are maintained at M&T.

### b.     The Debtors' Patient Trust Accounts.

55.     The Debtors also maintain 28 Trust Accounts for the benefit of their patients.  Five Trust Accounts are maintained at M&T; six Trust Accounts are maintained at Community Bank; seven Trust Accounts are maintained at Key; and twelve Trust Accounts are maintained at DDMS. The Debtors' patients, or a third party on behalf of the patients, deposit funds into these accounts, which the Debtors hold in trust for the benefit of their patients.  The patients use those funds for incidental expenses incurred in the Debtors' facilities and have access to those funds to use as spending money.  These patient funds are for all purposes property of the Debtors' patients – not the Debtors or their estates.

56.    There are several types of Trust Accounts.  While they have slightly different uses, all hold patient funds, rather than property of the estate, and all are held in trust for the benefit of the Debtors' patients.  A description of the different Trust Accounts is set forth below:

- Checking/Savings accounts maintained at the Banks:  These Trust Accounts are checking and savings accounts that hold patient money in savings and for spending by the Debtors' patients.  Through these accounts, the Debtors' patients can pay for expenses and incidentals.

- Resident Council accounts maintained at the Banks:  These are collective accounts where patient funds are deposited for general welfare and expenses that benefit the residents as a group (e.g., pooled patient contributions or fees for group activities, events, and other general use items like a community computer.

- Trust account maintained at DDMS:  To be eligible to use an account at DDMS the patient must be the recipient of a recurring governmental benefit payment. Those payments are deposited in to the DDMS "trust" account for the benefit of the applicable patients.

- Care account maintained at DDMS:  These accounts house patients' room and board expenses, and direct deposits to a patient's DDMS trust account automatically have room and board liabilities transferred to the care accounts (which are then swept regularly to the Debtors).

- General Trust Account:  This account, maintained by AFM, serves as a collective account for residents who don't utilize DDMS for their recurring Social Security deposits.  Funds received into this account are transferred to the appropriate facility and applied to individual patient balances in their other Trust Accounts.

### 2.    Compliance with Section 345(b) of the Bankruptcy Code and the Guidelines

57.    Each of the Debtors' Accounts, other than the Trust Accounts maintained at DDMS, are maintained at a bank that is insured by the FDIC, and therefore, I understand each account complies with section 345(b) of the Bankruptcy Code.  Because Section 345 of the Bankruptcy Code applies to property of the estate, and because the Trust Account proceeds are not estate property, I understand that the Trust Accounts, including the Trust Accounts maintained at DDMS need not comply with Section 345.

58.    I understand that the Guidelines require chapter 11 debtors to, among other things, deposit all estate funds into a new debtor-in-possession bank account that is insured by the FDIC and on the U.S. Trustee's approved depository list.  Complying with the guidelines, however, would create unnecessary costs and administrative inconvenience for the Debtors at the time when they need to be focused on their reorganization.  The Debtors therefore have not opened new bank accounts.  However, each of the Debtors' existing bank accounts (other than the DDMS accounts, which do not hold estate property) is insured by the FDIC.  Moreover, the Debtors do seek to maintain their prepetition Depository Accounts and the Trust Accounts, despite that certain of those are maintained at CFG, which is not a depository that is on the U.S. Trustee's approved list.

59.    Closing the Debtors' existing accounts and opening new debtor-in-possession accounts would unnecessarily utilize the Debtors' time and resources to the detriment of their estates, their creditors, and all parties-in-interest.  Likewise, with respect to the Depository Accounts and the Trust Accounts, it would take substantial time for the payors into those accounts to migrate their payments to new accounts.  During that time, if the Depository Accounts and the Trust Accounts were closed, the Debtors would miss out on much needed collections and the Debtors' patients would be left without access to their spending money, all to the detriment of the Debtors' estates and patients.  Finally, any potential risk of maintaining the Depository Accounts will be mitigated because, each day, the cash in the Depository Accounts will be swept into the Operating Accounts, which are maintained at a U.S. Trustee approved depository – M&T.

### 3.    Business Forms

60.    As part of their Cash Management System, the Debtors utilize numerous preprinted business forms in the ordinary course of businesses.  To minimize expenses to their estate and avoid confusion on the part of employees, customers, vendors, and suppliers during the pendency of these Chapter 11 Cases, by the Cash Management Motion, the Debtors request that the Court authorize the Debtors' continued use of all preprinted correspondence and business forms (including, without limitation, letterhead, purchase orders, invoices, and preprinted checks) (collectively, the "**Business Forms**") as such forms were in existence immediately before the Petition Date (and without reference to the Debtors' status as debtors in possession) rather than requiring the Debtors to incur the expense and delay of ordering new Business Forms.

61.    The Debtors submit that authorization to use the Business Forms will minimize disruption to the Debtors' business affairs and save the unnecessary expense and delay of ordering entirely new forms as required under the Guidelines.  If the Debtors exhaust their existing supply of Business Forms during these Chapter 11 Cases, the Debtors will transition to using forms with the designation "debtor in possession" and the corresponding bankruptcy number.

### 4.    The Continued Use of the Debtors' Cash Management System, as Modified by the Cash Management Motion is Essential to the Debtors' Operations and Restructuring Efforts

62.    I believe that the Cash Management System constitutes an ordinary course and essential business practice of the Debtors.  The Cash Management System provides significant benefits to the Debtors including, among other things, ensuring the availability of funds when necessary, and reducing costs and administrative expenses to the estates by facilitating the movement of funds and ensuring timely and accurate account balance information.  Thus, to ensure the seamless operation of the Debtors' business and realize the benefits of the Cash Management

System, the Debtors should be allowed to continue using the Cash Management System, as modified in the Cash Management Motion, and should not be required to open new bank accounts.

63.    A waiver of the Guidelines' requirement that the Debtors use only depositories that are on the U.S. Trustee's approved depository list is also appropriate here.  As noted above, requiring the Debtors to close the Depository Accounts and the Trust Accounts that are not at U.S. Trustee approved depositories and open new accounts would cause substantial prejudice to the Debtors, their estates and their patients.  Indeed, strict enforcement of the Guidelines in these cases, however, would severely disrupt the ordinary financial operations of the Debtors by reducing efficiencies, depriving the Debtors of substantial revenues and causing unnecessary expenses.

64.    The Debtors will maintain strict records of all receipts and disbursements from their accounts during the pendency of these cases, thereby ensuring that the Debtors properly distinguish between prepetition and postpetition transactions.  Moreover, the Debtors will work with their staff and advisors to ensure that any checks issued prior to the Petition Date, but presented after the Petition Date, will not be honored absent further approval from the Court.

65.    The Depository Accounts are critical to the continued operations and liquidity of the Debtors.  All of their receipts (with the exception of the receipts of Orchard Brooke and AFM, which are deposited into the non-HUD Operating Account) are deposited into the Depository Accounts, and most of those funds are deposited into the CFG Depository Accounts.  If the Debtors were forced to close the Depository Accounts, there would be massive disruption to their ability to collect revenues.  It would take a great deal of time for the payors into the Depository Accounts to migrate payment to new accounts.  Indeed, the Debtors opened the CFG Depository Accounts in August 2018 to replace the M&T Depository Accounts, yet to this day substantial revenues are still deposited in the M&T Depository Accounts by payors who have not yet transferred payment.

Even a modest interruption in the Debtors' efforts to collect cash would be disastrous for the Debtors and their stakeholders.  Finally, all of the cash in the Depository Accounts will be swept each day into the Operating Accounts at M&T, which is an approved depository.  No cash will spend even a single night in an account not maintained at a U.S. Trustee approved depository.

66.     The Debtors' patients would also face substantial prejudice if the Debtors were forced to close and replace the Trust Accounts.  The Debtors' patients rely on the Trust Accounts to access their spending money.  Certain amounts are deposited by Medicare and Medicaid as well as through private contributions.  If the Trust Accounts were forced to close, receipt of payments into new Trust Accounts would be delayed, which would cause substantial prejudice to the Debtors' patients, who would not be able to obtain access to their funds.  Since these funds are not property of the estate, there is also no potential consequence to the estates' creditors of the funds being maintained in the existing Trust Accounts.

67.     For the reasons set forth above, the Debtors would suffer immediate and irreparable harm if the relief sought by the Cash Management Motion is not promptly granted.

### G.      Critical Vendor Motion

68.     By the Critical Vendor Motion, the Debtors seek authority to pay certain prepetition claims of critical vendors (the "**Critical Vendors**").  Without the products and services provided by the Critical Vendors, the Debtors would not be able to operate their businesses effectively and efficiently, serve their patients or generate revenue.

69.     With the assistance of their advisors, the Debtors have spent time reviewing and analyzing their books and records, consulting operations managers and purchasing personnel, reviewing contracts and supply agreements and identified approximately $785,493.97 in Critical Vendors for purposes of the relief requested in the Critical Vendor Motion and are listed in Exhibit

C, attached thereto. This number represents only approximately 7.7 percent of the amount due outstanding to the Debtors' creditors with outstanding accounts payable as of the Petition Date.

70.     To identify the Critical Vendors identified on Exhibit C to the Critical Vendor Motion, the Debtors considered a variety of factors, including:

- whether a vendor is a sole- or limited-source or high-volume supplier for goods or services critical to the Debtors' business operations;

- whether alternative vendors are available that can provide requisite volumes of similar goods or services on equal (or better) terms and, if so, whether the Debtors would be able to continue operating while transitioning business thereto;

- the degree to which replacement costs (including pricing, transition expenses, professional fees, and lost sales or future revenue) exceed the amount of a vendor's prepetition claim;

- whether an agreement exists by which the Debtors could compel a vendor to continue performing on prepetition terms;

- whether certain specifications or contract requirements prevent, directly or indirectly, the Debtors from obtaining goods or services from alternative sources;

- whether failure to pay all or part of a particular vendor's claim could cause the vendor to refuse to ship inventory or to provide critical services on a postpetition basis;

- whether the Debtors' inability to pay all or part of the vendor's prepetition claim could trigger financial distress for the applicable vendor; and

- whether failure to pay a particular vendor could result in contraction of trade terms as a matter of applicable non-bankruptcy law or regulation.

71.     The Debtors believe that their trade relationships with the Critical Vendors may materially deteriorate, causing disruption to the Debtors' operations if the Debtors are unable to pay Critical Vendor Claims as requested in the Critical Vendor Motion.  The Debtors rely on timely and frequent delivery of the products and services provided by Critical Vendors and any interruption in this supply-however brief-would disrupt the Debtors' operations and could potentially cause irreparable harm to their businesses, goodwill, employees, patients, and market share.  Such harm would likely far outweigh the cost of payment of the Critical Vendor claims.

72.     In many cases, the products and services provided by Critical Vendors are available from only a limited number of vendors, and in some cases, only one vendor.  Even where alternative vendors exist, the costs associated with switching from one vendor to another are often significant and would be detrimental to the Debtors' estates.  The Debtors believe that jeopardizing their relationships with the Critical Vendors and attempting to procure the Critical Vendor Products and Services from replacement vendors would impose a severe strain on the Debtors' business operations, and would likely result in significant revenue loss.  Even a temporary halt of the provision of Critical Vendor Products and Services would impose a severe strain on the Debtors' operations, and the cumulative impact of such events could have a significant adverse effect on the Debtors' operations and, particularly, on the ability of the Debtors to maintain business-as-usual and serve their patients.

73.     Accordingly, in light of the potential for immediate irreparable consequences if the Critical Vendors do not continue to provide uninterrupted and timely deliveries of goods and services, the Debtors have determined, in the exercise of their business judgment, that payment of the Critical Vendor Claims is essential to avoid costly disruptions to their operations.

74.     As noted above, to date, the Debtors have identified counterparties, set forth on Exhibit C attached to the Critical Vendor Motion, that may hold more than $785,493.97 in claims that may qualify as Critical Vendors, constituting approximately 7.7 % of the amount of the Debtors' unsecured claims presently estimated to total $10.2 million.

### H.    **Insurance Motion**

75.     By the Insurance Motion, the Debtors seek entry of orders (I) authorizing the Debtors to (A) continue insurance coverage entered into prepetition, (B) pay and satisfy prepetition

obligations related thereto, including broker fees and premium financing obligations; and (II) granting related relief.

76.    In the ordinary course of business, the Debtors maintain and are covered by various insurance policies (collectively, the "**Insurance Policies**") that are provided and/or administered by multiple third-party insurance carriers (collectively, the "**Insurance Carriers**").

### 1.    The Insurance Policies

77.    The Insurance Policies are as follows:

- General Liability & Professional Liability Insurance. The Debtors maintain a general liability and professional liability insurance policy (the "**GL and PL Policy**") to provide coverage relating to, among other things, personal injury liability, advertising injury, and professional liability.  The aggregate annual premium paid for the GL and PL Policy is approximately $1,211,546.57.  The GL and PL Policy expired on August 9, 2019 but has been extended, subject to a finance agreement with Agile Premium Finance, a Division of Valley National Bank.  The finance agreement requires a down payment of $274,821.01 on or about the Petition Date and 10 monthly installments of $95,220.77 due to Agile on the 8th of each month, beginning on October 8, 2019.

- Automobile Insurance. The Debtors maintain an automobile insurance policy (the "**Automobile Policy**"), which covers seventeen automobiles owned or leased by the Debtors that are used for business-related activities. The aggregate annual premium paid for the Automobile Policy is approximately $29,481.00.  The Automobile Policy expired on August 9, 2019 but has been renewed, subject to a finance agreement with Bank Direct, which requires monthly installments of $13,879.72 (covering the premiums for the Automobile Policy and the Property Insurance) due on the 7th of each month. The September 2019 installment has not been paid and has accrued a late fee of $689.99.  The Debtors seek to pay that installment pursuant to the Insurance Motion.

- NY Statutory Disability Benefit Law Insurance.  The Debtors maintain an insurance policy to provide disability benefits in accordance with Section 205 of the New York Disability Benefits Law (the "**Disability Benefits Policy**").  The aggregate annual premium paid for the Disability Benefits Policy is approximately $400,000.00; however this amount is variable based on actual payroll figures.  The Disability Benefits Policy expires on December 31, 2019.

- Crime Insurance.  The Debtors maintain a crime insurance policy (the "**Crime Insurance Policy**") to protect against employee theft, premises, in transit, forgery, computer fraud, funds transfer fraud, money order and counterfeit currency fraud, credit card fraud, client coverage, and expense coverage.  The aggregate annual premium for the Crime Insurance Policy is $5,517.  The Crime Insurance Policy expires on March 15, 2020.

- Director and Officer Insurance and Employment Practices Liability. Each of the Debtors maintains a directors' and officers' and employment practices liability policy (each being a "**DOLI Policy**") covering, among other things, actions taken by directors and officers in connection with these Chapter 11 Cases, and wrongful acts arising from the employment process. The aggregate annual premium owed for the DOLI Policy is approximately $66,125.00. Each of the DOLI Policies expired on September 9, 2019. The Debtors are binding a new DOLI Policy for a period of one year.

- Workers' Compensation Insurance. The Debtors maintain a workers' compensation insurance policy (the "**Workers' Compensation Insurance Policy**"), which provides coverage for medical expenses and a portion of lost wages for employees who become injured or ill on the job. The aggregate annual cost of maintaining the Workers' Compensation Insurance Policy is approximately $1,116,059.16. The Workers' Compensation Insurance Policy expires on May 1, 2020. The monthly installment due under the Workers' Compensation Insurance Policy is $93,004.93 and is due to First Insurance on the 1st of the month. The September 2019 installment has been remitted, and there are five remaining installments, due on the 1st of each month beginning with October 1, 2019 for a total of $465,024.65 still owed.

- Property Insurance. The Debtors maintain property insurance (the "**Property Insurance Policy**"), which provides coverage for various damage to and restoration of the Debtors' property such as, but not limited to, mold, pollutant clean up and removal, damage to buildings, and damage to personal property. The aggregate annual cost of maintaining the Property Insurance Policy is approximately $128,484.00, and, as set forth above, is subject to a finance agreement with Bank Direct, which requires monthly installments of $13,879.72 (covering the premiums for the Automobile Policy and the Property Insurance) due on the 7th of each month. The Property Insurance Policy expires on August 9, 2020.

78.    The Debtors request that the Court authorize them to continue insurance coverage entered into prepetition.

## 2.    Insurance Premiums and Related Finance Payments

79.    The Debtors pay for the cost of insurance in the ordinary course of business (*e.g.* monthly, quarterly, or annually) from immediately available funds.

80.    On an interim basis, the Debtors seek authority, but not direction, to satisfy prepetition obligations to pay insurance premiums and associated fees in an amount not to exceed $345,000, which may become due and payable prior to a final hearing, representing the initial premium financing payment due to Agile Premium Finance in respect of the GL and PL Policy

along with the DOLI Policies, the past-due payment on the Automobile Insurance and Property

Insurance Policies, as well as a partial payment to the Insurance Broker (defined below).

### 3.    Premium Financing Agreements

81.    Premium Financing.   The Debtors maintain the following premium financing

agreements (the "Premium Financing Agreements"), described below:

- **Bank Direct Capital Finance**.   The Debtors are party to that certain Commercial Insurance Premium Finance and Security Agreement dated July 3, 2019, pursuant to which the Debtors finance their premiums relating to the Automobile Policy and Property Insurance Policy.  The premiums on those policies, together with applicable fees and taxes, total $169,915.  The Debtors' monthly obligation in respect of this Premium Financing Agreement equals $13,879.72.

- **Agile Premium Finance.**   The GL and PL Policy along with the DOLI Policies were extended subject to entry by the Debtors into a finance agreement with Agile Premium Finance, a Division of Valley National Bank. The finance agreement requires a down payment of  $274,821.01 on or about the Petition Date and 10 monthly installments of $95,220.77 due to Agile on the 8th of every month, beginning October 8, 2019.

### 4.    Insurance Brokers and Administrators

82.    The Debtors procure their Insurance Policies through Grandview Brokerage, Inc.

(the "**Insurance Broker**").   The Insurance Broker assists the Debtors in obtaining insurance

coverage at competitive rates by evaluating available offerings.   The Insurance Broker collects

commissions when the Debtors purchase coverage or when premium payments are remitted in

connection with the policies.   As of the Petition Date, the Debtors owed the Insurance Broker

$331,167.81 (the "**Prepetition Balance**").   Absent payment of the Prepetition Balance, which the

Debtors propose to pay in six monthly installments of $55,194.64, the Debtors will be unable to

obtain coverage through the Insurance Policies.   Accordingly, the Debtors seek authority to pay

the Prepetition Balance to the Insurance Broker to ensure uninterrupted coverage under the

Insurance Policies.

**5.     The Debtors Seek Authority Make Necessary Payments Related to the Insurance Policies**

83.     The Insurance Policies are critical to the preservation of the Debtors' property, and nonpayment of any premiums, deductibles, or similar obligations under the Insurance Policies could result in the (a) termination of the existing Insurance Policies, (b) failure to renew the Insurance Policies, or (c) refusal to enter into new insurance agreements with the Debtors in the future.  Any interruption in insurance coverage could expose the Debtors to serious risks, such as (a) incurring direct liability for claims, material costs, and other losses that would have been payable by the Insurance Carriers under the Insurance Policies, and (b) higher costs to re-establish lapsed policies or obtain new insurance coverage.

84.     Moreover, I understand that maintaining the Insurance Policies is required by the Bankruptcy Code and the U.S. Trustee's Guidelines.  The Debtors believe it is essential to their estates, and consistent with the Bankruptcy Code and the U.S. Trustee's Operating Guidelines, to maintain and continue to make all payments required under their Insurance Policies and have the authority to supplement, amend, extend, renew, or replace their Insurance Policies as needed, in their judgment, without further order of the Court.

**I.     DIP / Cash Collateral Motion**

85.      By the DIP/Cash Collateral Motion, the Debtors request the entry of an order (a) authorizing, but not directing, the Debtors to (i) obtain postpetition financing, (ii) use cash collateral, (iii) grant adequate protection and certain protections to prepetition secured parties; and (b) scheduling a final hearing on the DIP/Cash Collateral Motion.

86.     As noted above, as of the Petition Date, certain Debtors are parties to financing arrangements with Pre-Petition Lender.  Specifically, the HUD Borrowers are party to the HUD Prepetition Loan Agreement in the maximum outstanding principal amount of $5,800,000.

Additionally, the Non-HUD Borrowers are parties to the Non-HUD Prepetition Loan Agreement in the maximum outstanding principal amount of $920,000.

87.    The obligations under the Pre-Petition Loan Agreements are secured by liens on substantially all of the personal property of the HUD Borrowers and Non-HUD Borrowers, as described in more detail in the Pre-Petition Loan Agreements (collectively, the "**Pre-Petition Collateral**").    Additionally, Absolut at Orchard Brooke, LLC has also granted liens on substantially all of its assets to the Pre-Petition Lender.    As of the Petition Date, the HUD Borrowers and Non-HUD Borrowers owe approximately $5,000,000 under the HUD Prepetition Loan Agreement and approximately $700,000 under the Non-HUD Prepetition Loan Agreement, exclusive of accrued and unpaid interest (collectively, the "**Pre-Petition Obligations**").

88.    As set forth in more detail in the Cash Management Motion, as additional security for the Pre-Petition Obligations, the majority of the Debtors' accounts receivable (other than for Orchard Brooke) are deposited by account debtors into lockbox accounts (collectively, the "**Lockbox Accounts**") that are subject to liens in favor of the Pre-Petition Lender and that are swept daily by the Pre-Petition Lender, M&T Bank, and CFG Community Bank (collectively, the "**Deposit Banks**").

### 1.    The Debtor-in-Possession Financing

89.    The Debtors' assets are fully encumbered by liens in favor of the Pre-Petition Lender.    However, the Debtors believe that the value of their assets exceeds the Pre-Petition Obligations, with not less than $15 million in accounts receivable owing from Medicare and Medicaid.    The Debtors do not receive borrowing availability for the majority of their accounts receivable from the Pre-Petition Lender due to the accounts being more than 180 days old, despite

the fact that the Debtors eventually collect the vast majority of these receivables in the ordinary course of their businesses.

90.     The DIP Facility consists of a $2.0 million revolving line of credit to be provided by the Lender to the Debtors.  Amounts repaid under the DIP Facility are permitted to be reborrowed.  The DIP Facility will be junior in all respects to the Pre-Petition Obligations, including the proposed adequate protections liens in favor of the Pre-Petition Lender, as well as all other pre-petition liens that are perfected as of the Petition Date, subject to the Debtors' right to subsequently challenge or avoid any such liens during these Chapter 11 Cases.  There are no origination or prepayment fees owing to the Lender, no financial covenants, and no significant milestones other than those relating to entry of the Interim Order and Final Order.  Accrued and unpaid interest under the DIP Facility is payable on the last business day of each month (and shall be paid in connection with any borrowing request), and principal under the DIP Facility will be payable upon the maturity or termination of the DIP Facility.

91.     Prior to the Petition Date, the Debtors engaged in a process to identify new capital providers and post-petition lenders.  The Debtors did not receive any offers for postpetition financing more favorable than those being offered by the Lender.  Indeed, the Debtors did not receive **any** other offers for postpetition financing.  The Debtors submit that due to the lack of any significant unencumbered assets in which to grant a security interest, the nature of the Debtors' businesses, and the unwillingness of any other lender to offer financing that would not prime the Pre-Petition Lender or other pre-petition secured parties that the Lender is the only viable financing source for the Debtors.

92.     The Debtors determined that neither the sole use of cash collateral, nor the sole reliance on the DIP Facility, would be sufficient on its own, to provide sufficient liquidity to allow

the Debtors to operate their businesses in an appropriate manner. Further, in the event of any delay in receiving proceeds of cash collateral post-petition from the Deposit Banks via the Lockbox Accounts and operating accounts, the Debtors need to ensure that they have adequate sources of liquidity to meet daily working capital needs. Consequently, the DIP Facility, combined with the ongoing use of cash collateral, will give the Debtors the liquidity they need, at least in the immediate short-term, to obtain breathing room and effectuate a restructuring and reorganization of their affairs to right size their ongoing expenses and repay their creditors while continuing to operate as a going concern and preserve jobs and minimize disruption to their patients and customers.

### a.      Summary of Material Terms of the DIP Facility

93.      The following chart contains a summary of the material terms of the proposed DIP Facility as required by Bankruptcy Rule 4001(b)(1)(B) and 4001(c)(1)(B).

| Summary of Material Terms of DIP Facility | |
|---|---|
| **Borrowers** | The Debtors. The Debtors will be jointly and severally liable for all loans, advances, debts, liabilities and obligations under the DIP Facility. |
| **Guarantors** | None |
| **Lender** | ABS DIP, LLC |
| **Borrowing Limit** | $2,000,000 |
| **Interest Rate** | 14%. Upon the occurrence of an event of default, the interest rate shall be increased by 2%. |
| **Payments** | Accrued and unpaid interest shall be payable on the last business day of each month, and in connection with any notice of borrowing. All unpaid principal shall be payable in full on the Termination Date. |
| **Collateral** | All assets of the Debtors, whether now owned or hereafter acquired, and all proceeds thereof, including, without limitation, all personal |

| | |
|---|---|
| | property, all real property, all equipment, inventory, deposit accounts, securities accounts, cash, and cash equivalents of the Debtors, any claims and causes of action of the Debtors including without limitation all commercial tort claims, but excluding avoidance actions as well as any claims for preferences, fraudulent conveyances, and other avoidance power claims under sections 541, 542, 544, 545, 547, 548, 549, 550, and 553 of the Bankruptcy Code; and (the "**DIP Collateral**"). |
| **Superpriority Claim** | Subject to the Carve-Out, pursuant to section 364(c)(1) of the Bankruptcy Code, all the proceeds of the DIP Facility shall constitute allowed administrative expense claims against each of the Debtors' estates, jointly and severally, with priority over any and all administrative expenses (other than the Pre-Petition Adequate Protection Liens), including any superpriority claims associated with any other postpetition financing, any adequate protection claims, and, to the fullest extent permitted under the Bankruptcy Code, all other claims against the Debtors, now existing or hereafter arising, other than claims in favor of the Pre-Petition Lender arising under the Pre-Petition Loan Agreement and all validly perfected liens existing as of the Petition Date, subject to the Debtors' right to challenge or avoid any such liens. |
| **Use of DIP Proceeds** | For the ongoing operations, professional fees and capital needs of the Debtors.<br><br>Proceeds of the DIP Facility or cash collateral shall not be used (a) to permit the Debtors, or any other party-in-interest or their representatives to challenge or otherwise contest or institute any proceeding to determine the validity, perfection or priority of security interests in favor of the Lender, (b) to commence, prosecute or defend any claim, motion, proceeding or cause of action against the Lender and its agents, attorneys, advisors or representatives including, without limitation, any lender liability claims or subordination claims, (c) to commence, prosecute or defend any claim or proceeding or cause of action to disallow or challenge the obligations of the Debtors under the DIP Loan Agreement, or (d) to fund acquisitions, capital expenditures, capital leases, or any other similar expenditure. |
| **Expenses and Fees** | None, other than reimbursement of Lender's reasonable, actual, third party legal fees. |
| **Maturity Date** | The earliest to occur of: (a) fifteen (15) days after the Petition Date if the Interim Order has not been entered, (b) forty (40) days after the Petition Date if the Final Order has not been entered; (c) the occurrence and continuance of any Event of Default (as defined |

| | |
|---|---|
| | below) beyond the expiration of any applicable cure or grace period; (d) the effective date of a confirmed plan of reorganization or liquidation that provides for indefeasible payment in full of all Obligations or is otherwise acceptable to DIP Lender in its reasonable discretion; and (e) the date which is the closing date of any 363 Sale. |
| **Financial Covenants** | None |
| **Events of Default** | • The Chapter 11 Cases shall be converted to a case under Chapter 7 of the Bankruptcy Code or be dismissed or a motion requesting such relief shall have been filed.<br><br>• Filing or support of a proposed plan of reorganization by Debtors that does not provide for the indefeasible payment in full of the Obligations, unless otherwise agreed in writing by Lender in its commercially reasonable discretion.<br><br>• Entry of an order confirming (or the filing of any motion or pleading requesting confirmation of) a plan of reorganization that does not require the indefeasible repayment in full of the DIP Facility as of the effective date of the plan, unless otherwise agreed in writing by the Lender in its commercially reasonable discretion.<br><br>• Appointment of a trustee under Section 1104 of the Bankruptcy Code without the express written consent of the Lender, or the filing of any motion or other pleading requesting such relief which the Debtors fail to timely oppose.<br><br>• Entry of an order by the Bankruptcy Court staying or vacating the DIP Facility, the Interim Order or Final Order approving the DIP Facility, without the prior written consent of the Lender or the filing of a motion or other pleading requesting such relief which the Debtors fail to timely oppose.<br><br>• Any attempt by Debtors to obtain, or if any other party in interest obtains, an order of the Bankruptcy Court or other judgment, and the effect of such order or judgment is to, invalidate, reduce or otherwise impair the Lender's claims, or to subject any of the Lender's collateral to a surcharge pursuant to Section 506(c) of the Bankruptcy Code.<br><br>• A final order is entered granting any creditor with a claim in excess of $250,000 relief from the automatic stay.<br><br>• Failure to make all payments under the DIP Facility when due. |

- Any breach in any material respect of any covenant or obligation set forth in the DIP Facility.

- Any material representation or warranty by the Debtors is incorrect or misleading in any material respect when made.

- The Debtors shall take (or support any other Person in taking) any action in order to restrict or prohibit the Lender or Pre-Petition Lender from submitting a "credit bid" for any assets of the Debtors.

- The Debtors fail to disburse the sale proceeds to the Lender, in accordance with the priority of proceeds set forth herein, contemporaneously with the closing of a sale of substantially all of their assets, subject to payment of the Carve Out.

- (a) The material impairment of any of the Debtors' ability to perform its obligations under the DIP Facility or of the Lender to enforce the Obligations, (b) a material adverse effect on the value of the Debtors' assets or the amount that the Lender would be likely to receive (after giving consideration to delays in payment and costs of enforcement) in the liquidation of such assets, or (c) a material impairment of the priority of the Lender's rights and liens with respect to the Collateral pledged to it hereunder.

- The commencement of any suit by any Person that is not subject to the automatic stay against the Lender that would, or seek to, in any way reduce, set off, or subordinate the Obligations or DIP Liens.

- The Debtors shall be denied, or otherwise not obtain or lose authorization to, use cash collateral as that term is used in section 363 of the Bankruptcy Code.

- Any Person is granted (or awarded) an administrative expense claim that is not subordinated to the super-priority administrative claims granted to the Lender.

- The Debtors' seek to grant a security interest or lien on or to any of their assets other than the DIP Liens.

- The Court enters an order requiring the Debtors to pay rent to any landlords within the first 60 days of the Chapter 11 Cases.

| | |
|---|---|
| | • Medicare or Medicaid, or any other governmental entity, sets off or otherwise withholds payment against any accounts receivable owing to Debtors. |
| **Milestones** | None |
| **Carve-Out** | (a) unpaid, postpetition fees and expenses of the Clerk of the Court and the U.S. Trustee pursuant to 28 U.S.C. § 1930(a) in such amount, with respect to the U.S. Trustee as agreed to by the U.S. Trustee or as determined by the Court (collectively, the "Statutory Fees"); (b) the unpaid postpetition fees and expenses of the professionals retained by the Debtors and by any Committee (up to a maximum of $50,000 in the case of any professionals retained by the Committee), whose retentions are approved pursuant to final orders of the Court under sections 327, 328, 363 or 1103(a) of the Bankruptcy Code (the "Chapter 11 Professionals"), but only to the extent that such fees and expenses are (i) incurred prior to the giving of a notice of the occurrence of the Termination Date by the DIP Lender to the Debtors and any Committee, (ii) subsequently allowed by the Bankruptcy Court under sections 330, 331, or 363 of the Bankruptcy Code, and (iii) not otherwise paid from retainers; (c) postpetition fees and expenses of the Chapter 11 Professionals retained by the Debtors and incurred after a DIP Lender's transmission of notice of the Termination Date, to the extent such fees and expenses are (i) subsequently allowed by the Bankruptcy Court under sections 330, 331, or 363 of the Bankruptcy Code, and (ii) not otherwise paid from any retainers; provided that such notice of Termination Date is not rescinded or withdrawn; and (d) all reasonable fees and expenses incurred by a trustee under Section 726(b) of the Bankruptcy Code in an aggregate amount not exceeding $10,000 (collectively, the "**Carve-Out**"). |
| **Challenge Period** | 60 days after the formation of any official committee of unsecured creditors in these chapter 11 cases, or 75 days after the Petition Date for any other party-in-interest |
| **Entities with Interest in Cash Collateral** | The Pre-Petition Lender |
| **Usage of Cash Collateral** | The Debtors propose to use the cash collateral of the Pre-Petition Lender, subject to the terms of the Interim Order and Final Order. |
| **Adequate Protection** | As adequate protection for the use of its cash collateral and in consideration for being primed in part by the DIP Lender's claims and liens, the Pre-Petition Lender (a) shall receive a claim having priority over any and all expenses of the kind specified in, among |

| | other sections of the Bankruptcy Code, Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 726, and 1114, subject to payment of the Carve Out and subject to the super-priority administrative claims of the Lender under the DIP Facility and existing claims of the Pre-Petition Lender on its pre-petition collateral; and (b) shall have valid, binding, enforceable and perfected replacement liens in all DIP Collateral, subject to payment of the Carve Out and any prepetition liens, in each case equal to the sum of the aggregate diminution, if any, subsequent to the Petition Date, in the value of its pre-petition collateral resulting from the sale, use, lease or disposition of such pre-petition collateral during the Chapter 11 Cases (the **"Pre-Petition Lender Adequate Protection Liens"**). |
|---|---|
| **Waivers/Modification of Automatic Stay** | The automatic stay is modified as necessary to effectuate all of the terms and provisions of the DIP Facility. |
| **Releases** | In consideration of the furnishing of the DIP Facility, the Debtors, subject to the entry of the Final Order, hereby absolutely release and forever discharge the Lender from any and all claims and causes of action of every kind and nature that the Debtors may hold against such released parties. |
| **Indemnification** | The Debtors shall indemnify and hold the Lender and its officers, directors, employees and agents (including all of their professionals) (each an **"Indemnified Party"**) harmless from and against any and all claims, damages, losses, liabilities and expenses (including, without limitation, all fees and disbursements of attorneys and other professionals) to which any Indemnified Party may become liable or which may be incurred by or asserted against any Indemnified Party, in each case in connection with or arising out of or by reason of any investigation, litigation or proceeding arising out of or relating to or in connection with the DIP Facility, any obligation, or any act, event or transaction related or attendant thereto or any use or intended use of the proceeds of the DIP Facility, except to the extent the same is found in a final, nonappealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Party's fraud, bad faith, negligence or willful misconduct. The Debtors' indemnification obligations include the obligation to pay all out-of-pocket expenses of the Lender (including reasonable attorneys' fees) upon the lawful enforcement of any provision of this agreement or under the DIP Facility in response to the occurrence of any Event(s) of Default.  The Debtors' obligations under this section shall be capitalized and added to the outstanding principal balance of the DIP Facility and thereafter bear interest in accordance with this agreement. |

| Cross-Collateralization | None |
|---|---|
| **Provisions Deeming Prepetition Debt to be Postpetition Debt** | None |
| **Non-Consensual Priming Liens** | None |
| **Section 506(c) Waiver** | Upon entry of the Final Order, subject to the Carve Out, the Debtors hereby waive any right to surcharge the prepetition collateral or DIP Collateral, whether pursuant to Bankruptcy Code sections 506(c) or 105(a) or under any other applicable law |
| **Section 552(b)(1) Waiver** | None |

### b.    Highlighted Provisions Pursuant to Financing Guidelines

19.    Pursuant to Local Rule 4001-5(a)(i)-(iii), the Debtors are required to disclose the following provisions of the Interim Order and Loan Documents:

| REQUIRED DISCLOSURES | RESPONSE |
|---|---|
| The absence of any carve-out for professional fees, or provisions that provide treatment for the professionals retained by the debtor that is different than that provided for the professionals retained by a creditors' committee with respect to a professional fee carve-out.<br><br>Local Rule 4001-5(a)(i). | The DIP Loan Agreement reflects the Lender's willingness to provide funding for professional fees incurred by the Debtors and the Committee, subject to the limits set forth in the DIP Loan Agreement. |
| Provisions that require the debtor to pay the secured creditor's expenses and attorneys' fees in connection with the proposed financing or use of cash collateral, without any notice or review by the Office of the United States Trustee, creditors' committee (if formed), or the Court.<br><br>Local Rule 4001-5(a)(ii). | The Debtors are required to pay the Lender's reasonable costs and expenses (including without limitation, professional fees and legal fees and expenses) set forth in the DIP Facility Documents whether incurred before or after the Petition Date; provided, that Debtors will pay all such reasonable fees and expenses within thirty (30) days of delivery of a statement or invoice for such fees and expenses (it being understood that such |

| | statements or invoices shall not be required to be maintained in accordance with the U.S. Trustee Guidelines, nor shall any such counsel or other professional be required to file any interim or final fee applications with the Court or otherwise seek Court's approval of any such payments) to the Debtors, the U.S. Trustee and the Committee. |
|---|---|
| Provisions that exclude from a carve-out any request for professional fees related to the investigation of whether the secured creditor's lien is valid or properly perfected.<br><br>Local Rule 4001-5(a)(iii). | The Lender has not extended any pre-petition indebtedness to the Debtors. |

### c. Entry into the DIP Facility Is an Exercise of Sound Business Judgment

94.     I believe that entry into the DIP Facility was within the Debtors' sound business judgment considering the circumstances of this case.  The use of cash collateral alone is insufficient to meet the Debtors' working capital needs to operate their businesses in the ordinary course. The DIP Facility contains terms and conditions that are the best available under the circumstances and provides the Debtors with sufficient liquidity during the early stages of the Chapter 11 Cases.

### d. The Debtors Were Unable to Obtain Financing on More Favorable Terms

95.     As noted above, the Debtors have been unable to obtain sufficient financing on an unsecured basis.  Notwithstanding the Debtors' efforts to contact various lenders, the Debtors have been unable to obtain postpetition financing or other financial accommodations from any alternative prospective lender or group of lenders, much less financing on more favorable terms and conditions than those for which approval is sought by the DIP/Cash Collateral Motion.

96.     More specifically, the Debtors reached out to over 20 different lenders who typically lend in distressed situations regarding the possibility of postpetition financing.  None of these lenders agreed to provide any funding at this time.  Indeed, only 6 signed a non-disclosure

agreement, and ultimately none other than the Lender expressed any interest in considering making a loan of any nature to the Debtors in the timeframe in which the Debtors needed to obtain financing, although the Debtors reserve the right to continue discussions with such parties to assess their cash needs postpetition if a better offer for financing is made in the Debtors' business judgment. Based on the above, the Debtors believe that they are unable to obtain any other postpetition financing on terms more favorable than the DIP Facility. As a failure to secure financing and use cash collateral would effectively mean the end of these chapter 11 cases, the wind-down of the Debtors' operations, and the displacement of hundreds of sick and elderly individuals from the Debtors' nursing home facilities, the Debtors request that the Court grant the relief requested in the DIP/Cash Collateral Motion.

### e.        The Lender is Extending Credit in Good Faith

97.       Although the Lender is an entity affiliated with Israel Sherman, the Debtors' principal, the Debtors and the Lender negotiated the DIP Facility in good faith and at arms' length. The Lender had independent counsel, and substantial, substantive negotiations were had. Likewise, because the DIP Facility involves related parties, the Debtors employed a well-regarded independent advisor[7] to review the terms of the DIP Facility. Ultimately, Mr. Lenhart approved the entry by the Debtors into the DIP Facility.

98.       The resulting DIP Facility incorporates terms favorable to the Debtors that were unavailable through other financing options. The Lender is agreeing to be a junior lender in the capital stack behind the Pre-Petition Lender and other validly perfected pre-petition secured

---

[7] William K. Lenhart has been appointed as independent advisor to the Debtors, with sole authority to consider and approve any related party transactions. In a corporate structure, Mr. Lenhart's title likely would be independent director. The Debtors' organizational structure, however, does not provide for directors. Thus, he has been given a different title, even though his role is that of a typical independent director.

claims. Additionally, the Lender is not taking liens on avoidance actions and is not charging any fees in connection with the Debtors' entry into the DIP Facility or charging any other amounts that are not normal and customary for similar facilities.

### 2.      The Cash Collateral

99.     The Debtors have an urgent need for the immediate use of the Cash Collateral pending the final hearing on this DIP /Cash Collateral Motion and seek to use Cash Collateral existing on or after the Petition Date in accordance with the DIP Loan Agreement. The Debtors require the use of the Cash Collateral to, among other things, fund payroll, maintain their ongoing business operations and to pay the costs and expenses associated with the administration of these Chapter 11 Cases. Absent the use of Cash Collateral, the value of the Debtors' business as a going concern would be irreparably impaired.

100.    The proposed adequate protection is typical and appropriate under the circumstances. Specifically, as adequate protection for the Pre-Petition Lender with respect to, and solely to the extent of, any diminution of value in the Pre-Petition Collateral from and after the Petition Date, the Prepetition Lender shall receive (i) replacement liens, junior and subordinate only to the Carve-Out, and (ii) monthly payments of interest at a non-default rate set forth in the Pre-Petition Loan Agreements, in each case equal to the sum of the aggregate diminution, if any, subsequent to the Petition Date, in the value of its Pre-Petition Collateral resulting from the sale, use, lease or disposition of such pre-petition collateral during the Chapter 11 Cases.

101.    I understand that these forms of adequate protection are customary in chapter 11 cases, and appropriate under the circumstances in this case. Further, given that the Pre-Petition Adequate Protection Liens are senior in priority to the DIP Liens, and that the Pre-Petition Lender is overcollateralized due to the significant value of the Debtors' accounts receivable versus the

relatively small amount of Pre-Petition Obligations outstanding as of the Petition Date, the Debtors should be authorized to use Cash Collateral as set forth in the DIP/Cash Collateral Motion.

### C.    Irreparable Harm

102.    Based on the Debtors' urgent need for the DIP Facility and the use of Cash Collateral, the Debtors will face irreparable harm if the DIP/Cash Collateral Motion is not promptly granted.

### J.    <u>Wage Motion</u>

103.    By the Wage Motion, the Debtors seek entry of orders authorizing the Debtors to: (a) honor any prepetition and ongoing obligations on account of accrued wages, salaries, and other compensation such as bonuses (collectively, the "**Employee Compensation**") in the ordinary course of business; (b) honor any prepetition and ongoing obligations on account of certain vacation and paid time off policies, employee benefit plans, and severance (collectively, the "**Employee Benefits**") in the ordinary course of business; (c) reimburse Employees for prepetition expenses incurred on behalf of the Debtors in the ordinary course of business, (the "**Reimbursable Expenses**"); (d) pay all related prepetition payroll taxes and other deductions (the "**Withholding Obligations**"); (e) pay, to the extent that any of the foregoing programs is administered, brokered, insured, or paid through a third party administrator or provider (an "**Administrator**"), any prepetition claims of such Administrator in the ordinary course of business (the "**Administration Fees**") (f) pay all Union Obligations ((a) through (f), collectively, the "**Prepetition Employee Obligations**"); and (g) maintain and continue prepetition compensation and benefit programs postpetition.

104.    The Employees are the key to the Debtors' ability to provide best-in-class care to their patients.  Their skills, knowledge and understanding of the Debtors' operations and of the

needs of the Debtors' patients are essential to preserving operational stablishing and efficiency and to the continued provision of top-flight care to the Debtors' patients.  In many instances, the Employees include highly trained personnel who are not easily replaced.  Without the continued, uninterrupted services of the Employees, the Debtors' restructuring efforts will be halted.  Further, replacing Employees can be difficult for the Debtors given the limited number of individuals in their industry with the breadth of skills and experience required to successfully care for the Debtors' patients, particularly in the geographic region where the Debtors operate.  Even outside of bankruptcy, the market for capable, experienced employees such as the Employees is very tight.

105.    If the Debtors cannot assure their Employees that they will promptly pay Prepetition Employee Obligations to the extent allowed under the Bankruptcy Code, and will continue to honor Employee Benefits, certain Employees will likely seek employment elsewhere. The loss of Employees at this critical juncture would have a material adverse impact on the Debtors' business and ability to maximize value through these chapter 11 cases.

106.    Moreover, the vast majority of Employees rely exclusively on their compensation and benefits to pay their daily living expenses and support their families.  Thus, Employees will be exposed to significant financial hardships if the Debtors are not permitted to continue paying their compensation, providing benefits, and maintaining existing programs.  The Debtors cannot risk the substantial damage to their business that would certainly occur if there were a delay in or failure to pay the Prepetition Employee Obligations or if they were unable to maintain and continue existing compensation and benefit programs postpetition.  Consequently, I believe the relief requested is necessary and appropriate.

### 1.    Employee Compensation

#### a.    Wages and Salaries

107.    Employee Compensation is comprised of wages and salaries ("**Wages and Salaries**").  The Debtors spent approximately $35,880,000 on payroll for their Employees in 2018, which amounts to an average of approximately $2,990,000 per month.  Going forward, the Debtors' expect their estimated average payroll will continue to be approximately $2,990,000 per month.

108.    In the ordinary course of business, the Debtors incur payroll obligations for Wages and Salaries.[8]  All Employees are paid weekly, and the Debtors make payroll to Employees in arrears, such that each payroll covers approximately one week prior to the payroll date.  The Debtors' last payroll was paid on September 6 2019 on account of services performed and wages earned from August 25, 2019 through and including August 31, 2019.

109.    Because Employees are paid in arrears, Employees are owed accrued but unpaid Wages and Salaries as of the Petition Date.  As of the Petition Date, the Debtors estimate that they owe approximately $992,857 on account of Wages and Salaries for prepetition services, all of which will become due within twenty-one (21) days of the Petition Date.  To the best of the Debtors' understanding, none of the Debtors' Employees is owed more than $13,650 in accrued and unpaid general prepetition wages or salaries. To the extent that any Employee is owed more than $13,650 and the Debtors seek to pay such greater amount, the Debtors will seek authority to pay such amounts by separate motion.

---

[8] Wages and Salaries include amounts owing as a result of a settlement or determination with respect to a union grievance, if any.  More specifically, at any particular time, the Debtors may be subject to a number of grievances filed by their Employees through their applicable unions.  Most of the amounts requested in the grievances are in the nature of wages or similar compensation. The Debtors seek authority, but not direction, to pay as part of the Wages and Salaries any amounts owing as a result of a settlement or determination with respect to a union grievance.

### b.    Incentive Plans

110.    In the ordinary course of business, the Debtors have also typically maintained performance-based incentive and bonus programs for Employees (the "**Incentive Programs**"). The Debtors offer three types of Incentive Programs.  First, all unionized Employees are eligible to receive "pick-up shift" bonuses, which are paid weekly.  Second, the Employees on the Debtors' admissions team are eligible to receive "admissions performance bonuses" based on individual and team-based metrics, including patient census, which are paid monthly after the close of the prior month.  Finally, five Employees in the Debtors' business office are eligible to receive bonus compensation based on the collection of past-due accounts receivable.

111.    As of the Petition Date, the Debtors estimate that they owe approximately $159,472 to Employees in respect of the Incentive Programs.  For those Employees who receive them, bonuses earned under the Incentive Programs are an important aspect of their overall compensation.  Maintaining historical prepetition practices with regard to the Incentive Programs is essential to ensuring that the Debtors can retain their Employees and maximize value through the duration of these chapter 11 cases.  Therefore, the Debtors seek authority, but not direction, to honor their obligations under the Incentive Programs, up to the aggregate $13,650 cap per Employee, and to maintain the Incentive Programs in the ordinary course of the Debtors' business.

### 2.    Employee Benefits

112.    As part of its Employee Benefits, the Debtors offer their Employees: (a) paid time off, including vacation pay and miscellaneous paid time off; and (b) various standard employee benefits plans and programs, including without limitation, (i) health insurance, (ii) dental insurance, (iii) workers' compensation insurance, (iv) COBRA coverage, (v) short term disability, and (vi) other miscellaneous benefits (collectively, the "**Benefit Programs**").

### a.      Paid Time Off

### i.      Vacation Time

113.    The Debtors' Employees accrue vacation and personal time off (collectively, "**Vacation Time**"), pursuant to the Debtors' Employee benefit policies (the "**Vacation Time Policies**").  If an Employee resigns, gives proper notice of his or her resignation, and fulfills that notice, the Debtors will pay that Employee on account of accrued, but unused, Vacation Time through the last day of work.

114.    At any point in time, Vacation Time is accruing or being used by Employees, making it difficult to quantify the cost of accrued Vacation Time as of the Petition Date. Nonetheless, the Debtors estimate that they owe approximately $994,830 in the aggregate of accrued and unused Vacation Time as of August 31, 2019.  As noted above, the Debtors do not anticipate having to pay out anything more than a nominal amount of this unpaid Vacation Time, though the precise amount is hard to predict.

115.    By this Wages Motion, the Debtors seek authorization, but not direction, to:  (a) honor, in the ordinary course of business, all unused Vacation Time accrued prior to the Petition Date, but not to make cash payments on account of such accrued but unused Vacation Time, except at separation of employment, as is consistent with prepetition practices, and in no event in excess of the statutory cap of $13,650 per Employee;[9] and (b) continue their Vacation Time Policies on a postpetition basis in the ordinary course of business and consistent with prepetition practices.

---

[9]  To the best of the Debtors' knowledge, approximately 11 Employees have accrued but unused Vacation Time in excess of $13,650.  To the extent the Debtors seek to pay such greater amounts in cash, the Debtors will seek authority to pay such amounts by separate motion.

### ii.      Miscellaneous Paid Time Off

116.      Other than Vacation Time, the Debtors offer other types of paid time off to their Employees (the "**Miscellaneous PTO**").  For example, the Debtors offer, among other things, paid sick time, holiday pay, bereavement leave, paid time off for jury duty as well as paid family leave, medical leave and leave under the family medical leave act.  If an Employee is terminated for any reason, the Debtors do not pay that Employee on account of any accrued, but unused, Miscellaneous PTO.

117.      By this Wages Motion, the Debtors seek authorization, but not direction, to continue the Miscellaneous PTO policies and to honor, in the ordinary course of business, all unused Miscellaneous PTO accrued prior to the Petition Date; provided, however, that the Debtors will not make cash payments on account of accrued but unused Miscellaneous PTO, as is consistent with prepetition practices.

### b.      Additional Benefit Programs

### i.      Health Insurance

118.      The Debtors offer their full-time and part-time Employees self-funded health plans (the "**Health Plans**") provided by American Plan Administrators (the "**TPA**"), the costs of which are shared by the Debtors and the Employees.  Approximately 309 Employees participate in the Health Plans.  Also participating in the Health Plans are the employees of certain non-Debtor entities ("**Non-Debtor Entities**").  Without the Health Plans, the Employees would be forced to either forgo health insurance coverage entirely or obtain potentially expensive out-of-pocket insurance coverage, which would likely adversely affect the Employees' morale.

119.      The Debtors' average cost (after taking into account Employee contributions) of maintaining the Health Plans, including administrative costs and premiums, has been

approximately $126,630 in the aggregate per month.  As of the Petition Date, however, the TPA asserts that the Debtors are obligated to pay approximately $790,000 on account of the Health Plans.  The Debtors reserve the right to dispute this amounts, but acknowledge that at least $285,000 of this amount is due to the TPA in respect of the Debtors' employee Health Plan Participants.  All $285,000 of this amount is due or will become due within twenty-one (21) days of the Petition Date.

120.    By the Wages Motion, the Debtors seek authorization, but not direction, to pay prepetition amounts due on account of the Health Plans, in an aggregate amount not to exceed $285,500 on an interim basis, plus additional amounts determined to be owed to the TPA that are necessary to ensure the provision of medical care to the Debtors' employee participants in the Health Plans in an amount not to exceed $790,000 on a final basis.  The Debtors further seek to continue to pay postpetition costs of the Health Plans in the ordinary course of business and consistent with prepetition practices during the pendency of these Chapter 11 Cases

### ii.    Dental Insurance

121.    The Debtors offer eligible Employees dental insurance provided by Guardian (the "**Dental Plan**"), the costs of which are paid solely by the participating Employees.  Approximately 186 Employees participate in the Dental Plan.   By the Wages Motion, the Debtors seek authorization, but not direction, to continuing offering the Dental Plan.

### iii.    Workers' Compensation Insurance

122.    The Debtors provide their Employees with workers' compensation insurance ("**Workers' Compensation**") as required by applicable law, which is provided by American Guarantee and Liability Insurance Company.  The average annual cost of maintaining Workers' Compensation, including administrative costs and premiums, is approximately $1,026,954 in the

aggregate per annum. As of the Petition Date, the Debtors owe $55,391 in deposits associated with their Workers' Compensation obligations.

123.    By the Wages Motion, the Debtors seek authorization, but not direction, to pay prepetition amounts on account of Workers' Compensation, in an aggregate amount not to exceed $55,391 on an interim basis, and to continue to pay postpetition Workers' Compensation costs in the ordinary course of business and consistent with prepetition practices during the pendency of these Chapter 11 Cases.

### iv.    COBRA

124.    By the Wages Motion, the Debtors seek to continue to perform any obligations under section 4980B of the Internal Revenue Code (26 U.S.C. § 4980B) to administer continuation health coverage ("**COBRA**") with respect to former Employees and their covered dependents. As of the Petition Date, the Debtors do not believe that they have any accrued, but unpaid COBRA fees.

125.    By this Wages Motion, the Debtors request authority, but not direction, to continue offering COBRA and paying associated costs or fees, if any, in the ordinary course of business and consistent with prepetition practices during the pendency of these Chapter 11 Cases.

### c.    Severance Obligations

126.    The Debtors maintain certain severance policies and programs for their Employees in the ordinary course of business (collectively, the "**Severance Program**"). The Severance Program provides that terminated Employees are entitled to a certain amount of severance pay, including but not limited to, wages based on the Employee's year(s) of service with the Debtors and, if applicable, a continuation of medical benefits (COBRA) for no longer than four (4) months following their last date of service with the Debtors.

127.    Obligations under the Severance Program will only be available to Employees who remain with and assist the Debtors in ongoing operations during the pendency of these Chapter 11 Cases.

128.    By this Wages Motion, and to maintain employee morale and goodwill, the Debtors are seeking authority, but not direction, to continue to honor the Severance Program obligations that may come due in the ordinary course of business for non-insider Employees, not to exceed the statutory cap, as those policies may be modified, supplemented, and amended in the ordinary course of business and consistent with the prepetition practices during the pendency of these Chapter 11 Cases.

### d.    401(k) Plan.

129.    The Debtors maintain the Absolut Retirement Savings Plan, a 401(k) plan for the benefit of the Debtors' Employees (the "**401(k) Plan**").  The 401(k) Plan provides for automatic pre-tax deductions of eligible compensation up to the limits set by the Internal Revenue Code. Approximately 424 current Employees participate in the 401(k) Plan, and the approximate amount withheld from the Employees' paychecks per payroll period is $12,800. The Debtors pay no matching amounts into the 401(k) Plan.  There are no costs to the Debtors of maintaining and administering the 401(k) Plan except for professional fees to conduct an annual audit of the plan.

130.    The Debtors request authority, but not direction, to continue the 401(k) Plan in the ordinary course of business, to continue to forward amounts deducted from Employees' wages to the 401(k) Plan and to pay any prepetition amounts owed thereunder or related thereto.

### e.    Flexible Spending Account.

131.    The Debtors maintain flexible spending accounts for the benefit of their Employees to allow the Employees to set aside money to pay for medical expenses and dependent care with

pre-tax dollars (together, the "**Flexible Spending Plans**").  Each employee who is eligible and chooses to participate may set aside up to $2,600 per year for medical expenses and up to $5,000 per year for dependent care expenses. The contributions are spread evenly over the entire year and are automatically deducted from the Employees' pay. Approximately 34 Employees participate in the Flexible Spending Plans and the approximate monthly amount withheld from the Employees' paychecks is $3,332.  The annual cost to the Debtors of maintaining the Flexible Spending Plans is approximately $1,877.

132.    By the Wages Motion, the Debtors seek authority, but not direction, to (a) continue the Flexible Spending Plans for their Employees in the ordinary course of business, (b) continue making the above-described payroll deductions and contributions and (c) pay any amounts related thereto, including any fees owed or others and claim amounts, to the extent that they remain unpaid on the Petition Date.

### f.    Income Protection Plans.

133.    The Debtors maintain certain Income Protection Plans including life insurance and accidental death or dismemberment insurance ("**Life Insurance Plans**") through Unum. Approximately 85 Employees are enrolled in the Life Insurance Plans.  Three of the Debtors' facilities – Aurora Park, Three Rivers and Westfield – have a closed, grandfathered Employee paid life insurance policy in which 5 Employees participate (the "**Employee Paid Plans**").  The Employees are responsible for payment of the premiums relating to the Employee Paid Plans.  The Debtors also maintain for 80 Employees at the Aurora Park, Orchard Park, Orchard Brooke and Gasport facilities employer paid life insurance through Unum (the "**Employer Paid Plans**").  The Debtors' incur approximately $361.60 per month in respect of the Employer Paid Plans.  As of the Petition Date, the Debtors had no outstanding obligations in respect of the Life Insurance Plans.

134.    Additionally, as part of the Income Protection Plans, the Debtors also offer their full-time and part-time Employees voluntary short term disability, universal life, accident, hospital indemnity, whole life, term life and cancer and specified diseases insurance (the "**Additional Insurance Plans**") provided by Colonial Life.  With the exception of disability insurance, the Employees are responsible for payment of the premiums relating to the Additional Insurance Plans. As of the Petition Date, the Debtors had no obligations in respect of the Additional Insurance Plans, except for $146.32 in respect of the disability insurance.

135.    By the Wages Motion, the Debtors seek authority, but not direction, to (a) continue the Life Insurance Plans and the Additional Insurance Plans in the ordinary course of business, (b) continue making the above-described payroll deductions and contributions and (c) pay any amounts related thereto, including any amounts owed that remain unpaid on the Petition Date.

### g.    Educational Assistance.

136.    The Debtors also provide educational assistance to non-unionized full-time Employees, up to $335/quarter, $500/semester and $1,000/year, with a lifetime maximum of $5,000 (the "**Educational Assistance**").    The Debtors do not currently incur any costs in connection with the Educational Assistance.  As of the Petition Date, the Debtors owed no amounts in respect of the Educational Assistance.

137.    By the Wages Motion, the Debtors seek authority, but not direction, to (a) continue the Educational Assistance in the ordinary course of business and (b) pay any amounts related thereto, including any amounts owed that remain unpaid on the Petition Date.

### h.    Union Obligations

138.    The Debtors provide Union Employees, in the ordinary course of business, with certain benefits through union plans funded by the Debtors' contributions, which are required

under the CBAs.  Specifically, the Debtors contribute to pension funds under the CBAs, which contributions are due on the 15th day of each month (the "**Pension Fund Obligations**").  The amount of the Pension Fund Obligations depends on the number of hours work and the rate of pension (due to the Employee's work anniversary date).  On average, however, the Debtors spend approximately $25,405 per month on the Pension Fund Obligations.  The Debtors also contribute .5% of gross payroll to an education fund, which contribution is due by the 10th day of each month (the "**Education Fund Obligations**" and together with the Pension Fund Obligations, the "**Union Obligations**").  On average, the Debtors incur $7,327 per month in Education Fund Obligations.

139.    As of the Petition Date, the Debtors are obligated in respect of the Union Obligations in the aggregate amount of $81,095.  The Debtors seek authority to pay that amount and to continue paying the Union Obligations in the ordinary course of business.

### 4.    Reimbursable Expenses

140.    Prior to the Petition Date, the Debtors routinely reimbursed the Employees for Reimbursable Expenses incurred on behalf of the Debtors during the scope of their employment. The Reimbursable Expenses are incurred in the ordinary course of the Debtors' business operations and include, without limitation**,** business related travel expenses, business meals, relocation allowances, tuition reimbursement, car rentals, mileage reimbursement.  Employees receive reimbursement in one of two ways.

141.    *First*, they can submit expense reports and paper receipts and receive reimbursement for approved expenses in accordance with the Debtors' internal policies, which includes approval of all Reimbursable Expenses by a member of management.  Although it is the Debtors' policy to submit reimbursement requests promptly, submission delays do occur. Accordingly, Employees may submit reimbursement requests for prepetition expenses after the

Petition Date.  Reimbursable Expenses are incurred by Employees with the understanding that they will be reimbursed by the Debtor.  Without continued reimbursement of the Reimbursable Expenses, Employees relying on these benefits would be saddled with additional costs, potentially causing personal financial hardship.

142.    Historically, the Debtors pay approximately $3,500 in the aggregate on account of Reimbursable Expenses each month.  As of the Petition Date, the Debtors estimate that they owe approximately $434.21 in Reimbursable Expenses, all of which will become due within twenty-one (21) days of the Petition Date.  Absent authority to pay the Reimbursable Expenses incurred prepetition, the Employees could be obligated to pay such amounts out of their personal funds.  The Debtors therefore seek authority to pay all outstanding prepetition Reimbursable Expenses, in an aggregate amount not to exceed $500, on an interim basis upon entry of the Interim Order, and to continue the foregoing policy in the ordinary course of business and consistent with prepetition practices during the pendency of these Chapter 11 Cases.

143.    *Second*, certain of the Debtors' Employees can charge expenses to corporate credit cards.  Specifically, the Debtors are a party to a corporate credit card program (the "**Corporate Credit Card Program**") with American Express.  As of the Petition Date, the Debtors estimate that they owe approximately $3,763 under the Corporate Credit Card Program for Reimbursable Expenses.  The Debtors request authority to continue the Corporate Credit Card Program and to pay amounts due thereunder as of the Petition Date in the ordinary course of business.

### 5.    Withholding Obligations

144.    The Debtors routinely deduct certain amounts from Employees' compensation that represent various Withholding Obligations, including for example, various federal, state and local income, Federal Insurance Contribution Act ("**FICA**"), unemployment and disability taxes and

fees, union dues, insurance premiums, FSA withholdings and other taxes, garnishments, child support, service charges, and similar deductions (collectively, the "**Employee Withholdings**"). The amount deducted and remitted by the Debtors with respect to Employee Withholdings averages approximately $135,005 per week in the aggregate. Approximately $1,134,898 of deductions have accrued prepetition but have not yet been remitted to various third parties. All of the amounts relating to the Employee Withholdings will become due within twenty-one (21) days of the Petition Date.

145.    The Debtors seek authority to deduct and remit accrued but unfunded Employee Withholdings, in an aggregate amount not to exceed $794,429, on an interim basis. The Debtors also seek authority to continue to deduct and remit Employee Withholdings in the ordinary course of business and consistent with prepetition practices during the pendency of these Chapter 11 Cases.

### K.    Tax Motion

146.    By the Tax Motion, the Debtors request the entry of an order (i) authorizing, but not directing, the Debtors to pay various local, state, and federal taxing authorities (collectively, the "**Taxing Authorities**")[10] all Taxes (as defined below) that arose before the Petition Date, including all Taxes subsequently determined by audit or otherwise to be owed for periods before the Petition Date; and (ii) directing applicable banks and financial institutions (collectively, "**Banks**") to receive, honor, process, and pay all checks issued or to be issued and electronic funds transfers requested or to be requested relating to the above.

---

[10]    The definition of "Taxing Authorities" includes, but is not limited to, those parties set forth on the Taxing Authorities List (as defined in the Tax Motion). The inclusion of any entity on, or the omission of any entity from, the Taxing Authorities List is not an admission by the Debtors that such entity is, or is not, a Taxing Authority to which the Debtors owe any amount, and the Debtors reserve all rights with respect to any such determination.

147.    In connection with the normal operation of their business, the Debtors collect, withhold and/or incur an assortment of taxes and assessments that they remit periodically to various Taxing Authorities.

148.    The taxes and assessments to which the Debtors are typically subject generally fall into the following categories: sales taxes, franchise taxes, income taxes, local city ordinary taxes, bed taxes, property taxes, trust fund taxes, and other taxes (collectively, the "**Taxes**").  Debtors pay the Taxes weekly, monthly, quarterly or annually, in each case as required by applicable laws and regulations.

149.    As of the Petition Date, the Debtors have federal tax obligations of $1,337,091, representing outstanding payroll tax and federal income tax withholding (the "**IRS Tax Obligations**").  In addition, the IRS has asserted a claim for penalties relating to the federal payroll taxes in the amount of $303,605 for the fourth quarter of 2018 and the first quarter of 2019, which the Debtors dispute (the "**IRS Penalties**").  The Debtors further have tax obligations to the New York State of $233,201, representing past-due state income tax withholding (the "**NYS Tax Obligations**").  Additionally, New York State has asserted claims which the Debtors dispute, for penalties relating to State payroll taxes for the fourth quarter of 2018 and the first quarter of 2019 in the amount of $16,741 (the "**NYS Penalties**").  Moreover, the New York State Department of Health asserts a claim under the Health Receipts Cash Assessment Program of approximately $2,161,127 (the "**DOH Obligations**").[11]  The Debtors do not seek authority to pay the IRS Penalties, the NYS Penalties or the DOH Obligations by the Tax Motion.  The Debtors do, however, seek authority to pay the IRS Tax Obligations and the NYS Tax Obligations pursuant hereto.

---

11 The Debtors reserve all rights in respect of the IRS Penalties and the DOH Obligations, including to assert that such amounts are not owed by the Debtors and/or are not entitled to payment on a priority basis.

150.    While the Debtors believe they are current on all other prepetition taxes, except as described above, there may be certain taxes that were incurred prior to the Petition Date but have not been assessed.  It is also possible, that it will be determined, either through further review or audit, that the Debtors are in fact obligated to pay certain Taxes that arose prior to the Petition Date.  As such, the Debtors believe it would be in the best interest of the Debtors and their estates to have authority, but not direction, to pay any prepetition Taxes other than the IRS Penalties and the DOH Obligations as they become due in the ordinary course of business.

151.    The Debtors seek authority to pay any prepetition Taxes in the ordinary course of business to, among other things, discourage the Taxing Authorities from taking actions that may interfere with the Debtors' continued business operations.  Nonpayment of any Tax obligations may cause the Taxing Authorities to take precipitous action, including, but not limited to, asserting liens or seeking to lift the automatic stay, which could disrupt the Debtors' day-to-day operations and could potentially impose significant costs on the Debtors' estates.  Failure to satisfy the prepetition Taxes may jeopardize the Debtors' maintenance of good standing to operate in the jurisdictions in which they does business.

152.    Some prepetition Taxes may constitute "trust fund" taxes, which the Debtors are required to collect and hold in trust for payment to the Taxing Authorities.  To the extent that the Debtors have collected or hold Taxes in trust for payment to the Taxing Authorities, such funds do not constitute property of the Debtors' estates.

153.    Failure to pay certain prepetition Taxes may also inhibit the Debtors' reorganization efforts.  The failure to remit prepetition Taxes, such as Sales Taxes, and certain other Taxes, significantly increases the Debtors' officers' and directors' exposure to possible personal liability during the pendency of these Chapter 11 Cases.  The threat of a lawsuit or criminal prosecution,

and any ensuing liability, would distract the Debtors and their officers and directors from important tasks during a critical time. This would be detrimental to parties in interest because the dedicated and active participation of the Debtors' officers and directors is integral to the Debtors' continued operations and essential to the orderly administration of these Chapter 11 Cases. The Debtors' estates are best served by eliminating the possibility of these distractions at the outset of these Chapter 11 Cases. Accordingly, because the proposed relief is in the best interests of the Debtors' estates, the Debtors request authority to pay the prepetition Taxes.

154.    Most, if not all, of the potential Taxes on which the Debtors could be liable are afforded priority status pursuant to section 507(a)(8) of the Bankruptcy Code, and such prepetition Taxes must be paid in full under any chapter 11 plan before any general unsecured obligations of the Debtors may be satisfied. Accordingly, the proposed relief will affect only the timing of payment of the prepetition Taxes and will not prejudice the rights of any general unsecured creditor or other party-in-interest.

155.    Payment of the prepetition Taxes is an exercise of sound business judgment and necessary to permit a successful reorganization, as the Debtors' satisfaction of the prepetition Taxes is necessary to avoid the obstacles to a smooth transition through these Chapter 11 Cases. Significant disruptions of the Debtors' operations of the types described above threaten to irreparably impair the Debtors' ability to conduct successful reorganization processes and thereby maximize the value of the Debtors' estates for the benefit of their creditors.

156.    Based on the foregoing, the Debtors would suffer immediate and irreparable harm if the relief sought herein is not promptly granted.

L.    **Utilities Motion**

157.    By the Utilities Motion, the Debtors seek entry of an order (i) prohibiting the Utility Companies from altering or discontinuing service on account of unpaid prepetition invoices; (ii) permitting the Debtors to pay the Utility Companies in the ordinary course, including payment of the most recent invoice received from the Utility Companies, even if a portion of the period covered by the invoice is for the pre-Petition Date period, (iii) approving the use of the Debtors' deposit account as adequate assurance of payment; (iv) establishing the procedures (as defined below) for resolving any future disputes regarding requests for adequate assurance of payment.

158.    The Debtors have relationships with many different utility companies and other providers (each a "**Utility Company**" and, collectively, the "**Utility Companies**") for the provision of electric, water, sewer, natural gas, trash removal, telephone, cellular telephone, internet services, and similar utility products and services (collectively, the "**Utility Services**"). The Utility Companies include, without limitation, the entities set forth on the list attached to the Utilities Motion as <u>Exhibit A</u>.[12]

159.    The Debtors estimate that the average monthly amount owed to the Utility Companies is approximately $97,978.  The Debtors owe certain amounts to Utility Companies as of the Petition Date for prepetition Utility Services.  Due to the timing of the Petition Date in relationship to the Utility Companies' billing cycles, the Debtors are also aware of Utility Services that have been invoiced to the Debtors for which payment is not yet due and Utility Services that

---

[12] While the Debtors have used their best efforts to list their Utility Companies in Exhibit A to the Utility Motion, the Debtors may have inadvertently omitted certain Utility Companies.  Accordingly, the Debtors request that they be authorized, without further order of the Court, to amend Exhibit A to add any Utility Companies that were omitted therefrom and that the relief requested in the Utility Motion apply to all such entities added to Exhibit A.  In addition, the Debtors reserve the right to argue that (a) any of the entities now or hereafter listed in Exhibit A is not a "utility" within the meaning of Bankruptcy Code § 366; and (b) any such entity is compelled by contractual obligation, state or local law, or otherwise, to continue to furnish services to the Debtors notwithstanding the filing of the Chapter 11 Cases.

have been provided since the end of the last billing cycle but not yet invoiced to the Debtors.  The Debtors seek to pay the most recent invoice received from the Utility Companies, even if a portion of the period covered by the invoice is for the pre-Petition Date period.

160.    The Debtors anticipate that their cash flow, coupled with the proposed funding from the DIP Facility, will be sufficient to allow them to satisfy administrative expenses.  Accordingly, the Debtors intend to pay all postpetition obligations owed to the Utility Companies in a timely manner.

161.    Nevertheless, to provide additional adequate assurance of payment for future Utility Services, the Debtors are prepared to earmark a sum equal to approximately fifty percent (50%) of the Debtors' estimated monthly cost of their Utility Services, for the sole use of satisfying post-petition administrative expense claims of Utility Companies (the "**Utility Deposit Account**"), subject to the terms and conditions of the DIP Financing agreement and applicable orders authorizing the Debtors to enter into the same, including, without limitation, the Interim DIP Order.  The Debtors request authority to maintain the Utility Deposit Account in one of the Debtors' existing bank accounts, and not in a separate bank account.

162.    The Debtors will maintain the Utility Deposit Account with a minimum balance equal to 50% of the Debtors' estimated monthly cost of Utility Services, which may be adjusted by the Debtors to account for the termination of Utility Services by the Debtors or other arrangements with respect to adequate assurance of payment reached with individual Utility Companies.  The Debtors represent that the Utility Deposit Account, coupled with the Debtors' ability to pay for future Utility Services in the ordinary course of business, provides protection well in excess of that required to grant adequate assurance to the Utility Companies.

163.    Notwithstanding the foregoing proposal for adequate assurance to the Utility Companies, the Debtors are further willing to abide the Procedures outlined in the Utilities Motion to the extent any of the Utility Companies seeks additional adequate assurance.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct.

Dated:          September 10, 2019
                New York, New York

                                    */s/* Michael Wyse
                                    Michael Wyse
                                    Chief Restructuring Officer

## SCHEDULE 1

Pursuant to rule 1007-4(a)(1) of the Local Bankruptcy Rules for the Eastern District of New York ("**E.D.N.Y. LBR**"), the Debtors are not small business debtors within the meaning of Bankruptcy Code § 101(51D).

**SCHEDULE 2**

Pursuant to E.D.N.Y. LBR 1007-4(a)(iv), and to the best of the Debtors' knowledge, no committees were organized prior to the Petition Date.

**SCHEDULE 3**
**Consolidated List of the Holders of the**
**Thirty (30) Largest Unsecured Claims on a Consolidated Basis**

Pursuant to E.D.N.Y. LBR 1007-4(a)(v), I incorporate by reference the list of the holders of the thirty (30) largest unsecured claims against the Debtors on a consolidated basis, excluding insiders, which is attached to the Debtors' chapter 11 petitions (the "**Consolidated Top 30 List**").

The information contained in the Consolidated Top 30 List shall not constitute an admission of liability by, nor is it binding on, the Debtors.  The Debtors reserve all rights to assert that any debt or claim listed in the Consolidated Top 30 List is a disputed claim or debt, and to challenge the priority, nature, amount, or status of any such claim or debt.  In the event of any inconsistencies between the summaries set forth in the Consolidated Top 30 List and the respective corporate and legal documents relating to such obligations, the descriptions in the corporate and legal documents shall control.  The Consolidated Top 30 List includes estimates of outstanding amounts as of the Petition Date.

**SCHEDULE 4**
**Consolidated List of the Holders of the Five (5) Largest Secured Claims**

Pursuant to E.D.N.Y. LBR 1007-4(b), the Debtors intend to submit a supplemental affidavit containing the information requested by this schedule forthwith, but no later than 14 days after the date on which the order for relief is entered.

**SCHEDULE 5**
**Summary of the Debtors' Assets and Liabilities**

Pursuant to E.D.N.Y. LBR 1007-4(b), the Debtors intend to submit a supplemental affidavit containing the information requested by this schedule forthwith, but no later than 14 days after the date on which the order for relief is entered.

18147146

**SCHEDULE 6**
**Schedule of Publicly Held Securities**

Pursuant to E.D.N.Y. LBR 1007-4(a)(viii), there are no shares of the Debtors' stock, debentures, and/or other securities that are publicly held.

**SCHEDULE 7**
**List of Debtors' Property in the Possession of Third Parties**

Pursuant to E.D.N.Y. LBR 1007-4(a)(ix), the Debtors represent that the Debtors do not have property that is in the possession or custody or any custodian, public officer, mortgage, pledgee, assignee or rents, or secured creditor, or agent for such entity.

## SCHEDULE 8
## Summary of Property from Which the Debtors Operate Their Businesses

Pursuant to E.D.N.Y. LBR 1007-4(a)(x), the following lists the property or premises owned, leased, or held under other arrangement from which the Debtors operate their businesses.

The following list is solely intended to provide the Court with information as to the premises from which the Debtors operate their businesses, and includes the locations of the Debtors' various showrooms. The Debtors reserve all rights, including, but not limited, under section 365 of the Bankruptcy Code.   The Debtors make no admission as to the contractual relationship or enforceability of any lease agreement and further reserve all rights in connection therewith.

| Debtor | Premises Address | Leases/Owned |
|---|---|---|
| Absolute Facilities Management, LLC | 255 Warner Avenue, Roslyn Heights, New York  11577 | Leased |
| Absolute Facilities Management, LLC | 300 Gleed Avenue, East Aurora, New York  14052 | Leased |
| Absolut Center for Nursing and Rehabilitation at Allegany, LLC | 2178 North 5th Street, Allegany, New York  14706 | Leased |
| Absolut Center for Nursing and Rehabilitation at Aurora Park, LLC | 292 Main Street, Aurora Park, New York  14052 | Leased |
| Absolut Center for Nursing and Rehabilitation at Gasport, LLC | 4540 Lincoln Drive, Gasport, New York  14067 | Leased |
| Absolut at Orchard Brooke, LLC | 6060 Armor Duells Road, Orchard Park, New York 14127 | Leased |
| Absolut Center for Nursing and Rehabilitation at Orchard Park, LLC | 6060 Armor Duells Road, Orchard Park, New York 14127 | Leased |
| Absolut Center for Nursing and Rehabilitation at Three Rivers, LLC | 101 Creekside Drive, Painted Post, New York  14870 | Leased |
| Absolut Center for Nursing and Rehabilitation at Westfield, LLC | 26 Cass Street, Westfield, New York  14787 | Leased |

18147146

## SCHEDULE 9
### Location of the Debtors' Assets, Books, and Records

Pursuant to E.D.N.Y. LBR 1007-4(a)(xi), the following lists the locations of the Debtors' significant assets, the locations of their books and records, and the nature, location, and value of any assets held by the Debtors outside the territorial limits of the United States.

### Location of the Debtors' Significant Assets

The Debtors have working capital assets at the operating facilities identified on Schedule 8.

### Books and Records

The Debtors' books and records are located at the operating facilities identified on Schedule 8.

### Debtors Assets Outside the United states (if applicable)

The Debtors do not have assets outside of the United States.

**SCHEDULE 10**
**Summary of Legal Actions Against the Debtors**

Pursuant to E.D.N.Y. LBR 1007(a)(xi), to the best of the Debtors' knowledge, there is no material action or proceeding, pending or threatened, against the Debtors or their properties where a judgment against the Debtors or a seizure of their property may be imminent.

## SCHEDULE 11
## Senior Management

Pursuant to E.D.N.Y. LBR 1007-4(a)(xiii), the following provides the names of individuals who comprise the Debtors' existing senior management, a description of their tenure with the Debtors, and a brief summary of their relevant responsibilities and experience.

| Name/Position | Relevant Experience and Responsibilities | Tenure |
|---|---|---|
| Israel Sherman | CEO:  Mr. Sherman is the primary owner and operator of the Debtors and their facilities.  He has an MBA from Baruch College/Mt. Sinai School of Medicine.  Mr. Sherman has fourteen years of experience as a nursing home administrator followed by twenty-four years in management and ownership of various nursing homes. He has been owner/operator of the Absolut facilities since the beginning, in 2007. | 2007-Present |
| William K. Lenhart | Independent Advisor:  William K. Lenhart is a nationally known restructuring and turnaround advisor with over 25 years of diversified experience.  He started his career as an auditor and was a licensed CPA.  Mr. Lenhart has spent most of his career as a financial advisor assisting companies, stockholders, lenders and other interested parties through various business transitions: restructuring, profit improvement, distressed and insolvent situations. He was a partner and National Director of the restructuring practice of BDO Consulting. He has significant experience in serving the retail, manufacturing, construction, media, technology, real estate, sub-prime mortgages, hedge funds, healthcare and service industries.  Mr. Lenhart has been a court appointed Examiner and Trustee and a board member, including audit committee chair, of several industry organizations. He has been involved in many engagements requiring forensic accounting expertise and has provided expert testimony in various state and federal courts. Mr. Lenhart has been certified as a Turnaround Professional, a Insolvency and Restructuring Advisor and a Fraud Examiner. He has been a speaker at educational conferences and has been quoted in various publications. | September 2019-Present |

| Name/Position | Relevant Experience and Responsibilities | Tenure |
|---|---|---|
| Michael Wyse | Chief Restructuring Officer:  Mr. Wyse has more than 20 years of experience advising companies and other constituents through stressed, distressed and bankruptcy situations.  Having sat in every possible seat in these types of situations (Advisor, CRO, C-Level Management, Independent Director, Banker, Investor, Liquidator), Mr. Wyse brings a truly unique and unmatched perspective. Mr. Wyse's works spans situations of all shapes and sizes, from $20 Million in revenues to $20 Billion, across all industries and asset classes. | September 2019-Present |
| Phillip Hoffman | Interim Chief Financial Officer:  MBA, Columbia University Thirty-Five years of experience as CFO and COO in a healthcare services business with deep concentration in Home Health and Hospice. For the past 5 years, specializes in post-acute care, interim management for health systems. | August 2019-Present |
| Lorry Dotter | Chief Operating Officer:  Ms. Dotter is responsible for all aspects of operations of the Debtors' facilities. She previously served as a VP of Park Associates, a national operator of skilled nursing facilities. Ms. Dotter is trained as a registered dietitian. | May 2017-Present |

## SCHEDULE 12
### Payroll

Pursuant to E.D.N.Y. LBR 107-4(xiv)-(xv), the following provides the estimated amount of weekly payroll to be paid to the Debtors' employees (not including officers and directors) and the estimated amount to be paid to the officers, directors, and financial and business consultants retained by the Debtors for the 30-day period following the filing of these Chapter 11 Cases.

| Payments to Employees, Officers, and Directors | |
| --- | --- |
| Weekly Payroll to Employees (Not Including Officers and Directors) | Total payroll is approximately $2.9 million per month. |
| Estimated Payments to Officers and Directors | Officers and directors are paid separately by affiliated entity, Billit, which the Debtors reimburse. Total to officers and directors per month is approximately $46,000. |

**SCHEDULE 13**
**Cash Receipts and Disbursements**
**Net Cash Gain or Loss, Unpaid Obligations, and Receivables**

Pursuant to E.D.N.Y. LBR 1007-4(b), the Debtors intend to submit a supplemental affidavit containing the information requested by this schedule forthwith, but no later than 14 days after the date on which the order for relief is entered.

18147146

**<u>EXHIBIT A</u>**

**Org Chart**

