Andrew I. Silfen
George P. Angelich
Jordana L. Renert
ARENT FOX LLP
1301 Avenue of the Americas, Floor 42
New York, NY  10019
Telephone: (212) 484-3900
Facsimile: (212) 484-3990
Email: andrew.silfen@arentfox.com
      george.angelich@arentfox.com
      jordana.renert@arentfox.com

*Counsel for Arba Group*

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>Absolut Facilities Management, LLC, *et al.*,<br><br>              Debtors.[1] | Chapter 11<br><br>Case No. 19-76260 (AST)<br>Case No. 19-76263 (AST)<br>Case No. 19-76267 (AST)<br>Case No. 19-76268 (AST)<br>Case No. 19-76269 (AST)<br>Case No. 19-76270 (AST)<br>Case No. 19-76271 (AST)<br>Case No. 19-76272 (AST)<br><br>(Jointly Administered) |

**LANDLORDS' SUPPLEMENTAL OBJECTION TO DEBTORS' DEBTOR-IN-POSSESSION FINANCING MOTION AND OTHER FIRST DAY MOTIONS**

Arba Group and its affiliates (collectively, the "Landlords"[2]) for the six skilled nursing facilities and one assisted living facility (collectively, the "Senior Care Facilities") operated by the above-captioned debtors and debtors-in-possession (collectively, the "Debtors"), by and through

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are: Absolut Facilities Management, LLC (1412); Absolut Center for Nursing and Rehabilitation at Allegany, LLC (7875); Absolut Center for Nursing and Rehabilitation at Aurora Park, LLC (8266); Absolut Center for Nursing and Rehabilitation at Gasport, LLC (8080); Absolut at Orchard Brooke, LLC (1641); Absolut Center for Nursing and Rehabilitation at Orchard Park, LLC (8300); Absolut Center for Nursing and Rehabilitation at Three Rivers, LLC (8133); and Absolut Center for Nursing and Rehabilitation at Westfield, LLC (7924).

[2] The Landlords are 292 Main Street, LLC; 6060 Armor Road, LLC; 2178 N. Fifth Street, LLC; 101 Creekside Drive, LLC; 4540 Lincoln Drive, LLC; and 26 Cass Street, LLC.

their undersigned counsel, hereby file this Supplemental Objection to (i) the *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Obtain Postpetition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), and 364(e) and (B) Use Cash Collateral* [Docket No. 4] (the "DIP Motion") and (ii) certain additional first day motions indicated herein [Docket Nos. 6, 10, 12], and in support hereof, respectfully state as follows:

## SUPPLEMENTAL OBJECTION

### A. Any DIP Financing Must Facilitate the Viability of These Cases Going Forward

1. At the first day hearing on September 12, 2019, this Court indicated concerns about the viability of these cases. The Landlords share the Court's concerns, particularly in light of conflicting and inconsistent statements regarding the Debtors' immediate financing needs in their first day motions and at the hearing, as well as the continued absence of a docketed proposed or updated budget. The Debtors' statement regarding their intention to move forward with the closure of their Orchard Park facility in the near term (*see* Docket No. 20) raises further concerns and serious questions as to what the Debtors view as an acceptable outcome for these cases, as they appear committed to moving forward with closure of at least the one facility despite the chaos, patient displacement, loss of jobs, and impact on the other Senior Care Facilities that closure would entail. Since the first day hearing, the Debtors have provided no more clarity as to the viability of these cases or their intended direction. At this stage, a transaction that allows *all* of the Debtors' facilities to continue operating on a going-concern basis should be the priority and focus for all parties. The Landlords believe that is the only acceptable outcome and, furthermore, that it is viable and available, as the Landlords' discussions with a potential replacement operator are encouraging. The Landlords file this Supplemental Objection in advance of the September 18 second interim hearing to raise its continued concerns with the Court and to attempt to prevent the

Debtors from irreversibly steering these cases down a value- and job-destructive path for the benefit of insiders and to the detriment of patients, employees, the Landlords, and other creditors.

2. The Landlords support postpetition financing to the extent it is necessary, but it must be properly used and ultimately be in an amount sufficient to ensure administrative solvency, including the payment of rent, and be supported by a detailed, credible, and publicly filed budget. As argued at length in the Landlords' initial objection [Docket No. 30] (the "Initial Objection")[3], the Debtors should be required to provide the Landlords with adequate protection under sections 363(e) and 361 in the form of rent payment, which is routine and common practice in this and other Districts. Barring the provision of immediate and continuing rent payments, any second interim order must be limited in amount to only what is needed to get the Debtors' through a final hearing and must ensure the *status quo* is maintained in the meantime. The Debtors' and Mr. Israel Sherman, in his capacity as proposed DIP lender,[4] must not be permitted to use DIP financing as a vehicle to subordinate the Landlords' administrative claims, provide unnecessary and inappropriate protections to the insider DIP lender, or lock these cases into a path to insolvency or unnecessary closure of any of the facilities. At a minimum, the proceeds of any DIP loan should be used to pay current rent or any liens granted in a second interim order must carve out and be subordinate to the Landlords' administrative expense claims for rent.

3. After filing first day motions which, without a supporting budget, seemed to show interim financing needs of as much as $6 million and said nothing about cash flow or cash on hand, the Debtors supplied a draft budget to present parties only minutes before the first day hearing that

---

[3] The Initial Objection and all arguments therein are incorporated by reference as if fully set forth herein.

[4] Mr. Sherman is the owner of the proposed DIP lender, the Debtors' CEO, the ultimate owner of the Debtors, and the owner of the Debtors' affiliate Billit Accounting & Information Technology, LLC ("Billit"), which provides back-office services to the Debtors.

seemed to show interim financing needs of approximately $1.2 million.[5] After questioning from the Court, the Debtors represented they needed to borrow only $850,000.00 to get them to a second interim hearing on September 18, 2019. After further questions from the Court and cross-examination, however, it became clear that all that was needed was possibly less than $209,000.00. Throughout the first day hearing, the Debtors' representatives were asked numerous straightforward questions about their budget and cash needs by the Court, the U.S. Trustee, and Landlords' counsel, to which Debtors' counsel and CRO struggled to provide clear responses. As of today, the Debtors have still not filed a budget on the docket. Nor have they provided any other evidentiary support for the DIP Motion, such as testimony from their "independent advisor" who was purportedly tasked with reviewing and approving the proposed DIP facility. In fact, as of today, the Debtors have failed to respond to the Landlords' informal information and document requests of last Friday, September 13, which sought basic information about the Debtors' DIP financing needs and budget such as the amount the Debtors intend to seek at the second interim hearing, the status of discussions with potential replacement DIP lenders, and amounts to be paid to insiders.

4. Just as concerning, the Debtors have not provided any clear direction for how they plan to deal with their Senior Care Facilities going forward, which is a crucial consideration for determining these cases' viability and whether any postpetition financing will be sufficient to ensure administrative solvency. Specifically, despite requests from the Landlords, the Debtors provided no further details or plans surrounding their disclosure in the *Supplemental Declaration of Michael Wyse Regarding Closure of Orchard Park Facility* [Docket No. 20] that they intend to move forward with a closure plan for their Orchard Park facility "immediately." The Debtors'

---

[5] *See* **Exhibit A** hereto, which remains the only budget provided by the Debtors to date.

plans for their Senior Care Facilities are of vital importance to their patients, employees, creditors, and, not least, the Landlords. The closure of even one of the Senior Care Facilities would have drastic implications for all parties, resulting in significant hardship to patients and their families, loss of jobs, and the creation of substantial claims against the estates. The Debtors know this.

5. The Landlords, if not the Debtors, are actively pursuing an alternative to the uncertainty and chaos that would necessarily flow from closure. As discussed in the Landlords' Initial Objection, the Landlords are actively negotiating a letter of intent with a new operator for all seven of the Senior Care Facilities, who is an experienced and well-established operator in this industry[6] and has been conducting its due diligence on the Senior Care Facilities for approximately 30 days. Therefore, the Landlords expect to have an alternative transaction to present to the Debtors in the near term that will allow operations to continue.

6. As a result of the Debtors' lack of disclosure and engagement, the Landlords, like all parties, are left only to guess the Debtors' intentions for their Senior Care Facilities and these cases as a whole. Based on the Orchard Park disclosure, however, it appears likely the Debtors are moving in the direction of a piece-meal, facility-by-facility approach. In fact, only moments before the filing of this Supplemental Objection, Landlords' counsel was informed that the Debtors were removing language from the proposed first interim DIP order that would have prevented the Debtors from disposing of assets outside the ordinary course of business, which was the Debtors' own provision. Nevertheless, the Landlords are hopeful that the Debtors will be open to altering their approach and pursuing a holistic, value-maximizing transaction for the benefit of all

---

[6] The CRO's first day declaration [Docket No. 15] states that the Senior Care Facilities "obtain[ed] a 97% satisfaction rate for their rehabilitation services." *Id*. ¶ 5. The declaration provides no support for this assertion and fails to mention that rehabilitation services are only one aspect of the Senior Care Facilities' functions. Moreover, there is reason to believe the Debtors overstate their industry reputation, as Medicare itself has assigned below average ratings to several of the Senior Care Facilities in areas such as health inspections, staffing, and quality measures. Medicare ratings and reports are available at: https://www.medicare.gov/nursinghomecompare/search.html

stakeholders rather than locking these cases into a path that furthers only the insider DIP lender's agenda.[7] Such a transaction is the only path to viability at this time.

### B. The Proposed DIP Facility's Inappropriate, Prejudicial Provisions

7. In addition, the proposed DIP facility contains numerous inappropriate provisions that would force the risk of administrative insolvency onto the Landlords while providing unnecessary protections to the insider DIP lender. Most notably, as discussed in detail in the Initial Objection, the extreme and unprecedented "event of default" provision related to payment of the Landlords' rent would effectively force the Landlords to provide the Debtors with interest free, unsecured, involuntary, and subordinated post-petition loans in the form of unpaid rent.[8] The proposed section 506(c) surcharge waiver is likewise inappropriate because, by supplying the Debtors' operating facilities (rent-free), the Landlords are effectively preserving and allowing for the generation of collateral in the form of receivables. By waiving their ability to surcharge the DIP lender *and* not paying rent, the Debtors, together with the insider DIP lender, attempt to even further unload their risk onto the Landlords. The waiver must not be permitted.

8. In addition, the insider DIP lender should not be permitted to be further enriched through the DIP facility at the expense of the Landlords and other creditors by receiving a superpriority claim and an unreasonably high 14% interest rate. All of the foregoing lender protections are unnecessary and inappropriate for an insider lender, who appears to be using cash

---

[7] The Debtors also likely intend to lead this Court into a legal minefield by eventually seeking to reject the Senior Care Facilities' leases while standing firm on their alleged inability to pay, especially during any closure process. The Debtors will likely commence some form of "use and occupancy" litigation on grounds that, post-rejection, it cannot pay rent but is obligated by regulatory mandate to remain open for the duration of what will certainly be an extended closure process. Such a path would be a wasteful exercise that should be avoided. Furthermore, the Landlords reserve all rights related to any subsequent rejection efforts, including the right to assert the leases for the Senior Care Facilities constitute a single, integrated agreement that may only be rejected or assumed in full as a single integrated lease. The Landlords assert that the intention of the parties, the subject matter of the leases, and the conduct of the parties demonstrate that the leases were intended to be a single integrated agreement.

[8] Despite the Debtors' representation at the first day hearing that a 365(d)(3) motion was imminent, none has been filed.

that *should probably have been paid to the Landlords and other creditors* prepetition to effectively prime the Landlords' claims and interests and burden the estates with a new layer of liens and claims. Any additional postpetition financing must be conditioned on subordination of the DIP lender's liens and claims to the Landlords' administrative claims, a reasonable interest rate, and the removal of (a) the event of default related to rent payments, (b) the 506(c) waiver, and (c) the insider DIP lender's superpriority claim. At a minimum, all of these protections must be denied on an interim basis to ensure the *status quo* is maintained pending a final hearing. To that end, any second interim order must, in addition the other modifications described herein:

- Provide for preservation of the Landlords' rights of setoff and recoupment and reserve their rights to seek recharacterization, equitable subordination, and disgorgement;
- Preserve the priority of all valid pre-existing liens of non-consenting creditors;
- Include the Landlords as a notice party for all purposes in any DIP order, which must also include standard weekly budget reports, including variance reports and rolling budget updates;
- Provide that any release of the insider DIP lender must be limited to his capacity as DIP lender *and* be subject to an appropriate challenge period.

### C. Objections to Other First Day Motions

9. The Landlords object to certain other relief requested in the Debtors' first day motions. First, the Landlords object to any payments sought in the first day motions for which the Debtors cannot establish primary liability, necessity, and a real, tangible benefit to the Debtors. The Debtors must be required to demonstrate that all obligations they seek to pay, such as credit card expenses in the critical vendor motion [Docket No. 10], are not in fact a direct obligation of insiders or affiliates, such as Billit, which is wholly owned by Mr. Sherman, or Mr. Sherman himself. To the extent such expenses are the liability of another party or subject to a third-party guarantee, they must not be approved. Second, the Landlords object to payment of prepetition insurance brokerage fees pursuant to the insurance motion [Docket No. 12], which are in excess

7

of $330,000.00. The Debtors cannot establish such payments are appropriate or necessary to avoid immediate and irreparable harm and, therefore, they must be denied.

10.     Finally, the Landlords object to the Debtors' request for extension of time to file their schedules and statements of financial affairs to October 22, 2019 [Docket No. 6]. While the Landlords acknowledge that Schedule F containing patient information (which was approved to be filed under seal) may require additional time to complete, the Debtors offer no credible reason why their statements of financial affairs and additional schedules indicating the Debtors' unsecured trade creditor body, a complete understanding of which is crucial to these cases going forward, cannot be completed on time. In fact, the engagement letter attached to the Debtors' application to retain Prime Clerk LLC as claims and noticing agent [Docket No. 34] indicates that Prime Clerk will be preparing the schedules. However, the Debtors are not seeking approval of Prime Clerk's retention until October 11, 2019, or only eleven days prior their requested extended deadline. As a result, it is unclear how long the project will actually take or when Prime Clerk intends to commence work. At a minimum, no extension should be granted without further explanation from the Debtors as to how much time is actually needed to file statements of financial affairs and schedules indicating the Debtors' unsecured trade creditor body. Absent such explanation, the Debtors should be required to file their statements of financial affairs and schedules other than Schedule F (patient creditors) within the required time.

11.     Timely schedules and statements of financial affairs are also critical for evaluating any claims, challenges, or avoidance actions that may be asserted against the insider DIP lender. While the DIP Motion states there will be a challenge period for the prepetition lenders' liens and claims (which would expire on November 25 absent appointment of a committee), it provides no challenge period for the DIP lender who demands a full, unlimited release of all claims upon entry of a final order.

## **RESERVATION OF RIGHTS**

12. The Landlords reserve all rights to further address the DIP Motion, the other first day motions, and any other ancillary issues, either by further submissions to this Court, at oral argument or by testimony to be presented at any hearing. All matters on for hearing at the September 18, 2019 hearing should be limited to interim relief and no final relief should be granted until after the appointment of a committee of unsecured creditors.

WHEREFORE, the Landlords respectfully request that (i) the Court deny the DIP Motion or, alternatively, and assuming a sufficient evidentiary record is established, condition approval of interim financing on the modifications requested herein, including the payment of the Landlords' stub rent and post-petition rent and limiting the amount to only what is necessary to get through a final hearing, (ii) deny the relief sought in the other first day motions as requested herein, and (iii) take such other actions as the Court may deem appropriate.

Dated:   New York, New York
         September 17, 2019

ARENT FOX LLP

*Counsel for Arba Group*

By:   */s/ George P. Angelich*
      Andrew I. Silfen
      George P. Angelich
      Jordana L. Renert
      1301 Avenue of the Americas
      New York, New York 10019
      Telephone: (212) 484-3900
      Facsimile: (212) 484-3990