Andrew I. Silfen
George P. Angelich
Jordana L. Renert
ARENT FOX LLP
1301 Avenue of the Americas, Floor 42
New York, NY  10019
Telephone: (212) 484-3900
Facsimile: (212) 484-3990
Email: andrew.silfen@arentfox.com
         george.angelich@arentfox.com
         jordana.renert@arentfox.com

*Counsel for 6060 Armor Road, LLC*

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| | ) Chapter 11 |
| | ) |
| | ) Case No. 19-76260 (AST) |
| In re: | ) Case No. 19-76263 (AST) |
| | ) Case No. 19-76267 (AST) |
| Absolut Facilities Management, LLC, *et al.*, | ) Case No. 19-76268 (AST) |
| | ) Case No. 19-76269 (AST) |
| Debtors. [1] | ) Case No. 19-76270 (AST) |
| | ) Case No. 19-76271 (AST) |
| | ) Case No. 19-76272 (AST) |
| | ) |
| | ) (Jointly Administered) |
| | ) |
| 6060 ARMOR ROAD, LLC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Adversary Proceeding No. 19-08121 |
| | ) |
| ABSOLUT FACILITIES MANAGEMENT, LLC | ) |
| and ABSOLUT CENTER FOR NURSING AND | ) |
| REHABILITATION AT ORCHARD PARK, LLC | ) |
| | ) |
| Defendants. | ) |

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are: Absolut Facilities Management, LLC (1412); Absolut Center for Nursing and Rehabilitation at Allegany, LLC (7875); Absolut Center for Nursing and Rehabilitation at Aurora Park, LLC (8266); Absolut Center for Nursing and Rehabilitation at Gasport, LLC (8080); Absolut at Orchard Brooke, LLC (1641); Absolut Center for Nursing and Rehabilitation at Orchard Park, LLC (8300); Absolut Center for Nursing and Rehabilitation at Three Rivers, LLC (8133); and Absolut Center for Nursing and Rehabilitation at Westfield, LLC (7924) (collectively, the "Debtors").

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S
APPLICATION FOR THE ENTRY OF ORDERS GRANTING A TEMPORARY
RESTRAINING ORDER AND PRELIMINARY INJUNCTION ENJOINING
DEFENDANTS FROM IMPLEMENTING UNAPPROVED PLAN
OF CLOSURE PRIOR TO APPROVAL UNDER 11 U.S.C. § 363**

6060 Armor Road, LLC ("Plaintiff"), by and through its attorneys, Arent Fox LLP, submits this memorandum of law in support of its application (the "Application") against defendants Absolut Facilities Management, LLC and Absolut Center for Nursing and Rehabilitation At Orchard Park, LLC (collectively, the "Defendants") seeking the entry of Orders under section 105(a) of Title 11 of the United States Code (the "Bankruptcy Code") and Rule 7065 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") (a) temporarily restraining the Defendants from taking any steps or proceeding in any way to implement their voluntary plan of closure (the "Closure Plan") with respect to the skilled nursing facility located at 6060 Armor Road, Orchard Park, New York 14127 (the "Orchard Park Facility") prior to this Court's approval thereof in violation of 11 U.S.C. § 363; and (b) granting a preliminary injunction enjoining the Defendants from proceeding in any way to implement the Closure Plan with respect to the Orchard Park Facility prior to this Court's approval thereof in violation of 11 U.S.C. § 363.

In support of its Application, Plaintiff submits this Memorandum of Law, the *Affidavit of Ira Smedra* in support of injunctive relief (the "Affidavit")[2] and the declaration of counsel pursuant to Rule 9077-1 of the Local Rules for the Bankruptcy Court of the Eastern District of New York.

## JURISDICTION

This Court has jurisdiction to consider the Application pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory predicates for the relief sought in the Application

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings assigned such terms in the Affidavit.

are Sections 105 and 363 of the Bankruptcy Code.  Relief is further authorized pursuant to Rules 7065 and 9006(c)(1) of the Bankruptcy Rules.

## FACTS

The relevant facts are set forth in the Affidavit and are incorporated herein in their entirety. The Court is also respectfully referred to the Complaint dated September 23, 2019 and the docket of these Chapter 11 cases.

## REQUESTED RELIEF

By the Application, Plaintiff seeks a temporary restraining order ("TRO"), followed by a preliminary injunction, temporarily restraining and enjoining the Defendants from implementing their voluntary Closure Plan unless and until they obtain this Court's approval under section 363 of the Bankruptcy Code in order to avoid rendering the Closure Motion moot.  Accordingly, Plaintiff seeks the entry of Orders pursuant to section 105(a) of the Bankruptcy Code and Bankruptcy Rule 7065: (a) temporarily restraining the Defendants from taking any steps or proceeding in any manner to implement the Closure Plan with respect to the Orchard Park Facility prior to this Court's approval thereof in violation of 11 U.S.C. § 363; and (b) granting a preliminary injunction enjoining the Defendants from proceeding in any way to implement the Closure Plan with respect to the Orchard Park Facility prior to this Court's approval thereof in violation of 11 U.S.C. § 363.

## ARGUMENT

A preliminary injunction may be issued where a plaintiff demonstrates (1) irreparable harm, "and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make fair ground for litigation," plus a tipping of the balance of equities in favor of the plaintiff.  *MONY Group, Inc. v. Highfields Capital Mgmt., L.P.*, 368 F.3d 138, 143

(2d Cir. 2004) (citation omitted); *see Pashaian v. Eccelston Props.*, 88 F.3d 77, 85 (2d Cir. 1996) (citations omitted); *Blum v. Schlegel*, 18 F.3d 1005, 1010 (2d Cir. 1994) (citation omitted); *Citibank, N.A. v. Nyland (CF8), Ltd.*, 839 F.2d 93, 97 (2d Cir. 1988) (citation omitted); *Church of Scientology Int'l v. Elmira Mission*, 794 F.2d 38, 41 (2d Cir. 1986) (citation omitted); *Power Test Petroleum Distribs., Inc. v. Calcu Gas, Inc.*, 754 F.2d 91, 95 (2d Cir. 1985) (citation omitted); *see also* FED. R. CIV. P. 65 (outlining requirements for issuance of preliminary injunctions); FED. R. BANKR. P. 7065 (applying FED. R. CIV. P. 65 in bankruptcy proceeding).

The showing of irreparable injury is "the most important prerequisite for the issuance of a preliminary injunction." *NAACP v. Town of East Haven*, 70 F.3d 219, 224 (2d Cir. 1995) (citing *Reuters Ltd. v. United Press Int'l, Inc.*, 903 F.2d 904, 907 (2d Cir. 1990)); *accord Citibank, N.A v. Citytrust*, 756 F.2d 273, 275 (2d Cir.1985) (citation omitted). As a general rule, an irreparable injury is also one that cannot be redressed through a monetary award. *See*, *e.g.*, *Wisdom Import Sales Co., L.L.C. v. Labatt Brewing Co., Ltd.*, 339 F.3d 101, 113–14 (2d Cir. 2003) (citations omitted).

For the reasons stated above and reiterated below, sufficient grounds exist for the entry of a TRO, as well as a preliminary injunction.[3]

## A. <u>Absent Injunctive Relief, the Landlord Will Suffer Irreparable Harm</u>

By the Complaint, Plaintiff asserts, *inter alia*, that Defendants are violating section 363(b) of the Bankruptcy Code by taking active steps outside the ordinary course of business to implement the Closure Plan prior to approval of this Court, which, absent a TRO, will render moot this Court's consideration on October 3, 2019 of the *Motion for Entry of Order Approving the Debtors' Plan*

---

[3] The Landlords' objections to the Debtors' debtor-in-possession financing facility [Docket Nos. 30, 39] (the "<u>DIP Objections</u>") and all arguments therein are incorporated by reference as if fully set forth herein.

*of Closure for Orchard Park Facility* [Docket No. 51] (the "<u>Closure Motion</u>"). Defendants are actively and rapidly discharging patients at the Orchard Park Facility in furtherance of the Closure Plan and outside the ordinary course of business. Specifically, Plaintiff has come to learn that, since commencing these cases on September 10, 2019, Defendants have discharged no fewer than between 60 and 70 patients from the Orchard Park Facility, which, for context, housed approximately 176 patients (out of 202 patient beds) as of June 2019. Affidavit at ¶¶ 8, 20. Because the Orchard Park Facility is no longer admitting new patients, the facility is likely, at best, at half-capacity. *Id.* ¶ 20. By now, the patient population of the Orchard Park Facility is likely even less. In fact, Plaintiff's counsel learned today that only 40 patients remain at the Orchard Park Facility as of today.

Accordingly, the Complaint seeks a declaratory judgment pursuant to 28 U.S.C. §§ 2201-02 (the "<u>Declaratory Judgment Act</u>") that section 363(b)(1) of the Bankruptcy Code prohibits Defendants from implementing the Closure Plan prior to this Court's approval of the Closure Motion. Absent a TRO, followed by a preliminary injunction, Defendants' actions to date indicate it will continue to discharge patients from the Orchard Park Facility in furtherance of the Closure Plan. The resulting harm to Plaintiff (and to the Debtors' estates as a whole) would be devastating and irreparable. Accordingly, Plaintiff requests entry of a TRO and preliminary injunction to maintain the *status quo* pending a hearing on the Closure Motion on October 3, 2019.

The first and most obvious fact is that closing the Orchard Park Facility would indisputably harm Plaintiff, who would cease to be paid rent and would be left with only an empty building. Plaintiff and its affiliate landlords (collectively, the "<u>Landlords</u>") will oppose the Closure Motion in due course and the Court will consider the Closure Motion and objections thereto and make its ruling at or after the October 3 hearing. For the purposes of the instant action, however, Plaintiff

will be seriously and irreparably harmed if Defendants continue to implement the Closure Plan *before* it is approved by discharging patients at the current rate.

First, if Defendants continue this course of action, the Closure Motion will be rendered moot before the Court has an opportunity to issue a ruling.  If the Court denies the Closure Motion, Plaintiff (and all other creditors) will be irreparably harmed if, at the time of denial, Defendants have already substantially consummated the Closure Plan.  Put another way, denial of the Closure Motion will be meaningless if, come October 3, most or all of the patients at the Orchard Park Facility have already been discharged.  Critically, the potential for this Court's denial of the Closure Motion is not remote.  Plaintiff contends, as the Landlords will contend in their objection to the Closure Motion, that denial is warranted.  When considering motions to close healthcare facilities, bankruptcy courts routinely acknowledge the gravity of such action and the heavy burden borne by a debtor seeking its approval.  *See*, *e.g.*, *In re Saint Vincents Catholic Med. Centers of New York*, 429 B.R. 139 (Bankr. S.D.N.Y. 2010) (noting the extent of the record established by moving debtors and stating "[t]he process of winding down the Hospital has been done in a procedurally proper manner.  The Debtors have been open at all hearings and in all their papers about their dire financial condition.  The efforts to save St. Vincent's Hospital have been widely reported in the media and documented in court papers. The Court is saddened by the closing of this historic Hospital that has provided so many services to so many people for more than 150 years."); *In re Spectrum Healthcare LLC et al.*, Case Nos. 16-21365 - 21639 (Bankr. D. Conn. July 12, 2017) (ECF No. 463) (approving closure of nursing home facilities but noting "the Court has struggled with the toll that closing the Facilities might inflict upon the residents, who are among our most vulnerable citizens, and the employees, who have devoted skill, time and humanity to their service").  The gravity of closing a healthcare facility and the debtor's heavy

burden to establish it is warranted was noted by the Bankruptcy Court for the Southern District of

New York in *In re Saint Vincents Catholic Med. Centers of New York*, 2007 WL 2492787, at *21

(Bankr. S.D.N.Y. Aug. 29, 2007), which noted:

> The closing of any medical facility in a big city is almost certain to generate intense
> and emotional opposition from doctors, other hospital staff and affected local
> community groups.  The Court must be sensitive to such pressures and must grant
> time and attention to the objecting community voices.  *Most important, the debtors
> must provide the Court with a comprehensive, well-documented record of affidavits
> and supporting exhibits demonstrating to the press, politicians and the public the
> economic or other facts of life requiring closure*. (emphasis added).

In fact, courts have delayed and even denied closure when a debtor has failed to provide

sufficient detail regarding their closure plan or when they have failed to explore strategic

alternatives.  *See In re Center City Healthcare, LLC et al*., Case No. 19-11466 (Bankr. D. Del)

(ECF No. 101) (delaying determination on motion to approve closure of Hahnemann University

Hospital until debtor discloses plans and engages in discussions with interested parties); *In re St.

Mary Hosp.*, 86 B.R. 393 (Bankr. E.D. Pa. 1988) (denying motion to close hospital and ordering

debtor to explore alternatives to closure with interested parties).  In fact, in both of the foregoing

cases, the delay or denial of the respective closure plans bore substantial fruit for the estates.  The

denial in *St. Mary* resulted in a sale of the hospital.  *See In re St. Mary Hosp*., 117 B.R. 125 (Bankr.

E.D. Pa. 1990).  In *Center City*, delaying consideration of the closure plan for the Hahnemann

University Hospital led to an unexpectedly robust auction process resulting in a $55 million bid

for certain assets.[4]

Here, the Closure Motion is startlingly devoid of detail regarding the Closure Plan.  In fact,

the Closure Motion does not even attach the actual Closure Plan of which it seeks approval and,

despite this Court's urging at the September 18 hearing that it should made available with only

---

[4] *See* https://www.inquirer.com/business/hahnemann-university-hospital-residency-slots-55-million-20190809.html

confidential patient information redacted, neither Landlords nor their counsel have seen the Closure Plan. Furthermore, the summary of the Closure Plan's terms is limited to a single, three-sentence paragraph that explains only that the Closure Plan provides for cessation of admissions as of August 15, 2019, a target closing date of November 15, 2019, and for personnel to solicit patient preferences for alternative placement. Closure Motion at ¶ 11.[5] The Closure Motion also fails to address whether any other regulatory approvals are required, including consent of the United States Department of Housing and Urban Development pursuant to the Defendants' Healthcare Regulatory Agreement with HUD. The Closure Motion is simply insufficient for the drastic relief it requests. Moreover, the Closure Motion does not even mention any exploration of strategic alternatives to closure, such as a sale to a replacement operator. Rather, the Debtors seek to run straight to closure,[6] ignoring the requests of the Landlords to consider a transaction with one of the interested operators they have already identified. This course of action defies good business sense and the Closure Motion falls far short of what is necessary for obtaining approval of closure of a healthcare facility. Thus, it is likely that this Court will deny the Closure Motion. Denial of the Closure Motion, however, would have no meaning or value to any interested party, including Plaintiff, if the Orchard Park Facility has already effectively been shut down by the time a ruling is entered. Thus, absent a TRO, Plaintiff will be irreparably harmed.

In addition, continuing to discharge patients at the Orchard Park Facility has already begun to chill and will potentially foreclose the possibility of an alternative, value-maximizing transaction for any or all of the Senior Care Facilities, not just the Orchard Park Facility. The

---

[5] The very first mention of any closure timeline came at the second interim hearing in these cases on September 18, 2019, when, only after urging from Landlords' counsel, Debtors' counsel indicated the process would take 60 days.

[6] The Debtors' efforts to implement the Closure Plan are premature in these cases, as their schedules and statements of financial affairs have yet to be filed demonstrating the universe of claims against the Orchard Park Debtor and the Court has yet to make a determination on the appointment of a patient care ombudsman as requested by the Clerk's Office.

Landlords have been contacted by and are in discussions with multiple parties that have expressed strong interest in a transaction to assume operations for one or more of the Skilled Nursing Facilities.  Affidavit at ¶¶ 27, 29.  In fact, the Landlords have made clear on multiple occasions that they are actively negotiating a letter of intent with one party in particular who wishes to replace the Debtors as operator for all seven of the Senior Care Facilities.[7]  *See* DIP Objections; Affidavit at ¶ 28.  This party is an experienced and well-established operator in this industry who is currently operating other facilities in the State of New York, and has been conducting its due diligence on the Senior Care Facilities for approximately 30 days.  Affidavit at ¶ 28.  Unfortunately, however, Defendants' rapid discharge of patients from the Orchard Park Facility, has already changed the trajectory of negotiations and has the potential to chill a transaction altogether.  *Id*.

The Landlords have repeatedly requested that the Defendants delay closure of the Orchard Park Facility in favor of considering a transaction with one or more of these interested parties, or any other potential replacement operator the Debtors may identify.  Closing the Orchard Park Facility now, however, to which the Defendants appear committed, would disrupt and potentially foreclose the possibility of any such transaction.  It should go without saying that a skilled nursing facility's ability to generate revenue derives directly from its patient population.  If most or all of the patients at the Orchard Park Facility are discharged, the value of that facility to any replacement tenant would be drastically reduced, thereby hampering any potential deal.  Skilled nursing facility operators, including those expressing interest in assuming operations of the Debtors' facilities, are interested in turn-key facilities with a robust patient census.  *Id.* at ¶ 30.  A defunct or nearly-empty facility that requires an operator to start from scratch in filling over 200 patients beds—let alone

---

[7] These discussions commenced prepetition and the Debtors were aware of and, in fact, supported these discussions. The Landlords further understand that the Debtors have been in contact with this party in the course of its ongoing due diligence as recently as within the last 10 days.  Affidavit at ¶ 16.  The Landlords welcome and urge the Debtors to participate in discussions with this potential new operator and any other potential new operator.

hiring a new staff, buying new equipment, and incurring other start-up costs (such as licensure and certification, itself a tremendously difficult if not impossible task for a closed facility) is significantly less attractive than acquiring a facility as a going concern. *Id.* As a result, the potential replacement operators interested in the Debtors' facilities have expressed concerns over the efforts to rapidly discharge patients and close the Orchard Park Facility. *Id.* at ¶ 29.

Every discharge of a patient reduces the value of the Orchard Park Facility both in terms of present cash flow and in terms of locating a replacement operator. *Id.* at ¶ 31. If Defendants are permitted to continue to discharge patients from the Orchard Park Facility, its value by the October 3 hearing will be substantially depleted. *Id.* That is textbook waste of a skilled nursing facility and a substantial asset in these Chapter 11 cases. *Id.*

In addition, the Orchard Park Facility is adjoined to an assisted living facility known as Orchard Brooke, which is also leased by an affiliate of Plaintiff to Debtor Absolut at Orchard Brooke, LLC. *Id*. at ¶ 9. Potential new operators are likely to consider the two adjoining facilities to together hold a significantly higher going concern value than each would otherwise hold separately, meaning that the closure of Orchard Park will likely negatively impact the value of Orchard Brooke in particular, because the value of having an adjoining skilled nursing and assisted living facilities is likely greater than the sum of the parts individually. *Id*. at ¶¶ 9, 24. Allowing the Defendants to continue to reduce the Orchard Park Facility's patient population in furtherance of a Closure Plan that has yet to be approved will set an unsettling precedent for any interested replacement tenant, who will likely become hesitant to consider a transaction for one or more of the other Senior Care Facilities.[8]

---

[8] It would also set an unacceptable precedent for this Court, which, if the Debtors' ongoing implementation of the Closure Plan is allowed to continue prior to approval, will likely face the same conduct from other debtors in similar cases in the future.

For the foregoing reasons, absent a TRO and preliminary injunction enjoining Defendants' continued discharge of patients from the Orchard Park Facility, Plaintiff will suffer irreparable harm. However, for the reasons stated above, the harm would not be limited to Plaintiff, but would be borne by the Debtors' estates as well. "Courts in the Second Circuit have recognized a limited exception to the irreparable harm requirement for issuance of a preliminary injunction in the bankruptcy context where the action to be enjoined is one that threatens the reorganization process[.]" *Lyondell Chem Co. v. Centerpoint Energy Gas Servs. (In re Lyondell Chem. Co.)*, 402 B.R. 571, 590 (Bankr. S.D.N.Y. 2009). By implementing the Closure Plan prior to approval and rapidly discharging patients, Defendants are threatening the Debtors' own reorganization process by ignoring promising alternatives that would maximize value.

Moreover, they are pursuing a course of action that would violate the requirement of section 365(d)(3)[9] that, absent court approval, they timely perform all obligations under executory contracts and unexpired leases until assumption or rejection, thereby creating substantial additional claims in the chapter 11 cases, including wind-down and closure costs and the post-petition damages claims of Plaintiff and other contract counterparties for the post-petition breach of their respective agreements, which would be entitled to administrative expense priority.[10] The Debtors' projections and budget in connection with their pending debtor-in-possession financing do not provide or account for any of these costs and claims and, therefore, as a result of their chosen

---

[9] The Debtors are ignoring the requirements of section 365(d)(3) while simultaneously relying on it for the proposition that they are entitled to not pay rent during the first 60 days of these cases.

[10] Though the Debtors have yet to make a motion to reject the Lease, there are numerous continuing, postpetition breaches of and defaults under the Lease, including, in addition to failure to pay rent and among others, (i) failure to continue to operate the business in the ordinary course (Lease, § 19.1(c)), (ii) committing waste on the leased premises (*id.*, § 10.2) and (iii) committing any act that may cause regulatory licenses to be revoked. *See Affidavit* at ¶¶ 10-13; 21-22. Furthermore, the Landlords reserve all rights related to any subsequent rejection efforts, including the right to assert the leases for the Senior Care Facilities constitute a single, integrated agreement that may only be rejected or assumed in full as a single integrated lease. The Landlords assert that the intention of the parties, the subject matter of the leases, and the conduct of the parties demonstrate that the leases were intended to be a single integrated agreement.

direction to date, the Debtors are setting these cases up for administrative insolvency and, indeed, may be administratively insolvent already.

The Defendants and other Debtors are acting intentionally, recklessly, and without regard for their estates, patients, or good business sense.  For these reasons and others, the appointment of a chapter 11 trustee is warranted and the Landlords intend to request such appointment in the near term.  In the meantime, however, a TRO and preliminary injunction are necessary for preventing irreparable harm to Plaintiff and the Debtors' estates as a whole.

### B.  Plaintiff Has Demonstrated A Likelihood Of Success On The Merits

Plaintiff is likely to succeed on the merits of its request for a declaratory judgment that section 363(b)(1) requires notice, a hearing, and this Court's approval *before* Defendants may implement the Closure Plan.  In fact, the "merits" are no longer in dispute as Defendants have already acknowledged and submitted to the requirements of section 363(b)(1) by seeking this Court's approval of the Closure Plan through the filing of the Closure Motion.  In so doing, Defendants have already commenced section 363(b)'s procedure for obtaining approval of transactions outside the ordinary course of business.  Remarkably, however, Defendants are continuing to take  action outside the ordinary course of business prior to this Court's ruling on the Closure Motion by actively taking steps to implement the Closure Plan.  Defendants cannot have it both ways, and must cease implementing the Closure Plan until this Court's ruling.  As a result, there is an actual controversy that justifies and requires a declaratory judgment to protect Plaintiff's rights and interests.  Therefore, Plaintiff is likely to succeed on the merits and obtain its requested declaratory judgment.

When a proposed transaction is outside the ordinary course of the debtor's business, the Bankruptcy Code prohibits the debtor from using property of the estate until creditors and other

parties in interest are given notice and the opportunity to be heard.  *See* 11 U.S.C. § 363(b)(1); *In re Advanced Contracting Sols., LLC*, 582 B.R. 285, 304 (Bankr. S.D.N.Y. 2018) ("[A] debtor and its CRO are not given automatic and advance approval for all their actions. Instead, they must come back to the Court to seek authority as appropriate, including for actions outside the ordinary course of business[.]")

The term "ordinary course of business" has generally been accepted "to embrace the reasonable expectations of interested parties of the nature of transactions that the debtor would likely enter in the course of its normal, daily business." *In re Fairfield Sentry Ltd.*, 539 B.R. 658, 675 (Bankr. S.D.N.Y. 2015), *subsequently aff'd*, 690 F. App'x 761 (2d Cir. 2017) (quoting *Med. Malpractice Ins. Ass'n v. Hirsch* (*In re Lavigne* ), 114 F.3d 379, 384 (2d Cir.1997)) (internal quotations and citations omitted). To determine whether a transaction is an ordinary course transaction, "courts apply the 'vertical' test, which asks whether the transaction subjects creditors to economic risks different from those accepted at the time of contract with the debtor, and the 'horizontal' test, which asks whether the transaction is the type that similar businesses engage in as part of their ordinary business operations." *Id*. "[T]he touchstone of 'ordinariness' is thus the interested parties' reasonable expectations of what transactions the debtor in possession is likely to enter in the course of its business." *Id.* (internal quotations and citations omitted).  Thus, "the Court must examine the debtor's business and similar businesses in the same industry."  *Id.*

Shutting down a healthcare facility and discharging patients at the rate Defendants are doing are clearly outside the ordinary course of business.  It bears repeating that by seeking this Court's approval of the Closure Plan, Defendants have already admitted that all of the foregoing factors are satisfied and that the Closure Plan is outside the ordinary course of business. Defendants have asked for the Court's approval of the Closure Plan.  Now it must wait for it.

Furthermore, the "vertical" and "horizontal" tests are plainly satisfied here. Shutting down the Orchard Park Facility and discharging patients in furtherance thereof satisfies the "vertical" test as it subjects Plaintiff (and all creditors) to "economic risks different from those accepted at the time of contract with the debtor[.]" *Id.* The lease for the Orchard Park Facility was entered into with the expectation that it would be an operating, income-generating skilled nursing facility that would enable Defendants to pay rent. The "horizontal" test is likewise satisfied because rapidly discharging patients and shutting down a healthcare facility are not typical actions taken by healthcare facility operators "as part of their ordinary business operations." *Id.* It is self-evident that ceasing business operations is the opposite of "ordinary business operations" and is clearly well outside "the reasonable expectations of interested parties of the nature of transactions that the debtor would likely enter in the course of its normal, daily business."

In addition, as explained above, numerous chapter 11 healthcare debtors acknowledge the obvious non-ordinariness of closing a healthcare facility by routinely seeking court approval. *See, e.g.*, *In re Saint Vincents Catholic Med. Centers of New York*, 429 B.R. 139 (Bankr. S.D.N.Y. 2010); *In re Spectrum Healthcare LLC et al.*, Case Nos. 16-21365 - 21639 (Bankr. D. Conn. July 12, 2017) (ECF no. 463)*; In re Center City Healthcare, LLC et al.*, Case No. 19-11466 (Bankr. D. Del) (EFC No. 101); *In re St. Mary Hosp.*, 86 B.R. 393 (Bankr. E.D. Pa. 1988).

Closing a skilled nursing facility such as the Orchard Park Facility is a serious endeavor with drastic implications for all parties, including patients, employees, trade vendors and, not least, a landlord such as Plaintiff. It is clearly outside the ordinary course of business, which the Defendants have already acknowledged by filing the Closure Motion. A declaratory judgment is warranted and necessary to establish what Defendants already acknowledge, that they may not implement the Closure Plan before Court approval.

The Declaratory Judgment Act "creates a means by which rights and obligations may be adjudicated in cases involving an actual controversy that has not reached the stage at which either party may seek a coercive remedy, or in which the party entitled to such a remedy fails to sue for it." *In re Old Carco LLC*, 530 B.R. 614, 618 (Bankr. S.D.N.Y. 2015) (quoting *United States v. Doherty*, 786 F.2d 491, 498 (2d Cir.1986)). To demonstrate subject matter jurisdiction, a plaintiff must demonstrate an "actual controversy", which "must be a real and substantial controversy admitting of specific relief through a decree of conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts." *Id.* In determining whether an "actual controversy" exists to support a declaratory judgment, "the question in each case is whether the facts alleged, under all circumstances, show that there is a substantial controversy, between the parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Id.* (citing *Maryland Cas. Co.*, 312 U.S. at 273, 61 S.Ct. 510; *Nike, Inc. v. Already, LLC*, 663 F.3d 89, 95 (2d Cir.2011); *Kidder, Peabody & Co., Inc. v. Maxus Energy Corp.*, 925 F.2d 556, 562 (2d Cir.1991)).

Here, an actual controversy exists, arising from the fact that, despite multiple requests by Plaintiff, Defendants have refused to cease their active implementation of the Closure Plan prior to the hearing on October 3, 2019 where this Court will consider its approval. In doing so, Defendants are acting inconsistently with their own Closure Motion as well as the Bankruptcy Code, demonstrating their apparent (and conflicting) belief that they are permitted to take action outside the ordinary course of business before obtaining the specific approval they are seeking. Plaintiff has repeatedly demanded that Defendants cease such actions unless and until this Court approves the Closure Motion. Defendants have ignored Plaintiff's demands and, upon information and belief, are continuing to discharge patients at the Orchard Park Facility in furtherance of the

Closure Plan.  Because Defendants' actions are taking place *now* and, absent a TRO, will continue

between today and the October 3 hearing, this actual controversy is "of sufficient immediacy and

reality to warrant the issuance of a declaratory judgment."  *Old Carco LLC*, 530 B.R. at 618.  Under

these circumstances, a declaratory judgment is warranted and necessary.

### C.  <u>The Balance of Equities Weighs in Favor of Plaintiff</u>

Here, the balance of equities weighs decidedly in favor of Plaintiff.  Without a TRO and

preliminary injunction, Defendants will continue to rapidly discharge patients, potentially down to

zero, before the Court hears and rules on the Closure Motion.  For the reasons stated herein, this

would cause irreparable harm to Plaintiff, not to mention the Debtors' estates as a whole.  On the

other hand, enjoining the Defendants from acting in a manner that is in violation of section 363 of

the Bankruptcy Code presents no harm to Defendants, but merely forces them to comply with the

Bankruptcy Code.  In fact, enjoining further action pending a ruling on the Closure Motion is likely

to benefit the Debtors' reorganization, as it will facilitate and leave open the possibility of a value-

maximizing transaction with one or more replacement tenants.  Closure is the most harmful action

that can be taken for all parties under the circumstances and it must not occur or be substantially

consummated absent express Court approval.

### D.  <u>Plaintiff Should Not Be Required to Post A Bond</u>

Plaintiff should be excused from the requirement of Rule 65(c) to post a bond.  Such

security is only required "in an amount that the court considers proper to pay the costs and damages

sustained by any party found to have been wrongfully enjoined or restrained." FED. R. CIV. P.

65(c).  Here, there is no scenario in which Defendants could be "found to have been wrongfully

enjoined or restrained" as Plaintiff is merely seeking to enjoin the Defendants from violating the

Bankruptcy Code.  Furthermore, for the reasons stated above, the Defendants and other Debtors

are likely to benefit, not be harmed, by the injunction sought here as it will facilitate one or more valuable alternative transactions.

## **CONCLUSION**

In view of the gravity of the Defendants' actions, their apparent desire to continue to violate the Bankruptcy Code while simultaneously purporting to comply with it by seeking approval of the Closure Motion, and the impending hearing on the Closure Motion on October 3, 2019 with objections due on September 26, 2019, Plaintiff has reasonable concerns that, absent an immediate TRO, the Defendants will continue to rapidly discharge patients prior to the October 3 hearing to the detriment and irreparable harm to Plaintiff.

Based upon the foregoing, Plaintiff respectfully requests that the Court enter Orders granting a temporary restraining order and a preliminary injunction, pursuant to section 105(a) of the Bankruptcy Code and Bankruptcy Rule 7065 enjoining the Defendants from proceeding in any way to implement the Closure Plan with respect to the Orchard Park Facility prior to this Court's approval thereof in violation of 11 U.S.C. § 363.

*[Signature on following page*

Dated:    New York, New York
          September 23, 2019

                      ARENT FOX LLP

                      *Counsel for 6060 Armor Road, LLC*

                      By:    */s/ George P. Angelich*
                                  Andrew I. Silfen
                                  George P. Angelich
                                  Jordana L. Renert
                                  1301 Avenue of the Americas, Floor 42
                                  New York, New York 10019
                                  Telephone: (212) 484-3900
                                  Facsimile: (212) 484-3990
                                  Email: andrew.silfen@arentfox.com
                                              george.angelich@arentfox.com
                                            jordana.renert@arentfox.com