Andrew I. Silfen
George P. Angelich
Jordana L. Renert
ARENT FOX LLP
1301 Avenue of the Americas, Floor 42
New York, NY  10019
Telephone: (212) 484-3900
Facsimile: (212) 484-3990
Email: andrew.silfen@arentfox.com
          george.angelich@arentfox.com
          jordana.renert@arentfox.com

*Counsel for Arba Group*

**UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>Absolut Facilities Management, LLC, *et al.*,<br><br>Debtors. [1] | Chapter 11<br><br>Case No. 19-76260 (AST)<br>Case No. 19-76263 (AST)<br>Case No. 19-76267 (AST)<br>Case No. 19-76268 (AST)<br>Case No. 19-76269 (AST)<br>Case No. 19-76270 (AST)<br>Case No. 19-76271 (AST)<br>Case No. 19-76272 (AST)<br><br>(Jointly Administered) |

**LANDLORDS' (I) MOTION FOR ENTRY OF AN ORDER
APPOINTING CHAPTER 11 TRUSTEE OR, ALTERNATIVELY, AN EXAMINER,
PURSUANT TO SECTION 1104 AND (II) PRELIMINARY OBJECTION TO DEBTORS'
MOTION TO APPROVE PLAN OF CLOSURE FOR ORCHARD PARK FACILITY**

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are: Absolut Facilities Management, LLC (1412); Absolut Center for Nursing and Rehabilitation at Allegany, LLC (7875); Absolut Center for Nursing and Rehabilitation at Aurora Park, LLC (8266); Absolut Center for Nursing and Rehabilitation at Gasport, LLC (8080); Absolut at Orchard Brooke, LLC (1641); Absolut Center for Nursing and Rehabilitation at Orchard Park, LLC (8300); Absolut Center for Nursing and Rehabilitation at Three Rivers, LLC (8133); and Absolut Center for Nursing and Rehabilitation at Westfield, LLC (7924).

Arba Group and its affiliates (collectively, the "Landlords"[2]) for the six skilled nursing facilities and one assisted living facility (collectively, the "Senior Care Facilities") operated by the above-captioned debtors and debtors-in-possession (collectively, the "Debtors"), by and through their undersigned counsel, hereby (i) move for entry of an order appointing a chapter 11 trustee or, alternatively, an examiner for the Debtors (the "Motion") pursuant to section 1104 of title 11 of the United States Code (the "Bankruptcy Code") and (ii) object on a preliminary basis to the *Motion for Entry of Order Approving the Debtors' Plan of Closure for Orchard Park Facility* [Docket No. 51] (the "Closure Motion").[3]  In support hereof, Landlords rely on the *Affidavit of Ira Smedra* (the "Smedra Affidavit") filed in connection with the 6060 Armor Road, LLC's adversary proceeding against the Debtors seeking a temporary restraining order and injunction,[4] and respectfully state as follows:

## PRELIMINARY STATEMENT

1.    The Debtors' hurried, careless, and unauthorized pursuit of their voluntary closure of the Orchard Park Facility and their reckless disregard for the Bankruptcy Code and their estates, creditors, patients, and employees are merely a continuation of a prepetition pattern of bad faith, self-dealing, and conflicted conduct (not to mention gross mismanagement and incompetence) that not only mandates denial of the Closure Motion, but warrants the appointment of a chapter 11 trustee.  In fact, it has come to the Landlords' attention that the Debtors have already discharged nearly 90% of the Orchard Park Facility's patients *without Court approval*.  By taking such drastic steps to implement the Closure Plan prior to this Court's hearing on the Closure Motion, the

---

[2] The Landlords are 292 Main Street, LLC; 6060 Armor Road, LLC; 2178 N. Fifth Street, LLC; 101 Creekside Drive, LLC; 4540 Lincoln Drive, LLC; and 26 Cass Street, LLC.

[3] Capitalized terms used but not defined herein shall have the meanings assigned such terms in the Closure Motion.

[4] *See* Adv. Pro. No. 19-08121 (AST) (the "TRO Action") [Docket No. 2].

Debtors knowingly evade section 363(b)(1) of the Bankruptcy Code. Such a blatant violation is, on its own, grounds for a chapter 11 trustee and denial of the Closure Motion. *See In re Grasso*, 490 B.R. 500, 519 (Bankr. E.D. Pa. 2013) (violation of section 363(b)(1) "constitutes mismanagement and is cause for appointment of a chapter 11 trustee.").

2.     The Landlords have for months attempted to work constructively with the Debtors to construct a solution to the Debtors' prepetition financial issues and failure to pay rent. To that end, the Debtors and Landlords held a meeting in early August 2019 in an attempt to explore alternatives to a bankruptcy filing. There, the Landlords proposed transferring operations to a new operator as a potential alternative to any shut-down and informed the Debtors that they were in discussions with another operator who was interested in a transaction to assume operations of one or more of the Senior Care Facilities.[5]   The Debtors encouraged the continuation of those discussions. In the course of that same meeting, however, the Debtors' principals told the Landlords that a bankruptcy filing and closure could be avoided if they would simply pay $10 million to or for the benefit of the Debtors' owner and CEO (and now DIP lender), Israel Sherman.

3.     The Landlords did not accept the "offer." Now, almost two months later, the Debtors have nearly emptied the Orchard Park Facility. In fact, the Landlords understand that, as of September 25, 2019, the Orchard Park Facility, which housed 180 patients as of August 15, 2019, *is now down to only approximately 20 remaining patients*. This is a disturbingly different state of affairs from Debtors' counsel representation to the Court at the September 18 hearing that fully discharging patients and closing the facility would take approximately 60 days. The Debtors have done all of this without (i) obtaining approval under section 363 of the Bankruptcy Code; (ii)

---

[5] Such a meeting with the Debtors has occurred in the past. Approximately two years ago, the Landlords were approached by Mr. Sherman concerning 5 other underperforming facilities, which were eventually transitioned to a replacement operator rather than closed.

AFDOCS/20973768.5

engaging with the Landlords, other creditors, or community stakeholders; or (iii) giving *any* consideration to strategic alternatives that might prevent a wholesale shut-down and displacement of patients[6] and employees, and allow the Orchard Park Facility to continue as a going-concern to the benefit of the estate and creditors.

4.      Shutting down a nursing home is a serious endeavor with drastic implications for numerous stakeholders.  But the Debtors have not taken this process seriously and have shown little interest in exercising their fiduciary duties.  For that very reason, and because the Debtors have apparently made substantial progress towards effectively implementing the Closure Plan *before* the Court has even held a hearing to approve their motion allowing them to implement the Closure Plan, the Landlords were compelled to separately commence an adversary proceeding seeking to temporarily restrain the Debtors from their efforts to discharge patients and shut down the Orchard Park Facility at least until the October 3 hearing.  *See generally*, TRO Action.  That such a costly effort was even required of the Landlords is unfortunate, as Landlords' counsel made multiple prior requests that the Debtors halt closure efforts pending the hearing.  But the Debtors ignored those entreaties.  The Debtors' callous conduct in connection with their attempted closure of the Orchard Park Facility makes clear that they are completely incapable of, and indeed disinterested in, exercising their fiduciary duties as debtors-in-possession.  Since the Debtors appear unwilling to protect their estates, patients, and employees, the Court should appoint a chapter 11 trustee to do so.

5.      Accordingly, the Landlords respectfully request that the Court appoint a chapter 11 trustee for the Debtors' estates, deny the Closure Motion, and halt further closure proceedings to allow the trustee to engage with all stakeholders, explore strategic alternatives, and eventually

---

[6] All of which is occurring prior to the Court's appointment of a patient care ombudsman pursuant to 11 U.S.C. § 333.

present to the Court a disinterested proposal regarding the future of the Orchard Park Facility and the other Senior Care Facilities.  At a minimum, the Court should appoint a trustee for the Debtor Absolut Center for Nursing and Rehabilitation at Orchard Park, LLC (the "OP Debtor") and Debtor Absolut at Orchard Brooke, LLC (the "OB Debtor") before the last patient is discharged to avoid the irrevocable harm the Debtors are committed to causing.

6.    If the Court does not appoint a trustee (and it should), further closure proceedings should be halted and an examiner appointed to investigate (a) whether the Orchard Park Facility should be closed or if an alternative exists that benefits all parties, and (b) the circumstances surrounding, and any claims arising from, the decisions of the Debtors and their directors, officers, owners, professionals, and independent advisor that led to implementation of the Closure Plan and rapid discharge of patients from the Orchard Park Facility without this Court's approval in violation of section 363 of the Bankruptcy Code.

7.    Even if the Court is unwilling to appoint a trustee or examiner at this time, the Court should deny the Closure Motion, halt further closure proceedings, and direct the Debtors to comply with specific guidelines for fulfilling their fiduciary duties with respect to the Orchard Park Facility.  Those guidelines must require, at least:  (a) a good faith effort to explore potentially value-maximizing strategic alternatives to closure of the Orchard Park Facility, including engaging with the Landlords and potential replacement operators; (b) offering discharged patients the opportunity to return to the Orchard Park Facility and (c) if, in the exercise of their reasonable business judgment, the Debtors continue to believe closure is in the best interests of their estates, renew their request for approval of the Closure Plan, which must:  (i) give adequate notice to all interested parties, including patients; (ii) provide the Court and *all parties in interest* with the full Closure Plan (redacted only as necessary to protect confidential patient information); and (iii)

supply a detailed evidentiary record supporting closure, none of which has been provided thus far.

## BACKGROUND

8.      One of the Landlords' affiliates, 6060 Armor Road, LLC ("Armor Road"), leases a skilled nursing facility located at 6060 Armor Road, Orchard Park, New York (the "Orchard Park Facility"), to the OP Debtor.

9.      The Orchard Park Facility has 202 patient beds.  According to the Closure Plan provided to the Landlords on September 24, 2019, the Orchard Park Facility had approximately 180 patients occupying beds as of August 15, 2019.

10.     In addition, Armor Road leases an adjoining assisted living facility, Orchard Brooke, to the OB Debtor.  *Id.* at ¶ 9.  There is access between the Orchard Brooke assisted living facility and the Orchard Park Facility.  *Id.*  As a result, potential new operators are likely to consider the two adjoining facilities together hold a significantly higher going concern value than each would otherwise hold separately.  *Id.* at ¶¶ 9, 24.

11.     On September 10, 2019 (the "Petition Date") each of the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

12.     On September 11, 2019, the Debtors filed the *Declaration of Michael Wyse in Support of Debtors' Chapter 11 Petition and First Day Motions* [Docket No. 15], which stated:

> The Debtors intend to use these Chapter 11 Cases to evaluated [*sic*] their leases and other obligations and, to the extent possible, *restructure them in a way that will afford the Debtors an opportunity to emerge from bankruptcy, with all of their Senior Care Facilities intact, as a going concern.*

*Id.* at ¶ 29 (emphasis added).

13.     Several hours later, on September 11, 2019, the Debtors filed the *Supplemental Declaration of Michael Wyse Regarding Closure of Orchard Park Facility* [Docket No. 20], disclosing that a voluntary plan of closure for the Orchard Park Facility (the "Closure Plan") was

approved by the New York State Department of Health (the "<u>DOH</u>") on September 11, 2019 and that the Debtors intended to move forward with the Closure Plan "immediately."

14.    During the second interim hearing in these cases on September 18, 2019, Landlords' counsel asked Debtors' counsel on the record whether the Debtors were taking active steps to implement the Closure Plan, to which Debtors' counsel responded in the affirmative. Debtors' counsel further stated he did not believe it was necessary to seek this Court's approval of any closure.   Landlords' counsel stated on the record that he believed such a motion was, in fact, necessary, given that the closure of a healthcare facility is outside the ordinary course of business and therefore requires court approval under section 363(b)(1) of the Bankruptcy Code.

15.    On September 20, 2019, the Debtors filed the Closure Motion, in which the Debtors reiterated their belief that Court approval is unnecessary.   Closure Motion at ¶ 2.   The Closure Motion does not attach the Closure Plan, and a copy of the Closure Plan was provided to Landlords' counsel for the first time on September 24, 2019, or approximately one week after the Landlords requested and the Court directed that it be provided.   Neither does the Closure Motion provide a detailed summary of the Closure Plan or explain whether any strategic alternatives were explored.   Finally, in derogation of Bankruptcy Rule 2002, which requires 21 days' notice of a section 363(b) application on all creditors, the Debtors did not file a motion for an expedited hearing or file a certificate of service for the Closure Motion showing service to all creditors. Instead, the Closure Motion states that notice was provided only to the Office of the United States Trustee, secured creditors, the Landlords, parties who have "formally appeared and requested notice", and "governmental agencies having a regulatory or statutory interest."   The Debtors omit which agencies received notice, an important detail in light of the broad-ranging governmental and regulatory interests in skilled nursing facilities.   Critically, the Landlords are concerned that at

7

least notice, and possibly consent, is required from the United States Department of Housing and Urban Development ("HUD"). And nowhere in the Closure Motion is there any mention of service of the Closure Motion on patients that are still in the Orchard Park Facility or have already been relocated.

16.     Between the Petition Date and the filing of the Closure Motion on September 20, 2019, the Debtors, upon information and belief, discharged no fewer than 60-70 patients from the Orchard Park Facility in furtherance of the Closure Plan, notwithstanding the fact that they have yet to obtain this Court's approval. According to the Closure Motion, the Orchard Park Facility ceased admitting new patients as of August 15, 2019. Closure Motion at ¶ 11. Landlords' counsel was recently informed that, as of September 25, 2019, only 20 patients remained at the Orchard Park Facility.

17.     The Closure Motion suggests that patients will be transferred to another of the Debtors' Senior Care Facilities. *Id.* ("The Closure Plan also calls for personnel at the Orchard Park [*sic*] to solicit residents' preferences for alternative long-term placement at nearby facilities of the Debtors."). Indeed, the Debtors bolster this suggestion in their reply to the Landlords' requested TRO in support of the alleged "benefits of closing Orchard Park to [the Debtors'] other facilities." *See* TRO Action [Docket No. 8] at ¶ 21 ("For example, many residents of Orchard Park moved to the Debtors' Aurora Park facility, which will increase the Debtors' income, while at the same time reducing expenses."). Transferring patients to another Debtor facility, however, is not contemplated in the Closure Plan. *See* Closure Plan, § 11. Moreover, recent reports indicate that, at a minimum, approximately 50 Orchard Park Facility patients had been transferred to other facilities not operated by the Debtors as of September 19, 2019.[7]

---

[7] https://www.bizjournals.com/buffalo/news/2019/09/19/mcguire-group-elderwood-take-in-displaced-nursing.html

18.     Both prior to and after the Petition Date, the Landlords have been in discussions with multiple parties expressing strong interest in a transaction to assume operations for the Orchard Park Facility and the other Senior Care Facilities.  Most of these parties are interested in assuming the operation of all of the Debtors' Senior Care Facilities, provided those facilities are operating at the time of assumption.  Smedra Affidavit at ¶ 27.

19.     One such party has conducted substantial due diligence for more than one month and is very close to signing a Letter of Intent.  This potential operator is experienced and well-established in the industry.  *Id.* at ¶ 16.  Importantly, the Debtors are well aware of the status of discussions with this party as there have been ongoing discussions between the Debtors and such party regarding the due diligence for weeks.  *Id.*  Indeed, the Landlords understand this party has made at least one site visit to the Orchard Park Facility, where they engaged directly with OP Debtor personnel.  Unfortunately, the Debtors' efforts to rapidly discharge patients has already changed the trajectory of negotiations and has the potential to chill a transaction altogether.  *Id.* at ¶ 28.  In addition, multiple other interested parties have expressed concerns over the Debtors' efforts to rapidly discharge patients and close the Orchard Park Facility.  *Id.* at ¶ 29.

20.     In addition, in August 2019, the Landlords, Debtors, and their respective counsel engaged in discussions regarding the Debtors' substantial accruing payment defaults and the possibility of a new replacement operator. *Id.* at ¶ 16. In the course of those discussions, the Debtors' management indicated that, if the Landlords were to pay $10,000,000 to the Debtors' owner and CEO, Israel Sherman, the Debtors would not commence a bankruptcy filing or close their Senior Care Facilities because, according to Mr. Sherman, that was the value of his interest in the facilities.  *Id.*

AFDOCS/20973768.5

## **CLOSING A HEALTHCARE FACILITY**

21.    The Debtors are implementing a voluntary postpetition closure of the Orchard Park Facility, which was approved by DOH postpetition and is plainly outside the ordinary course of business, without seeking Court approval under section 363(b)(1).  The Debtors ultimately filed the Closure Motion only after being after being confronted by a motion from Landlords' counsel to prohibit closure.  Even as they sought Court approval, the Debtors reiterate in their Closure Motion that they "do not believe Court approval is necessary to implement the Closure Plan" and "have been implementing the Closure Plan."  Closure Motion at ¶¶ 3, 12.  Indeed, the Debtors' implementation of the Closure Plan involved rapidly discharging patients all the way down to 20 patients (and now likely less) and ignoring the Landlords' requests to cease implementation at least until the October 3 hearing.  Contrary to the Debtors' cavalier and dismissive posture toward the requirements of section 363 of the Bankruptcy Code, however, healthcare debtors routinely seek bankruptcy court approval when they wish to close a facility.  They do so because it is common sense that shutting down a facility is the opposite of "ordinary course of business."  And in fact, unlike these Debtors, bankruptcy courts take shutting down facilities quite seriously.

22.    When considering motions to close healthcare facilities, bankruptcy courts routinely acknowledge the gravity of such action and the heavy burden borne by a debtor seeking its approval:

> [T]he process of winding down the Hospital has been done in a procedurally proper manner.  The Debtors have been open at all hearings and in all their papers about their dire financial condition.  The efforts to save St. Vincent's Hospital have been widely reported in the media and documented in court papers. The Court is saddened by the closing of this historic Hospital that has provided so many services to so many people for more than 150 years.

*In re Saint Vincents Catholic Med. Centers of New York*, 429 B.R. 139, 152 (Bankr. S.D.N.Y. 2010) (noting the extent of the record established by moving debtors); *In re Spectrum Healthcare*

*LLC et al.*, Case Nos. 16-21365 - 21639 (Bankr. D. Conn. July 12, 2017) [ECF No. 463] (approving closure of nursing home facilities but noting "the Court has struggled with the toll that closing the Facilities might inflict upon the residents, who are among our most vulnerable citizens, and the employees, who have devoted skill, time and humanity to their service").  The Bankruptcy Court for the Southern District of New York also has commented on the gravity of closing a healthcare facility and the debtor's heavy burden, noting some of the documentation that must be provided in connection with such a closure:

> The closing of any medical facility in a big city is almost certain to generate intense and emotional opposition from doctors, other hospital staff and affected local community groups.  The Court must be sensitive to such pressures and must grant time and attention to the objecting community voices.  *Most important, the debtors must provide the Court with a comprehensive, well-documented record of affidavits and supporting exhibits demonstrating to the press, politicians and the public the economic or other facts of life requiring closure.* (emphasis added).

*In re Saint Vincents Catholic Med. Centers of New York*, 2007 WL 2492787, at *21 (Bankr. S.D.N.Y. Aug. 29, 2007).

23.    In fact, contrary to the Debtors' unsupported assertion that "[i]t appears that no court has required a debtor to continue operating a facility or any other type of operation" (Closure Motion at ¶ 15), courts have delayed and even denied closure when a debtor has failed to provide sufficient detail regarding their closure plan or when they have failed to explore strategic alternatives.  *See In re Center City Healthcare, LLC et al.*, Case No. 19-11466 (Bankr. D. Del) [ECF No. 101] (delaying determination on motion to approve closure of Hahnemann University Hospital until debtor discloses plans and engages in discussions with interested parties); *In re St. Mary Hosp.*, 86 B.R. 393 (Bankr. E.D. Pa. 1988) (enjoining hospital closure and ordering debtor to explore alternatives to closure with interested parties).

24.    Separately from the specific issues unique to healthcare facilities, case law in this circuit clearly mandates that the Closure Plan is outside the ordinary course of business and, thus,

requires court approval under section 363(b)(1) of the Bankruptcy Code.  To determine whether a transaction is an ordinary course transaction, "courts apply the 'vertical' test, which asks whether the transaction subjects creditors to economic risks different from those accepted at the time of contract with the debtor, and the 'horizontal' test, which asks whether the transaction is the type that similar businesses engage in as part of their ordinary business operations." *In re Fairfield Sentry Ltd.*, 539 B.R. 658, 675 (Bankr. S.D.N.Y. 2015), *subsequently aff'd*, 690 F. App'x 761 (2d Cir. 2017) (quoting *Med. Malpractice Ins. Ass'n v. Hirsch* (*In re Lavigne*), 114 F.3d 379, 384 (2d Cir.1997)).  "[T]he touchstone of 'ordinariness' is thus the interested parties' reasonable expectations of what transactions the debtor in possession is likely to enter in the course of its business." *Id.* (internal quotations and citations omitted).

25.    Shutting down the Orchard Park Facility and discharging patients in furtherance thereof satisfies the "vertical" test as it subjects the Landlords (and all creditors) to "economic risks different from those accepted at the time of contract with the debtor[.]" *Id.*  The lease for the Orchard Park Facility was entered into with the expectation that it would be an operating, income-generating skilled nursing facility that would enable Defendants to pay rent.  The "horizontal" test is likewise satisfied because rapidly discharging patients and shutting down a healthcare facility are not typical actions taken by healthcare facility operators "as part of their ordinary business operations." *Id.*  It is self-evident that ceasing business operations is the opposite of "ordinary business operations" and is clearly well outside "the reasonable expectations of interested parties of the nature of transactions that the debtor would likely enter in the course of its normal, daily business."

## MOTION FOR APPOINTMENT OF CHAPTER 11
## <u>TRUSTEE OR, IN THE ALTERNATIVE, AN EXAMINER</u>

26.     A trustee is warranted as a result of the Debtors' and Mr. Sherman's self-dealing, bad faith, incompetence, and gross mismanagement.  In fact, by intentionally and rapidly implementing the non-ordinary-course Closure Plan before the Court has even had an opportunity to hear and consider the Closure Motion, the Debtors knowingly violate section 363(b)(1), which is itself sufficient grounds for a trustee.  *See In re Grasso*, 490 B.R. 500, 519 (Bankr. E.D. Pa. 2013) (violation of section 363(b)(1) "constitutes mismanagement and is cause for appointment of a chapter 11 trustee.").  Moreover, the impact of the Debtors' actions on their patients must not be overlooked.  The Orchard Park Facility is not just a "facility" the Debtors should be allowed to simply "close" because it no longer suits equity's near term financial goals.  The "facility" is a home to these patients, who likely chose to live at the Orchard Park Facility in the first place because it was in or near their hometown, families, friends, or community.  The Debtors, however, abusing the cover of the Bankruptcy Court and Bankruptcy Code, have chosen to alter those lives without so much as following the most basic rules of the Bankruptcy Code.  This must be called what it is: a bold belief that the Debtors' powers and authority supersede those of the Court.

27.     Thus, the Court should appoint a chapter 11 trustee for the Debtors' estates, or, at minimum, the Court should appoint a trustee for the OP Debtor and the OB Debtor.  Since the Debtors are disinterested in operating the Orchard Park Facility, a trustee should be appointed to do so.  Alternatively, the Court should appoint an examiner to conduct an investigation of the facts and circumstances detailed in this motion.

28.     Either subsection (a)(1) <u>or</u> subsection (a)(2) of § 1104(a) must be satisfied to warrant the appointment of a chapter 11 trustee.  *See* 11 U.S.C. § 1104(a).  The facts of this case, for the reasons set forth below, satisfy both subsections.

AFDOCS/20973768.5

29.    Section 1104(a) of the Bankruptcy Code provides as follows:

At any time after the commencement of the case but before confirmation of a plan, on request of a party in interest or the United States Trustee, and after notice and a hearing, the court <u>shall</u> order the appointment of a trustee –

(1)  for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause, but not including the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor;

(2)  if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate, without regard to the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor; <u>or</u>

(3)  if grounds exist to convert or dismiss the case under section 1112, but the court determines that the appointment of a trustee or an examiner is in the best interest of creditors and the estate.

11 U.S.C. § 1104(a) (emphasis added).

30.    Subsection (a)(1) of section 1104 mandates the appointment of a trustee when "cause" to do so is present, and a determination that such cause exists lies within the province of the Court. *In re North American Communications, Inc.*, 138 B.R. 175, 178 (W.D. Pa. 1992) (citing *Comm. of Dalkon Shield Claimants v. A.H. Robins Co.*, Inc., 828 F.2d 239, 242 (4th Cir. 1987)). However, even where "cause" does not exist, section 1104(a)(2) creates a flexible standard which allows the Court to appoint a trustee when it is in the best interests of the creditors and the estate. *In re Sharon Steel*, 871 F.2d 1217, 1226 (3d Cir. 1989); *In re Microwave Prods. of America*, 102 B.R. 666, 671-73 (Bankr. W.D. Tenn. 1989).

31.    Incompetence and gross mismanagement are the most common grounds for appointment of a trustee for "cause" under Section 1104(a)(1) of the Bankruptcy Code.  *Id.* (citations omitted); *see also Boineau's Inc. v. Boineau (In re Boineau's, Inc.)*, No. 90-1165, 1992 U.S. App. LEXIS 3447, at *2 (4th Cir. Mar. 3, 1992).  The language of section 1104(a)(1) does

14

not promulgate an exclusive list of causes for which a trustee must be appointed.  *In re Marvel Entm't Group, Inc.*, 140 F.3d 463, 472 (3d Cir. 1998).  It has been recognized by other courts that the language "or similar cause" in section 1104(a)(1), encompasses a wide range of conduct, and must be made on a case-by-case basis.  *In re Sharon Steel Corp.*, 871 F.2d at 1226.

32.    Section 1104(a)(2) of the Bankruptcy Code considers the best interest creditors and thus "the factors constituting a basis for appointing a trustee under §1104(a)(2) are amorphous, diverse and necessarily involve a great deal of judicial discretion."  *In re V. Savino Oil & Heating Co., Inc.*, 99 B.R. 518, 527 n.11 (Bankr. E.D.N.Y. 1989).  Courts will leave a debtor in possession only "upon an assurance that the officers and managing employees can be depended upon to carry out the fiduciary responsibilities of a trustee."  *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 355 (1985).

33.    Thus, where management suffers from material conflicts of interest in performing their fiduciary duties, an independent trustee should be appointed under § 1104(a)(2).  *In re Euro-American Lodging Corp.*, 365 B.R. 421, 428 (Bankr. S.D.N.Y. 2007).  In addition, the appointment of a trustee under Section 1104(a)(2) is justified when the loyalty of the debtor's management is substantially called into question by its many competing business interests favoring the debtor's management and equity holders, thereby causing its creditors to lose confidence in management's abilities to reach a successful reorganization.  *See In re Concord Coal Corp.*, 11 B.R. 552, 554 (Bankr. S.D. W. Va. 1981); *In re Cardinal Indus.*, 109 B.R. 755, 766 (Bankr. S.D. Ohio 1990) (loss of confidence in the debtor has been held to constitute sufficient cause to appoint a trustee).

A.    <u>A Trustee is Warranted Under Section 1104(a)(1) or (a)(2)</u>

34.    Here, the Debtors have exhibited incompetence, gross mismanagement, bad faith, and self-dealing, thereby establishing "cause" for appointment of a chapter 11 trustee under section

15

1104(a)(1). In addition, appointment of a trustee or, alternatively, an examiner is certainly in the best interests of the Debtors' estates, creditors, and all stakeholders under section 1104(a)(2).

### 1. *Conflicts of Interest and Self-Dealing*

35. The Debtors' efforts to rapidly and recklessly implement the Closure Plan are merely a continuation of the prepetition self-dealing of Mr. Sherman, the Debtors' owner, CEO, and now DIP lender. As the Debtors mention in their reply to the Landlords' objections to post-petition financing [Docket No. 40], the Debtors and Landlords held a meeting in early-August 2019, the purpose of which was to explore alternatives to the exact situation the parties find themselves in now: a bankruptcy and potential closure of facilities. By requesting a $10 million payment from the Landlords for the benefit of Mr. Sherman (not the Debtors) in exchange for avoiding a bankruptcy filing and closure of the Senior Care Facilities, Mr. Sherman demonstrated that: (i) in his operation and management of the Debtors, he is placing his own self-interest above the interests of the Debtors', their estates, patients, and employees and (ii) Mr. Sherman apparently did not believe that closure of the Orchard Park Facility or any of the Senior Care Facilities was in fact necessary. The Landlords did not make the requested payment and, as the Landlords learned only after these cases were filed, the Debtors commenced the Closure Plan on August 15, 2019.

36. In light of Mr. Sherman's actions and the Debtors' complete unwillingness to explore an alternative transaction that would allow the Orchard Park Facility to continue as a going-concern, it appears that Mr. Sherman's and the Debtors' efforts to move forward with and implement the Closure Plan even before this Court's approval are motivated by, rather than any necessity, a vindictive attempt to strip the Landlords of the value of their bargained-for contractual arrangement with the Debtors. The Landlords have repeatedly requested that the Debtors delay closure of the Orchard Park Facility in favor of considering a transaction with one or more

interested new operators identified by the Landlords, or any other potential replacement operator the Debtors may identify. But the Landlords' requests have been ignored.

37.    Mr. Sherman is far too conflicted and self-interested to be allowed to remain in control. His prepetition business judgment was clearly conflicted and self-interested and was the impetus for commencing the Closure Plan. If a trustee is not appointed, Mr. Sherman will only continue to run the Debtors for his own benefit. Thus, Mr. Sherman cannot "be depended upon to carry out the fiduciary responsibilities of a trustee." *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. at 355. By demanding $10 million from the Landlords for his own benefit, rather than the Debtors, he has made his loyalties clear. He is after his own benefit, and an independent trustee is required to ensure that the interests of the estates and creditors are prioritized over those of management and equity. *See In re Euro-American Lodging*, 365 B.R. at 428; *In re Concord Coal*, 11 B.R. at 554; *In re Cardinal Indus.*, 109 B.R. at 766.

**2.    *The Grossly Mismanaged, Unauthorized, and Bad Faith Closure Process***

38.    The Debtors' entire process in attempting to close the Orchard Park Facility, beginning prepetition, has defied good business sense, ignored value-maximizing alternatives, disregarded the interests of patients and employees, and flouted the Bankruptcy Code. The Debtors have acted more than negligently and irresponsibly; they have acted in bad faith.

39.    Despite their knowledge of multiple parties interested in pursuing a transaction to assume operations of the Senior Care Facilities, including the Orchard Park Facility, the Debtors have rushed to closure without regard to the consequences for all stakeholders. The Closure Motion does not even mention any exploration of strategic alternatives, such as a sale to a replacement operator. Rather, the Debtors seek to run straight to closure, ignoring the requests of the Landlords to consider a transaction with one of the interested operators they have already

17

identified.  Closing the Orchard Park Facility now will likely foreclose any salvaging transaction that would allow it to continue operating as a going-concern under a new operator.  Skilled nursing facility operators, including those expressing interest in assuming operations of the Debtors' facilities, are interested in taking over operating facilities with a robust patient census.  Smedra Affidavit, at ¶ 30.  If the Orchard Park Facility is closed, the value of that facility to any replacement tenant would be drastically reduced, thereby hampering any potential deal.  A closed facility that requires an operator to start from scratch in filling over 200 patients beds—let alone hiring a new staff, buying new equipment, and incurring other start-up costs (such as licensure and certification, itself a tremendously difficult if not impossible task for a closed facility) is significantly less attractive than acquiring a facility as a going concern.  *Id.*  As a result, the potential replacement operators interested in the Debtors' facilities have expressed concerns over the efforts to rapidly discharge patients and close the Orchard Park Facility.  *Id.* at ¶ 29.

40.    In addition, most of the potential new operators are interested in a transaction to assume operations of all of the Senior Care Facilities.  *Id.* at ¶ 27.  The Landlords are concerned that closing one of the facilities altogether will chill interest in a potential transaction for the remaining Senior Care Facilities.  Notably, the Orchard Park Facility has the second highest bed capacity of all of the Debtors' Senior Care Facilities, making it an especially attractive piece of the entire portfolio to interested parties.  Thus, closing the Orchard Park Facility may sabotage an alternative transaction.  In addition, because the Orchard Park Facility is adjoined to Orchard Brooke assisted living facility, potential new operators are likely to consider the two adjoining facilities together to hold a significantly higher going concern value than each would otherwise hold separately.  In other words, closing Orchard Park will likely negatively impact the value of Orchard Brooke in particular, because the value of having an adjoining skilled nursing and assisted

living facilities is likely greater than the sum of the parts individually.  *Id*. at ¶¶ 9, 24.

41.    Thus, implementing the Closure Plan would foreclose the possibility of a potential value-maximizing deal for the Orchard Park Facility, and damage the prospects of a deal for any or all of the other Senior Care Facilities.  This course of action not only defies good business sense, but is negligent and irresponsible.   The Debtors and their management are plainly not interested in operating the Orchard Park Facility or acting in the best interests of their estates, employees, or patients.  Therefore, a trustee should be appointed to do so.

42.    Moreover, in their efforts to implement the closure of the Orchard Park Facility, the Debtors and their managers have intentionally evaded and, at best, blatantly disregarded the strict requirements of the Bankruptcy Code.  They are picking and choosing which Bankruptcy Code provisions are applicable to them based on self-manufactured exigencies and conditions that would be well within a reasonable debtor-in-possession's control.   Specifically, the Debtors attempted to implement their Closure Plan, which is plainly outside the ordinary course of business, without involving the Bankruptcy Court and other parties-in-interest.  They only filed the Closure Motion after being confronted by a motion from Landlords' counsel to prohibit closure.  Even after filing the Closure Motion, however, the Debtors have been actively and rapidly discharging patients at the Orchard Park Facility in furtherance of the Closure Plan and outside the ordinary course of business.  The Debtors already acknowledged and submitted to the requirements of section 363(b)(1) by seeking this Court's approval of the Closure Plan through the filing of the Closure Motion.  In so doing, the Debtors commenced section 363(b)'s procedure for obtaining approval of transactions outside the ordinary course of business.  *At the same time, however*, the Debtors continued to take the non-ordinary-course actions of which they sought approval prior to this Court's ruling on the Closure Motion.

AFDOCS/20973768.5

43.    The Debtors should not be permitted to have it both ways.  The Landlords thus commenced the TRO Action to halt the Debtors' rapid discharge of patients prior to approval by this Court, arguing, among other things, that absent a TRO, the Court's consideration of the Closure Motion would be rendered moot.  TRO Action [Docket No. 3].  Indeed, the Debtors' conduct to date indicates that was exactly their intent.  They must be held accountable for their knowing and willful violation of section 363(b)(1), a violation that supports and even necessitates the appointment of a trustee to pursue remedial action.  Violation of section 363(b)(1) "constitutes mismanagement and is cause for appointment of a chapter 11 trustee." *In re Grasso*, 490 B.R. 500, 519 (Bankr. E.D. Pa. 2013); *see also In re AG Service Centers, L.C.*, 239 B.R. 545, 550 (Bankr.W.D.Mo.1999) ("Section 1104(a)(1) does not specifically list 'noncompliance with court orders' or 'failure to comply with the Bankruptcy Code' as causes for the appointment of a trustee, but such conduct clearly falls within the scope circumscribed by the statute—either as a 'similar cause' or as a permutation of 'incompetence, or gross mismanagement.'").

44.    In addition, by ceasing operations at the Orchard Park Facility, the Debtors continue to violate the requirement of section 365(d)(3)[8] that, absent court approval, they timely perform all obligations under executory contracts and unexpired leases until assumption or rejection.  The Debtors have violated section 365(d)(3) since the beginning of these cases by failing to pay rent without Court approval.[9]  Debtors' counsel indicated at the first day hearing that they would be filing a motion seeking 365(d)(3) approval imminently, but they have not done so.[10]

---

[8] The Debtors are ignoring the requirements of section 365(d)(3) while simultaneously relying on it for the proposition that they are entitled to not pay rent during the first 60 days of these cases.

[9] Rent for the Senior Care Facilities was due on September 15, 2019.

[10] Though the Debtors have yet to make a motion to reject the lease for the Orchard Park Facility, there are numerous continuing, postpetition breaches of and defaults under the Lease, including, in addition to failure to pay rent and among others, (i) failure to continue to operate the business in the ordinary course (Lease, § 19.1(c)), (ii) committing waste on the leased premises (*id.*, § 10.2) and (iii) committing any act that may cause regulatory licenses to be revoked (*id.*, § 10.1).  *See Affidavit* at ¶¶ 10-13; 21-22.  Furthermore, the Landlords reserve all rights related to any subsequent

20

### 3.    *Operational Gross Mismanagement and Incompetence*

45.    The Debtors' incompetence and gross mismanagement are further demonstrated by the Senior Care Facilities' dismal reputations in their communities.  *See*, *e.g.*:

- "*Inside one of WNY's worst nursing homes: Absolut at Aurora Park*": https://buffalonews.com/2018/11/18/inside-one-of-wnys-worst-nursing-homes-absolut-at-aurora-park/ (discussing Aurora Park and its "troubled history", and noting: "For four years, the Absolut nursing home has been one of the lowest-rated in Erie and Niagara counties and among the lowest-rated in New York.");

- "*Absolut Care sells four area nursing homes*": https://buffalonews.com/2018/04/27/absolut-care-sells-four-area-nursing-homes/ ("Absolut Care has been cited by the government for quality issues and violations, even leading to fines.");

- "*16 of the nation's worst-rated nursing homes located in western New York*":  https://www.wkbw.com/news/local-news/16-of-the-nations-worst-rated-nursing-homes-located-in-western-new-york (listing 2 Debtor facilities among the 16-most poorly rated nursing homes in the State of New York).

46.    The Debtors should have responded to their poor ratings and citations by taking corrective action to improve their patient care.  Instead, they have continued to provide subpar services.  The Debtors' subpar operations and patient care are borne out by their poor ratings from

---

rejection efforts, including the right to assert the leases for the Senior Care Facilities constitute a single, integrated agreement that may only be rejected or assumed in full as a single integrated lease.  The Landlords assert that the intention of the parties, the subject matter of the leases, and the conduct of the parties demonstrate that the leases were intended to be a single integrated agreement.

the U.S. Centers for Medicare & Medicaid Services, undercutting the unsupported statement by the CRO in the first day declaration [Docket No. 15] that the Senior Care Facilities "obtain[ed] a 97% satisfaction rate for their rehabilitation services." *Id*. ¶ 5. Specifically, the Medicare.gov database provides "Overall Ratings" of one star (out of five possible stars, or "Much Below Average") for four of the seven Senior Care Facilities, including the Orchard Park Facility. For example, the Orchard Park Facility received the following ratings:

- Overall Rating: 1 star ("Much Below Average")
- Health Inspections: 1 star ("Much Below Average")
- Staffing: 2 stars ("Below Average")
- Quality Measures: 3 stars ("Average")[11]

47.    Furthermore, by recklessly pursuing closure, the Debtors are creating substantial additional claims in the chapter 11 cases, including wind-down and closure costs and the post-petition damages claims of the Landlords and other contract counterparties for the post-petition breach of their respective agreements, which would be entitled to administrative expense priority. The Debtors' projections and budget in connection with their pending debtor-in-possession financing do not provide or account for any of these costs and claims and, therefore, as a result of their chosen direction to date, the Debtors are setting these cases up for administrative insolvency and, indeed, may be administratively insolvent already.[12]    The Debtors should be required to immediately segregate funds sufficient for payment of rent for the Orchard Park Facility.

48.    As a result of the Debtors' gross mismanagement and incompetence, evidenced by their poor operating track record and plain lack of interest in operating the Orchard Park Facility,

---

[11]  Medicare's ratings for the Debtors' facilities may be viewed at:
https://www.medicare.gov/nursinghomecompare/results.html#state=NY&lat=0&lng=0&name=absolut

[12] In fact, Capital Finance, LLC has made it clear multiple times that it does consent to the use of its cash collateral for the Orchard Park Facility.  [Docket Nos. 60, 63].

as well as management's self-dealing, a trustee is warranted under § 1104(a), either for "cause" or for the benefit of the estates and creditors.

49.     If the Court is unwilling to appoint a chapter 11 trustee for all of the Debtors (and one should be), the Landlords respectfully request that a trustee be appointed for the OP Debtor and the OB Debtor to evaluate the Orchard Park Facility's condition, prospects, and all strategic alternatives to closure and to make a reasoned, unbiased determination as to the proper course forward.

### B.     Alternatively, an Examiner Should Be Appointed

50.     If the Court does not appoint a chapter 11 trustee (which it should), an examiner should be appointed.  Section 1104(c)(1) of the Bankruptcy Code provides that a Court *shall* order the appointment of an examiner to conduct an investigation of the debtor as is appropriate if: (a) no trustee has been appointed; (b) no plan has been confirmed; (c) a party in interest or the U.S. Trustee has requested an examiner; and (d) such appointment is in the interests of creditors, any equity security holders, and other interests of the estate.  Section 1104(c)(2) separately authorizes appointment if the first three elements are met and if, instead of it being in the interests of creditors or the estate, "the Debtor's fixed, liquidated, unsecured debts, other than debts for goods, services, or taxes, or owing to an insider, exceed $5,000,000."[13]

51.     For the same reasons appointment of a trustee is in the best interests of the estate and creditors, an examiner is warranted.  The conduct of Mr. Sherman as well as the Debtors' stubborn refusal to act in the best interests of their estates or comply with the Bankruptcy Code raise serious concerns regarding the broader circumstances surrounding the Debtors' attempted

---

[13] Indeed, "it is generally accepted that, as long as the $5 million debt requirement is met by a debtor, the appointment of an examiner is required."  *In re: Enron Corp., et al., Debtors.*, 2002 WL 32150478, at *4 (Bankr. S.D.N.Y. Feb. 13, 2002).  The Debtors' balance sheet shows $61 million in total liabilities.  *See Supplemental Declaration of Michael Wyse in Support of Debtors' Chapter 11 Petitions and First Day Motions* [Docket No. 57], Schedule 5.

23

implementation of the Closure Plan.

52.    In addition to Mr. Sherman's misconduct, the Debtors' professionals and advisors have demonstrated their own questionable conduct and an unwillingness to exercise their responsibilities as professionals and advisors to estate fiduciaries.  Thus, if this Court appoints an examiner, it has full discretion to establish the parameters of the examiner's investigation. *See, e.g., Morgenstern v. Revco D.S., Inc. (In re Revco D.S., Inc.)*, 898 F.2d 498, at 501 (6th Cir. 1990) ("[T]he bankruptcy court retains broad discretion to direct the examiner's investigation, including its nature, extent, and duration.").  In view of such conduct, an examiner is warranted to investigate, among other things, (a) the best path forward for the Orchard Park Facility and (b) the circumstances surrounding, and any claims arising from, the decisions of the Debtors and their directors, officers, owners, professionals, and independent advisor that led to implementation of the Closure Plan and rapid discharge of patients from the Orchard Park Facility without this Court's approval in violation of section 363 of the Bankruptcy Code.

## **PRELIMINARY OBJECTION TO CLOSURE MOTION**

53.    For all of the reasons set forth in the foregoing motion, the Landlords object to the Closure Motion.  In light of the shortened notice sought by the Closure Motion (this Court's permission for which was not requested by appropriate motion) and the fact that the Landlords only received a copy of the Closure Motion on September 24, 2019, or nearly one week after the Landlords requested and the Court directed that it be provided,[14] the Landlords expressly reserve their rights to submit further objections to the Closure Motion, either by further submissions to this Court, at oral argument or by testimony to be presented at any hearing

---

[14] The Landlords also requested reports of patient headcount and discharge.  The Debtors have not provided any such report, but instead provided a blank spreadsheet titled "Resident Discharge Tracking."

54.     Section 363 of the Bankruptcy Code provides, in relevant part, that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). The debtor bears the burden of establishing that a proposed action under section 363 "will aid [the debtors'] reorganization and is supported by a good business justification." *In re Ionosphere Clubs, Inc.,* 100 B.R. 670, 675 (Bankr. S.D.N.Y. 1989). When considering whether to approve a debtor's use of property under section 363 of the Bankruptcy Code, courts will apply the same business judgment standard applicable to other business decisions. *See In re Ames Dep't Stores,* 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990).

55.     Further, a bankruptcy court cannot approve an action under section 363 unless the court "expressly find[s] from the evidence presented" that there is a sound business reason for the sale. *In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir. 1983) ("The rule we adopt requires that a judge determining a § 363(b) application expressly find from the evidence presented before him at the hearing a good business reason to grant such an application."). Because actions outside the ordinary course of business fall outside of the Bankruptcy Code's carefully considered protections of creditors' rights, it becomes "incumbent upon the bankruptcy judge" to hold a debtor to its burden. *In re Au Natural Rest., Inc.,* 63 B.R. 575, 580 (Bankr. S.D.N.Y. 1986) (citing *Lionel,* 722 F.2d at 1071).

56.     The United States Court of Appeals for the Second Circuit set out several non-exclusive factors bankruptcy courts may consider when conducting an analysis under section 363(b), including whether: (a) a "sound business purpose" exists to justify the sale; (b) adequate and reasonable notice has been provided to interested parties; (c) the value obtained is fair and reasonable; and (d) the debtor acted in good faith. *See In re Glob. Crossing Ltd.*, 295 B.R. 726, 744 (Bankr. S.D.N.Y. 2003) (citing *Lionel*, 722 F.2d at 1071).

25

57.     For all of the reasons already detailed in the foregoing motion to appoint a chapter 11 trustee and because the Debtors have not met their evidentiary burden in the Closure Motion, the Closure Plan lacks a sound business purpose and must be denied.  The Closure Motion is startlingly devoid of detail regarding the Closure Plan, providing absolutely no evidentiary record on which this Court can evaluate the Debtors' business judgment.  *See Lionel,* 722 F.2d at 1071. In fact, the Closure Motion does not even attach the actual Closure Plan of which it seeks approval, despite this Court's urging at the September 18 hearing that it should be made available with only confidential patient information redacted.  Furthermore, the summary of the Closure Plan's terms is limited to a single, three-sentence paragraph that explains only that the Closure Plan provides for cessation of admissions as of August 15, 2019, a target closing date of November 15, 2019, and for personnel to solicit patient preferences for alternative placement.  Closure Motion at ¶ 11.[15] And rather than provide evidence regarding the financial necessity of closing the Orchard Park Facility or its "dire financial condition" (*In re Saint Vincents,* 429 B.R. at 152), the Closure Motion merely offers a few unsupported allegations of general distress (almost none of which are specific to the Orchard Park Facility) and conclusory statements regarding necessity.  Closure Motion at ¶ 17.

58.     The Closure Motion also fails to address several vital questions and concerns that are necessarily raised in connection with closure of a healthcare facility, such as :

- Whether any other regulatory approvals are required, including consent from HUD pursuant to the Defendants' Healthcare Regulatory Agreement with HUD;[16]
- Wind-down costs and claims, and their source of funding; and

---

[15] The very first mention of any closure timeline came at the second interim hearing in these cases on September 18, 2019, when, only after urging from Landlords' counsel, Debtors' counsel indicated the process would take 60 days.

[16] If HUD approval is required prior to closure, the Debtors are in violation of their regulatory duties and obligations to HUD.

- Whether and how books and records will be stored, preserved, or disposed of in compliance with 11 U.S.C. § 351.

59.     The Closure Motion is simply insufficient for the drastic relief it requests.  It is also unclear to whom the Debtors provided notice of the Closure Motion, as the Debtors did not file a certificate of service for the Closure Motion, or whether they have notified affected patients, HUD, as required under their Healthcare Regulatory Agreement, or tort claimants, as the first day declaration indicates they are substantial [Docket 15] at ¶¶ 17, 21, 27.  Bankruptcy Rule 2002 requires notice to "all creditors", which is particularly vital given the gravity of the action the Debtors are seeking to take.

60.     In addition, the Closure Motion does not even mention any exploration of strategic alternatives to closure, such as a sale to a replacement operator.  Rather, despite the CRO's representation in the first day declaration that the Debtors intended to continue operating all of the Senior Care Facilities, the Debtors seek to run straight to closure, ignoring the requests of the Landlords to consider a transaction with one of the interested operators they have already identified.  This course of action defies good business sense and precludes the possibility of a valuable transaction.  Indeed, delay or denial of healthcare facility closures by other bankruptcy courts have resulted in substantial benefit for the estates.  The denial in the aforementioned *St. Mary* case resulted in a sale of the hospital.  *See In re St. Mary Hosp.*, 117 B.R. 125 (Bankr. E.D. Pa. 1990).  In the more recent *Center City* case, delaying consideration of the closure plan for the Hahnemann University Hospital led to an unexpectedly robust auction process resulting in a $55 million bid for certain assets.[17]

61.     Moreover, the Debtors' efforts to implement the Closure Plan are premature in these cases, as a creditors committee has yet to be appointed, the Debtors' schedules and statements

---

[17] *See* https://www.inquirer.com/business/hahnemann-university-hospital-residency-slots-55-million-20190809.html

of financial affairs have yet to be filed demonstrating the universe of claims against the OP Debtor, and the Court has yet to make a determination on the appointment of a patient care ombudsman pursuant to 11 U.S.C. § 333.

62.    The Closure Motion falls far short of what is necessary for obtaining court approval of closure of a healthcare facility and the Closure Plan has no sound business purpose. Accordingly, the Closure Motion must be denied.  Even if the Court is inclined to grant the Closure Motion (which it should not), the facts and circumstances discussed herein warrant the appointment of a trustee as argued in the foregoing Motion.

### THE COURT'S REMEDIAL OPTIONS

63.    For the reasons set forth above, the Landlords respectfully request the following relief:

A. Denial of the Closure Motion and appointment of a chapter 11 trustee for (i) all of the Debtors' estates or, alternatively, (ii) the OP Debtor and OB Debtor, and halting of further closure proceedings until appointment;

B. Alternatively to a trustee, appointment of an examiner (and halting further closure proceedings until appointment) to investigate (a) whether the Orchard Park Facility should be closed or if another more valuable alternative exists and (b) the circumstances surrounding, and any claims arising from, the decisions of the Debtors and their directors, officers, owners, professionals, and independent advisor that led to implementation of the Closure Plan and rapid discharge of patients from the Orchard Park Facility without this Court's approval in violation of section 363 of the Bankruptcy Code;

C. If the Court does not appoint a trustee or examiner, denial of the Closure Motion, halting of further closure proceedings, and direction to the Debtors to comply with specific guidelines for fulfilling their fiduciary duties with respect to the Orchard Park Facility, including:

    i.    a good faith effort to explore potentially value-maximizing strategic alternatives to closure of the Orchard Park Facility, including engaging with the Landlords and potential replacement operators;

    ii.    offering discharged patients the opportunity to return to the Orchard Park Facility;

    iii.    if, in the exercise of their reasonable business judgment, the Debtors continue to believe closure is in the best interests of their estates, renew their

request for approval of the Closure Plan, which must: (i) give adequate notice to all interested parties; (ii) provide the Court and all parties with the full Closure Plan (redacted only as necessary to protect confidential patient information); and (iii) supply a detailed evidentiary record supporting closure; and

iv.      additional guidelines this Court deems necessary or appropriate.

## NOTICE

64.    Notice of the Motion has been provided to: (i) the Debtors, (ii) the Office of the United States Trustee, and (iii) the Debtors' master service list. The Landlords respectfully submit that no further notice is required.

## RESERVATION OF RIGHTS

65.    The Landlords reserve all rights to further address its motion for appointment of a chapter 11 trustee or, in the alternative, an examiner, the Closure Motion, and any other ancillary issues, either by further submissions to this Court, at oral argument or by testimony to be presented at any hearing.

**WHEREFORE**, the Landlords respectfully request that the Court enter orders (a) appointing a chapter 11 trustee, (b) denying the Closure Motion, and (c) directing such other and further relief as this Court deems just and appropriate.

*[Signature on following page]*

29

Dated:    New York, New York
          September 26, 2019

                                        ARENT FOX LLP

                                        *Counsel for Arba Group*

                              By:    /s/ George P. Angelich
                                      Andrew I. Silfen
                                      George P. Angelich
                                      Jordana L. Renert
                                      1301 Avenue of the Americas
                                      New York, New York 10019
                                      Telephone: (212) 484-3900
                                      Facsimile: (212) 484-3990

30