**LOEB & LOEB LLP**
Schuyler G. Carroll
Stephen A. Aschettino
Daniel B. Besikof
Noah Weingarten
345 Park Avenue
New York, NY 10154
Tel: (212) 407-4000
Fax: (212) 407-4990
Email: scarroll@loeb.com
        saschettino@loeb.com
        dbesikof@loeb.com
        nweingarten@loeb.com

*Proposed Counsel to the Debtors*
*and Debtors-in-Possession*

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| | ) | Chapter 11 |
| | ) | |
| | ) | Case No. 19-76260 (AST) |
| | ) | Case No. 19-76263 (AST) |
| In re: | ) | Case No. 19-76267 (AST) |
| | ) | Case No. 19-76268 (AST) |
| Absolut Facilities Management, LLC, *et al.* | ) | Case No. 19-76269 (AST) |
| | ) | Case No. 19-76270 (AST) |
| Debtors.[1] | ) | Case No. 19-76271 (AST) |
| | ) | Case No. 19-76272 (AST) |
| | ) | |
| | ) | (Jointly Administered) |
| | ) | |

---

[1]  The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are: Absolut Facilities Management, LLC (1412); Absolut Center for Nursing and Rehabilitation at Allegany, LLC (7875); Absolut Center for Nursing and Rehabilitation at Aurora Park, LLC (8266); Absolut Center for Nursing and Rehabilitation at Gasport, LLC (8080); Absolut at Orchard Brooke, LLC (1641); Absolut Center for Nursing and Rehabilitation at Orchard Park, LLC (8300); Absolut Center for Nursing and Rehabilitation at Three Rivers, LLC (8133); and Absolut Center for Nursing and Rehabilitation at Westfield, LLC (7924).

18210898

**DEBTORS' OMNIBUS RESPONSE TO (I) LANDLORDS' MOTION FOR
ENTRY OF AN ORDER APPOINTING CHAPTER 11 TRUSTEE OR,
ALTERNATIVELY, AN EXAMINER, PURSUANT TO SECTION 1104 AND
PRELIMINARY OBJECTION TO DEBTORS' MOTION TO APPROVE PLAN
OF CLOSURE FOR ORCHARD PARK FACILITY; (II) OBJECTION OF
CAPITAL FINANCE, LLC TO THE MOTION FOR ENTRY OF ORDER APPROVING
THE DEBTORS' PLAN OF CLOSURE FOR ORCHARD PARK FACILITY;
(III) OBJECTION OF CAPITAL FUNDING, LLC TO DEBTORS' MOTION
FOR ENTRY OF AN ORDER APPROVING THE DEBTORS' PLAN OF
CLOSURE FOR ORCHARD PARK FACILITY; AND (IV) UNITED STATES
TRUSTEE'S JOINDER IN LANDLORDS' MOTION SEEKING ENTRY OF
AN ORDER UNDER 11 U.S.C. § 1104 DIRECTING APPOINTMENT OF A
CHAPTER 11 OPERATING TRUSTEE AND FOR RELATED RELIEF**

Absolut Facilities Management, LLC and Absolut Center for Nursing and Rehabilitation at Orchard Park, LLC (collectively, the "**Debtors**"), through proposed counsel, Loeb & Loeb LLP, respectfully submit this omnibus response (this "**Response**") to the (i) *Landlords' Motion For Entry of an Order Appointing Chapter 11 Trustee or, Alternatively, an Examiner, Pursuant to Section 1104 and (II) Preliminary Objection to Debtors' Motion to Approve Plan of Closure for Orchard Park Facility* (the "**Trustee Motion**") [Docket No. 69] filed by the Arba Group and its affiliates (the "**Landlords**"); (ii) *Objection of Capital Finance, LLC to the Motion for Entry of Order Approving the Debtors' Plan of Closure for Orchard Park Facility* [Docket No. 63] filed by Capital Finance, LLC ("**Capital Finance**"); (iii) *Objection of Capital Funding, LLC to Debtors' Motion for Entry of an Order Approving the Debtors' Plan of Closure for Orchard Park Facility* [Docket No. 67] filed by Capital Funding, LLC ("**Capital Funding**"); and (iv) *United States Trustee's Joinder in Landlords' Motion Seeking Entry of an Order Under 11 U.S.C. § 1104 Directing Appointment of a Chapter 11 Operating Trustee and For Related Relief* [Docket No. 87]. In further support of this response, the Debtors file contemporaneously herewith, the (1) Declaration of Michael Wyse (the "**Wyse Declaration**"), (2) Declaration of William Lenhart (the

"**Lenhart Declaration**"), (3) Declaration of Israel Sherman (the "**Sherman Declaration**"), and (4) Declaration of Sean Doolan (the "**Doolan Declaration**").

## PRELIMINARY STATEMENT

1.      The dispute here is simple.  The Landlords seek to stop the Debtors from exercising their sound business judgment and closing a facility that lost approximately $2.5 million on a cash basis in 2018 – at a time when the Debtors are able safely to continue providing care to the Orchard Park residents and transition them to nearby facilities – because the Landlords believe that closure of that facility would be economically disadvantageous to the Landlords.  Instead, the Landlords ask the Court to substitute the Landlords' judgment for that of the Debtors and compel the Debtors to continue operating the Orchard Park facility, at a continuing loss to the Debtors' estates, for an indefinite period of time, as the Landlords seek, with no assurance of success, a replacement operator to minimize the Landlords' damages as part of a callous disregard for patient safety.

2.      The Debtors have operated Orchard Park at a loss for almost all of 2019 in hopes of finding an alternative transaction that would be beneficial to the Landlords and the Debtors' estates.  They can no longer afford to do so, both economically and in terms of patient safety.  It is for that reason that the Debtors submitted, and the New York Department of Health (the "**DOH**") approved, the Closure Plan.  The Closure Plan was filed at a time when there is an abundance of bed capacity at neighboring skilled nursing facilities, which ensures that the Debtors' residents were able to move to a neighboring home of their choice in a safe manner, with oversight from the DOH.  If forced to continue to operate for any material amount of time, the Debtors will run out of money.  Not only would that be detrimental to the Debtors' creditors, it is entirely possible that patient care – the Debtors' primary concern – will suffer.  In effect, the Landlords are asking the Court to authorize gambling with other people's money – and with patients' lives – purely on the

speculative possibility that they might be able to find a third party to take over the facility for their exclusive benefit. The Court should also not lose sight of the fact that beds that are available for patient transfers may not be available on another day. And the Debtors cannot be forced to speculate on the availability of other locations to please the Landlords.

3.     This result is unacceptable to the Debtors and is contrary to their fiduciary duties to creditors and their responsibility to Orchard Park residents and their families. While the Landlords are an important stakeholder, the Debtors must do everything possible to maintain quality care for their residents and to maximize recovery for all creditors, not just the Landlords.

4.     In attempt to maximize their leverage to achieve their self-serving goals, the Landlords have not only objected to the Debtors' Closure Motion but seek appointment of a trustee or an examiner. Presumably, the Landlords believe that since they have no chance of convincing the Debtors they should keep operating a facility that is hemorrhaging cash at a dangerous rate, maybe they would have at least a long shot possibility of convincing a trustee – or bludgeoning the Debtors into an improvident settlement with them.

5.     The Landlords' grounds for a trustee or examiner should be rejected. They fasten onto a short gap between commencement of wind-down processes for the facility and the filing of the Closure Motion, on shortened notice – a motion the Debtors assert does is not required and which was not filed in similar cases. While the motion is pending, Orchard Park continues to operate. Orchard Park's operating certificate remains valid and has not been surrendered. The Debtors' have laid off few, if any, employees. All of the estate property that was at Orchard Park when the Closure Plan was approved remains at Orchard Park. However, once residents received notice of the Closure Plan, as was immediately required by the DOH, patients desired to leave. This is a simple reality that would have occurred upon the patients learning of the approval

of the closure plan, whether or not a motion was filed before seeking to implementation the Closure Plan formally.  The Debtors, obviously, cannot hold the patients captive and are obligated to facilitate their transfer to other appropriate facilities of the residents' choosing.

6.      If the Court determines that a motion was required, the Debtors apologize to the Court for not bringing it at the outset of the case.  It was not their intention or desire to flout any Bankruptcy Code provisions or rules.  Their desire is, quite simply, to ensure the safe and orderly transition of their residents and maximize value for their stakeholders.  It would never be an exercise of sound business judgment to delay the inevitable when there is no sale in prospect for the Orchard Park Facility, there is an undisputed operating loss and the Debtors cannot control permanent, readily available bed space if the Orchard Park Facility were closed on some date in the future.

7.      Ultimately, however, whether the motion was filed on the second day of the case or the ninth, the outcome should be the same.  The closure of Orchard Park is squarely in the Debtors' business judgment.  As noted below, that business judgment was exercised carefully and reluctantly, after substantial consideration and mounting losses over a period of months.  Closure of Orchard Park is the only outcome that makes sense.  It is consistent with the aims of the Bankruptcy Code, is in the best interests of the Debtors' patients and the Debtors' estates, and it is entirely consistent with their fiduciary duties and federal and state laws seeking to ensure patient safety.  No trustee or examiner is necessary, appropriate or beneficial.

8.      The Landlords repeatedly state (as if by saying it repeatedly, that would make it true) that the Closure Plan is somehow being implemented as a result of self-dealing for the benefit of Israel Sherman.  That accusation is facially absurd.  Mr. Sherman has personally guaranteed the lease for Orchard Park.  The Landlords have already sued him on account of his obligations under

that guaranty. It would be substantially better for Mr. Sherman personally to have a new operator in order to avoid that significant liability. The Landlords further point to a settlement communication to suggest that Mr. Sherman is somehow engaged in self-dealing in connection with the Closure Plan by requesting payment in order to facilitate a transition to a new operator. This cheap attempt to paint Mr. Sherman in a bad light is inappropriate, taken out of context and, ultimately irrelevant to the analysis of whether a trustee is appropriate in these cases. While Mr. Sherman and the Landlords did negotiate about a payment of money to transition operations, any payment would have been used largely to satisfy the Debtors' creditors. Indeed, the Debtors expressly discussed with the Landlords and their counsel the need for Mr. Sherman to implement an out of court wind-down composition or similar process, to be funded in part with the cash to be paid by the Landlords, to ensure that the Debtors' creditors were satisfied. In any event, the Debtors have retained William Lenhart as an independent advisor to evaluate transactions to ensure there is no self-dealing in these cases.

9.      The Landlords further argue, inaccurately, that the Closure Plan puts the Debtors on a path to administrative insolvency. On the contrary, the Closure Plan will cut off continuing operating losses, including approximately $250,000 per month in rent for Orchard Park to the Landlords, all of which presumably would be entitled to administrative priority. More administrative expenses and more operating losses would *increase* the odds of administrative insolvency, not decrease it.

10.      Finally, the United States Trustee has joined in the Trustee Motion, arguing substantially the same points as the Landlords. The responses to the Landlords and the Trustee Motion are intended to respond to the U.S. Trustee's joinder as well. The U.S. Trustee does, however, make one unique argument that should be addressed – *i.e.*, that the hotly contested nature

of this case is itself some form of cause for appointment of a trustee.  That argument should be rejected.  Bankruptcy cases are often hotly contested, yet appointment of a trustee is an extraordinary remedy.  Appointing a trustee here would set a terrible precedent, encouraging antagonists to the Debtors to be particularly adversarial in hope of reaching the sufficient threshold where the acrimony is sufficient for a trustee.  Counter the collaborative spirit of the bankruptcy code, such a precedent would create additional litigation and reduce consensus.

11.    For those reasons and as discussed below in substantially greater detail, the Closure Motion should be approved, and the Trustee Motion should be denied.

## **BACKGROUND**

12.    This dispute is not new.  The Debtors' rent is dramatically above market.  In fact, the Orchard Park lease, which the Debtors have moved to reject, has a rental rate that is nearly twice the market rate for comparable facilities.  *See* Sherman Declaration at ¶¶ 37-38.  The above-market leases are the cause of these cases, and the Debtors have been negotiating with the Landlords for concessions or to facilitate an orderly transition to a new operator since as early as January 2019.  *See id.* at ¶ 9.

13.    During that time, the Debtors have worked diligently to find solutions other than bankruptcy and the closure of Orchard Park.  They sought out a potential purchaser of the facilities or someone willing to take over operations.  While one party expressed interest in taking over the facilities, that operator required substantial rent concessions to bring the leases in line with the market, which the Landlord were unwilling to grant.  The Landlords, with the Debtors' full cooperation, also sought out a replacement operator to take over the Facilities, hiring a top broker to lead their search.  The Debtors worked hard to assist that broker and promptly provided broker with all information they requested.  That search, which began no later than May of 2019, has to

date resulted in no new operator stepping forward. *See id.* at ¶¶ 9-20.

14.    The Debtors repeatedly made clear to the Landlords that, at some point, the losses would be insurmountable and that they would need to close Orchard Park and/or file for bankruptcy.  At a meeting on August 7, the Debtors were told that a replacement operator was days away from signing on to a new lease package – at reduced rents – with the Landlords.  Weeks later, the Landlords are telling the same story – but with no actual deal. *See id.* at ¶¶ 21-23.  In any event, a replacement operator cannot be installed merely by signing a new lease package. Approval by the New York Department of Health (the "**DOH**") is required, which can take up to six months. *See* Doolan Declaration at ¶ 7.  Meanwhile, the Landlords are accruing millions of dollars of over-market rent, while the Debtors' estates are depleted by losses of as much as $50,000 per week. *See* Wyse Declaration at ¶ 6.

15.    Ultimately, after many months of mounting losses and futile efforts to find a third party to take over Orchard Park, the Debtors decided, in an exercise of their reasonable business judgment, to close Orchard Park. *See* Sherman Declaration at ¶¶ 5, 9-25.  To that end, the Debtors filed a plan of closure (the "**Closure Plan**") with the DOH in accordance with all applicable guidelines and regulations, which the DOH approved on September 11, 2019, the day after the Petition Date. *See* Doolan Declaration at ¶ 11; Sherman Declaration at ¶ 28.  This decision was not made lightly or in a rushed fashion.  Rather, it followed several months of sustained losses and lack of success uncovering a more viable alternative. *See* Wyse Declaration at ¶ 9; Sherman Declaration at ¶ 9-25.

16.    The Landlords' lead argument in favor of a trustee, framed in inflammatory and *ad hominem* language, is that the Debtors operated in bad faith in connection with the Closure Plan because they did not seek approval of the Closure Plan prior to its implementation.  The opposite

is true.  The Debtors have operated in a transparent fashion and in good faith in all respects.  DOH guidelines prohibited the Debtors from disclosing the existence of the Closure Plan until it was approved.  *See* Doolan Declaration at ¶¶ 13-15.  However, within hours of the approval of the Closure Plan by the DOH, the Debtors filed a supplemental declaration of the Debtors' Chief Restructuring Officer, Michael Wyse [Docket No. 20] (the "**Supplemental Declaration**") advising that the Closure Plan had been approved and that the Debtors would begin implementing it.  Simultaneously, and as required by the Closure Plan, the Debtors provided extensive notice to the affected residents and their guardians, among many others, as well as issuing a press release.  *See* Doolan Declaration at ¶ 16.  Therefore, once the Closure Plan was approved, it's existence and implementation were secrets to nobody, let alone the Landlords.

17.    The Debtors in good faith determined that a motion was not necessary to effectuate the initial phases of the Closure Plan.  For example, the Chapter 11 trustee in *In re Peninsula Hospital*, No. 11-47056 (Bankr. E.D.N.Y.) (Stong, J.) [Docket No. 542], did not file a motion to close the hospital before exercising her business judgment to submit a closure plan to the DOH and taking steps to close the debtors clinics, emergency room, and ancillary services in accordance with such closure plan once it was approved by the DOH.  Similarly, in *In re Revel AC, Inc.*, No. 14-22654 (Bankr. D. N.J.) [Docket No. 536], the debtors, operators of a casino, commenced wind down efforts by filing a petition with the New Jersey Department of Gaming Enforcement ("**DGE**"), seeking approval of a shutdown plan.  The debtors filed a summary of the shutdown plan with the court, but filed no motion seeking approval to cease operations.  The debtors did later file a motion to reject certain leases *nunc pro tunc* to the date it ceased operations, which the court approved.  *See IDEA Boardwalk, LLC v. Polo North Country Club, Inc. (In re Revel AC, Inc.)*, No. 14-017562016 Bankr. LEXIS 3805, at *9 (Bankr. D. N.J. Oct. 21, 2016).  The Debtors have taken

the same approach here.  This well-worn path is not grounds for appointment of a trustee, nor is it bad faith.

18.     The current status is that, pursuant to the Closure Plan and DOH requirements, the Debtors have ceased taking any new residents at Orchard Park.  *See* Doolan Declaration at ¶ 12. The Debtors have also notified the residents of their intent to close Orchard Park and have provided alternative housing options for their residents, including at the Debtors' other facilities.  *See id.* at ¶¶ 17-18.  Those residents are human beings – not property of the estate – and they are entitled to move out of Orchard Park at any time and for any reason.  In fact, residents routinely move out of Orchard Park.  While the Debtors do ultimately intend to dispose of the estate property and move business records currently located on the premises of Orchard Park as part of the Closure Plan, the Debtors have at all times intended (and still intend) to file a motion seeking authority to do so (or to preserve business records in a different location).  *See* Sherman Declaration at ¶ 36.  Likewise, the Debtors have filed a motion to reject the Orchard Park lease.  *See* Docket No. 85.

19.     While the Debtors believe in good faith that no motion was necessary to start assisting residents in moving from Orchard Park in accordance with the DOH order, ultimately the Debtors did file a motion, to be heard on shortened notice, approximately one week after the Closure Plan's approval.  *See* Docket No. 51 (the "**Closure Motion**").  During this short period, Orchard Park continues to operate.  Orchard Park's operating certificate remains valid and has not been surrendered. *See* Sherman Declaration at ¶ 36.  The Debtors' have let go of few, if any, employees.  *See id.* at ¶ 56.

20.     Ultimately, however, whether the motion was filed on the second day of the case or the ninth, the outcome should be the same.  Orchard Park loses a tremendous amount of money. The Debtors have operated it since at least January 2019, even after concluding it could never be

profitable without significant restructuring, largely because they believed the Landlords might be able to come through on their assurance that a successor operator could be found. That effort proved futile and expensive. So, finally, the Debtors concluded they could no longer continue accruing losses, on the increasingly distant hope that a successor operator could be found. *See* Sherman Declaration at ¶¶ 9-25.

21.    It is contrary to the Bankruptcy Code and the Debtors' fiduciary duties for the Debtors to continue expending substantial sums operating a money-losing facility to the detriment of all of their stakeholders, for the sole (and speculative) benefit of just the Landlords. The facility was moribund, and the Debtors have exercised their sound business judgment in seeking to close it. *See id.* at ¶ 25.

22.    The Landlords further argue that the Closure Plan is somehow being implemented as a result of self-dealing for the benefit of Israel Sherman or a vindictive desire to strip value from the Landlords, and that a trustee or examiner is therefore appropriate. The exact opposite is true. Mr. Sherman has personally guaranteed the lease for Orchard Park. The Landlords have already sued him on account of his obligations under that guaranty. It would be vastly better for Mr. Sherman personally if the facility could be transferred to a new operator who would be willing to assume the lease, thus extinguishing (or at least substantially mitigating) Mr. Sherman's potential guarantee liabilities. *See id.* at ¶¶ 46-48. Moreover, Mr. Sherman has poured millions of dollars into the Debtors over the past several years to fund operations and capital improvements. *See id.* at ¶ 49. He is criticized for making a DIP loan to the company, but that loan was made on a junior, non-priming basis, subject to and subordinate to any and all existing liens. *See id.* at ¶ 50. Without that DIP loan, which nobody else was willing to provide, the Debtors could not operate, which would put resident care at significant risk. *See id.* Finally, the Debtors have retained William

Lenhart, a well-respected and experienced insolvency professional, as independent advisor (comparable to an independent director, but the Debtors are member-managed LLCs without boards of directors) to vet transactions that may implicate self-dealing concerns involving Mr. Sherman. While Mr. Lenhart had not yet been retained by the Debtors as of the time of the filing of the Closure Plan, he has been involved in the implementation of the Closure Plan and wholly concurs that closing is the best option for the estates. *See* Lenhart Declaration at ¶¶ 9-10.

23.    As further support for their Trustee Motion, the Landlords point to a settlement communication to suggest that Mr. Sherman is somehow engaged in self-dealing in connection with the Closure Plan. This cheap shot at Mr. Sherman is flat-out wrong. In any case, it is ultimately irrelevant to the analysis of whether a trustee is appropriate in these cases. It is true only that Mr. Sherman had a meeting with the Landlords' principal, Ira Smedra on August 7, with counsel for all parties present. *See* Sherman Declaration at ¶ 21. The parties negotiated for more than 12 hours regarding the Debtors' future. *See id.* At that meeting, the Debtors presented Mr. Smedra with a number of strategic alternatives, but Mr. Smedra made clear that the only settlement he would consider entertaining was for the Debtors to hand over operations to a new operator, with which he was offering more favorable lease package. *See id.* at ¶ 22. Even if such a settlement would have been acceptable, it would have been subject to a process that could have taken six months for DOH approval while the Debtors continued to incur significant financial losses. *See* Doolan Declaration at ¶ 7.

24.    Because Mr. Smedra does not own the Debtors' operations and has no right to force the Debtors to continue to operate for the Landlords' benefit, Mr. Sherman did request that the Landlord pay money to transition operations. *See* Sherman Declaration at ¶ 23. That is no different than any other party negotiating a buyout of its leases. In any event, any payment would have

been used largely to satisfy the Debtors' creditors. *See id.* Indeed, the Debtors expressly discussed with the Landlords and their counsel the need for Mr. Sherman to implement an out of court wind-down composition or similar process, to be funded in part with the cash to be paid by the Landlords, to ensure that the Debtors' creditors were satisfied. *See id.* Ultimately, however, no agreement was reached, and Mr. Smedra, who promised at that meeting to come up with a replacement operator in just a few days, has not delivered on that promise in the nearly eight weeks since that meeting. *See id.* at ¶¶ 5, 23.

25.    The Landlords further assert that the Debtors are mismanaged because Orchard Park has poor CMS star ratings and because of a handful of news articles criticizing the facilities. The Debtors are not proud of, but do not run away from Orchard Park's ratings.  The cause, however, is not incompetence or mismanagement.  Mr. Sherman is a nearly 30-year veteran of operating skilled nursing facilities, and certain of the Debtors have much better CMS star ratings. The true cause is that the rent – the rent charged by these selfsame Landlords – is way over-market, leaving the Debtors with little to no free cash flow and depriving them of resources necessary to complete much needed capital improvements.  With adequate resources, the Debtors believe these facilities could be exceptional.  Rectifying this issue is one of the Debtors' stated reasons for filing these cases. *See Declaration of Michael Wyse In Support of Debtors' Chapter 11 Petitions and First Day Motions* [Docket No. 15] (the "**First Day Declaration**") at ¶ 22.

26.    Finally, the Debtors' cases are administratively solvent and will become more so as a result of the Closure Plan.  The Debtors burn substantial cash operating the Orchard Park facility, totaling $200,000 per month. *See* Wyse Declaration at ¶ 8.  The Orchard Park facility lost nearly $2.5 million in 2018. *See id.* at ¶ 6.  A substantial contributing factor to the losses is the approximately $250,000 rent in monthly rent. *See id.* at ¶ 7.  The Debtors want to stop incurring

13

these losses as soon as possible in order to avoid accruing substantial administrative expenses that could lead to administrative insolvency. Moreover, the Aurora Park facility operated by the Debtors has been an ancillary beneficiary of the Debtors' closure efforts. *See* Sherman Declaration at ¶¶ 40-43; Wyse Declaration at ¶¶ 11-13. While DOH regulations require the Debtors to give each departing resident at least three options for alternative care facilities, many of those residents have chosen to move to the Aurora Park facility. As a result, the census at Aurora Park – a facility with a less unfavorable lease – is increasing, providing the Debtors with a boost in cash flow. In fact, approximately 50 residents have moved to Aurora Park. *See* Wyse Declaration at ¶ 12. The fact that this many residents moved to another of the Debtors' facilities in itself negates the Landlords' unfounded allegations of mismanagement.

27.     The Landlords' suggestion that the Debtors continue operating the Orchard Park facility, apparently indefinitely, for the Landlords' benefit would serve only to exacerbate the risk of administrative insolvency. Moreover, the addition of a chapter 11 trustee or examiner, also would layer additional administrative expenses on the Debtors' estates, which could ill afford them.

28.     The Trustee Motion is a last-ditch effort by the landlord to sling mud at the Debtors in hopes of keeping Orchard Park operating, to the detriment of all other stakeholders. The Debtors owe no duty to the Landlords to continue money-losing operations solely for the Landlords' benefit. The Debtors have elected to exercise their sound business judgment not to do so any longer. That business judgment should be respected, and the Landlords' motion should be denied.

## **ARGUMENT**

I.    **Merely days into the case, the Landlords have come nowhere near meeting the heavy burden necessary for appointment of a Chapter 11 trustee.  The decision to close Orchard Park was a valid exercise of business judgment and was not the result of any self-dealing or bad faith.**

29.    The law is clear that appointment of a trustee is an extraordinary remedy and that the party urging appointment of a chapter 11 trustee bears a heavy burden that must be met with clear and convincing evidence.  *See In re JNL Funding Corp.*, No. 10-73724-AST, 2011 Bankr. LEXIS 622, at *29 (Bankr. E.D.N.Y. Feb. 10, 2011) (Trust, J.) (citing *Adams v. Marwil (In re Bayou Group, LLC)*, 564 F.3d 541 (2d Cir. 2009)).  The standard for appointment of a trustee is necessarily high because the appointment of a trustee is the exception, rather than the rule in a chapter 11 case.  *See In re Bayou Group, LLC*, 564 F.3d at 546 (appointment of a trustee is an unusual remedy and "'[t]he standard for § 1104 appointment is very high . . . .'"); *In re Adelphia Comm'ns Corp.*, 336 B.R. 610, 655 (Bankr. S.D.N.Y. 2006) ("It has been repeatedly held that the appointment of a chapter 11 trustee is an 'extraordinary remedy'").

30.    Indeed, because chapter 11 of the Bankruptcy Code is "designed to allow the debtor-in-possession to retain management and control of the debtor's business operations," there is a "strong presumption" that a debtor should remain in possession.  *In re Ionosphere Clubs, Inc.*, 113 B.R. 164, 167 (Bankr. S.D.N.Y. 1990); *In re WorldCom, Inc.*, No. 02-13533 (AJG), 2003 Bankr. LEXIS 2192, at *16 (Bankr. S.D.N.Y. May 16, 2003) ("The appointment of a chapter 11 trustee is recognized as an extraordinary remedy because there is a strong presumption that the debtor should remain in possession."); *In re McCorhill Pub., Inc.*, 73 B.R. 1013, 1016-17 (Bankr. S.D.N.Y. 1987) ("The appointment of a trustee in a Chapter 11 case is not the usual procedure because 11 U.S.C. § 1108 contemplates that the debtor will continue to manage its property and operate its business.").

31.     To overcome this presumption in favor of the debtor-in-possession, a party seeking appointment of a chapter 11 trustee must either demonstrate (1) "cause," which includes "fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management," or (2) that the appointment of a trustee is in "the interests of creditors, any equity security holders, and other interests of the estate." *See* 11 U.S.C. § 1104(a).

32.     As the Second Circuit has noted, courts "must bear in mind that the appointment of a trustee 'may impose a substantial financial burden on a hard pressed debtor seeking relief under the Bankruptcy Code,' by incurring the expenditure of 'substantial administrative expenses' caused by further delay in the bankruptcy proceedings." *In re Bayou Group, LLC*, 564 F.3d at 546-47 (quoting *In re Anchorage Boat Sales, Inc.*, 4 B.R. 635, 644 (Bankr. E.D.N.Y. 1980)); *see also In re Stein & Day, Inc.*, 87 B.R. 290 (Bankr. S.D.N.Y. 1988) (appointment of trustee in Chapter 11 case under 11 U.S.C. § 1104 is not usual procedure because 11 U.S.C. § 1108 contemplates that debtor will continue to manage its property and operate its business; court must weight all factors and interests carefully because appointment of trustee is extraordinary remedy which will cause additional expense to estate); *Taub v. Taub (In re Taub)*, 427 B.R. 208, 225 (Bankr. E.D.N.Y. 2010) ("Many courts, including courts in this Circuit, have observed that the appointment of a trustee must be supported by clear and convincing evidence.") (citations omitted). Ultimately, the decision to appoint such a trustee is a factual determination that is left to the discretion of the bankruptcy judge. *See In re WorldCom, Inc.*, 2003 Bankr. LEXIS 2192, at *16.

33.     The Landlords, adopting a "kitchen sink" approach, and hurling a variety of *ad hominem* attacks against the Debtors' principal, Mr. Sherman, and the Debtors' advisors, assert that appointment of a trustee is justified under both Sections 1104(a)(1) and (2), arguing that incompetence, gross mismanagement, bad faith and self-dealing establish "cause" under Section

1104(a)(1) and that appointment of a trustee, or alternatively an examiner is in the best interests of the Debtors' estates under Section 1104(a)(2).

34.     In each case, the Landlords' assertions are self-serving, inconsistent with the interests of the Debtors, their estates or their creditors and with respect to the allegations of mismanagement, bad faith and self-dealing, completely untrue.    The Landlords' claims are designed with one goal in mind – to force the Debtors to continue to incur significant losses, for the benefit of the Landlord and to the detriment of their estates, on the longshot hope that the Landlords will be able to find a replacement operator to take over the Orchard Park facility.    For the reasons discussed below, the Landlords' arguments should be rejected, and the Trustee Motion should be denied.    Moreover, a truly rational view point would show that the Landlord's actions are punitive, not practical.    These cases are about health care facilities.    One needs credentialing and licensing to own and operate nursing homes.    Bankruptcy trustees generally lack such credentials and expertise.    What most frequently happens is that a trustee will seek to shut down the facilities over which he or she is appointed, precisely because they do not have the credentials and expertise to operate such facilities, and they must find skilled operators on a chaotic basis, all to the financial detriment to a bankruptcy estate and jeopardizing patient care.

35.     The Landlords spill much ink criticizing the Debtors' decision to close Orchard Park, asserting that the Debtors "defied good business sense, ignored value maximizing alternatives, disregarded the interests of residents and employees, and flouted the Bankruptcy Code."    The Landlords further go on to describe the Debtors' decision to close Orchard Park – a facility that lost approximately $2.5 million in 2018 alone – as bad faith.    These accusations are, as the Landlords know, grossly inaccurate.

a. **The Closure Plan followed a lengthy process by which the Debtors and the Landlords sought to achieve a "value maximizing alternative."**

36.    The decision to close Orchard Park was not one that the Debtors desired or made hastily.  There was a long process by which the Debtors came to the conclusion that no other alternative was viable.  *See* Sherman Declaration at ¶¶ 9-25.  The primary force driving the closure of Orchard Park is the above-market lease.  Orchard Park had revenue of approximately $18.1 million in 2018 and lease obligations of $3.2 million, excluding additional amounts that are to be set aside for taxes and other improvement and replacement escrows.  *See* Wyse Declaration at ¶ 7. This lease rate equates to approximately 17.6% of revenue, which is nearly double the typical market-rent lease for a comparable facility of approximately 8-9.5% of revenue.  *See* Sherman Declaration at ¶ 37.

37.    Moreover, the Debtors' facility at Aurora Park is nearby and is competitive with Orchard Park.  Aurora Park recently underwent some capital improvements, while the Debtors have been unable to improve Orchard Park because of the choking rental payments.  By closing Orchard Park, not only do the Debtors shed the obligation to pay the exorbitant lease on that facility, but an ancillary benefit is that Aurora Park's census will be boosted.  *See id.* at ¶¶ 40-43. In 2017 and 2018, the Debtors suffered net losses at Orchard Park.  Aurora Park was profitable in 2017 with an average census of 92.5%.  Aurora Park's census dropped in 2018 to 87.1%, causing Aurora Park, too, to become unprofitable.  Since Orchard Park stopped admitting residents on August 15, as required by DOH guidelines as a result of the Closure Plan's submissions, Aurora Park's census has grown to 97%, well above its profitable occupancy of 2017.  *See* Wyse Declaration at ¶ 13.

38.    In recognition of these realities, the Debtors approached the Landlords as early as January 2019 to discuss potential strategic alternatives.  *See* Sherman Declaration at ¶ 9. Beginning

in earnest in March of 2019, the Debtors began seeking out a transaction whereby they would transfer operations of the facilities or other "value maximizing alternatives," to use the Landlords' words.   In May of 2019, the Landlords joined that effort, retaining Blueprint – the "leading advisory firm exclusively focused on senior housing" – to find a replacement operator, which the Debtors understand engaged in a robust process to market the Debtors' facilities.  *See id.* at 17. Attached as Exhibit A to the Sherman Declaration are detailed marketing materials prepared by Blueprint relating to the Debtors' facilities.  No person has showed any interest in taking over the operations of the Debtors' facilities without significant concessions from the Landlords, which the Debtors obviously could not provide.   However, the Debtors did introduce the Landlords to operators to facilitate negotiation of revised terms.  On information and belief, the Landlords did not agree to provide any revised terms to potential replacement operators that were acceptable. *See id.* at

39.    In total, the Debtors approached numerous multi-facility operators of skilled nursing facilities in New York to discuss a take-over of the leases or other "value maximizing transactions."  As noted above, none of those operators was willing to take on the leases without substantial rent reductions, which the Landlords were not willing to provide.  Certain piecemeal offers were made just for certain facilities, which the Landlords would not consider.  *See* Sherman Declaration at ¶ 9.

40.    In addition to the Debtors' own efforts, the Debtors cooperated with the Landlords' efforts, including through Blueprint, to find a replacement operator.  The Landlords also used the services of Harborview Capital to market the facilities.  *See id.* at ¶ 18.  All diligence requests and requests for information made to the Debtors by the Landlords, people acting on their behalf or prospective operators identified by the Landlords were fulfilled in a timely manner.  The Debtors

also made their CFO available for many conference calls to explain the financials and answer any questions of potential replacement tenants, and provided access when requested for tours with the Debtors' staff by prospective operators identified by the Landlords.  Finally, the Debtors have provided the Landlords with monthly detailed financials since inception on the lease.  *See id.* at ¶ 19.

41.    Finally, in a last-ditch effort to avoid closure of Orchard Park and potentially a bankruptcy filing, the Debtors met for more than 12 hours with the Landlords on August 7, 2019, at which the Debtors and the Landlords discussed strategic alternatives for the Debtors' facilities. At that meeting, the Debtors presented a number of alternatives to the Landlords, including a proposal by which the Debtors would have obtained financing to purchase the real estate from the Landlords.  The Debtors further made clear that a closure was imminent if no agreement could be reached, coupled with a likely bankruptcy filing.  *See id.* at ¶ 21.

42.    The Landlords made clear at that meeting that only the transition of the facilities to a new, replacement operator would be satisfactory to the Landlords, a process that could take up to six months for DOH approval.  The Landlords promised that they were days away from inking a deal with a replacement operator, and the parties neared an arrangement by which the Debtors would have turned over the facilities to that operator in exchange for consideration from the Landlord, which was to be used (as discussed below) to compensate for the value of the operations in the profitable facilities, the operation of the facilities during the at least six-month transition process and to satisfy the Debtors' creditors.  The Debtors waited for a week to hear confirmation that a deal with a replacement operator was in place, but never heard another word from the Landlords. *See id.* at ¶¶ 22-23.

43.    Despite the Debtors' best efforts, no replacement operator has materialized.  During

the period in which the Debtors tried to find one, the Debtors operated Orchard Park – largely for the Landlords' benefit – and incurred in excess of $900,000 of operating losses relating to Orchard Park. *See* Wyse Declaration at ¶ 9. In light of the foregoing extensive efforts to consider "value maximizing transactions," all of which proved futile, and in light of the Debtors' dwindling liquidity and mounting operating losses, the Debtors made the only sensible decision – *i.e.* to close the Orchard Park facility and file for bankruptcy.

44.     To that end, after nearly an eight month process, the Debtors filed the Closure Plan on August 15, 2019. To suggest that the Debtors rushed into this decision, that this decision "defied good business sense," or that the Debtors refused to explore "value maximizing alternatives" is just flat out wrong, and the Landlords know it. They suggest otherwise, in bad faith, to paint the Debtors in a negative light and to achieve a result that would only ever even potentially benefit themselves – the continued operation of Orchard Park, at the expense of the Debtors' estates, for some unspecified period of time, to see if a replacement operator can be found. The Debtors' estates cannot bear further operating losses. Nor should they have to.

**b. The Closure Plan accounted for the interests of residents and is not harmful to the community, the residents or the Debtors' employees.**

45.     The Landlords criticize the Closure Plan by asserting that there is some community interest in maintaining the facility, and that the Debtors have "disregarded the interests of residents and employees." The opposite is true.

46.     Orchard Park is in Erie County. Erie County has excess skilled nursing bed capacity. Of course there is no assurance that such capacity will exist at a future date. As demonstrated by the DOH's of RHCF Bed Need by County, Erie County has a need for 5,291 skilled nursing beds, but has capacity of 5,714 beds. *See* Doolan Declaration at ¶ 9. Accordingly, the DOH approved the reduction contemplated by the Closure Plan. Moreover, the ease with

which most of the Orchard Park residents were able to find new homes of their choosing is further evidence that ample skilled nursing beds are available in Erie County.

47.     Moreover, the entire focus of the Closure Plan is on prioritizing the interests of the residents.  *See id.* at ¶ 8.  In addition, the DOH has had multiple weekly calls with facility staff and the ombudsman at Orchard Park since the Closure Plan was approved to discuss implementation of the Closure Plan, with a focus on transitioning residents to other facilities and maintaining resident services until all residents are transferred.  *See id.* at ¶¶ 25-26; Sherman Declaration at ¶¶ 32-34.  The Debtors have been following the mandates of the Closure Plan and the DOH.  All residents that have moved from the facility have been safely transferred to a new facility, and all residents remaining on site are receiving the same level of care that they received prior to the beginning of the Closure Plan's implementation.

48.     Finally, the effect on the Debtors' employees is minimal.  Out of 270 employees at Orchard Park, the Debtors anticipate laying off fewer than 10%.  The remainder will remain employed at other Absolut Facilities with the same, uninterrupted pay, benefits and seniority scale. *See* Sherman Declaration ¶ 56.

49.     The Landlords cite to *In re Saint Vincent Catholic Med. Centers of New York*, 429 B.R. 139, 152 (Bankr. S.D.N.Y. 2010) as suggesting that a high burden exists for closing a healthcare facility.[2]  Their reliance on that decision is misplaced.  In that case, the court noted that

---

[2] *Saint Vincent* suggests that the Debtors "must provide the Court with a comprehensive, well-documented record of affidavits and supporting exhibits demonstrating to the press, politicians and the public the economic or other facts of life requiring closure."  First, no press, politicians or members of the public are questioning the need for the closure of Orchard Park – only the Landlords, which stand to suffer economic loss.  Second, the Motion, as supplemented by the Declarations submitted in connection with this Response and the testimony to be adduced at the hearing on the Closure Plan and the Trustee Motion more than amply demonstrate the "facts of life" requiring closure.

"[t]he closing of any medical facility in a big city is almost certain to generate intense and emotional opposition from doctors, other hospital staff and affected local community groups." In that case it was true. Saint Vincent hospital provided important and irreplaceable services for the community in which it was located. When it closed, many people lost jobs, and residents of the community lost access to nearby care, including access to emergency rooms and other sensitive facilities. Even so, the facility was allowed to close. As noted above, none of the considerations that gave the court pause in *Saint Vincent* is present here. There has been no outcry from the employees (almost all of whom will keep their jobs), from the residents (the majority of whom have already found replacement care) or from the community at large. In fact, as noted above, the DOH swiftly approved the Closure Plan, in a process that takes these same considerations into account.

50.     The Debtors have taken into account the effects of closure on their residents, their employees and the community. These considerations do not justify the appointment of a trustee or the appointment of an examiner, nor do they justify the denial of the Closure Motion.

### c. The Closure Plan is not the result of self-dealing.

51.     The Landlords further hurl a variety of accusations of self-dealing against the Debtors' principal, Israel Sherman. Most pertinent to the implementation of the Closure Plan is that the Debtors' efforts to implement the Closure Plan "are merely a continuation of the prepetition self-dealing of Mr. Sherman, the Debtors' owner, CEO, and now DIP lender." Trustee Motion at ¶ 35. That suggestion makes no sense. Mr. Sherman has personally guaranteed the Debtors' leases with the Landlord and stands to face substantial potential liability to the Landlords as a result of the Debtors' not honoring their commitments to the Landlords under the leases. *See* Sherman Declaration at ¶ 46. In fact, the supposed self-dealing by Mr. Sherman in implementing the Closure Plan has already resulted in the Landlords bringing suit against Mr. Sherman in respect

of his obligations under the Orchard Park lease.[3]  *See id.* at ¶ 47.  Mr. Sherman would be much better off, personally, if the Debtors could find a way to operate, pay the rent to the Landlords and find a new operator to take over the facilities and eliminate, or at least mitigate, Mr. Sherman's guaranty obligations.  But that result is not what is best for the estates – the Closure Plan is – so Mr. Sherman opted to institute the Closure Plan.

52.    The Landlords further disclose settlement communications, taken out of context, in order to make Mr. Sherman look bad.  Mr. Sherman did ask for a payment at the August 7 meeting to transfer operations from the Debtors to a replacement operator designated by the Landlords.  The Landlords do not own the Debtors' operations, several of which are profitable.  But, as the Landlords know, any payment would have been used largely to satisfy the Debtors' creditors.  *See id.* at ¶ 23.  Indeed, the Debtors' advisors discussed expressly with the Landlords' advisors the need for Mr. Sherman to implement an out of court wind-down, composition or similar process – including, potentially, a bankruptcy filing by the former operating entities – to be funded in part with the cash to be paid by the Landlords, to ensure that the Debtors' creditors were satisfied.

53.    Moreover, nothing about Mr. Sherman's suggestion that he would be willing to transfer operations to another operator suggests that he "did not believe that closure of the Orchard Park Facility or any of the Senior Care Facilities was in fact necessary."  Trustee Motion ¶ 35.  To the contrary, the Debtors were clear that if there were no deal and no replacement operator, bankruptcy and closure of at least the Orchard Park facility were imminent.  *See* Sherman Declaration at ¶ 21.

54.    Prior to the Petition Date, the Debtors engaged William Lenhart as independent

---

[3] The Landlords have also sued Mr. Sherman for past-due amounts owed to the Landlords in respect of other of the Debtors' facilities.

advisor, and granted him authority to consider and approve any transactions involving potential related parties, such as Mr. Sherman. *See* Lenhart Declaration at ¶ 8. After the Petition Date, for example, Mr. Lenhart – a seasoned restructuring professional and financial advisor with decades of experience – not Mr. Sherman, has authority to make all decisions for the Debtors on related-party transactions, and has done so in consultation with the Debtors' CRO and CFO. *See id.* While Mr. Lenhart was not with the Debtors at the time of the filing of the Closure Plan, he has been since before the DOH approved the Closure Plan and has monitored its implementation for self-dealing, among other things. He concurs that it is the right decision and is supportive of the manner in which it is being executed. *See id.* at ¶¶ 9-10.

### d. Seeking approval of the Closure Plan shortly after necessary shutdown procedures began is not cause for appointment of a Trustee or denial of the Closure Motion.

55.     Orchard Park's orderly shutdown pursuant to the DOH-approved Closure Plan is not cause for appointment of a trustee and is not indicia of the "gross mismanagement" or "bad faith" asserted by the Landlords. The Landlords cite exactly one case for the proposition that failure to follow Section 363(b)(1) is cause for appointment of a trustee: *In re Grasso*, 490 B.R. 500, 519 (Bankr. E.D. Pa. 2013). This case could not be less relevant. The individual debtor there was an out-and-out scoundrel. The Court spent many pages detailing his misdeeds. The court concluded "(1) the Debtor was dishonest in his testimony to this Court, (2) the Debtor diverted estate assets, and (3) the Debtor breached his fiduciary duty as a debtor-in-possession." Furthermore, his "conduct was part of an intentional scheme to obscure from this Court and his creditors the nature of his finances. Generally speaking, the Debtor has consistently provided incomplete or inaccurate information to this Court, hidden assets from his creditors, caused the dissipation of estate assets, breached his fiduciary obligations and exhibited a general disregard for the requirements imposed upon a debtor in possession by the Bankruptcy Code." *Id.* at 506.

56.    The Landlords try to make it sound as if mere failure to follow Section 363(b)(1) was the sole reason for appointment of a Chapter 11 trustee in *Grasso*.  In fact, the language Landlords quote was a throwaway, just part of a litany of bad acts and statutory obligations violated by this debtor:

> This Court made several factual findings that, after further consideration, **this Court determined to require appointment of a Chapter 11 Trustee.** Among those findings were this Court's determination that the Debtor (1) had lied to this Court and his creditors about his purchase of the claim asserted by the Wilmington Savings Fund Society FSB ("WSFS"); (2) breached his fiduciary obligation as a debtor-in-possession by failing to disclose the opportunity to purchase the same claim; and (3) diverted assets that should have accrued to estate as a result of the sale of property located at 124–134 S. 15th Street, Philadelphia, Pennsylvania.

*In re Grasso*, 490 B.R. at 506 (emphasis added)

57.    Furthermore, in *Grasso*, "the Debtor had purposefully obscured the nature of his business interests to frustrate his creditors' efforts to obtain repayment of their claims." *Id.* at 507. "He is an owner of at least four other entities that have recently filed for bankruptcy relief." *Id.* n.2.  He was an "often belligerent and uncooperative witness", yet he claimed "ignorance of material information about his financial affairs", and he filed late and inaccurate financial disclosures. *Id.*

58.    Compare *Grasso* to the Fourth Circuit's decision in *Committee of Dalkon Shield Claimants v. A.H. Robins Co.*, where it affirmed the decision of the bankruptcy court denying a trustee motion, even where the bankruptcy court had previously ordered the debtor to pay civil contempt sanctions for paying prepetition claims in contravention to court order. *Comm. of Dalkon Shield Claimants v. A.H. Robins Co.*, 828 F.2d 239, 240 (4th Cir. 1987).  The bankruptcy court had found that cause did not exist to appoint a trustee because present management was "capable and amenable to a fair and expeditious plan to compensate claimants." *Id.* at 241.  The court

further held that "to require the appointment of a trustee, regardless of the consequences, in the event of an act of dishonesty by the debtor, however slight or immaterial, could frustrate the purpose of the Bankruptcy Act." *Id.* at 242.

59.     It speaks volumes that *Grasso* would be the one and only case Landlords could find to support their Motion.   The *Grasso* judge was understandably infuriated by the outrages perpetrated by the miscreant in that case and ordered a Chapter 11 trustee.  That ruling in no way supports the proposition that a trustee is warranted because Debtors, while acting in good faith and being fully transparent to the court, the public and the Landlords about their intent, filed their Closure Motion a few days after starting to implement the DOH order.

60.     Far from being the lawless renegades that the Landlords try to depict, the Debtors have been entirely transparent and conscientious about the approval of the Closure Plan and their intention to implement the initial phases – which consist primarily of giving notice of the Closure Plan (which is required by DOH guidelines and the Closure Plan itself upon its approval) and assisting the residents who desire to leave immediately in finding new homes.  They filed a supplemental declaration of Mr. Wyse on the second day of the case.  They published press releases.   Indeed, the planned closure was broadly covered in the press.   *See*, *e.g.*, https://buffalonews.com/2019/09/11/orchard-park-nursing-home-closing-as-owner-files-for-bankruptcy-protection/;   https://news.wbfo.org/post/absolut-care-files-bankruptcy-close-orchard-park-nursing-home;   https://www.wgrz.com/article/news/health/absolut-care-files-chapter-11-bankruptcy-will-close-orchard-park-location/71-b3bc47b7-a68f-4584-b9e2-65e4758c01e2.   The Debtors discussed the Closure Plan on the record at in court, in each case identifying that they did not believe the Debtors were required to file a motion to facilitate the Plan.

61.     The residents are human beings, not property of the estate, and cannot be compelled

to stay at Orchard Park in any event.  Indeed, as a practical matter, it is very likely residents would have started to move out immediately upon hearing of the approval of the Closure Plan, regardless of when the motion was made.  In fact, residents regularly are discharged from Orchard Park.  The Debtors have laid off few, if any employees.  Their operating certificates and licenses have not been surrendered.  When the Debtors do plan to dispose of estate property – such as the fixtures and equipment – an act which the Debtors acknowledge triggers Section 363(b), they will seek to do, and have always intended to seek to do so, by motion, on notice and a hearing.  Likewise, since the Debtors desire to reject the lease and give possession back to the Landlords, they have moved to do so.  *See* Docket No. 85.

62.    Moreover, if the Debtors had not moved forward with the Closure Plan as they have, the Debtors would be in violation of their obligations to the DOH.  To the contrary, the Debtors have complied with all such obligations, have worked closely with the DOH and fully protected all of their residents.

63.    Ultimately, however, the Debtors not filing a motion at the outset of the case, instead of several days later, should have no impact on how these cases unfold.  Under any standard, the decision to close the facility is plainly the sensible and prudent one, for all of the reasons described herein, from the perspective of the Debtors' estates.  The Landlords' economic motive here is completely clear.  If the facility were to stay open and operating, the Landlords would continue to accrue well-above-market rent, while potentially improving the remote chance of the facility being transferred to a new operator.  But that contingent possibility, while possibly favorable to the Landlords, does little or nothing for the estates, which would bear the burden of the mounting losses resulting from the Landlords' open-ended desire for the Debtors to continue operating the Orchard Park, or the Debtors' residents, who would run the risk of the Debtors

running out of money or of available alternative beds filling up. Each day the facility stays open means a lower potential return for the Debtors' other creditors. The Debtors waited for months, yet no one has agreed to take over Orchard Park. The Debtors are now in bankruptcy. They can no longer afford to subsidize the Landlords' search for a new operator through continued operations.

64.    In short, the Landlords ask the Court to interfere with the Debtors' good-faith business judgment (which the case law says should be respected), in order to take a gamble with estate money for the benefit of the Landlords, to the detriment of all the other creditors and at the risk of resident safety. The Debtors ask that the Court reject this invitation, deny the Trustee Motion and approve the Orchard Park facility's orderly wind-down.

### e.    The Debtors are capably and professionally managed by competent industry veterans.

65.    The Landlords point to poor Medicare and Medicaid ratings for Orchard Park and a handful of news articles criticizing certain other facilities as further evidence of mismanagement. These ratings, however, are not indicia of incompetence. Mr. Sherman has been capably operating skilled nursing facilities for approximately 30 years. While Orchard Park does have poor ratings, others do not. For example, the Debtors' facility at Allegany has a five star CMS rating. The reason that certain facilities have lower ratings is that the rent is too high, which impedes the Debtors' ability to invest in these facilities and to make capital improvements that are admittedly needed. The Debtors filed for bankruptcy, in part, to rectify this issue. *See* First Day Declaration at ¶ 22.

66.    Additionally, it is ironic that the Landlords are heard to complain about mismanagement of skilled nursing facilities when the Arba Group has been the target of substantial litigation alleging resident abuse and other misconduct in the nursing facilities that they operate.

For example, in a case captioned *United States of America v. The Arba Group et al.*, Case No. 14-3946 (N.D. Cal 2014), claims were asserted by the U.S. Government against the Arba Group for among other things, (i) persistently and severely overmedicating elderly and vulnerable residents at Arba Group facilities, causing infection, sepsis, malnutrition, dehydration, falls, fractions, pressure ulcers and premature death, in a manner known to Arba Group senior management; (ii) submission of Medicare and Medi-Cal claims for non-existent, grossly inadequate, materially substandard and/or worthless services; (iii) false representations of compliance with Medicare and Medicaid requirements; and (iv) false or fraudulent statements to the U.S. Department of Health and Human Services and to CMS in order to obtain payment from those entities.

### f. Continued operation of the moribund Orchard Park facility, not the Closure Plan, enhances risk of administrative insolvency.

67.     Finally, the Landlords argue, inexplicably, that the Debtors are setting up these cases for administrative insolvency by closing the Orchard Park facility.  The Landlords are completely and totally wrong.   The monthly cash burn from operating Orchard Park is approximately $200,000.  *See* Wyse Declaration at ¶ 8.  In 2018, the Orchard Park facility lost nearly $2.5 million, plus an additional approximately $2.4 million litigation reserve for ongoing litigation at Orchard Park.  *See id.* at ¶ 6.  The Debtors cannot continue bearing these losses.  Cutting off these losses as soon as possible, including by closing Orchard Park and rejecting the underlying lease and burdensome vendor contracts, will avoid the accrual of substantial administrative expenses that could lead to administrative insolvency.  Moreover, as discussed herein, the Aurora Park facility has improved its performance since the Debtors' closure plan was filed, increasing its census and cash flow and reducing the potential for administrative insolvency.  The Landlords' suggestion that the Debtors continue operating the Orchard Park facility, apparently indefinitely, would serve only to force the Debtors to incur additional chapter 11

administrative expenses.  More expenses give rise to a higher risk of administrative insolvency. Moreover, the addition of a chapter 11 trustee also would layer additional administrative expenses on the Debtors' estates, which could ill afford them.  This argument of the Landlords, like their others, is misguided.

## II.     The Closure Motion should be approved as a valid exercise of Debtors powers under Code Section 1108 and applicable case law.

68.     Bankruptcy Code Section 1108 provides that "[u]nless the court, on request of a party in interest and after notice and a hearing, orders otherwise, the trustee may operate the debtor's business."  The Debtor's decision to close the facility is a classic "business judgment" call, squarely within the scope of a debtor's right to manage the business under Section 1108.  Even if the Debtors' decision to close the facility was unwise – which, as detailed above, it was not – the case law makes clear that this type of business judgment should be respected.  *See*, *e.g.*, *Comm. Of Asbestos-Related Litigants v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612 (Bankr. S.D.N.Y. 1986) (presumption of reasonableness attaches to debtor's management decisions and thus where debtor articulates reasonable basis for its business decision, courts will generally not entertain objections to debtor's conduct).  Indeed, where a debtor determines in a good faith manner that operation of the debtor's business is not in the best interests of the estate, he has "absolute discretion" to discontinue that business and cannot be compelled to resume operation of the business.  *In re Airlift Int'l, Inc.*, 18 B.R. 787 (Bankr. S.D. Fla. 1982).

69.     The case law supporting the proposition that a debtor-in-possession's business judgment is entitled to deference goes back to the earliest decisions under the Bankruptcy Code. *See In re Simasko Prod. Co*., 47 B.R. 444, 449 (Bankr. D. Colo. 1985) ("Business judgments should be left to the board room and not to this Court."); *In re De Luca Distrib. Co*., 38 B.R. 588, 591 (Bankr. N.D. Ohio 1984) (explaining that "[t]he discretion to act with regard to ordinary

business matters without prior court approval is at the heart of the trustee's [the debtor in possession's] powers"); *In re Lifeguard Indus*., 37 B.R. 3, 17 (Bankr. S.D. Ohio 1983) ("[B]usiness judgments should be left to the board room and not to this Court."); *In re Columbia Motor Express, Inc)*, 33 B.R. 389, 393 (Bankr. M.D. Tenn. 1983) ("The Bankruptcy Code favors the continued operation of a business by the debtor as debtor-in-possession and a presumption is accorded to the management decisions of the debtor-in-possession.")

70.    Once the debtor articulates a valid business justification, "[t]he business judgment rule 'is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company.'" *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc.,* 147 B.R. 650, 656 (S.D.N.Y. 1992) (citation omitted).  The Debtors have articulated ample business justification for closing the Orchard Park facility and that business judgment should not now be disturbed.

**III.    Appointment of an examiner, particularly one with expanded powers, should be denied.**

71.    The Landlords request, in the alternative to the appointment of a trustee, that an examiner with undefined, but seemingly expanded, powers be appointed in these cases.  However, the Landlords have not demonstrated that an examiner is warranted under either section 1104(c)(1) or (2) of the Bankruptcy Code.

**a.    Appointment of an examiner is not in the interests of the estates.**

72.    Section 1104(c)(2) of the Bankruptcy Code grants a court discretion to appoint an examiner if (1) the court determines not to appoint a trustee, (2) a request is made by a party in interest or the United States Trustee, and (3) "such appointment is in the interests of creditors, any equity security holders, and other interests of the estate".  11 U.S.C. § 1104(c)(1).  For all the

reasons discussed above, the Trustee Motion fails to meet this burden.  Appointing an examiner is simply not in the interests of the estates.

73.    In addition, a patient care ombudsman will soon be appointed and the formation meeting for an Official Committee of Unsecured Creditors is scheduled for October 3, 2019.  The DOH and state-appointed Ombudsman are already monitoring the Debtors' efforts to close the Orchard Park facility.    The Debtors have appointed an independent advisor and a chief restructuring officer.    Numerous parties are or will be involved in these Chapter 11 Cases to provide checks and balances to the Debtors' decisions moving forward.  It is unnecessary for another to be added to the mix.

**b.  Section 1104(c)(2) does not apply here.**

74.    Contrary to the Landlord's assertion, section 1104(c)(2) does not apply to the Debtors.  Appointment of an examiner pursuant to section 1104(c)(2) is only necessary if "the debtor's fixed, liquidated, unsecured debts, other than debts for goods, services, or taxes, or owing to an insider, exceed $5,000,000."  11 U.S.C. § 1104(c)(2).  The  court's discussion of the requirement in *In re Dewey & Leboeuf LLP*  is instructive.  There, the court noted that "[t]he $5 million requirement is typically satisfied 'where there is outstanding unsecured bank debt or outstanding publicly issued debentures in an aggregate sum in excess of $5,000,000."  *In re Dewey & Leboeuf LLP*, 478 B.R. 627, 636-37 (Bankr. S.D.N.Y. 2012) (quoting 7 Collier on Bankruptcy ¶ 1104.03[2] (Alan N. Resnick & Henry J. Sommer, eds., 16th rev. ed. 2012)).  The court went on to note that "[w]hile there is little case law on what constitutes a fixed and liquidated debt for purposes of section 1104(c)(2), Black's Law Dictionary defines 'fixed debt' as '[g]enerally, a permanent form of a debt commonly evidenced by a bond or debenture; long-term debt."  *Id.* at 637 (quoting Black's Law Dictionary 463 (9th ed. 2009)).  Further, "[Black's Law Dictionary]

defines a liquidated debt as '[a] debt whose amount has been determined by agreement of the parties or by operation of law." *Id.*

75.    While the Debtors do have secured debt that may exceed $5 million, such fixed, liquidated unsecured debt as required by the Bankruptcy Code simply does not exist here. Moreover, "debts for goods, services, or taxes, or owing to an insider" is plainly excluded from consideration. *See* 11 U.S.C. § 1104(c)(2).    Therefore, an examiner is not mandated merely because the Debtors have unsecured trade debt.    The Landlords' request for an examiner should be denied.

**c.    If an examiner is appointed, the scope should be exceptionally limited.**

76.    To the extent the Court determines that the Landlords' request should be granted and  that an examiner should be appointed, the Debtors assert that the scope of the examiner's role should be closely circumscribed and that a finite and limited budget be established for the examiner's fees.    These cases are administratively solvent, and the Debtors intend for them to become more solvent as the positive cash flow effects of the Orchard Park closure come to fruition, but there is not unlimited cash for another set of professionals in these cases, and the Court should decline the invitation to appoint an examiner with a sweeping role to be paid by blank check.

**IV.    The objections of Capital Finance and Capital Funding to the Closure Motion should be denied.**

77.    Capital Finance and Capital Funding (collectively, the "**Lenders**") have also filed objections to the Closure Motion.    Those objections raise essentially two points:  (i) they do not have enough information to judge whether closure is in their best interests and the best interests of the estates; and (ii) they are concerned that closure will erode their collateral by diminishing accounts receivable attributable to Orchard Park.

78.    The Lenders' concerns are misplaced.    First, as set forth above, there is ample

evidence suggesting that the closure of Orchard Park is justified.  Second, while the accounts receivable will certainly diminish on a going forward basis, the overall value of the Lenders' collateral package will increase as a result of the closure of Orchard Park.  As noted above, Orchard Park loses substantial money.  Every dollar of receivables generated at Orchard Park costs more than one dollar to generate.  Continued operation of Orchard Park would only erode, not enhance, the Lenders' collateral package.  For all of these reasons and as set forth herein, the Lenders' objections should be overruled.

## **CONCLUSION**

WHEREFORE, the Debtors respectfully submit that the Court deny the Landlords' Motion in its entirety and grant the Debtors such other and further relief as is just and appropriate.

Dated:    October 2, 2019                    LOEB & LOEB LLP
          New York, New York

                                             */s/ Schuyler G. Carroll*
                                             Schuyler G. Carroll
                                             Stephen A. Aschettino
                                             Daniel B. Besikof
                                             Noah Weingarten
                                             345 Park Avenue
                                             New York, NY 10154
                                             Tel: (212) 407-4000
                                             Fax: (212) 407-4990
                                             scarroll@loeb.com
                                             saschettino@loeb.com
                                             dbesikof@loeb.com
                                             nweingarten@loeb.com

                                             *Proposed Counsel to the Debtors
                                             and Debtors-in-Possession*