Hearing Date and Time: November 4, 2019 at 2:00 p.m.
Response Deadline: October 23, 2019 at 4:00 p.m.

Avery Samet
Jeffrey Chubak
AMINI LLC
140 East 45th Street, 25th Floor
New York, New York 10017
(212) 490-4100
asamet@aminillc.com
jchubak@aminillc.com
*Proposed Counsel for the Official
Committee of Unsecured Creditors*

**UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>ABSOLUT FACILITIES MANAGEMENT, LLC, et al.,[1]<br><br>              Debtors. | Chapter 11<br><br>Case No. 19-76260-ast<br>Case No. 19-76263-ast<br>Case No. 19-76267-ast<br>Case No. 19-76268-ast<br>Case No. 19-76269-ast<br>Case No. 19-76270-ast<br>Case No. 19-76271-ast<br>Case No. 19-76272-ast<br><br>(Jointly Administered) |

**OFFICIAL COMMITTEE OF UNSECURED CREDITORS' (1)
OBJECTION TO LANDLORDS' MOTION FOR A CHAPTER 11 TRUSTEE,
OR ALTERNATIVELY, AN EXAMINER, AND U.S. TRUSTEE'S MOTION FOR A
CHAPTER 11 TRUSTEE, AND (2) STATEMENT RESPECTING DEBTORS' MOTION
TO APPROVE CLOSURE PLAN FOR ORCHARD PARK FACILITY**

The Official Committee of Unsecured Creditors ("Committee") of the above-named

Debtors respectfully submits this (1) objection to the motion of Arba Group and its affiliates

("Landlords") for a chapter 11 trustee, or alternatively, an examiner (Doc. 69), and the motion of

---

[1] The Debtors are: Absolut Facilities Management, LLC; Absolut Center for Nursing and Rehabilitation at Allegany, LLC; Absolut Center for Nursing and Rehabilitation at Aurora Park, LLC; Absolut Center for Nursing and Rehabilitation at Gasport, LLC; Absolut at Orchard Brooke, LLC; Absolut Center for Nursing and Rehabilitation at Orchard Park, LLC; Absolut Center for Nursing and Rehabilitation at Three Rivers, LLC; and Absolut Center for Nursing and Rehabilitation at Westfield, LLC.

the Office of the U.S. Trustee ("U.S. Trustee") for a chapter 11 trustee (Doc. 102), and (2) statement in respect of the motion of the Debtors to approve the closure plan for the Orchard Park facility (Doc. 51).

## INTRODUCTION

1. The Debtors commenced these cases with the intention of restructuring or rejecting certain of their operating leases and emerging from bankruptcy as a going concern.

2. Following the filing of, inter alia, motions to stay the closure of the Orchard Park facility, motions to appoint a chapter 11 trustee, and objections to the use of cash collateral, the Debtors agreed to instead seek to sell their facilities.

3. Each of the Debtors, the Landlords, the Debtors' prepetition lender, the Landlords' mortgage lender, and the United States agreed to a form of Interim DIP Order (defined below) authorizing the Debtors to incur $819,000 in postpetition debt to an entity controlled by the Debtors' principal on an interim basis ($2 million on a final basis), and authorizing the Debtors to use cash collateral to support operations and pay restructuring costs pending a sale. (Doc. 137.)

4. Moreover, the Debtors appear dependent on the DIP facility given their projected operating losses through year end and projected restructuring costs. (Doc. 173-1.)

5. The appointment of a chapter 11 trustee at this stage would jeopardize the ability to move forward with a sale process, however, as it would constitute an Event of Default under the DIP Loan Agreement and a Termination Event respecting the use of cash collateral under the Interim DIP Order. Said appointment is accordingly not in the best interests of creditors or the Debtors' estates, under Bankruptcy Code section 1104(a)(2).

6. Further, given the potential consequences of the appointment of a chapter 11 trustee, careful consideration should be given to the nature of the alleged conflict and

mismanagement which the Landlords assert merit the appointment of a chapter 11 trustee under section 1104(a)(1).

7. At bottom, the Landlords argue that the Debtors' principal is conflicted because he asked for $10 million during a prepetition meeting with Landlords' principal concerning strategic alternatives for the Debtors, which the Debtors' principal states would have been used in part to pay the Debtors' creditors and in part to pay himself. While this certainly presented loyalty issues, no transaction was ever consummated and the Debtors have since engaged an independent advisor to handle matters that present loyalty issues. This accordingly does not constitute cause for the appointment of a chapter 11 trustee.

8. The Landlords also argue that the appointment of a chapter 11 trustee is warranted because the Debtors implemented their closure plan for the Orchard Park facility without prior Court approval. However, the Debtors have presented evidence that the facility was operationally insolvent, and once the closure plan was approved postpetition the Debtors were required to implement the same, pursuant to the New York State Department of Health ("DOH") Nursing Home Facility Closure Plan Guidelines and 28 U.S.C. § 959(b). The Debtors' implementing the closure plan accordingly likewise does not constitute cause for the appointment of a. Indeed, one could argue that failure to so would amount to mismanagement insofar as it would result in non-compliance with applicable nonbankruptcy law.

**BACKGROUND**

9. The Debtors commenced these cases because rent obligations under certain of their operating leases are above-market. (Doc. 15, ¶22 ($11 million for 2019, as of the Petition Date); Doc. 97 ("Wyse Decl."), ¶9 n.2 ($10.4 million in 2018).)

10. Annual lease obligations for the Orchard Park facility totaled $3.2 million, or nearly one-third of the Debtors' total. (Wyse Decl. ¶¶7, 9.)

11.   In addition, on an operational basis, the Orchard Park facility lost over $2.5 million in 2018 ($50,000/week).  (Wyse Decl. ¶¶6-8.)

12.   The Independent Auditor's Report for the Orchard Park Debtor for the years ended December 31, 2018 and 2017 further stated "substantial doubt exists about its ability to continue as a going concern."  (Wyse Decl. Ex. A.)

13.   The Debtors' principal Israel Sherman attested that the Debtors made efforts to sell the Orchard Park facility to another operator, both on a standalone basis and with certain of the Debtors' other facilities, beginning in January of 2019, and cooperated with efforts by professionals engaged by the Landlords to market the facility, beginning May of 2019.  (Doc. 100 ("Sherman Decl.") ¶¶9, 17-20; Doc. 96, ¶13.)

14.   However, neither the Debtors nor the Landlords' professionals were able to find a replacement operator at current lease rates. (Sherman Decl. ¶¶9, 20.)

15.   On August 7, 2019, Mr. Sherman met with the Landlords' principal Ira Smedra to discuss strategic alternatives for the Debtors' facilities.  (Sherman Decl. ¶21; Adv. Pro. No. 19-8121, Doc. 2 ("Smedra Aff.") ¶16.)

16.   At the meeting the Landlords proposed transferring operations to a new operator. (Doc. 69, ¶2; Smedra Aff. ¶16; see also Doc. 96, ¶14 (Landlords advised Debtors that "a replacement operator was days away from signing on to a new lease package—at reduced rents—with the Landlords").)

17.   The Landlords stated that at the meeting Mr. Sherman demanded they pay him $10 million if they wished "to avoid a bankruptcy filing and have any hope of retaining their buildings as going concern skilled nursing facilities because it was his position that such a payment reflected the value of his interest in the facilities."  (Smedra Aff. ¶16.)

18. Mr. Sherman admitted to having asked "for $10 million as an initial starting figure, which would have gone a long way to ensuring that all of the Debtors' creditors were paid in full," as part of a deal that "would have turned over the facilities to [a replacement] operator," but contends the requested funds were intended "to compensate for the value of the operations in the profitable facilities and the need for me to continue operation of the facilities for a transition period (for regulatory reasons), as well as to satisfy the Debtors' creditors through what I hoped would be an out of court wind down or composition process." (Sherman Decl. ¶23.)

19. No deal was reached. "The Debtors waited to hear confirmation that a deal with a replacement operator was in place, but never heard another word from the Landlords." (Sherman Decl. ¶23.)

20. On August 15, 2019, the Debtors filed their closure plan for the Orchard Park facility with the DOH. (Doc. 83.)

21. On September 10, 2019 ("Petition Date"), the Debtors commenced these cases. Their stated goal was to "to restructure or eliminate the[ir] burdensome leasehold obligations," and "emerge from bankruptcy, with all of their Senior Care Facilities intact, as a going concern." (Doc. 15 ¶¶22, 29.) "If that proves to be impossible, the Debtors will explore other strategic alternatives." (Doc. 15, ¶29.)

22. On September 11, 2019, the DOH approved the closure plan for the Orchard Park facility. (Doc. 20, ¶6.)

23. The Debtors have since implemented the closure plan, and contend that they would have risked enforcement activity and civil penalties had they failed to do so. (Doc. 99, ¶¶16-28.)

24. The Debtors' independent advisor concurred with the decision to close the Orchard Park facility because it was losing money. (Doc. 98, ¶10.)

25. On September 26, 2019, the Debtors' prepetition lender and its affiliate, the Landlords' mortgage lender, objected to the Debtors' continued use of cash collateral without further adequate protection. (Doc. 59, 70.)

26. On September 27, 2019, the Court entered an order to show cause why the operating lease for the Orchard Park facility should not be immediately terminated and the premises surrendered. (Adv. Pro. No. 19-8121, Doc. 13.)

27. At the October 3, 2019 hearing, the Debtors and Landlords announced preliminary terms for resolving the pending motions, objections, and adversary proceeding respecting the Orchard Park facility whereby, inter alia, the Debtors would seek to sell all of their facilities as a going concern.

28. The Court directed the filing of a term sheet by October 8, 2019. (Doc. 133, p.2.)

29. No term sheet was filed; instead on October 10, 2019 the Debtors filed a letter advising that the last patient had been discharged from the facility. (Doc. 137.)

30. In accordance with the DOH Nursing Home Facility Closure Plan Guidelines and the DOH-approved closure plan (Doc. 99-2, pp.1, 5; Doc. 83, p.10), the operating certificate for the facility has been surrendered.

31. Notwithstanding the inability to sell the Orchard Park facility with its operating certificate intact, the Debtors have advised they are committed to selling the Debtors' remaining facilities.

32. On October 16, 2019, the Court entered an Order authorizing the Debtors to borrow up to $819,000 from an entity controlled by Mr. Sherman and authorizing the Debtors' use of cash collateral, on an interim basis. (Doc. 173, "Interim DIP Order.")

33. Each of the Landlords, the Debtors' prepetition lender, the Landlords' mortgage lender, and the United States consented to the form of order. (Doc. 137.)

**ARGUMENT**

I.  **THE APPOINTMENT OF A TRUSTEE IS NOT WARRANTED AT THIS TIME**

   A.  **The Appointment of a Chapter 11 Trustee is Not in the Best Interests of Creditors**

   1. Section 1104(a)(2) provides that the Court shall appoint a chapter 11 trustee if in the best interests of creditors and the estate.

   2. "Appointment of a trustee under 11 U.S.C. § 1104 is an extraordinary remedy … which should not be made lightly." *In re General Oil Distribs., Inc.*, 42 B.R. 402, 408 (Bankr. E.D.N.Y. 1984).

   3. "Consequently, the party seeking the appointment bears the burden of proof … and said burden must be carried by clear and convincing evidence." *Id*.

   4. The Landlords and the U.S. Trustee have not carried their burden under section 1104(a)(2).

   5. "Courts construing this subsection 'eschew rigid absolutes and look to the practical realities and necessities' of the record to determine whether the appointment of a trustee is in the best interests of the estate." *In re Taub*, 427 B.R. 208, 227 (Bankr. E.D.N.Y. 2001)) (citing *In re Adelphia Commc'ns Corp.*, 336 B.R. 610, 658 (Bankr. S.D.N.Y. 2006)). *See also In re V. Savino Oil & Heating Co.*, 99 B.R. 518, 527 n.11 (Bankr. E.D.N.Y. 1989) ("factors constituting a basis for appointing a trustee under § 1104(a)(2) are amorphous, diverse, and necessarily involve a great deal of judicial discretion").

   6. The Debtors need access to the DIP facility and authorization to use cash collateral to, inter alia, support their operations and fund a sale process.

   7. The appointment of a chapter 11 trustee, however, would constitute an Event of Default under the DIP Loan Agreement approved by the Interim DIP Order and a Termination

Event under said Order (Doc. 4, Ex. A, p.8; Interim DIP Order ¶7(a)), which would allow the DIP Lender to terminate his commitment to fund the DIP facility and the DIP Lender and the Debtors' prepetition lender to exercise remedies with respect to the Debtors' property, pursuant to Paragraph 9(a) of the Interim DIP Order.

8.  The appointment of a chapter 11 trustee would also result in the estates incurring significant administrative expenses associated with transitioning the Debtors' operations to said trustee, in addition to professional fees already incurred to the Debtors' professionals, and the chapter 11 trustee's commission and professional fees. The Debtors' estates cannot afford the same, given the Debtors' projected negative cash flow from operations through year end, and restructuring costs incurred to date. (Doc. 173-1, pp.1, 9.)

9.  Moreover, there exists a significant likelihood that upon appointment, a chapter 11 trustee would seek to close one or more of the Debtors' facilities for want of credentials, expertise, or funding, and consume much of the value of the relevant Debtor's remaining healthcare receivables supporting operations pending closure.

10. At a minimum, the appointment of a chapter 11 trustee would likely seriously interfere with and delay the contemplated sale of the Debtors' facilities.[2]

B.  **Cause is Otherwise Lacking for the Appointment of a Chapter 11 Trustee**

11. Section 1104(a)(1) provides for the appointment of a chapter 11 trustee for cause, including dishonesty, incompetence, or gross mismanagement of a debtor's affairs, either before or after the commencement of the case.

---

[2] Acrimony between creditors and management constitutes cause to appoint a chapter 11 trustee where it "extend[s] beyond the healthy conflicts that always exist between debtor and creditor" and serves to jeopardize reorganization prospects. *In re Marvel Entm't Group, Inc.*, 140 F.3d 463, 474 (3d Cir. 1998). Notwithstanding the foregoing, a chapter 11 trustee should not be appointed on said grounds as the Landlords support a sale process for the remaining facilities.

12. The Landlords and the U.S. Trustee have not met their burden under section 1104(a)(1).

13. The Landlords and the U.S. Trustee have argued cause exists to appoint a chapter 11 trustee principally for two reasons: the Debtors' having proceeded with the closure plan without prior Court authorization; and Mr. Sherman's having requested the above-described $10 million payment prepetition.

14. The Debtors' having implemented the closure plan does not constitute cause. The closure plan was submitted prepetition while it appears the Orchard Park Debtor was operationally insolvent. Further, once the closure plan was approved postpetition, the Debtors were required to implement the same, and abide by the Nursing Home Closure Plan Guidelines, not just because they would otherwise risk enforcement action (not subject to the automatic stay), but also because 28 U.S.C. § 959(b) requires debtors in possession to manage their estates in accordance with non-bankruptcy law.

15. As to the $10 million request, it is well established that a chapter 11 trustee should be appointed to replace management that "suffer[s] from material conflicts of interest." *Taub*, 427 B.R. at 227 (citing *In re Ridgemour Meyer Props., LLC*, 413 B.R. 101, 112 (Bankr. S.D.N.Y. 2008)).

16. The Committee further agrees with the Landlords and the U.S. Trustee that the request presented serious loyalty issues, insofar as it would have provided for Mr. Sherman to receive substantial consideration, without providing for payment of all outstanding debt in full (his declaration stated it "would have gone a long way to ensuring that all of the Debtors' creditors were paid in full" and that he "hoped" that creditors' debts would be satisfied through "an out of court wind-down or composition process").

17. However, the $10 million request did not result in an agreed let alone consummated transaction. More significantly, the Debtors subsequently engaged William Lenhart as independent advisor with sole authority to consider and approve any related party transactions. (Doc. 98, ¶8.) In *General Oil Distribs.*, 42 B.R. at 409, the Court rejected the movant's view that "the court cannot consider factors such as improvement in the competence of management and other kinds of reformed conduct," in determining if a chapter 11 trustee should be appointed under section 1104(a)(1). So too here, subsequent changes to the Debtors' governance should be considered in ruling on the pending motions.

18. That is particularly true given the above-described consequences that would likely result from the appointment of a chapter 11 trustee herein. *General Oil Distribs.*, 42 B.R. at 409 ("While under § 1104(a)(1) the court is not directly called upon to weigh the costs and benefits of appointing a trustee, it nevertheless cannot ignore competing benefit *and harm* that such an appointment may place upon the estate … [I]t would be illogical to think that upon a showing that management had been slightly incompetent or dishonest on one occasion, despite the fact that the appointment of a trustee would be harmful to everyone involved, the court would have to … appoint a trustee").[3]

---

[3] Even if the Orchard Park facility could have been sold prepetition as a going concern to the Landlords' contemplated operator (notwithstanding that the new operator would require prior approval from the DOH which would take time to obtain (Doc. 99, ¶7)), that does not mean said operator would have assumed the Orchard Park Debtor's debts and that all of its creditors would have accordingly been paid in full. In general, a corporation that acquires the assets of another is not liable for its predecessor's debts. *Desclafani v. Pave-Mark Corp.*, No. 07-cv-4639, 2008 WL 3914881, at *3 (S.D.N.Y. Aug. 22, 2008). An exception exists where the purchaser is a mere continuation of the seller. *Id.* (citing *Schumacher v. Richards Shear Co.*, 59 N.Y.2d 239, 245, 451 N.E.2d 195, 198 (1983)). However, the "mere continuation" exception is inapplicable "[i]f the predecessor corporation continues to exist after the transaction, in however gossamer a form." *Diaz v. South Bond Lathe Inc.*, 707 F. Supp. 97, 100 (E.D.N.Y. 1989). *See also Conn. Indemn. Co. v. 21st Century Transp. Co.*, No. 99-cv-7735, 2001 WL 868230, at *6 (E.D.N.Y. July 27, 2001) ("a corporation cannot be considered a mere continuation where both parties to a purchase agreement continue to exist following the transaction"). The Orchard Park Debtor would have necessarily

19. The Landlords have requested, as alternative relief, the appointment of a chapter 11 trustee for just the Orchard Park and Orchard Brooke Debtors. (Doc. 69, ¶5.) The stated ground for relief with respect to the Orchard Park Debtor is that appointment is needed to avoid the facility's closure. (Doc. 69, ¶¶39-40.) That ship has sailed, however, the operating certificate having already been surrendered, as noted above. The stated ground for the appointment of a chapter 11 trustee for the Orchard Brooke Debtor is that its facility is adjoined to the Orchard Park facility, and so "potential new operators are likely to consider the two adjoining facilities together to hold significantly higher going concern value than each would otherwise hold separately." (Doc. 69, ¶40.) However, the Orchard Brooke facility must be considered separately given that Orchard Park facility's operating certificate has been surrendered. Accordingly, the motion should be denied insofar as it requests a chapter 11 trustee for those two Debtors.

        **C.**    **The Landlords' Alternative Request for an Examiner Should be Denied**

20. The Committee joins in Debtors' opposition to the Landlords' alternative request for an examiner. (Doc. 96, ¶¶71-76.) By its terms the request raises only a plain vanilla business judgment issue in respect of the decision to close the Orchard Park facility (Doc. 69, ¶¶50-52), which the Debtors were required by law to close on receipt of DOH approval. In addition, given the amount of the DIP facility ($2 million), and the Debtors' projected operating performance and restructuring costs, it behooves all parties to be judicious with the DIP facility, which goal would be undermined by the appointment of an examiner.

---

had to continue to exist post-transaction to collect its healthcare receivables, absent the sale of the same.

**II.     STATEMENT IN RESPECT OF THE ORCHARD PARK FACILITY CLOSURE PLAN**

21.     The motion to approve the closure plan appears to be moot given that the plan has already been implemented and the operating certificate has been surrendered. The Landlords' position appears to have been that the Debtors should have sought prior Court authorization before implementing the closure plan, because the closure does not satisfy the horizontal or vertical dimension tests under Bankruptcy Code section 363(b)(1). (Doc. 56, pp.7, 13.) However, that argument is premised on the closure plan's constituting a postpetition transaction under section 363(b)(1). That premise is false as the closure plan was submitted prepetition. Upon receipt of DOH approval postpetition the Debtors were required to implement the same, as noted above. *See also In re Peninsula Hospital Center, et al.*, No. 11-47056-ess (Doc. 510, 542) (no motion was filed prior to the chapter 7 trustee's submitting a closure plan for the Hospital due to inability to fund continued operations, and surrendering the operating certificate following implementation of the same).

WHEREFORE, the Committee requests that the Court deny the pending motions for relief under section 1104, and grant such other and further relief as the Court deems just and proper.

Dated: October 23, 2019                                Respectfully submitted,
       New York, New York

                                                    /s/ Jeffrey Chubak
                                                    Avery Samet
                                                    Jeffrey Chubak
                                                    AMINI LLC
                                                    140 East 45th Street, 25th Floor
                                                    New York, New York 10017
                                                    (212) 490-4100
                                                    asamet@aminillc.com
                                                    jchubak@aminillc.com
                                                    *Proposed Counsel for the Official Committee of Unsecured Creditors*