**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| | Chapter 11 |
| | |
| | Case No. 19-76260-ast |
| In re: | Case No. 19-76263-ast |
| | Case No. 19-76267-ast |
| ABSOLUT FACILITIES MANAGEMENT, | Case No. 19-76268-ast |
| LLC, et al.,[1] | Case No. 19-76269-ast |
| | Case No. 19-76270-ast |
| Debtors. | Case No. 19-76271-ast |
| | Case No. 19-76272-ast |
| | |
| | (Jointly Administered) |

**OFFICIAL COMMITTEE OF UNSECURED CREDITORS'**
**SECOND AMENDED JOINT CHAPTER 11 PLAN**

Dated: March 24, 2020

Avery Samet
Jeffrey Chubak
AMINI LLC
131 West 35th Street, 12th Floor
New York, New York 10001
(212) 490-4700
asamet@aminillc.com
jchubak@aminillc.com
*Attorneys for the Official Committee of*
*Unsecured Creditors*

---

[1] The Debtors are: Absolut Facilities Management, LLC; Absolut Center for Nursing and Rehabilitation at Allegany, LLC; Absolut Center for Nursing and Rehabilitation at Aurora Park, LLC; Absolut Center for Nursing and Rehabilitation at Gasport, LLC; Absolut at Orchard Brooke, LLC; Absolut Center for Nursing and Rehabilitation at Orchard Park, LLC; Absolut Center for Nursing and Rehabilitation at Three Rivers, LLC; and Absolut Center for Nursing and Rehabilitation at Westfield, LLC.

# TABLE OF CONTENTS

**Page**

ARTICLE I DEFINED TERMS; RULES OF CONSTRUCTION ................................................. 1

1.1    Defined Terms ................................................................................................... 1

1.2    Rules of Construction ...................................................................................... 10

1.3    Computation of Time ...................................................................................... 10

1.4    Exhibits, Supplements, and Schedules ........................................................... 10

ARTICLE II TREATMENT OF UNCLASSIFIED CLAIMS ................................................. 10

2.1    Administrative Expense Claims ....................................................................... 10

    (a)    General Administrative Expense Claims ........................................... 10

    (b)    Professional Fee Claims ..................................................................... 11

2.2    Priority Tax Claims .......................................................................................... 11

2.3    DIP Loan Claim ............................................................................................... 11

2.4    U.S. Trustee Fees ............................................................................................. 11

ARTICLE III CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY
INTERESTS ...................................................................................................................... 12

3.1    Classification .................................................................................................... 12

3.2    Treatment of Claims and Equity Interests ...................................................... 12

    (a)    Class 1: Prepetition Loan Claims ...................................................... 12

    (b)    Class 2: Other Secured Claims .......................................................... 12

    (c)    Class 3: Priority Non-Tax Claims ...................................................... 13

    (d)    Class 4: Landlord Cure Claim ............................................................ 13

    (e)    Class 5: General Unsecured Claims ................................................... 13

    (f)    Class 6: Intercompany Claims ........................................................... 13

    (g)    Class 7: Equity Interests ..................................................................... 14

ARTICLE IV MEANS FOR IMPLEMENTATION ............................................................. 14

4.1    Limited Consolidation ..................................................................................... 14

4.2    Continued Corporate Existence after the Plan Effective Date ......................... 15

4.3    Vesting of Assets ............................................................................................. 15

4.4    Wind Down Budget ......................................................................................... 15

4.5    Appointment of Plan Administrator and Oversight Committee ....................... 15

4.6    Plan Administrator ........................................................................................... 16

4.7    Oversight Committee ....................................................................................... 17

4.8    Officers ............................................................................................................ 18

4.9   Collection of Healthcare Receivables ............................................................... 19

4.10  Wind Down and Dissolution of the Debtors ...................................................... 19

4.11  Dissolution of Committee .................................................................................. 19

4.12  Discharge of Patient Care Ombudsman ............................................................. 20

4.13  Preservation of Causes of Action ...................................................................... 20

4.14  Preservation of Insurance .................................................................................. 20

4.15  Comprehensive Settlement of Claims and Controversies .................................. 20

ARTICLE V PROVISIONS GOVERNING DISTRIBUTIONS ............................................. 21

5.1   Generally ........................................................................................................... 21

5.2   Priority of Distributions .................................................................................... 21

5.3   Timing of Distributions on Allowed Landlord Cure and General Unsecured Claims ..... 21

      (a)    Interim Distributions ............................................................................. 21

      (b)    Final Distributions ................................................................................ 21

5.4   Reserves ............................................................................................................ 22

      (a)    Wind Down Expense Reserve ............................................................... 22

      (b)    Disputed Claims Reserve ...................................................................... 22

5.5   Manner of Distribution ...................................................................................... 22

5.6   Fractional Shares; de Minimis Distributions ..................................................... 22

5.7   Delivery of Distributions ................................................................................... 22

5.8   Undeliverable Distributions ............................................................................... 23

5.9   Time Bar to Cash Payments ............................................................................... 23

5.10  Setoffs and Recoupments .................................................................................. 23

5.11  No Distribution in Excess of Allowed Amount of Claim .................................... 23

5.12  No Interest on Claims ........................................................................................ 24

5.13  Withholding Taxes ............................................................................................. 24

ARTICLE VI PROCEDURES FOR RESOLVING DISPUTED CLAIMS ............................... 24

6.1   Exclusive Right to Object to Claims .................................................................. 24

6.2   Claims Objection Bar Date ................................................................................ 24

6.3   No Distributions on Disputed Claims ................................................................ 24

6.4   Resolution of Claims .......................................................................................... 25

6.5   Estimation of Claims .......................................................................................... 25

ARTICLE VII TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED
LEASES ................................................................................................................. 26

7.1    Rejection of Contracts and Leases .......................................................... 26

7.2    Exceptions to Rejection ........................................................................... 26

7.3    Rejection Claims ...................................................................................... 26

7.4    Effect of Anti-Assignment Provisions .................................................... 26

ARTICLE VIII DISCHARGE, INJUNCTION, EXCULPATION, AND RELEASE ................ 27

8.1    Discharge ................................................................................................. 27

8.2    Injunction ................................................................................................. 27

8.3    Releases by the Debtors ........................................................................... 27

8.4    Exculpation .............................................................................................. 28

8.5    Mutual Releases between (i) Debtor Release Parties and Committee and (ii) Landlord
Release Parties ......................................................................................... 28

8.6    Limitation on Discharge, Injunction, Exculpation, and Release Provisions ..................... 29

8.7    Binding Effect .......................................................................................... 29

8.8    Reservation of Rights in Favor of Governmental Units;  Injunction as to Settlement
Fund ......................................................................................................... 29

ARTICLE IX PLAN MODIFICATION ................................................................................ 30

9.1    Preconfirmation Amendment .................................................................. 30

9.2    Postconfirmation Amendment Not Requiring Solicitation ...................... 31

9.3    Postconfirmation Amendment Requiring Solicitation ............................. 31

ARTICLE X RETENTION OF JURISDICTION ................................................................. 31

10.1    Retention of Jurisdiction .......................................................................... 31

10.2    Courts of Competent Jurisdiction ............................................................ 33

ARTICLE XI CONDITIONS PRECEDENT ....................................................................... 33

11.1    Conditions Precedent to Plan Effective Date .......................................... 33

11.2    Effect of Nonoccurrence of Conditions Precedent to Plan Effective Date ...................... 33

11.3    Conditions Precedent to Sale Effective Date ........................................... 34

ARTICLE XII MISCELLANEOUS ..................................................................................... 34

12.1    Governing Law ........................................................................................ 34

12.2    Continuing Effect of Prior Orders ........................................................... 34

12.3    Exemption from Certain Transfer Taxes .................................................. 34

12.4    Waiver of Bankruptcy Rule 3020 ............................................................ 34

12.5    No Admissions ......................................................................................... 34

12.6    Successors and Assigns ............................................................................ 35

12.7    Severability .................................................................................................... 35

12.8    Notice of Plan Effective Date and Sale Effective Date .................................... 35

12.9    Notices ............................................................................................................ 35

12.10   Post-Effective Date Notice .............................................................................. 36

12.11   Deemed Acts .................................................................................................. 36

12.12   Conflicts ......................................................................................................... 36

The Official Committee of Unsecured Creditors ("<u>Committee</u>") appointed in these Chapter 11 Cases pursuant to section 1102 of title 11 of the United States Code ("<u>Bankruptcy Code</u>") hereby proposes this second amended joint chapter 11 plan (as amended, modified, or supplemented, the "<u>Plan</u>") for Absolut Facilities Management, LLC ("<u>AFM</u>"), Absolut Center for Nursing and Rehabilitation at Allegany, LLC ("<u>Allegany</u>"), Absolut Center for Nursing and Rehabilitation at Aurora Park, LLC ("<u>Aurora Park</u>"), Absolut Center for Nursing and Rehabilitation at Gasport, LLC ("<u>Gasport</u>"), Absolut at Orchard Brooke, LLC ("<u>Orchard Brooke</u>"), Absolut Center for Nursing and Rehabilitation at Orchard Park, LLC ("<u>Orchard Park</u>"), Absolut Center for Nursing and Rehabilitation at Three Rivers, LLC ("<u>Three Rivers</u>"), and Absolut Center for Nursing and Rehabilitation at Westfield, LLC ("<u>Westfield</u>", and together with AFM, Allegany, Aurora Park, Gasport, Orchard Brooke, Orchard Park, and Three Rivers, the "<u>Debtors</u>").

# ARTICLE I
# DEFINED TERMS; RULES OF CONSTRUCTION

## 1.1    Defined Terms

Unless the context otherwise requires, the following capitalized terms used in this Plan shall have the meanings set forth below:

"<u>Administrative Expense Claim</u>" means a Claim arising under sections 503(b), 507(a), 507(b), or 1114(e) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred after the Petition Date and through the Plan Effective Date of preserving the Estates or operating the Debtors' businesses, and (b) Professional Fee Claims, to the extent Allowed by the Court.

"<u>Administrative Services Agreement</u>" or "<u>ASA</u>" means the Administrative Services and Consulting Agreement, dated as of January 30, 2020, among the Selling Debtors and Purchaser.

"<u>Allowed</u>" means, with respect to any Claim: (a) any Claim against the Debtors which has been listed by the Debtors in their Schedules as liquidated in amount and not disputed or contingent and for which no contrary Proof of Claim has been filed; (b) any Claim arising on or before the Plan Effective Date for which a Proof of Claim has been timely filed before the applicable Bar Date (i) as to which no objection to allowance has been interposed or (ii) as to which any objection has been determined by a Final Order to the extent such objection is determined in favor of the respective holder; (c) any Claim as to which the liability of the Debtors and the amount thereof are determined by a Final Order of a court of competent jurisdiction other than the Court and for which a Proof of Claim has been timely filed before the applicable Bar Date; or (d) any Claim expressly Allowed hereunder or pursuant to a Final Order of the Court; <u>provided</u>, <u>however</u>, that Claims allowed solely for voting purposes by order of the Court shall not be considered Allowed hereunder. Unless otherwise specified herein or by order of the Court, the term "Allowed … Claim" shall not, for any purpose under this Plan, include interest, punitive damages or any fine or penalty on such Claim from and after the Petition Date. Unless otherwise provided in an order of the Court, for purposes of determining the amount of an Allowed Claim, there shall be deducted therefrom an amount equal to the value or amount of any Cause of Action which the Debtors may hold or assert against the holder thereof, to the extent such Cause of Action may be set off pursuant to sections 502(d) or 558 of the Bankruptcy Code.

"ASA Effective Date" means the date the Administrative Services Agreement became effective in accordance with its terms.  The ASA Effective Date was March 1, 2020.

"Avoidance Actions" means any and all actual or potential claims and Causes of Action to avoid a transfer of property or an obligation pursuant to Chapter 5 of the Bankruptcy Code.

"Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure.

"Bar Dates" means those dates and times defined as the "Bar Dates" in the *Order (A) Establishing Deadline for Filing Proofs of Claim, Including Requests for Payment under Section 503(b)(9) of the Bankruptcy Code, and (B) Approving Form and Manner of Notice of Bar Date*, entered October 28, 2019 [Dkt. No. 205], and those dates and times specified in Section 2.1(a) and Section 7.3.

"Billit" means of Billit Accounting & Information Technology LLC.

"Capital Funding" means Capital Funding, LLC, Capital Funding Group, Inc., and any of their predecessors, successors, and/or assigns.

"Capital Funding Security Agreements" means the Lessee Security Agreements executed by Allegany, Aurora Park, Gasport, Orchard Park, Orchard Brooke, and Three Rivers, as well as any related documents, that granted to Capital Funding and to HUD security interests in and Liens upon the Collateral (as defined therein).

"Cause" means gross negligence, breach of fiduciary duty, reckless or willful mishandling of the Debtors' property, fraud, or willful misconduct.

"Causes of Action" means all actions, causes of action (including Avoidance Actions), liabilities, obligations, rights, suits, debts, damages, judgments, remedies, demands, setoffs, defenses, recoupments, cross-claims, counterclaims, third-party claims, indemnity claims, contribution claims or any other claims whatsoever, in each case held by the Debtors, whether disputed or undisputed, suspected or unsuspected, foreseen or unforeseen, direct or indirect, choate or inchoate, existing or hereafter arising, in law, equity or otherwise, whether direct, indirect, derivative, or otherwise, based in whole or in part upon any act or omission or other event occurring prior to the Petition Date, or during the course of the Chapter 11 Cases through the Plan Effective Date.

"Chapter 11 Cases" means when used with reference to a particular Debtor the chapter 11 case commenced by it, and when used with reference to all Debtors the jointly administered chapter 11 cases commenced by all of them.

"CHOW Process" means Purchaser's submission of its Certificate of Need application to the New York State Department of Health and its Transfer of Physical Assets application to the U.S. Department of Housing and Urban Development, with respect to each skilled nursing or assisted living facility being acquired.

"Claim" means any claim (as defined in section 101(5) of the Bankruptcy Code) against a Debtor.

"Claims Agent" means Prime Clerk LLC.

"Claims Objection Bar Date" means the General Claims Objection Bar Date and the Tort Claims Objection Bar Date.

"Class" means a category of Claims or Equity Interests classified together as described in Article III, pursuant to section 1122(a) of the Bankruptcy Code.

"Confirmation Date" means the date on which the Court enters the Confirmation Order.

"Confirmation Hearing" means the hearing conducted by the Court pursuant to section 1128(a) of the Bankruptcy Code to consider confirmation of this Plan, as such hearing may be adjourned or continued from time to time.

"Confirmation Order" means the order of the Bankruptcy Code confirming this Plan pursuant to section 1129 of the Bankruptcy Code.

"Consent Decree" means the Consent Decree entered in the EEOC Action on September 24, 2018 [Dkt. No. 4].

"Court" means the United States Bankruptcy Court for the Eastern District of New York.

"Cure Amounts" means all amounts that must be paid by the Debtors and all obligations that otherwise must be satisfied pursuant to section 365(b)(1)(A) of the Bankruptcy Code in connection with any assumed Executory Contracts or Unexpired Leases in connection with the Sale as provided in the Purchase Agreement or the Sale Order.

"Debtor(s)" has the meaning set forth in the preamble to this Plan.

"Debtor Release Parties" shall have the meaning set forth in Section 8.5(a).

"DIP Lender" means ABS DIP, LLC.

"DIP Loan" means the revolving credit facility provided under the DIP Loan Agreement.

"DIP Loan Agreement" has the meaning ascribed to such term in the DIP Order.

"DIP Loan Claim" means the Claim of ABS DIP, LLC against each Debtor arising under the DIP Loan Agreement and the DIP Order, which shall be Allowed in the amount set forth in Section 2.3.

"DIP Order" means the *Final Order (i) Authorizing Debtors to (a) Obtain Postpetition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), and 364(e), and (b) Use Cash Collateral pursuant to 11 U.S.C. § 363, and (ii) Granting Adequate Protection Pursuant to 11 U.S.C. §§ 361, 362, 363, and 364*, entered November 22, 2019 [Dkt. No. 264].

"<u>Disclosure Statement</u>" means the disclosure statement to accompany this Plan, including all attached exhibits, appendices, and schedules, as provisionally approved by the Court as containing adequate information, pursuant to section 1125 of the Bankruptcy Code, and as may be amended, modified, or supplemented from time to time.

"<u>Disputed</u>" means, with respect to any Claim, a Claim or any portion thereof that has not been Allowed pursuant to this Plan or a Final Order of the Court and:

(a)    if a Proof of Claim has been timely filed by the applicable Bar Date, such Claim is designated on such Proof of Claim as unliquidated, contingent, or disputed, or in zero or unknown amount, and has not been resolved by written agreement of the parties or a Final Order of the Court;

(b)    if either (i) a Proof of Claim has been timely Filed by the applicable Bar Date or (ii) a Claim has been listed on the Schedules as liquidated in amount, non-contingent and undisputed, a Claim as to which an objection or request for estimation has been timely filed which has not been withdrawn, overruled, or determined by a Final Order;

(c)    that is the subject of an objection or request for estimation filed in the Court and which objection or request for estimation has not been withdrawn, resolved, or overruled by a Final Order; or

(d)    that is otherwise disputed by the Plan Administrator or Responsible Officer, as applicable, in accordance with the provisions of this Plan or applicable law, which dispute has not been withdrawn, resolved, or overruled by a Final Order.

"<u>Disputed Claims Reserve</u>" means a reserve established in accordance with Section 5.4(b) for the payment of Disputed Claims.

"<u>Distribution</u>" means cash distributed under this Plan to holders of Allowed Claims.

"<u>Distribution Date</u>" means the date of any Distribution under this Plan.  The initial Distribution Date shall occur as soon as reasonably practicable following the Plan Effective Date, as determined by the Plan Administrator.  Subsequent Distribution Dates shall occur as soon as practicable following a determination by the Plan Administrator that there exists sufficient available cash to warrant subsequent Distributions.

"<u>DOH</u>" shall mean the New York State Department of Health.

"<u>EEOC Action</u>" means the action titled *Equal Employment Opportunity Commission v. Absolut Facilities Management, LLC, et al.*, Case No. 1:18-cv-01020 (W.D.N.Y.).

"<u>Equity Interests</u>" means any membership interest in one or more of the Debtors.

"<u>Estates</u>" means the estates of the Debtors created upon the Petition Date pursuant to section 541 of the Bankruptcy Code.

"<u>Executory Contract or Unexpired Leases</u>" means a contract or lease to which one or more Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

"<u>Final Order</u>" means an order or judgment of the Court or other court of competent jurisdiction with respect to the subject matter, as entered on the docket in any Chapter 11 Cases or the docket of any court of competent jurisdiction, and as to which the time to appeal, seek reconsideration under Rule 59 of the Federal Rules of Civil Procedure, seek a new trial, reargument, or rehearing and, where applicable, petition for certiorari has expired, and no appeal or petition for certiorari or other proceedings for a new trial, reargument, or rehearing has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be timely filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, reargument, or rehearing shall have been denied, resulted in no stay pending appeal of such order, or has otherwise been dismissed with prejudice; <u>provided</u>, <u>however</u>, that the possibility that a motion pursuant to Rule 60 of the Federal Rules of Civil Procedure or Bankruptcy Rule 9024, or any analogous rule, may be filed relating to such order or judgment shall not cause such order or judgment not to be a Final Order.

"<u>General Administrative Expense Claim</u>" means any Administrative Expense Claim other than a Professional Fee Claim.

"<u>General Claims Objection Bar Date</u>" means the bar date for objecting to all Claims against the Debtors other than Tort Claims, which shall be three (3) years after the Plan Effective Date; <u>provided</u>, <u>however</u>, the Plan Administrator may seek additional extensions of this date for cause shown.

"<u>General Unsecured Claim</u>" means any Claim other than an Administrative Expense Claim, a Priority Claim, a Secured Claim, or a Landlord Cure Claim, asserted as unsecured against the Debtors.

"<u>Governmental Unit</u>" has the meaning ascribed to such term in section 101(27) of the Bankruptcy Code.

"<u>Healthcare Receivables</u>" means all of the Debtors' accounts receivable and other rights to payment from any source that arise from services rendered by the Debtors prior to the ASA Effective Date, whether billed before or after the ASA Effective Date.

"<u>HUD</u>" means the United States Department of Housing and Urban Development.

"<u>Insurance Policy</u>" means any issued policy of insurance and any agreements relating thereto covering the Debtors, the Estates, or their members, managers, officers, employees, or fiduciaries, or that may be available to provide coverage for Claims against the Debtors or any of the foregoing, including without limitation any general liability, property, workers compensation, casualty, umbrella, or excess liability policy(ies), errors and omissions, directors and officer or similar executive, fiduciary and organization liability policy(ies) (Side A, B, or C coverage), and any tail with respect thereto.

"Intercompany Claims" means collectively any Claim, Cause of Action, or remedy held by a Debtor against another Debtor.

"Landlord Claim Settlement" means: (a) Allowance of the Landlord Group's Claims as follows: (i) $1 million of the cure amount due the Landlord Group as an Administrative Expense Claim that will be paid after Debtors' payroll taxes have been paid in full but before payment of all other Priority Tax Claims, and (ii) the balance of the amounts asserted in the Landlord Group's Proofs of Claim as General Unsecured Claims; and (b) upon the Plan Effective Date, in lieu of the foregoing: (i) Allowance of the Landlord Cure Claim which will receive treatment as a Class 4 Claim as set forth in Section 3.2(d), and (ii) Allowance of the Landlord Group's Claims asserted in the Proof of Claim filed against Orchard Park which will receive treatment as a Class 5 Claim as set forth in Section 3.2(e); provided, however, that in the event the Landlord Group informs the Debtors and Committee in a signed writing that its personal property that is alleged to be missing from the Orchard Park facility has been returned to the Landlord Group's reasonable satisfaction, the Landlord Group will waive its Class 5 Claims. The foregoing description is a summary only and is qualified in its entirety by reference to the Plan Term Sheet.

"Landlord Cure Claim" means the Landlord Group's General Unsecured Claim that is Allowed in the amount set forth in Section 3.2(d).

"Landlord Group" means 292 Main Street, LLC; 6060 Armor Road, LLC; 2178 N. Fifth Street, LLC; 101 Creekside Drive, LLC; 4540 Lincoln Drive, LLC; and 26 Cass Street, LLC.

"Landlord Release Parties" shall have the meaning set forth in Section 8.5(a).

"Lien" has the meaning ascribed to that term in section 101(37) of the Bankruptcy Code.

"Net Available Cash" shall mean, and be calculated, as follows: the amount of the Debtors' cash and all proceeds of Estate assets less Retained Proceeds and unpaid and outstanding Allowed Secured Claims, Allowed Administrative Expense Claims, and Allowed Priority Claims.

"Non-Debtor Entities" means Absolut Center for Nursing and Rehabilitation at Dunkirk, LLC, Absolut Center for Nursing and Rehabilitation at Eden, LLC, Absolut Center for Nursing and Rehabilitation at Endicott, LLC, Absolut Center for Nursing and Rehabilitation at Houghton, LLC, and Absolut Center for Nursing and Rehabilitation at Salamanca, LLC.

"Officers" shall have the meaning set forth in Section 4.8.

"OMIG" means the New York State Office of the Medicaid Inspector General.

"Other Secured Claim" means any Claim other than the Prepetition Loan Claims and the DIP Loan Claim that is secured by a Lien on property in which the Estates have an interest, to the extent of the value of the holder's interest in the Estates' interest in such property, as determined in accordance with section 506(a) of the Bankruptcy Code. For the avoidance of doubt, the Claims of Capital Funding and HUD are Other Secured Claims.

"Oversight Committee" means the committee established pursuant to Section 4.5 and Section 4.7.

"<u>Petition Date</u>" means September 10, 2020.

"<u>Plan Administrator</u>" means Ronald Winters of Gibbins Advisors, LLC, or any successor.

"<u>Plan Administrator Agreement</u>" means the agreement governing the employment, duties, and compensation of the Plan Administrator, as described in Section 4.6, the form of which shall be included in the Plan Supplement.

"<u>Plan Effective Date</u>" means a Business Day selected by the Committee in consultation with the Plan Administrator after all conditions specified in Section 11.1 have been satisfied or waived, and on which the Plan Administrator commences making Distributions. The Plan shall be deemed to be substantially consummated under sections 101 and 1127 of the Bankruptcy Code on the Plan Effective Date.

"<u>Plan Settlement</u>" means the settlement embodied by the Plan Term Sheet, which compromises and settles certain Claims and issues related to the Sale and this Plan and provides for among other things: (a) the Landlord Claim Settlement; (b) the DIP Lender's waiver of $50,000 on account of the DIP Loan Claim; (c) certain caps on Professional Fee Claims of Debtors' counsel and Chief Restructuring Officer; (d) certain releases provided in this Plan; and (E) appointment of the Plan Administrator. The foregoing description is a summary only and is qualified in its entirety by reference to the Plan Term Sheet.

"<u>Plan Supplement</u>" means the supplemental documents, schedules, and exhibits to this Plan, to be filed no later than seven (7) days before the deadline established by the Court for submitting votes to accept or reject this Plan; <u>provided</u>, <u>however</u>, that the Committee shall have the right to amend all such documents through the Plan Effective Date, with the consent of the Debtors and the Landlord Group which shall not be unreasonably withheld.

"<u>Plan Term Sheet</u>" means the Chapter 11 Plan Term Sheet that is annexed to the Sale Order, a copy of which is also annexed to the Disclosure Statement.

"<u>Prepetition Loan Agreements</u>" means (a) the Credit and Security Agreement dated as of May 22, 2009, among Capital Finance, LLC, as lender and agent, and Allegany, Aurora Park, Gasport, Orchard Park, and Three Rivers, as borrowers; and (b) the Credit and Security Agreement dated as of May 22, 2009, among Capital Finance, LLC, as lender and agent, and AFM and Westfield, as borrowers.

"<u>Prepetition Loan Claims</u>" means the Claims against the Debtors arising under the Prepetition Loan Agreements.

"<u>Priority Claims</u>" means, collectively, Priority Non-Tax Claims and Priority Tax Claims.

"<u>Priority Non-Tax Claim</u>" means any Claim accorded priority in right of payment under section 507(a)(4)-(7) of the Bankruptcy Code.

"<u>Priority Tax Claim</u>" means a Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

"<u>Pro Rata Share</u>" means, with respect to any Distribution to the holder of an Allowed Claim in a particular Class or otherwise, a fraction, the numerator of which will be the holder's Allowed Claim and the denominator of which will be the sum of all Allowed Claims and all Disputed Claims in such Class and, if applicable, other Classes.

"<u>Professional Fee Claim</u>" means a Claim for compensation or reimbursement of expenses under section 330, 331, or 503(b) of the Bankruptcy Code.

"<u>Professional Fee Claim Caps</u>" means the caps contained in the Plan Term Sheet for (a) Debtors' counsel Loeb & Loeb LLP in the amount of $2.7 million and (b) Debtors' Chief Restructuring Officer in the amount of $574,900.

"<u>Proof of Claim</u>" means a proof of claim filed against a Debtor in the Chapter 11 Cases.

"<u>Purchase Agreement</u>" means the Asset Purchase Agreement, dated as of January 30, 2020, among the Selling Debtors and Purchaser.

"<u>Purchaser</u>" means RCA Healthcare Management, LLC or its affiliates.

"<u>Released Parties</u>" shall have the meaning set forth in Section 8.3.

"<u>Rejection Claims</u>" shall have the meaning set forth in Section 7.3.

"<u>Rejection Deadline</u>" shall have the meaning set forth in Section 7.3.

"<u>Reserves</u>" means the Wind Down Expense Reserve and Disputed Claims Reserve.

"<u>Responsible Officer</u>" shall have the meaning set forth in Section 4.8(a).

"<u>Responsible Officer Agreement</u>" means an agreement governing the employment, duties, and compensation of the Responsible Officer, the form of which shall be included in the Plan Supplement.

"<u>Retained Proceeds</u>" means all amounts allocated to the Reserves plus any unpaid and outstanding fees due to the Plan Administrator or its professionals or the Responsible Officer that are not otherwise allocated to and provided for in the Wind Down Expense Reserve.

"<u>Sale</u>" means the sale of the Debtors' assets to Purchaser pursuant to the Purchase Agreement.

"<u>Sale Effective Date</u>" means a Business Day selected by the Plan Administrator in consultation with the Responsible Officer after all conditions specified in Section 11.3 have been satisfied or waived.

"<u>Sale Order</u>" means the *Order Authorizing (i) Sale of Substantially all of the Debtors' Assets to RCA Healthcare Management, LLC, Free and Clear of Liens, Claims, and Interests and (ii) Assumption and Assignment of Contracts*, entered February 10, 2020 [Dkt. No. 446].

"Sale Proceeds" means the proceeds from the Sale payable under the Purchase Agreement.

"Schedules" means the Schedules of Assets and Liabilities and the Statement of Financial Affairs filed by each Debtor on October 16, 2019, and any and all amendments and modifications thereto.

"Secured Claims" means, collectively, the Prepetition Loan Claims, DIP Loan Claim, and Other Secured Claims.

"Selling Debtors" means all of the Debtors other than Orchard Park.

"Settlement Agreement" means that certain Settlement Agreement, dated as of November 20, 2019, approved by *Order Approving Settlement Agreement Between the Debtors, the Landlord Group, and Israel Sherman*, dated December 18, 2019 [Dkt. No. 322].

"Settlement Fund" means the balance of the deposit account at M&T Bank titled in the name of AFM, opened on or about November 27, 2018 and funded in the amount of $425,000 pursuant to the Consent Decree (Acct. No. ending 7673).

"Tort Claims" asserting a right to payment on account of wrongful death, professional liability or malpractice or other tort Liability.

"Tort Claims Objection Bar Date" means the bar date for objecting to all Tort Claims, which shall be three (3) years after the Plan Effective Date; provided, however, the Responsible Officer may seek additional extensions of this date for cause shown.

"Undeliverable Distribution" shall have the meaning set forth in Section 5.8.

"U.S. Trustee Fees" means all fees and charges assessed against the Estates pursuant to 28 U.S.C. § 1930.

"Wind Down Budget" means the budget annexed to the Plan Term Sheet, as the same may be modified from time to time in accordance with this Plan.

"Wind Down Expense Reserve" means a reserve established for the payment of Wind Down Expenses.

"Wind Down Expenses" means all costs, expenses, and other liabilities incurred or anticipated to be incurred by the Plan Administrator and the Debtors in exercising their rights and fulfilling their obligations under this Plan and the Plan Administrator Agreement, including amounts due to the Plan Administrator and professionals employed by him, amounts due to the members of the Oversight Committee, amounts payable to the Responsible Officer, the cost of directors and officers liability insurance provided pursuant to Section 4.8, U.S. Trustee Fees, and all other amounts set forth in the Wind Down Budget.

## 1.2    Rules of Construction

The words "herein," "hereof," "hereto," and "hereunder," refer to this Plan as a whole and not to any particular Article or Section. Unless otherwise specified, all references in this Plan to an Article, Section, or Exhibit, are to the respective Article of, Section of, or Exhibit to, this Plan. Whenever from the context it is appropriate, each term, whether stated in the singular or the plural, will include both the singular and the plural. Any term that is not otherwise defined herein, but that is defined in the Bankruptcy Code or Bankruptcy Rules, shall have the meaning given to that term in the Bankruptcy Code or Bankruptcy Rules. The rules of construction contained in section 102 of the Bankruptcy Code shall apply to the construction of this Plan. Captions and headings in this Plan are for convenience of reference only and shall not limit or otherwise affect the provisions hereof.

## 1.3    Computation of Time

The provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed by this Plan.

## 1.4    Exhibits, Supplements, and Schedules

All exhibits, supplements, and schedules to this Plan, including those filed with the Plan Supplement, are incorporated into and are a part of this Plan as if set forth herein.

## ARTICLE II
## TREATMENT OF UNCLASSIFIED CLAIMS

## 2.1    Administrative Expense Claims

(a)    General Administrative Expense Claims

Except to the extent that the holder of an Allowed General Administrative Expense Claim agrees to less favorable treatment, and subject to Section 5.2, each such holder shall receive on account of such Claim cash in an amount equal to the Allowed amount of such Claim, on the later of the Plan Effective Date and the date on which such General Administrative Expense Claim becomes an Allowed General Administrative Expense Claim, or as soon as reasonably practicable thereafter; provided, however, absent an order to the contrary, no Allowed General Administrative Expense Claim (other than the DIP Loan Claim) may be paid prior to the Plan Effective Date that is not contained in the Wind Down Budget and has not been paid prior to the ASA Effective Date.

Each holder of a General Administrative Expense Claim, other than the holder of (i) the DIP Loan Claim, or (ii) a General Administrative Expense Claim for an expense or liability incurred and payable in the ordinary course of business by a Debtor, or arising in the ordinary course of business out of the employment of an individual from and after the Petition Date, must file with the Court an application for Allowance of such General Administrative Expense Claim within thirty (30) days following the Plan Effective Date. Such application must include at a minimum the name of the applicable Debtor that is purported to be liable for such Claim, the asserted amount of the General Administrative Expense Claim, the basis for such Claim, and

10

supporting documentation. **Any holder of a General Administrative Expense Claim that does not timely apply for Allowance of the same within the foregoing thirty (30) day period shall be forever barred from asserting such Claims against the Plan Administrator, the Debtors, or their property, and such holder shall be enjoined from commencing or continuing any action, employment of process, or act to collect, offset, or recover such Claim.**

(b)    Professional Fee Claims

All attorneys or other professional persons employed by the Debtors or the Committee pursuant to section 327 or 1103 of the Bankruptcy Code shall file their respective applications for final Allowance of their respective Professional Fee Claims within thirty (30) days following the Plan Effective Date. Each such professional shall receive on account of such Claim payment in full in cash in the amount Allowed by the Court after notice and a hearing, subject to the Professional Fee Claim Caps (as applicable) and subject to Section 5.2.

## 2.2    Priority Tax Claims

Except to the extent that the holder of an Allowed Priority Tax Claim agrees to less favorable treatment, and subject to Section 5.2, each such holder shall receive on account of such Claim, at the option of the Plan Administrator, (a) cash in an amount equal to the Allowed amount of such Claim, on the later of the Plan Effective Date and the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim, or as soon as reasonably practicable thereafter, or (b) installment payments in accordance with section 1129(a)(9)(C) of the Bankruptcy Code.

## 2.3    DIP Loan Claim

Subject to Section 5.2, the DIP Lender shall receive on account of its Allowed DIP Loan Claim cash in an amount equal to the Allowed amount of such Claim, on the Plan Effective Date or as soon as reasonably practicable thereafter. The DIP Loan Claim shall be Allowed in the amount of outstanding obligations due and payable under the DIP Order and DIP Loan Agreement with interest on all outstanding obligations owed calculated at the non-default rate, less $50,000. Except for the specific agreements of the DIP Lender in this Plan concerning the treatment to be afforded to the Prepetition Loan Claims and the DIP Loan Claim, post-confirmation governance of the Debtors, and use of the DIP Lender's collateral to fund the Wind Down Budget (as approved by the DIP Lender), until the DIP Loan Claim is paid in full, nothing in this Plan or the Confirmation Order shall constitute or be deemed to constitute a waiver or novation of any rights and remedies held by or granted to the DIP Lender under the DIP Order and the DIP Loan Agreement.

## 2.4    U.S. Trustee Fees

All U.S. Trustee Fees incurred by the Debtors attributable to the period ending on the Plan Effective Date shall be paid within thirty days following such date. Following the Plan Effective Date, the Plan Administrator shall file post-confirmation quarterly reports in accordance with the guidelines established by the Office of the U.S. Trustee, and pay U.S. Trustee Fees based on each Debtor's disbursements until its respective Chapter 11 Case has been closed.

## ARTICLE III
## CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS

**3.1     Classification**

The following table designates Classes of Claims and Equity Interests for all purposes, including voting, confirmation, and Distribution pursuant to this Plan, and specifies which Classes are impaired or unimpaired under sections 1123 and 1124 of the Bankruptcy Code, and entitled to vote to accept or reject this Plan in accordance with section 1126 of the Bankruptcy Code or deemed to accept or reject this Plan.

| Class | Designation | Status under Plan | Voting Status |
|-------|-------------|-------------------|---------------|
| 1 | Prepetition Loan Claims | Unimpaired | Deemed to accept |
| 2 | Other Secured Claims | Unimpaired | Deemed to accept |
| 3 | Priority Non-Tax Claim | Unimpaired | Deemed to accept |
| 4 | Landlord Cure Claim | Impaired | Entitled to vote |
| 5 | General Unsecured Claims | Impaired | Entitled to vote |
| 6 | Intercompany Claims | Impaired | Deemed to reject |
| 7 | Equity Interests | Impaired | Deemed to reject |

**3.2     Treatment of Claims and Equity Interests**

Subject to Section 5.2, each Class of Claims and Equity Interests shall receive treatment under this Plan as follows:

(a)     Class 1: Prepetition Loan Claims

Each holder of an Allowed Prepetition Loan Claim shall receive on account thereof cash in an amount equal to the Allowed amount of such Claim, on the Plan Effective Date or as soon as reasonably practicable thereafter.  Each Prepetition Loan Claim shall be Allowed in the amount of outstanding obligations due and payable under the applicable Prepetition Loan Agreement with interest on outstanding principal calculated at the non-default rate.

(b)     Class 2: Other Secured Claims

Except to the extent that the holder of an Allowed Other Secured Claim agrees to less favorable treatment, each such holder shall receive on account of such Claim, at the option of the Plan Administrator, (i) cash in an amount equal to the Allowed amount of such Claim, on the later of the Plan Effective Date and the date on which such Other Secured Claim becomes an Allowed Other Secured Claim, or as soon as reasonably practicable thereafter, (ii) delivery of the collateral

12

securing such Allowed Other Secured Claim and payment of any interest required by section 506(b) of the Bankruptcy Code, or (iii) such other treatment necessary to satisfy the requirements of section 1129 of the Bankruptcy Code. Each holder of an Allowed Other Secured Claim shall retain the Liens securing such Claim as of the Plan Effective Date until full and final satisfaction of such Claim is made as provided herein, after which such Liens shall be deemed released, terminated, and extinguished, in each case without further notice to or order of the Court, act or action under applicable law, regulation, order or rule, or the vote, consent, authorization, or approval of any person. For the avoidance of doubt, Capital Funding and HUD shall retain security interests in, and Liens upon the Collateral (as defined in the Capital Funding Security Agreements), which consists of substantially all of the Debtors' assets (except with respect to the assets of AFM and Westfield), including, but not limited to, contracts, Medicare and Medicaid provider agreements, operating licenses, cash, and accounts receivable, including, but not limited to, Healthcare Receivables. Nothing contained herein shall modify, affect, impair or alter any rights, remedies, claims, Liens, encumbrances, interests and/or defenses of Capital Funding and/or HUD under any agreements, regulatory agreements, loan agreements, security agreements, notes, mortgages, leases, lease addenda, deeds of trust, and/or any other documents, all of which shall remain in full force and effect, and/or any orders (including, but not limited to, the DIP Order and the Sale Order), statutes, rules, regulations, policies, and/or applicable law.

(c)    Class 3: Priority Non-Tax Claims

Except to the extent that the holder of an Allowed Priority Tax Claim agrees to less favorable treatment, and subject to Section 5.2, each such holder shall receive on account of such Claim, (a) cash in an amount equal to the Allowed amount of such Claim, on the later of the Plan Effective Date and the date on which such Priority Non-Tax Claim becomes an Allowed Priority Non-Tax Claim, or as soon as reasonably practicable thereafter.

(d)    Class 4: Landlord Cure Claim

The Landlord Group shall receive on account of its Allowed Landlord Cure Claim its Pro Rata Share of eighty-five percent (85%) of the Net Available Cash, on the Plan Effective Date or as soon as reasonably practicable thereafter. The Landlord Cure Claim shall be Allowed in the amount of $2,385,000.

(e)    Class 5: General Unsecured Claims

Except to the extent that the holder of an Allowed General Unsecured Claim agrees to less favorable treatment, each such holder shall receive on account of such Claim its Pro Rata Share of (i) fifteen percent (15%) of the Net Available Cash, prior to payment in full of the Allowed Landlord Cure Claim, and (ii) one hundred percent (100%) of the Net Available Cash thereafter.

(f)    Class 6: Intercompany Claims

Upon the Plan Effective Date, all Intercompany Claims shall be cancelled and holders of Intercompany Claims will receive no Distribution on account of such Claims.

(g)    <u>Class 7: Equity Interests</u>

Upon the Plan Effective Date, each holder of an Equity Interest in the Debtors shall retain such interests.  Upon the Sale Effective Date, all Equity Interests shall be deemed to be cancelled. Holders of Equity Interests shall receive no Distribution or other recovery on account of such interests.

**ARTICLE IV**
**<u>MEANS FOR IMPLEMENTATION</u>**

**4.1    Limited Consolidation**

(a)    This Plan is predicated upon the limited consolidation of the Debtors' Estates into a single Debtor for purposes of this Plan, the confirmation hereof, and Distributions hereunder.

(b)    Upon the Plan Effective Date, (i) all property of the Debtors' Estates, and all liabilities, obligations, or indebtedness of the Debtors accruing prior to the Plan Effective Date, will be deemed merged into AFM (as such, "<u>Consolidated Debtors</u>") solely for purposes of this Plan, the confirmation hereof, and Distributions hereunder; (ii) the obligations of each Debtor will be deemed to be the obligation of the Consolidated Debtors solely for purposes of this Plan, the confirmation hereof, and Distributions hereunder; (iii) any Claims filed or to be filed in connection with any such obligations will be deemed Claims against the Consolidated Debtors and all Claims filed against more than one Debtor for the same liability shall be deemed one Claim against any obligation of the Consolidated Debtors; (iv) all transfers, disbursements, and Distributions made by any Debtor hereunder on account of Allowed Claims and will be deemed to be made by the Consolidated Debtors, (v) all guarantees of the Debtors of the obligations of any other Debtors shall be deemed eliminated so that any Claim against any Debtor and any guarantee thereof executed by any other Debtor and any joint or several Liability of any of the Debtors shall be deemed to be one obligation of the Consolidated Debtors, and (vi) no Distributions shall be made under the Plan on account of Intercompany Claims and all such Claims shall be eliminated.

(c)    Notwithstanding the foregoing, such limited consolidation shall not modify, affect, impair, or alter: (i) any obligations under any contracts or leases that were entered into during the Chapter 11 Cases or Executory Contracts or Unexpired Leases that will be (or have been) assumed and assigned in connection with the Sale; (ii) distributions from any Insurance Policies or proceeds of such policies; (iii) each Debtor's obligation to file post-confirmation quarterly reports and pay related U.S. Trustee Fees, which obligation shall continue with respect to each Debtor until such time as its Chapter 11 Case has been closed; (iv) the respective collateral pledged by any of the Debtors to the holders of Allowed Secured Claims; (v) any rights, remedies, claims, Liens, encumbrances, interests, or defenses of Capital Funding and/or HUD under any agreements, regulatory agreements, loan agreements, security agreements, notes, mortgages, leases, lease addenda, deeds of trust, and/or any other documents, all of which shall remain in full force and effect, and/or any orders (including, but not limited to, the DIP Order and the Sale Order), statutes, rules, regulations, policies, and/or applicable law; or (vi) the rights, remedies, Claims, and Liens granted to the DIP Lender under the DIP Order, the DIP Loan Agreement, and the Sale Order.

14

## 4.2    Continued Corporate Existence after the Plan Effective Date

From and after the Plan Effective Date, each Debtor shall be reorganized and shall conduct the business of ensuring that the Sale is consummated, including satisfaction of the operational obligations provided under the ASA.  In accordance with section 1123(a)(6) of the Bankruptcy Code, each Debtor's certificate of incorporation and bylaws shall be deemed amended to include a provision prohibiting the issuance of non-voting equity securities.

## 4.3    Vesting of Assets

Except as otherwise provided in this Plan, pursuant to section 1141(b) of the Bankruptcy Code, upon the Plan Effective Date all property of the Debtors' Estates of any type or nature shall vest in the Debtors, free and clear of all Liens, Claims, or other encumbrances.  Such property shall include, but shall not be limited to: the Healthcare Receivables, cash on hand as of the ASA Effective Date less amounts subsequently disbursed prior to the Plan Effective Date as set forth in the Wind Down Budget, any right to payment under the ASA or Purchase Agreement, Causes of Action preserved under this Plan, the Settlement Fund (only if determined by Final Order to be Estate property, as contemplated in Section 8.8 or as otherwise provided in Section 8.8), and AFM's interests in the Non-Debtor Entities.  Except as otherwise provided in this Plan, on and after the Plan Effective Date the Debtors may use, sell, lease, or abandon their property without the need for prior approval of the Court.  For the avoidance of doubt, Capital Funding and HUD shall retain security interests and Liens upon the Collateral (as defined in the Capital Funding Security Agreements), and the DIP Lender shall retain all Liens granted in the DIP Order and the DIP Loan Agreement.

## 4.4    Wind Down Budget

The cost of monetizing the Debtors' non-cash assets, including the Healthcare Receivables and otherwise complying with the Debtors' obligations as debtors under the Bankruptcy Code and of closing out the Chapter 11 Cases, shall be funded from the Wind Down Budget.  If necessary, and subject to the reasonable approval of the Landlord Group, the DIP Lender, and the Oversight Committee, the Wind Down Budget will be extended through the full administration of the Plan. The Wind Down Budget may be modified from time to time with the consent of each of the Plan Administrator, DIP Lender (only until such time as the Allowed DIP Loan Claim has been paid in full), Landlord Group (only until such time as the Allowed Landlord Cure Claim has been paid in full), the Responsible Officer, and the Oversight Committee, which shall not be unreasonably withheld.

## 4.5    Appointment of Plan Administrator and Oversight Committee

Upon the Plan Effective Date, a Plan Administrator and Oversight Committee shall be appointed.  Their duties, powers, and obligations shall be as set forth in this Plan and the Plan Administrator Agreement.

**4.6    Plan Administrator**

(a)    On the Plan Effective Date, the Plan Administrator shall succeed to such powers as would have been applicable to the Debtors' members, managers, and officers, except as set forth in Section 4.8.

(b)    From and after the Plan Effective Date, all property vesting in the Debtors pursuant to Section 4.3 shall be managed by the Plan Administrator, and shall be held in the name of the Debtors free and clear of all Liens, Claims, or other encumbrances, except as otherwise provided in the DIP Order, the DIP Loan Agreement, the Sale Order, this Plan or the Confirmation Order.

(c)    In the event of the resignation or removal, liquidation, death, or incapacity of the Plan Administrator, the Oversight Committee shall designate another person to become Plan Administrator and such person will become the successor Plan Administrator and, without any further act, shall become fully vested with all of the rights, powers, duties, and obligations of the predecessor Plan Administrator.

(d)    The Plan Administrator shall be entitled to reasonable compensation at his current standard hourly rate, subject to periodic increase in the ordinary course, and reimbursement of actual, necessary costs and expenses, subject to the line item set aside for the Plan Administrator's professional fees in the Wind Down Budget, as may be modified from time to time in accordance with Section 4.4.  Compensation and expenses due the Plan Administrator shall be paid from the Wind Down Expense Reserve, following Oversight Committee review and approval of the Plan Administrator's fee statement(s) pursuant to Section 4.7(e).

(e)    The Plan Administrator shall be deemed the representative and fiduciary of the Debtors as contemplated by section 1123(b)(3)(B) of the Bankruptcy Code, and shall have all of the rights and powers of a trustee under sections 704 and 1106 of the Bankruptcy Code, including the right to: (i) monetize or abandon all property vesting in the Debtors pursuant to Section 4.3; (ii) prosecute objections to and settle or compromise Claims as provided in this Plan and the Plan Administrator Agreement; (iii) prosecute, settle, abandon, or compromise any Causes of Action as provided in the Plan and the Plan Administrator Agreement, (iv) establish and administer the Reserves as provided in the Plan and the Plan Administrator Agreement; (v) make all Distributions contemplated hereby; (vi) employ professionals to assist the Plan Administrator in fulfilling his duties, and compensate them following Oversight Committee review of their fee statement(s) in accordance with Section 4.7(e); (vii) except as otherwise provided herein, pay all wages, benefits, bonuses, fees, costs, or expenses provided in the Wind Down Budget; and (viii) take all actions and execute all agreements, instruments, and other documents necessary to implement this Plan and the Plan Administrator Agreement; provided, however, the Responsible Officer shall have consultation rights in respect of the foregoing and decisions by the Plan Administrator concerning payment of Allowed Priority Tax Claims, and the Plan Administrator will consult in good faith with the Responsible Officer in respect of the foregoing.  Notwithstanding the foregoing, until the DIP Lender has been paid in full, none of the Plan Administrator, Responsible Officer, nor the Oversight Committee shall have any authority to modify the Wind Down Budget, compromise the Healthcare Receivables, or pay amounts not reflected in the Wind Down Budget without the DIP Lender's prior written approval.

### 4.7    Oversight Committee

(a)     The Oversight Committee shall consist of the following three (3) members: (i) a representative designated by the Landlord Group until such time as the Allowed Landlord Cure Claim has been paid in full; (ii) the Responsible Officer; and (iii) a designee of the Committee. The identities of the Oversight Committee members shall be disclosed in the Plan Supplement.  In the event of the resignation or removal of the Committee designee, the Plan Administrator and Responsible Officer shall jointly select a replacement member from among the holders General Unsecured Claims other than the Landlord Group; and in the event that the Plan Administrator and Responsible Officer cannot reach agreement as to the replacement member, the Oversight Committee shall remain a two-person committee.

(b)     The Oversight Committee shall oversee the actions of the Plan Administrator in accordance with the terms of the Plan Administrator Agreement and shall have the right and powers set forth in such agreement.  Such rights and powers shall include the right to approve by majority vote the following: (i) limits on the Plan Administrator compensation; (ii) the settlement of any Cause of Action commenced after the Plan Effective Date by the Plan Administrator or any Debtors; (iii) the compromise of any Claim asserted in an amount in excess of $250,000, pursuant to Section 6.4; (iv) any transaction concerning, or change in the method of collecting, the Healthcare Receivables; (v) any increase to the Wind Down Expense Reserve; (vi) any changes to the Wind Down Budget; and (vii) any matter as to which the Plan Administrator desires guidance from the Oversight Committee.

(c)     The Oversight Committee shall have the right to determine by unanimous vote of all members to petition the Court to remove the Plan Administrator for Cause or to select a successor Plan Administrator when one is required.  If the Oversight Committee is unable to reach a unanimous decision with respect to these matters, and a deadlock persists for a period of one (1) week, any Oversight Committee member shall have the right to move the Court for appropriate relief.

(d)     With the exception of the Responsible Officer, who will be compensated in accordance with the Responsible Officer Agreement, and except for the reimbursement of reasonable, actual costs and expenses incurred in connection with their duties as members of the Oversight Committee, which amounts shall not be paid until the DIP Lender has been paid in full, such members shall serve without compensation.  Under no circumstances shall attorneys' fees incurred by the Oversight Committee or any individual members thereof be reimbursable.

(e)     The Oversight Committee shall have the right, within ten (10) days from the delivery of a fee statement by the Plan Administrator, a professional employed by the Plan Administrator, or the Responsible Officer, to object to such fees in whole or in part.  For an objection to be valid, it shall be in writing and set forth in detail the specific fees objected to and the basis for the objection. Any objection that remains unresolved fifteen (15) days after it is made may be submitted to the Court for resolution. The uncontested portion of each fee statement shall be paid within twenty (20) days after its delivery to the Oversight Committee, provided the amount requested has been budgeted for in the Wind Down Budget.

### 4.8    Officers

(a)    From and after the Plan Effective Date, through the Sale Effective Date, Israel Sherman shall remain an officer of each Debtor, and William Lenhart shall remain an officer of each of the Debtors ("Responsible Officer," and together with Israel Sherman, the "Officers"). The Officers shall have ultimate decision-making authority for the Debtors for all matters not expressly delegated to the Plan Administrator pursuant to this Plan or the Plan Administrator Agreement, including for the avoidance of doubt the exclusive right to object to and settle or otherwise compromise all Tort Claims; provided, however, decision-making authority with respect to matters regarding the provision of healthcare services shall be reserved for Israel Sherman unless such matter involves a related-party transaction in which case the Responsible Officer shall have authority. Notwithstanding the foregoing, Israel Sherman's responsibilities as Officer shall also include fulfilling all duties required of him by the Settlement Agreement, including without limitation in connection with the transfer of the Debtors' skilled nursing and assisted living facilities pursuant to the Purchase Agreement and the CHOW Process.

(b)    The Responsible Officer's employment shall be governed by a Responsible Officer Agreement. In the event that the Responsible Officer Agreement cannot be agreed upon, or in the event of the resignation, removal, death, or incapacity of the Responsible Officer, Mr. Lenhart shall be excused from serving as Responsible Officer and shall be replaced by a party selected by the Landlord Group from a list of three (3) or more candidates provided by the Debtors.

(c)    The Responsible Officer shall be entitled to reasonable compensation and the reimbursement of actual, necessary costs and expenses, pursuant to the terms of the Responsible Officer Agreement, subject to the line item set aside for the Responsible Officer's professional fees in the Wind Down Budget. Compensation and expenses due the Responsible Officer shall be paid by the Plan Administrator, from the Wind Down Expense Reserve, following Oversight Committee review and approval of the Responsible Officer's fee statement(s) pursuant to Section 4.7(e).

(d)    Israel Sherman shall serve as Officer of each Debtor without compensation, until such time as the Debtor has been dissolved in accordance with Section 4.10. Israel Sherman will execute and deliver an irrevocable proxy granting the Plan Administrator sole voting power with respect to his membership interests in AFM through the Sale Effective Date, the form of which shall be included in the Plan Supplement.

(e)    From and after the Plan Effective Date, until all of the Debtors have been dissolved in accordance with Section 4.10, the Debtors will continue to maintain directors and officers liability insurance coverage with policy limits and coverage not less than that maintained by the Debtors on the Petition Date, and the Plan Administrator and his employees and contractors shall be named as additional insureds.

(f)    Except as otherwise provided in this Article IV, upon the Plan Effective Date, all persons then acting as managers, officers, or employees of each Debtor, that are not retained by the Purchaser shall be, without further order of the Court, released and discharged from all further authority, duties, responsibilities, and obligations relating to and arising from the Debtors or the Chapter 11 Cases; provided, however, that the Plan Administrator and the Responsible Officer

may choose to retain such managers, officers, or employees to assist in the carrying out of their duties hereunder, subject to the Wind Down Budget.

## 4.9    Collection of Healthcare Receivables

Prior to the Plan Effective Date, the Responsible Officer shall oversee the collection of the Healthcare Receivables and will cause the Debtors to retain Billit for such purposes, subject to the Wind Down Budget.   From and after the Plan Effective Date, the Plan Administrator shall be responsible for overseeing collections of the Healthcare Receivables, and the Plan Administrator shall have absolute discretion to reduce utilization of Billit as the Plan Administrator deems appropriate.   After full and final satisfaction of the Allowed DIP Loan Claim and the Allowed Administrative Expense Claims, the Plan Administrator shall, in consultation with the Responsible Officer,  have absolute discretion to at any time elect to cease collection activities, or sell or assign the remaining Healthcare Receivables at such time and on such terms as the Plan Administrator determines is in the best interests of creditors, subject to Oversight Committee approval and subject to compliance with Paragraph 20 of the Sale Order, Sections 3.01 and 3.02 of the ASA, and all applicable non-bankruptcy law concerning the assignment of Healthcare Receivables.   To the extent that any third party collects any Healthcare Receivables on behalf of the Debtors, such third party shall be required to remit to the Plan Administrator proceeds thereof and copies of all information or reporting related to their collection.   For the avoidance of doubt, any authority granted to the Debtors or Plan Administrator in respect of the collection of Healthcare Receivables shall include the right to oversee any disputes with Purchaser regarding the allocation or true-up of any collections of Healthcare Receivables and the right to pursue collection actions in respect of the Healthcare Receivables against any party, whether or not such party is an account debtor of the Debtors or otherwise.   Nothing contained herein shall limit the right of the Debtors or the Plan Administrator to enforce their rights as against Purchaser all of which are expressly preserved.

## 4.10    Wind Down and Dissolution of the Debtors

As soon as practicable after the Sale Effective Date and entry of a final decree closing the Chapter 11 Case of a Debtor, the Plan Administrator shall: (a) complete and file all final or otherwise required federal, state and local tax returns; (b) file a certificate of dissolution for the Debtor together with all other necessary corporate  documents as may be necessary to effect its dissolution; and (c) take such other actions as the Plan Administrator may determine to be necessary or desirable to carry out the purposes of this Plan.  The filing by the Plan Administrator of certificates of dissolution for any of the Debtors shall be authorized and approved in all respects without further action under applicable law, regulation, order or rule, including, without limitation, any action by Israel Sherman or the Responsible Officer.  Notwithstanding the foregoing, the Plan Administrator shall not file a certificate of dissolution for AFM unless and until the full amount of the purchase price under the Purchase Agreement has been paid, and its ownership interests in the Non-Debtor Entities have been transferred to Upstate Services Group or Personal Healthcare LLC, as applicable, or otherwise disposed of.

## 4.11    Dissolution of Committee

As of the Plan Effective Date, the Committee shall dissolve, and its members shall be released and discharged from all further authority, duties, responsibilities, and obligations relating

to and arising from the Chapter 11 Cases; provided, however, the Committee shall continue to exist solely for the purpose of prosecuting objections to applications for Allowance of Professional Fee Claims.

## 4.12    Discharge of Patient Care Ombudsman

As of the Plan Effective Date, the Patient Care Ombudsman appointed in these Chapter 11 Cases shall be released and discharged from all further authority, duties, responsibilities, and obligations pursuant to section 333 of the Bankruptcy Code.

## 4.13    Preservation of Causes of Action

Except as otherwise expressly provided in this Plan, any rights or Causes of Action accruing to or held by the Estates prior to the Plan Effective Date shall vest in the Debtors on the Plan Effective Date, including those Causes of Action identified in the Plan Supplement, if any. The Plan Administrator may pursue those Causes of Action as deemed appropriate, in his name or that of the Debtors.  None of the Plan, Disclosure Statement, or Plan Supplement set forth an exhaustive list of all Causes of Action preserved under this Plan and vesting in the Debtors, and the failure to identify or list any particular Cause of Action therein shall not constitute a waiver or release. **All Causes of Action not expressly released or waived in this Plan or the Confirmation Order shall survive confirmation of this Plan, and the assertion of Causes of Action shall not be barred or limited by any estoppel doctrine.**

## 4.14    Preservation of Insurance

The treatment of Claims under this Plan shall not diminish or impair the enforceability of any Insurance Policy that may cover Claims against the Debtors or additional insureds.

## 4.15    Comprehensive Settlement of Claims and Controversies

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the Distributions and benefits provided under this Plan, this Plan is and shall constitute a good faith compromise and settlement of all Claims, interests, and controversies relating to the contractual, legal, and subordination rights that  a holder of a Claim or Equity Interest may have with respect to any Allowed Claim or Equity Interest, or any Distribution to be made on account of the same, subject to the reservations set forth in Section 8.8.  The entry of the Confirmation Order shall constitute the Court's approval as of the Plan Effective Date of the compromise or settlement of all such Claims, interests, and controversies, as well as a finding by the Court that such compromise or settlement is in the best interests of the Debtors and their Estates, and is fair, equitable, and reasonable.

Notwithstanding Section 12.7, the compromises, settlements, and releases described herein shall be deemed non-severable from each other and from all other terms of this Plan.  Without limiting the foregoing, entry of the Confirmation Order shall constitute approval of the Plan Settlement.

# ARTICLE V
# PROVISIONS GOVERNING DISTRIBUTIONS

## 5.1    Generally

The Plan Administrator shall apply property vesting in the Debtors pursuant to Section 4.3 only in accordance with this Plan and the Plan Administrator Agreement.  The Plan Administrator shall not be required to seek approval of the Court or any other court as a condition to making any Distribution pursuant to this Plan. All Distributions and the Reserves described in this Article V shall be managed by the Plan Administrator in a manner that accounts for the priority of Distributions described in Section 5.2.

## 5.2    Priority of Distributions

Notwithstanding anything to the contrary in Articles II and III, cash available for Distribution shall, subject to the funding of the Wind Down Budget from the collection of Healthcare Receivables in accordance with Section 4.9, be paid to holders of Allowed Claims or allocated to the Reserves in the following order or priority: <u>first</u>, to the holders of the Allowed Prepetition Loan Claims on account thereof; <u>second</u>, to the DIP Lender on account of the Allowed DIP Loan Claim; <u>third</u>, to holders of Allowed Administrative Expense Claims; <u>fourth</u>, to holders of Allowed Priority Non-Tax Claims; <u>fifth</u>, to holders of Allowed Priority Tax Claims; and <u>sixth</u>, to the Reserves.  Thereafter, all Net Available Cash shall be paid to holders of Allowed Landlord Cure Claims and Allowed General Unsecured Claims in accordance with Sections 3.2(d)-(e).

## 5.3    Timing of Distributions on Allowed Landlord Cure and General Unsecured Claims

(a)    <u>Interim Distributions</u>

After payment in full of all Allowed Secured Claims, Allowed Administrative Expense Claims, and Allowed Priority Claims, the Allowed Landlord Cure Claim and Allowed General Unsecured Claims shall be entitled to an initial Distribution from the Net Available Cash in an amount to be determined by the Plan Administrator in accordance with this Plan, and may also receive subsequent Distributions from the Net Available Cash on account of their respective Claims; <u>provided</u>, <u>however</u>, that the Plan Administrator has allocated adequate funds to the Reserves, and that the Reserves will remain adequate after any such interim Distribution is made.

(b)    <u>Final Distributions</u>

After (i) the payment in full of all Wind Down Expenses, Allowed Secured Claims, Allowed Administrative Expense Claims, and Allowed Priority Claims, (ii) the prosecution, settlement, or abandonment of all Causes of Action, (iii) the Allowance or disallowance of all Claims, and (iv) the liquidation or abandonment of all other property vesting in the Debtors pursuant to Section 4.3, the Landlord Group and holders of Allowed General Unsecured Claims shall be entitled to a final Distribution of all remaining Net Available Cash pursuant to the terms of this Plan and the Plan Administrator Agreement, until either all such Claims are paid in full or the Net Available Cash is exhausted.

**5.4    Reserves**

(a)    <u>Wind Down Expense Reserve</u>

On the Plan Effective Date, the Plan Administrator, in consultation with the Responsible Officer, shall establish the Wind Down Expense Reserve to ensure that the Plan Administrator will have sufficient funds to pay certain Wind Down Expenses that may from time to time arise. The initial amount of the Wind Down Expense Reserve shall be $250,000 funded from the collection of Healthcare Receivables as set forth in the Wind Down Budget. The Wind Down Expense Reserve may be augmented from time to time as provided in Section 4.4.

(b)    <u>Disputed Claims Reserve</u>

In addition to the Wind Down Expense Reserve, the Plan Administrator, in consultation with the Responsible Officer, shall establish a Disputed Claims Reserve. The Disputed Claims Reserve shall be for the payment of any Disputed Claim, to the extent such Disputed Claim becomes an Allowed Claim against the Debtors. The amount set aside in the Disputed Claims Reserve for any such Disputed Claim shall be the amount that would be Distributed on account of such Claim if it were an Allowed Claim in the lower of: (i) the amount set forth in the Proof of Claim filed by the holder of such Claim, and (ii) the estimated amount of such Claim for Distribution purposes, as determined by the Court pursuant to Section 6.5.

**5.5    Manner of Distribution**

Any Distributions of cash under this Plan may be made either by check drawn on a domestic bank, by wire transfer, or by ACH.

**5.6    Fractional Shares; de Minimis Distributions**

No payment of fractional cents will be made under this Plan. Any cash Distributions will be made only in whole cents. The Plan Administrator shall have no obligation to make a Distribution of under $100. If any Interim Distribution to be received by a holder of an Allowed Claim would be $100 or less in the aggregate, no such payment will be made to such holder and such cash shall be held for such holder until the date of the next Interim Distribution, or the date of the Final Distribution, at which time such cash payment shall be made. The Plan Administrator shall allocate an additional amount in the Disputed Claims Reserve for unpaid Distributions resulting from such undistributed small amounts.

**5.7    Delivery of Distributions**

Except as otherwise provided herein, Distributions to holders of Allowed Claims shall be made (a) at the addresses set forth in any Proof of Claim filed by such holder (or at the last known address of such holder if no application requesting payment or Proof of Claim has been filed or the Debtors or Plan Administrator have been notified in writing of a change of address); (b) at the addresses set forth in any written notices of address changes filed with the Court and served on the Plan Administrator after the date of any related Proof of Claim, or (c) at the addresses reflected in the Schedules if no Proof of Claim has been filed and no written notice of address change has been filed by such holder with the Court and served on the Plan Administrator.

### 5.8    Undeliverable Distributions

If any Distribution to the holder of an Allowed Claim is returned for lack of a current address for the holder or otherwise, or cannot be made to the applicable holder of because of such holder's failure to provide any required tax information including a signed Form W-8 or W-9 (in each case, an "Undeliverable Distribution"), no further Distributions shall be made to such holder unless and until the Plan Administrator is notified in writing of such holder's then-current address or other necessary information for delivery, at which time such undelivered Distribution shall be made to such holder within ninety (90) days of receipt of such holder's then-current address, or other necessary information.  If no such information is provided within ninety (90) days of an attempted Distribution becoming an Undeliverable Distribution, such Undeliverable Distribution shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code, and the Plan Administrator shall Distribute to the holders of Allowed Claims in the appropriate Class the amount of the Undeliverable Distribution, and the Allowed Claim giving rise to the Undeliverable Distribution shall be deemed satisfied and released, with no recourse to the Plan Administrator, the Debtors, or their property, to the same extent as if the Undeliverable Distribution had been made to the corresponding holder of the Allowed Claim.

### 5.9    Time Bar to Cash Payments

Checks issued by the Plan Administrator in respect of Allowed Claims shall be null and void if not negotiated within sixty (60) days after the date of issuance thereof.  Requests for reissuance of any check shall be in writing to the Plan Administrator by the holder of the Allowed Claim to whom such check originally was issued.  Any such written claim in respect of such a voided check must be received by the Plan Administrator on or before sixty (60) days after the expiration of the sixty (60) day period following the date of issuance of such check.  Thereafter, the amount represented by such voided check shall irrevocably revert to the Debtors free and clear of any restrictions.  Any Claim in respect of such voided check shall be discharged and forever barred from assertion against the Debtors, the Estates, or the Plan Administrator.

### 5.10    Setoffs and Recoupments

From and after the Plan Effective Date, the Plan Administrator may, to the extent permitted by section 558 of the Bankruptcy Code or applicable non-bankruptcy law, set off against or recoup from any Claim on which Distributions are to be made pursuant, any Causes of Action of any nature whatsoever that the Debtors or the Plan Administrator may have against the holder of such Claim; provided, however, that neither the failure to effect such offset or recoupment nor the Allowance of any Claim shall constitute a waiver or release of any right of setoff or recoupment, nor of any other Cause of Action.

### 5.11    No Distribution in Excess of Allowed Amount of Claim

Notwithstanding anything to the contrary contained in this Plan, no holder of an Allowed Claim shall receive in respect of that Claim any Distribution in excess of the Allowed amount of that Claim.

**5.12    No Interest on Claims**

Unless otherwise specifically provided for in this Plan, postpetition interest shall not accrue or be paid on any Claim, and no holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim.  In addition, interest shall not accrue on or be paid on any Disputed Claim in respect of the period from the Plan Effective Date to the date a final Distribution is made when and if such Disputed Claim becomes an Allowed Claim.

**5.13    Withholding Taxes**

The Plan Administrator shall be entitled to deduct any federal, state or local withholding taxes from any payments or Distributions under this Plan.  As a condition to making any Distribution under this Plan, the Plan Administrator may require that the holder of an Allowed Claim provide its taxpayer identification number and such other information and certification as may be deemed necessary for the Plan Administrator to comply with applicable tax reporting and withholding laws.  Failure of a holder of any Allowed Claim to provide such taxpayer identification number and such other information and certification may result in forfeiture of such holders' right to Distributions in respect of its Claim.

**ARTICLE VI**
**PROCEDURES FOR RESOLVING DISPUTED CLAIMS**

**6.1    Exclusive Right to Object to Claims**

On and after the Plan Effective Date, the Plan Administrator shall have the exclusive right to make, file, and prosecute objections to all Disputed Claims other than Tort Claims, and the Responsible Officer shall have the exclusive right to make, file, and prosecute objections to Tort Claims.  Notwithstanding the foregoing, the Plan Administrator shall be required to consult with the Responsible Officer in respect of any objections to or resolutions of any Priority Tax Claims.

**6.2    Claims Objection Bar Date**

All objections to Disputed Claims shall be served upon the Holders of each such Claim on or before the applicable Claims Objection Bar Date, unless otherwise ordered by the Court after notice and a hearing.

**6.3    No Distributions on Disputed Claims**

No Distributions shall be made on account of any Disputed Claim unless and until such Claim becomes an Allowed Claim.  In lieu of Distributions under this Plan to holders of Distributed Claims, a Disputed Claims Reserve shall be maintained by the Plan Administrator for payment of any Disputed Claim which becomes an Allowed Claim.  Distributions on account of any Disputed Claim that has become an Allowed Claim shall be made as provided above in Article 6, or as soon as is reasonably practicable following Allowance of the Claim.

## 6.4    Resolution of Claims

The Plan Administrator shall have the authority to settle and resolve any Disputed Claim other than any Tort Claim that was asserted in an amount equal to or less than $250,000 upon such terms as the Plan Administrator deems appropriate. With respect to any Disputed Claim (other than any Tort Claim) that was asserted in an amount that exceeds $250,000, the Plan Administrator shall have the authority to compromise and settle any such Claim on such terms as the Plan Administrator deems appropriate, subject to the approval of the Oversight Committee; provided, however, that in all cases the Plan Administrator must consult in good faith with the Responsible Officer in respect of any settlement of a Priority Tax Claim of any amount.  Any such compromise and settlement shall be deemed final and binding upon all parties in interest in the Chapter 11 Cases. Except as provided above in respect of the Priority Tax Claims, the Plan Administrator shall not have any obligation to provide notice to any parties in interest and shall not be required to obtain Court approval, in connection with compromising, settling, or otherwise resolving these Claims.

The Responsible Officer shall have the authority to settle and resolve any Disputed Tort Claim that was asserted in an amount equal to or less than $250,000 upon such terms as the Responsible Officer deems appropriate. With respect to any Disputed Tort Claim asserted in an amount that exceeds $250,000, the Responsible Officer shall have the authority to compromise and settle any such Claim on such terms as the Responsible Officer deems appropriate, subject to the approval of the Oversight Committee; provided, however, that the Responsible Officer shall consult in good faith with the Plan Administrator in respect of any settlement of a Disputed Tort Claim asserted in an amount exceeding $250,000. Any such compromise and settlement shall be deemed final and binding upon all parties in interest in the Chapter 11 Cases. Except as provided herein with respect to the settlement of any Disputed Tort Claim in an amount exceeding $250,000, the Responsible Officer shall not have any obligation to provide notice to any parties in interest and shall not be required to obtain Court approval, in connection with compromising, settling, or otherwise resolving these Claims.

## 6.5    Estimation of Claims

The Plan Administrator may request that the Court estimate any contingent or unliquidated Claim to the extent permitted by section 502(c) of the Bankruptcy Code, regardless of whether the Plan Administrator or any other party in interest has previously objected to such Claim or whether the Court has ruled on any such objection, and the Court shall have jurisdiction to estimate any Claim at any time during litigation concerning any objection to such Claim, including during the pendency of any appeal relating to any such objection.  If the Court estimates any contingent or unliquidated Claim, that estimated amount shall constitute either the Allowed amount of such Claim or a maximum limitation on the Claim, as determined by the Court.  If the estimated amount constitutes a maximum limitation on the Claim, the Plan Administrator may elect to object to the ultimate Allowance of the Claim or seek to reduce and Allow the Claim (as reduced). All of the aforementioned Claims objection, estimation, and resolution procedures are cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Court.

## ARTICLE VII
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

**7.1     Rejection of Contracts and Leases**

Subject to the exceptions set forth in Section 7.2, on and after the Plan Effective Date, each Executory Contract and Unexpired Lease entered into by the Debtors prior to the Petition Date that has not previously expired or terminated pursuant to its own terms will be deemed rejected pursuant to section 365 of the Bankruptcy Code, and written notice will be provided to each such counterparty of such deemed rejected contract or lease (together with a statement of the date by which any Proof of Claim must be filed). Each such contract and lease will be rejected only to the extent that any such contract or lease constitutes an Executory Contract or Unexpired Lease. The entry of the Confirmation Order by the Court shall constitute approval of any such rejections pursuant to sections 365(a) and 1123 of the Bankruptcy Code and that the rejection thereof is in the best interest of the Debtors, their Estates, and all parties in interest in the Chapter 11 Cases.

**7.2     Exceptions to Rejection**

The following Executory Contracts and Unexpired Leases shall <u>not</u> be rejected pursuant to this Plan: all Executory Contracts and Unexpired Leases (a) designated by the Purchaser as Assumed Contracts under the Sale Order; (b) that the Debtors either previously assumed, and/or assumed and assigned, or rejected; and (c) all Insurance Policies, to the extent they constitute Executory Contracts and Unexpired Leases.  Entry of the Confirmation Order shall constitute Court approval of the Debtors' assumption of each of the foregoing Executory Contracts and Unexpired Leases.

**7.3     Rejection Claims**

Claims created by the rejection of Executory Contracts and Unexpired Leases pursuant to Section 7.1, or the termination of any Executory Contract or Unexpired Lease prior to the Plan Effective Date (collectively, "<u>Rejection Claims</u>") must be filed with the Claims Agent no later than thirty (30) days after the Plan Effective Date ("<u>Rejection Deadline</u>").  Unless otherwise ordered by the Court, all Rejection Claims that are filed on or before the Rejection Deadline shall be treated as General Unsecured Claims under this Plan and shall be subject to the provisions of Article III. **All Rejection Claims that are filed after the Rejection Deadline (or not filed at all) shall be deemed disallowed without the need for any action or formal objection by the Plan Administrator, and shall be forever barred from assertion against the Plan Administrator, the Officers, the Debtors, or their property except as otherwise ordered by the Court.**

**7.4     Effect of Anti-Assignment Provisions**

The assignment of any Executory Contract and Unexpired Lease of any Debtor that is designated an Assumed Contract under the Sale Order shall be effective notwithstanding any provision in such contract or lease that prohibits, restricts, or conditions its assignment, pursuant to section 365(f) of the Bankruptcy Code, and notwithstanding that the assignment may not be effective until the Sale Effective Date after the Chapter 11 Case of the Debtor counterparty to such contract or lease has been closed.

# ARTICLE VIII
## DISCHARGE, INJUNCTION, EXCULPATION, AND RELEASE

**8.1    Discharge**

Upon the Plan Effective Date and in consideration for Distributions under the Plan, except as otherwise provided herein or in the Confirmation Order, each holder of a Claim or Equity Interest shall be deemed to have forever waived, released, and discharged the Debtors, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all Claims, rights, and liabilities that arose prior to the Plan Effective Date.  Except as otherwise provided herein, upon the Plan Effective Date, all such holders shall be forever precluded and enjoined from prosecuting or asserting any such discharged Claims, rights, and liabilities against or in any Debtor.

**8.2    Injunction**

Except as otherwise provided in this Plan or the Confirmation Order, on and after the Plan Effective Date, all persons who have held, currently hold, or may hold Claims against or Equity Interests in the Debtors or the Estates that arose prior to the Plan Effective Date shall be permanently enjoined from, on account of such Claims or Equity Interests, taking any of the following actions, either directly or indirectly, against or with respect to any Debtor, any Estate, or any of their respective properties or assets, or against or with respect to the Plan Administrator, the Officers, or any additional insureds under the Debtors' general liability insurance policies: (a) commencing or continuing in any manner any action or other proceeding of any kind; (b) enforcing, executing, levying, collecting, prosecuting, seeking, or recovering in any manner any judgment, award, decree, or order, or attaching any property pursuant to the foregoing; (c) creating, perfecting, or enforcing any Lien or encumbrance of any kind; (d) asserting or effecting any setoff, recoupment, or right of subrogation of any kind against any Claim or Cause of Action; (e) enjoining or invalidating any conveyance of any property of the Debtors; (f) interfering with or in any manner whatsoever disturbing the rights and remedies of the Plan Administrator, the Officers, the Debtors, or the Estates under this Plan and the Confirmation Order; and (g) taking any act, in any manner, in any place whatsoever, that does not conform to, comply with, or that is inconsistent with any provision of this Plan.  The foregoing injunction shall not enjoin or prohibit the holder of a Disputed Claim from seeking to have such Claim declared Allowed and paid in accordance with this Plan or any party in interest from seeking the interpretation or enforcement before the Court of any obligations of the Debtors, the Plan Administrator, or the Officers under this Plan.

**8.3    Releases by the Debtors**

Except as otherwise provided in this Plan or the Confirmation Order, as of the Plan Effective Date, the Debtors shall be deemed to have forever released, waived, and discharged all claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, and liabilities (other than the rights of the Debtors to enforce this Plan and the agreements delivered hereunder) against the Debtors' current and former members, managers, and Officers (including, for the avoidance of doubt, Israel Sherman and Samuel Sherman), the

Debtors' professionals (acting in such capacity), the Landlord Group, their current and former members, managers, and Officers, the Landlord Group's professionals (acting in such capacity), the members of the Committee and the Committee's attorneys (acting in such capacity), the DIP Lender and its current and former members, managers, and Officers, and the DIP Lender's attorneys (acting in such capacity) (together, the "**Released Parties**"), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law or in equity, that are based in whole or in part on any act, omission, transaction, event, or other occurrence taking place on or prior to the Plan Effective Date in any way relating to the Debtors, the Chapter 11 Cases, or this Plan or the Disclosure Statement, and that could have been asserted by or on behalf of the Debtors or their Estates, other than claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, and liabilities arising out of or relating to any act or omission of a Released Party that constitutes actual fraud, willful misconduct, or gross negligence, as determined by a Final Order of a court of competent jurisdiction.

**8.4    Exculpation**

Except as expressly otherwise provided in this Plan or the Confirmation Order, as of the Plan Effective Date, to the fullest extent permissible under applicable law, none of the Released Parties shall have or incur any liability to any holder of any Claim or Equity Interest for any act or omission in connection with, or arising out of, the formulation, preparation, dissemination, or confirmation of this Plan, including solicitation of acceptances thereto, the Disclosure Statement, any Plan Supplement, or any contract, instrument, release, or other agreement or document created or entered into, including without limitation the Purchase Agreement, or any other act taken or omitted from being taken, in connection with the Sale, this Plan or these Chapter 11 Cases, or any other post-petition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtors, except for acts or omissions that constitute actual fraud, willful misconduct, or gross negligence, as determined by a Final Order of a court of competent jurisdiction.

**8.5    Mutual Releases between (i) Debtor Release Parties and Committee and (ii) Landlord Release Parties**

(a)    Except as otherwise provided in this Plan or the Confirmation Order, as of the Plan Effective Date and to the fullest extent permitted by law the Debtors and each of their current and former officers, directors, principals, members, professionals, advisors, accountants, attorneys, investment bankers, consultants, employees, agents, and other representatives, including for the avoidance of doubt Israel Sherman, Samuel Sherman, and the DIP Lender ("**Debtor Release Parties**") and the Committee and the Committee's members shall be deemed to have forever released and waived all claims, suits, damages, demands, debts, rights, and Causes of Action against any of the Landlord Group and each of its current and former officers, directors, principals, members, professionals, advisors, accountants, attorneys, investment bankers, consultants, employees, agents, and other representatives (including, for the avoidance of doubt, Ira Smedra, Abraham Schoenfeld, and Jacob Wintner) ("**Landlord Release Parties**"), whether liquidated or unliquidated, fixed

28

or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity, or otherwise that are based in whole or in part on any act, omission, transaction, event or other occurrence taking place on or prior to the Plan Effective Date in any way relating to the Debtors or the Chapter 11 Cases, and that could have been asserted by or on behalf of the Debtors, their Estates, or the Plan Administrator; provided, however, that Israel Sherman's and Samuel Sherman's release of the Landlord Release Parties shall become effective at the time set forth and in accordance with the Settlement Agreement.

(b)    Except as otherwise provided in this Plan or the Confirmation Order, as of the Plan Effective Date and to the fullest extent permitted by law the Landlord Release Parties shall be deemed to have forever released and waived all claims, suits, damages, demands, debts, rights, and Causes of Action against any of the Debtor Release Parties, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity, or otherwise that are based in whole or in part on any act, omission, transaction, event or other occurrence taking place on or prior to the Plan Effective Date in any way relating to the Debtors or the Chapter 11 Cases; provided, however, that the Landlord Release Parties' releases in favor of Israel Sherman and Samuel Sherman shall become effective at the time set forth in and in accordance with the Settlement Agreement.

## 8.6    Limitation on Discharge, Injunction, Exculpation, and Release Provisions

Notwithstanding anything to the contrary in Section 8.1 through Section 8.4, nothing herein shall (a) serve to modify, affect, impair, or alter any rights, remedies, claims, Liens, encumbrances, interests, or defenses of (i) Capital Funding and/or HUD under any agreements, regulatory agreements, loan agreements, security agreements, notes, mortgages, leases, lease addenda, deeds of trust, and/or any other documents, all of which shall remain in full force and effect, and/or any orders (including, but not limited to, the DIP Order and the Sale Order), statutes, rules, regulations, policies, and/or applicable law; and (ii) the DIP Lender under the DIP Order, the DIP Loan Agreement, and the Sale Order; or (b) be construed to impact Israel Sherman's obligations to Sterling National Bank under any personal guaranty.

## 8.7    Binding Effect

Except as otherwise provided in section 1141(d)(3) of the Bankruptcy Code, on and after the Plan Effective Date, the provisions of this Plan shall bind any holder of a Claim against, or Equity Interest in, the Debtors, the Estates, and their respective successors or assigns, whether or not the Claim or Equity Interest of such holder is impaired under this Plan, whether or not such holder has accepted this Plan, and whether or not the holder has filed a Proof of Claim.

## 8.8    Reservation of Rights in Favor of Governmental Units; Settlement Fund

Notwithstanding anything to the contrary in this Plan (including the Plan Supplement), nothing herein shall serve to:

(a)    discharge, release, preclude, or enjoin: (i) any liability of a Debtor to any Governmental Unit that is not a Claim; (ii) any Claim of a Governmental Unit arising on or after the Plan Effective Date; (iii) any police or regulatory liability of any entity to a Governmental Unit; (iv) any Claim of or liability to a Governmental Unit on the part of any person or entity other than the Debtors; or (v) any obligations preserved or established in any order entered by the Court in any Chapter 11 Case;

(b)    enjoin or otherwise restrict a Governmental Unit from asserting or enforcing any liability described in the preceding subsection, or performing its statutory duties, in any non-bankruptcy action or proceeding; or

(c)    authorize the transfer of any representative payee applications, representative payee status, Social Security beneficiary trust accounts, National Provider Identifiers, provider agreements, licenses, permits, registrations, or other governmental authorizations or approvals without compliance with all applicable legal requirements under non-bankruptcy law governing such transfers;

(d)    limit any rights, claims, or defenses of setoff or recoupment, of the United States of America, DOH, or OMIG, all of which are expressly preserved, as are the Debtors' defenses and rights thereto;

(e)    grant exculpation as provided in Section 8.4 by a Governmental Unit; or

(f)    discharge, release, preclude, or enjoin the United States of America from commencing or prosecuting an action in the Court seeking a judicial determination that the Settlement Fund is not Estate property and should be distributed as provided in the Consent Decree.

Notwithstanding anything to the contrary in this Plan, including inter alia Section 4.3 and Section 4.15, the Plan Administrator and the Debtors shall be enjoined from Distributing, dissipating, or otherwise transferring the Settlement Fund, and the Settlement Fund shall not vest with the Debtors, until entry of a Final Order resolving any action contemplated in the preceding subsection, or as otherwise agreed by the United States of America and the Plan Administrator or the Debtors.  For the avoidance of doubt, nothing herein shall be construed, so as to determine ownership of the Settlement Fund or release any interest of the United States of America in the Settlement Fund, or as a compromise or settlement of any action or dispute concerning the Settlement Fund. Should the Court determine that the Settlement Fund is Estate property, the information contained herein shall be accepted as the United States of America's timely-filed Proof of Claim for the Settlement Fund, and nothing herein shall serve to bar or restrict the United States of America's or any third party's right to assert a General Administrative Expense Claim with respect to the Settlement Fund.

## ARTICLE IX
## PLAN MODIFICATION

### 9.1    Preconfirmation Amendment

The Committee reserves the right, in consultation with the Debtors and the Landlord Group, pursuant to section 1127(a) of the Bankruptcy Code, to amend or modify this Plan at any

time prior to the Confirmation Hearing. This Plan may be modified, without notice or hearing, or on such notice and hearing as the Court deems appropriate, if the Court finds that the proposed modification does not materially and adversely affect the rights of any parties in interest which have not had notice and an opportunity to be heard with regard to the proposed modification. Without limiting the foregoing, this Plan otherwise may be modified after notice and hearing. In the event of modification before the Confirmation Hearing, any votes in favor of this Plan shall be deemed to be votes in favor of this Plan as modified, unless the Court finds that the proposed modification materially and adversely affects the rights of the parties that cast such votes.

### 9.2    Postconfirmation Amendment Not Requiring Solicitation

After the entry of the Confirmation Order, the Committee, in consultation with the Debtors and the Landlord Group, may modify this Plan to remedy any defect or omission or to reconcile any inconsistencies in this Plan or Confirmation Order, as may be necessary to carry out the purposes and effects of this Plan, provided (a) Court approval of such modification is obtained, after notice and a hearing, and (b) such modification shall not materially and adversely affect the interests, rights, or treatment, of any Class of Claims under this Plan.

### 9.3    Postconfirmation Amendment Requiring Solicitation

After the Confirmation Date and before the Plan Effective Date, the Committee, in consultation with the Debtors and the Landlord Group, may modify this Plan in a way that materially or adversely affects the interests, rights, treatment, or Distributions of a class of Claims, provided: (a) the modified Plan meets applicable requirements of the Bankruptcy Code; (b) Court approval of such modification is obtained, after notice to all creditors entitled to receive notice, pursuant to the Bankruptcy Code and the Bankruptcy Rules, and a hearing; (c) such modification is accepted by at least two-thirds in amount, and more than one-half in number, of Allowed Claims voting in each Class affected by such modification; and (d) the Debtors comply with section 1125 of the Bankruptcy Code with respect to the modified Plan.

## ARTICLE X
## RETENTION OF JURISDICTION

### 10.1    Retention of Jurisdiction

Notwithstanding confirmation of this Plan or the occurrence of the Plan Effective Date, the Court shall retain jurisdiction and authority for all purposes permitted under applicable law, including, without limitation, for the following purposes:

(a) to determine any motion, adversary proceeding, Avoidance Action, application, contested matter, or other litigated matter pending on or commenced after the Confirmation Date;

(b) to hear and determine applications for the assumption or rejection of Executory Contracts or Unexpired Leases and the allowance, estimation, or payment of Rejection Claims and Cure Amounts resulting therefrom;

(c) to adjudicate any and all disputes arising from or relating to payment of Distributions under this Plan;

(d) to hear and determine objections to the allowance of Claims, whether filed, asserted, or made before or after the Plan Effective Date, including, without limitation, to hear and determine objections to the classification of Claims and the allowance or disallowance of Disputed Claims, in whole or in part;

(e) to consider Claims or the allowance, classification, priority, compromise, estimation, or payment of any Claim; provided, however, that the applicable District Court shall have jurisdiction to estimate any Claim that cannot be estimated by the Court;

(f) to enter, implement, or enforce such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, modified, or vacated;

(g) to determine any other matter under the Purchase Agreement, or in connection with the Sale or Sale Order;

(h) to issue injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any person with the consummation, implementation, or enforcement of this Plan, the Confirmation Order, or any other order of the Court;

(i) to hear and determine any application to modify this Plan in accordance with section 1127 of the Bankruptcy Code, to remedy any defect or omission or reconcile any inconsistency in this Plan, the Disclosure Statement, or any order of the Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

(j) to hear and determine all Professional Fee Claims;

(k) to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of this Plan, the Confirmation Order, or any transactions or payments contemplated under this Plan or the Confirmation Order, any agreement, instrument, or other document governing or relating to any of the foregoing;

(l) to take any action and issue such orders as may be necessary to construe, enforce, implement, execute, and consummate this Plan, the Responsible Officer Agreement, or the Plan Administrator Agreement, including any exculpation or injunction provisions set forth in this Plan, or to maintain the integrity of this Plan following consummation;

(m) to determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(n) to hear and determine matters concerning taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

(o) to enter a final decree closing any of the Chapter 11 Cases;

(p) to recover all assets of the Debtors and property of the Estates wherever located;

(q) to hear and determine any rights, claims, or Causes of Action held by or accruing to the Debtors or the Plan Administrator;

(r) to hear and determine any matters for which jurisdiction was retained by the Court pursuant to prior orders; and

(s) to hear and determine any other matters related hereto and not inconsistent with the Bankruptcy Code, title 28 of the United States Code, and other applicable law.

## 10.2    Courts of Competent Jurisdiction

If the Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising out of this Plan, such abstention, refusal, or failure of jurisdiction shall have no effect upon and shall not control, prohibit, or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

## ARTICLE XI
## CONDITIONS PRECEDENT

## 11.1    Conditions Precedent to Plan Effective Date

The Plan Effective Date may not occur unless and until each of the following conditions has been satisfied.  Any one or more of the following conditions may be waived in whole or in part at any time by the Committee, in consultation with the Debtors and the Landlord Group: (a) the Court shall have entered the Confirmation Order and it shall not have been stayed, modified, or vacated on appeal; (b) the Confirmation Order shall provide for the releases, injunctions, and exculpation of the persons provided for by this Plan; (c) Ronald Winters of Gibbins Advisors shall have been appointed as Plan Administrator and shall have agreed to act in such capacity in accordance with the terms and conditions of this Plan; (d) the Wind Down Expense Reserve shall have been funded in the full amount of $250,000 as provided in Section 5.4(a); (e) the Purchaser shall have designated those Executory Contract and Unexpired Lease to be treated as Assumed Contracts under the Sale Order; and (f) all actions, documents, and agreements necessary to implement and consummate this Plan shall have been affected or executed and binding on all parties thereto.

## 11.2    Effect of Nonoccurrence of Conditions Precedent to Plan Effective Date

If each of the conditions to the occurrence of the Plan Effective Date has not been satisfied or duly waived on or before the first Business Day after ninety (90) days after the Confirmation Date, or by such later date as is approved after notice and a hearing by the Court, then upon motion by any party in interest made before the time that each of the conditions has been satisfied or duly waived, the Confirmation Order may be vacated by the Court; provided, however, that, notwithstanding the filing of such a motion, the Confirmation Order shall not be vacated if each of the conditions to occurrence of the Effective Date is either satisfied or duly waived before the Court enters an order granting the relief requested in such motion.

### 11.3    Conditions Precedent to Sale Effective Date

The Sale Effective Date may not occur unless and until each of the following conditions has been satisfied: (a) all governmental and third-party approvals and consents contemplated by the Purchase Agreement shall have been given, not subject to unfilled conditions, and be in full force and effect, and any applicable waiting periods shall have expired without any action being taken or threatened by any competent authority that would restrain, prevent, or otherwise impose materially adverse conditions on such transaction; and (b) the Sale shall have closed.

### ARTICLE XII
### <u>MISCELLANEOUS</u>

### 12.1    Governing Law

Except to the extent that the Bankruptcy Code, the Bankruptcy Rules, or other federal laws apply, the laws of the State of New York shall govern the rights and obligations arising under this Plan without giving effect to conflicts of laws principles.

### 12.2    Continuing Effect of Prior Orders

Notwithstanding anything in this Plan to the contrary, the DIP Order and the Sale Order and any and all related documents including the Purchase Agreement shall not be modified, limited, or amended by this Plan or the Confirmation Order.

### 12.3    Exemption from Certain Transfer Taxes

Pursuant to section 1146(a) of the Bankruptcy Code, any transfers from any of the Debtors pursuant to the Plan or to the Purchaser in connection with the Sale shall not be subject to any stamp tax or similar tax, and the Confirmation Order shall direct the appropriate state or local governmental officials or agents to forgo the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other related documents without the payment of any such tax or governmental assessment.

### 12.4    Waiver of Bankruptcy Rule 3020

The Committee may request that the Confirmation Order include (a) a finding that Bankruptcy Rule 3020(e) shall not apply to the Confirmation Order and this Plan be immediately binding and enforceable; and (b) authorization to consummate this Plan immediately after entry of the Confirmation Order.

### 12.5    No Admissions

Notwithstanding anything herein to the contrary, nothing contained in this Plan or the Disclosure Statement shall be deemed as an admission by any person with respect to any matter set forth herein.

### 12.6    Successors and Assigns

The rights, benefits, and obligations of any person named or referred to in this Plan shall be binding upon, and shall inure to the benefit of, their heir, executor, administrator, successor, or assign.

### 12.7    Severability

Should any provision in this Plan be determined to be unenforceable, such determination shall in no way limit or affect the enforceability and operative effect of any other provision of this Plan.

### 12.8    Notice of Plan Effective Date and Sale Effective Date

Not later than seven (7) days following the occurrence thereof, the Debtors or the Plan Administrator shall file a notice of the occurrence of each the Plan Effective Date and the Sale Effective Date.

### 12.9    Notices

Any notice required or permitted to be provided under this Plan, unless otherwise provided herein, shall be in writing and served by either (a) certified mail, return receipt requested, postage prepaid, (b) hand delivery, or (c) overnight mail, postage prepaid, and addressed as follows:

If to the Plan Administrator:

> Gibbins Advisors, LLC
> 1900 Church Street, Suite 300
> Nashville, Tennessee 37203
> Attn: Ronald Winters

If to Israel Sherman:

> Absolut Facilities Management, LLC
> 111 Marcus Avenue, Suite 107
> Lake Success, New York 11042
> Attn: Israel Sherman

If to the Responsible Officer:

> WKL Advisors, LLC
> 400 Seasage Drive, Apt. 602
> Delray Beach, Florida 33483
> Attn: William K. Lenhart

With a copy to:

Loeb & Loeb LLP
345 Park Avenue
New York, New York 10154
Attn: Schuyler G. Carroll

If to the Committee:

Official Committee of Unsecured Creditors of Absolut Facilities Management, LLC, et al.
c/o Amini LLC
131 West 35th Street, 12th Floor
New York, New York 10001
Attn: Avery Samet and Jeffrey Chubak

## 12.10   Post-Effective Date Notice

Notice of all post-Plan Effective Date matters for which notice is required to be given shall be deemed sufficient if served upon the U.S. Trustee, counsel to the Plan Administrator, and any creditor that has a direct pecuniary interest in the relief that is the subject of the applicable notice, motion, or other document.  With the exception of the U.S. Trustee, any person desiring to remain on the Bankruptcy Rule 2002 service list shall be required to file a request for continued service. Parties who do not file such a request for continued service shall be removed from the Debtors' Bankruptcy Rule 2002 service list upon the Plan Effective Date and shall only be served motions or objections where they have a direct pecuniary interest in the subject relief.  Notice of the requirement to file a request for continued service will be provided in the notice of entry of the Confirmation Order served pursuant to Bankruptcy Rule 3020(c).

## 12.11   Deemed Acts

Whenever an act or event is expressed under this Plan to have been deemed done or to have occurred, it shall be deemed to have been done or to have occurred without any further act by any party by virtue of this Plan and the Confirmation Order.

## 12.12   Conflicts

Except as set forth in this Plan, to the extent that any provision of the Disclosure Statement, or any order (other than the Confirmation Order, the DIP Order, or the Sale Order) referenced in this Plan (or any exhibits, schedules, appendices, supplements, or amendments to any of the foregoing), conflict with or are in any way inconsistent with any provisions of this Plan, this Plan shall govern and control; provided, however, that if there is a conflict between this Plan and any document included in the Plan Supplement, the document included in the Plan Supplement shall govern and control.

Dated: March 24, 2020

OFFICIAL COMMITTEE OF UNSECURED
CREDITORS OF ABSOLUT FACILITIES
MANAGEMENT, LLC, et al.


By: /s/ Isaac Newman
Isaac Newman, Chief Operating Officer of
DentServ Dental Services, P.C.
Chairperson of the Committee