# **EXHIBIT 1**

**Plan Term Sheet**

# CHAPTER 11 PLAN TERM SHEET

This term sheet (the "Term Sheet") dated as of January 30, 2020, by and among (A) the Arba Group and the following landlord entities: 292 Main Street, LLC; 6060 Armor Road, LLC; 2178 N. Fifth Street, LLC; 101 Creekside Drive, LLC; 4540 Lincoln Drive, LLC; and 26 Cass Street, LLC (collectively, the "Landlord Group"), (B) Absolut Center for Nursing and Rehabilitation at Orchard Park, LLC ("Orchard Park"); Absolut Facilities Management, LLC ("AFM"); Absolut Center for Nursing and Rehabilitation at Allegany, LLC ("Allegany"); Absolut Center for Nursing and Rehabilitation at Aurora Park, LLC ("Aurora Park"); Absolut Center for Nursing and Rehabilitation at Gasport, LLC ("Gasport"); Absolut at Orchard Brooke, LLC ("Orchard Brooke"); Absolut Center for Nursing and Rehabilitation at Three Rivers, LLC ("Three Rivers"); and Absolut Center for Nursing and Rehabilitation at Westfield, LLC ("Westfield") (Allegany, Aurora Park, Orchard Brooke, Gasport, Three Rivers, and Westfield collectively referred to herein as the "Operating Debtors"; and the Operating Debtors with AFM, Orchard Park referred to as the "Debtors"), (C) the official committee of unsecured creditors (the "Committee") in the Chapter 11 Cases (as defined below); and (D) ABS DIP, LLC ("DIP Lender" and together with the Landlord Group, the Debtors, and the Committee, the "Parties"), contains the terms of the Parties' agreement regarding (a) the sale of the Operating Debtors' skilled nursing facilities and (b) a chapter 11 plan for the Debtors in their voluntary cases pending in the United States Bankruptcy Court for the Eastern District of New York (the "Bankruptcy Court"), Case No. 19-76260 (AST) (jointly administered) (the "Chapter 11 Cases"). **For the avoidance of doubt, nothing contained in this Term Sheet will be construed to prejudice or impair the rights of any party-in-interest to the Chapter 11 Cases that is not a Party hereto with respect to the Debtors or the Chapter 11 Cases and all such rights are preserved, including without limitation the right to object to the Plan and Disclosure Statement (each as defined below).**

NOTHING IN THIS TERM SHEET SHALL BE AN ADMISSION OF FACT OR LIABILITY BY ANY PARTY HERETO. THIS TERM SHEET IS NOT A SOLICITATION OF ACCEPTANCES OR REJECTIONS OF A CHAPTER 11 PLAN PURSUANT TO THE BANKRUPTCY CODE. ANY SUCH OFFER OR SOLICITATION WILL BE MADE ONLY IN COMPLIANCE WITH ALL APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE.

1.      This Term Sheet is subject to and conditioned upon: (i) the Debtors' selection of the bid submitted by RCA Healthcare Management, LLC (together with any affiliate, "RCA") to purchase the facilities of all of the Operating Debtors as the successful bidder in the Debtors' sale and marketing process, (ii) Israel Sherman's waiver of the $592,000 fee from the Landlord Group in connection with the transition services agreement (the "TSA Fee") contemplated in the settlement agreement dated November 22, 2019 (the "Settlement Agreement"); (iii) the Debtors' cancellation of the auction for the Operating Debtors' operating assets previously scheduled for January 9, 2020 and cancellation of the sale and marketing process for the Debtors' accounts receivable and the auction currently scheduled for February 18, 2020, and (iv) entry of an order by the Bankruptcy Court approving the sale of all of the Operating Debtors' facilities to RCA and related documentation on or before February 5, 2020 (or submission of such an order to the Bankruptcy Court for signature by such date). This Term Sheet shall be attached to and incorporated by reference into the order approving the sale to RCA.

2.      Except for the specific agreements of the DIP Lender herein concerning the treatment to be afforded to the Prepetition Loan Claim and the DIP Loan Claim, post-confirmation

1

governance of the reorganized debtors, and use of the DIP Lender's collateral to fund a Wind Down Budget (defined below) approved by the DIP Lender until the DIP Lender is paid in full, nothing in this Term Sheet shall constitute or be deemed to constitute a waiver or novation of all rights and remedies held by or granted to the DIP Lender under the Final Order (I) Authorizing Debtors to (A) Obtain Postpetition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), and 364(e) and (B) Use Cash Collateral Pursuant to 11 U.S.C. § 363, and (II) Granting Adequate Protection Pursuant to 11 U.S.C. §§ 361, 362, 363, and 364 [Docket No. 264] (the "Final DIP Financing Order"), and the DIP Loan Agreement defined therein (the "DIP Loan Agreement"). This reservation is incorporated into each provision of this Term Sheet. To the extent that it is referred to in any particular provision is for emphasis only and not to limit this reservation in any way.

3.    Counsel to the Committee, Amini LLC ("Amini"), will draft and file a joint chapter 11 plan ("Plan") and disclosure statement ("Disclosure Statement") for all of the Debtors that is reasonably acceptable to the Debtors and Landlord Group consistent with the terms provided herein.  Amini shall seek conditional approval of the Disclosure Statement and a consolidated hearing on the Plan and Disclosure Statement.  In the event a consolidated hearing is denied, Amini will act as expeditiously as reasonably possible to seek approval of a disclosure statement and plan on a non-combined basis.  The fees and expenses incurred by Amini in drafting and seeking confirmation of the Plan will be capped at $50,000.  In addition to the reservations of paragraph 2, the DIP Lender reserves its right to object to the Plan or Disclosure Statement on any ground other than the specific matters to which it has agreed herein.

4.    The Plan and Disclosure Statement will be filed within 30 days following the effective date of the administrative services agreement (or equivalent) in connection with the RCA sale transaction (the "ASA Effective Date"), and the Committee shall endeavor to obtain entry of an order confirming the Plan (the date on which such order is entered, the "Confirmation Date") by no later than 75 days after the ASA Effective Date (the "Confirmation Deadline"), which date shall be subject to a single automatic extension of 45 days in the event confirmation is denied or re-solicitation of votes is required and which otherwise will not be extended without the Landlord Group's reasonable consent.  The Debtors and Committee will share exclusivity under section 1121 of the Bankruptcy Code until the Confirmation Deadline (as such date may be extended with the Landlord Group's reasonable consent) after which, if the Confirmation Date has not occurred, or if any other breach of this Term Sheet by any Party other than the Landlord Group occurs: (i) the Landlord Cure Claim and the OP Claim (as defined below) will be allowed and paid as follows: (a) $1 million will be an allowed administrative expense claim that will be paid after the Debtors' payroll taxes are paid in full but before payment of all other priority claims, and (b) the balance of the amounts asserted in the Landlord Group's proofs of claim against the Debtors and AFM in respect of the Landlord Cure Claim and the OP Claim will be allowed general unsecured claims; and (ii) the Landlord Group otherwise reserves all rights with respect to the Chapter 11 Cases, including without limitation the right to seek termination of exclusivity as to the Landlord Group.

5.    The claim of Debtors' counsel, Loeb & Loeb LLP, for professional fees and expenses incurred through the Plan Effective Date (defined below) shall be capped at $2.7 million. The claim of the Debtors' CRO Michael Wyse for fees and expenses incurred through the Plan Effective Date shall be capped at $574,900.  None of the Landlord Group, its affiliates, nor the Plan Administrator (defined below) will object to Loeb & Loeb's or Michael Wyse's final fee applications provided they do not exceed the foregoing caps.

6. The CRO will provide access to the Debtors' books and records to the Responsible Officer (defined below) and Plan Administrator commencing February 28, 2020. The Debtors will propose a wind down budget reasonably acceptable to the Landlord Group, the DIP Lender, and the Committee ("Wind Down Budget"), in the form annexed hereto as Schedule 1 and which will be funded as provided herein and extended through the full administration of the Plan and may be modified from time to time with the reasonable agreement of the Landlord Group, the DIP Lender (to the extent not repaid in full), the Responsible Officer, and the Committee.

7. Between the ASA Effective Date and the appointment of Ronald Winters of Gibbins Advisors, LLC ("Gibbins") as Plan Administrator on the Plan Effective Date ("Plan Administrator"), Gibbins will remain employed as financial advisor to the Landlord Group and the Responsible Officer will permit Gibbins to monitor the Debtors' collection of Healthcare Receivables (defined below) and reconciliation of secured, administrative, and priority claims. Gibbins' fees and expenses in such capacity (and, for the avoidance of doubt, not in his capacity as financial advisor to the Landlord Group) shall be provided for, allowed, and paid under the Wind Down Budget as an administrative expense claim.

8. The Responsible Officer and Plan Administrator will provide regular, detailed reporting to one another regarding the fulfillment of their respective duties and financial condition and respond to inquiries on a regular basis. The Responsible Officer and Plan Administrator will work together in good faith, including to allocate work among them that may not be clearly allocated hereunder to maximize efficiency and value for stakeholders.

9. The Plan shall provide for terms and conditions as set forth in the following table:

| Treatment of Claims and Equity Interests ||
|---|---|
| **General Administrative Expense Claims** | Subject to the Priority of Distributions set forth below and the reservation of paragraph 2, payment in full of allowed administrative expense claims on the later of the Plan Effective Date and the date on which such claim becomes allowed, or as soon as reasonably practicable thereafter, unless otherwise agreed by the holder of such claim; provided, however, absent an order to the contrary, no administrative expense claim (other than the DIP Loan) may be paid prior to the Plan Effective Date that is not contained in the Wind Down Budget and has not been paid prior to the ASA Effective Date. The Plan shall establish an administrative expense claims bar date for administrative expense claims arising prior to the ASA Effective Date that is 30 days after the ASA Effective Date and another administrative expense claim bar date for claims arising after the ASA Effective Date and before the Plan Effective Date that is 45 days after the Plan Effective Date. |
| **Priority Tax Claims** | Subject to the Priority of Distributions set forth below, and the reservation of paragraph 2, at the option of the Plan Administrator, (1) cash in the allowed amount of such claim on the later of the Plan Effective Date and the date on which such claim becomes allowed, or as soon as reasonably practicable thereafter, or (2) installment payments in accordance with Bankruptcy Code section 1129(a)(9)(C). |

3

| | |
|---|---|
| **Prepetition Loan Claim (Class 1)** | To the extent not paid in full prior to the Plan Effective Date, payment in full of the prepetition loan claim against the Debtors, and for its allowance in the following amount: (1) outstanding principal obligations under the applicable Credit Agreement as of the Plan Effective Date, (2) plus accrued but unpaid interest on said principal obligations at the non-default rate through the Plan Effective Date, (3) plus interest accrued on said principal obligations at the non-default rate after the Plan Effective Date. |
| **DIP Loan Claim (Class 2)** | To the extent not paid in full prior to the Plan Effective Date, payment in full of all amounts due and payable to the DIP Lender under the Final DIP Financing Order and the DIP Loan Agreement until all such amounts are paid in full (the "DIP Loan Claim") minus $50,000. |
| **Other Secured Claims (Class 3)** | At the option of the Plan Administrator, payment in full, delivery of the collateral securing such claim plus any interest required by Bankruptcy Code section 506(b), or such other treatment needed to satisfy the requirements of section 1129. Each holder of an allowed other secured claim shall retain liens in existence of the Plan Effective Date until full and final satisfaction of such claim. |
| **Landlord Cure Claim (Class 4)** | Pro rata share of 85% of net available cash. The Landlord Group shall have an allowed cure claim against the Consolidated Debtors (as defined below) in the amount of $2,385,000 ("Landlord Cure Claim"), which shall not be subject to further reduction or challenge. |
| **General Unsecured Claims (Class 5)** | Pro rata share of 15% of net available cash until the Landlord Cure Claim has been paid in full and 100% thereafter. 6060 Armor Road LLC's claims under sections 365, 502(b)(6) and 503(b) of the Bankruptcy Code (the "OP Claims") shall be treated as general unsecured claims against the Consolidated Debtors; provided, however, that in the event the Landlord Group's personal property that is missing from Orchard Park is returned to the Landlord Group's reasonable satisfaction, the Landlord Group will waive the OP Claims. |
| **Equity Interests (Class 6)** | The Plan shall provide for Israel Sherman, Samuel Sherman, and AFM to retain their respective equity interests in each of the Debtors on the Plan Effective Date, but for such equity interests to be extinguished upon the closing of the RCA transaction ("Sale Effective Date"). They will not receive a distribution on account of such interests. |
| **Priority of Distributions** | Cash available for distribution shall, subject to the Wind Down Budget being funded from cash proceeds of Debtors' healthcare receivables for services rendered prior to the ASA Effective Date ("Healthcare Receivables"), be paid to holders of allowed claims or allocated to reserves in the following order: first, to the holder of the Prepetition Loan Claims on account thereof; second, to the DIP Lender on account of its allowed claim; third, to holders of allowed administrative expense claims, including professional fee claims; fourth, to holders of allowed priority non-tax claims; fifth, to holders |

|  | of allowed priority tax claims; sixth, to reserves (including the disputed claims reserve); and seventh, to the Landlord Group on account of the Landlord Cure Claim and to holders of allowed general unsecured claims. |
|---|---|
| **Limited Consolidation** | On the Plan Effective Date, all assets and liabilities of the Debtors will be deemed merged into AFM (as such, "Consolidated Debtors") solely for purposes of the Plan and distributions to be made thereunder, the obligations of each of the Debtors will be deemed to be the obligation of the Consolidated Debtors solely for purposes of the Plan and distributions to be made thereunder, and any claims filed on account of any such obligations will be deemed claims against the Consolidated Debtors and any and all claims filed against more than one Debtor for the same liability shall be deemed one claim against any of the Consolidated Debtors; provided, however, the foregoing limited consolidation shall not affect each of the Debtors' obligation to file quarterly operating reports and pay U.S. Trustee Fees, which shall continue until a final decree has been entered, and shall not affect, expand, or limit the collateral pledged to the holders of valid, perfected liens on each Debtor's assets. |
| **Means for Implementation** ||
| **Source of Distributions** | The source of cash needed for distributions to creditors shall include all assets of the Debtors, including but not limited to Healthcare Receivables, cash on hand as of the ASA Effective Date, sale proceeds payable in connection with the RCA transaction, and avoidance actions and other preserved causes of action as specified in a plan supplement to be filed in advance of the voting deadline. |
| **Continued Corporate Existence** | From and after the Plan Effective Date, each of the Debtors shall be reorganized and shall conduct the business of ensuring the RCA transaction is consummated. The Plan Administrator, in consultation with the Responsible Officer, shall cause the Debtors to be dissolved at such time as the Plan Administrator, in consultation with the Responsible Officer, deems appropriate and in the estates' best interests, after the Sale Effective Date and after entry of a final decree. |
| **Plan Administrator** | The Plan Administrator shall be appointed as such on the Plan Effective Date. The Plan Administrator's duties shall be as set forth in a Plan Administrator Agreement to be included in a plan supplement, and shall include: monetizing or abandoning the Debtors' assets, objecting to and resolving disputed claims other than tort claims (and consulting with the Responsible Officer regarding priority tax claims), making distributions to all creditors pursuant to the Plan, preparing post-confirmation quarterly reports and paying U.S. Trustee fees, preparing and filing tax returns for the Debtors, and closing the Chapter 11 Cases and dissolving the Debtors at the appropriate time. The Responsible Officer shall have consultation rights in respect of the foregoing. The Plan Administrator shall have the right to employ, in consultation with the Oversight Committee, attorneys and other professionals to assist the Plan Administrator in fulfilling his duties. The Plan Administrator shall have exclusive |

5

|  | authority to object to and resolve disputed claims filed against the Debtors other than tort claims. |
|---|---|
| **Officers** | Following the Plan Effective Date, Israel Sherman shall remain an officer of each of the Debtors, and William Lenhart shall remain an officer of each of the Debtors ("Responsible Officer," and together, the "Officers"), in both cases through the dissolution of the Debtors. The Officers shall have ultimate decision-making authority for the Debtors for all matters not expressly delegated to the Plan Administrator pursuant to the Plan or Plan Administrator Agreement, including for the avoidance of doubt objecting to and resolving tort claims against the Debtors, except that decision-making authority with respect to matters regarding the provision of healthcare services shall be reserved for Israel Sherman, unless such matter involves a related-party transaction in which case the Responsible Officer shall have authority. Notwithstanding the foregoing, Israel Sherman's responsibilities as officer shall include fulfilling all duties required of him by the Settlement Agreement, including without limitation in connection with the transfer of the facilities and the CHOW process. The Responsible Officer's employment shall be governed by a Responsible Officer Agreement to be included in a plan supplement. In the event the terms of such an Responsible Officer Agreement cannot be agreed upon, Mr. Lenhart shall be excused from any role as Responsible Officer and shall be replaced by a party selected by the Landlord Group from a list of 3 or more candidates provided by the Debtors. The Responsible Officer shall have exclusive authority to object to and resolve tort claims filed against the Debtors. |
| **Compensation of Plan Administrator and Officers** | The Plan Administrator and Responsible Officer shall be entitled to compensation at hourly rates and reimbursement of expenses as set forth in their respective agreements, subject to the line item set aside for their professional fees in the Wind Down Budget. Israel Sherman shall serve as officer of each of the Debtors without compensation. The Debtors will continue to maintain D&O insurance with policy limits and coverage not less than the D&O insurance maintained by the Debtors previously, and the Debtors shall also provide indemnities acceptable to the Officers with related obligations constituting allowed general administrative expense claims. |
| **Oversight Committee** | The Plan Administrator and Responsible Officer shall report to an oversight committee comprised of a representative of the Landlord Group until its claims have been fully satisfied, the Responsible Officer and a designee of the Committee ("Oversight Committee"). The following matters shall be subject to Oversight Committee review and approval: compensation of the Plan Administrator and Responsible Officer and payment of fees and expenses of any professional employed by the Plan Administrator to the extent in excess of the Wind Down Budget (with disputes to be resolved by the Court), modifications of the Wind Down Budget proposed by the Plan Administrator or Responsible Officer, and collection or monetization of the |

| | |
|---|---|
| | Healthcare Receivables other than by Billit employees. Except for reimbursement of reasonable, actual costs and expenses incurred in serving as an Oversight Committee member, which amounts shall not be paid until the DIP Lender has been paid in full, such members shall serve without compensation.  Under no circumstances will attorneys' fees incurred by the Oversight Committee or any individual members thereof be reimbursable.  Notwithstanding the foregoing, until the DIP Lender has been paid in full, none of the Plan Administrator, Responsible Person, or the Oversight Committee shall have any authority to increase the expenditures under the Wind Down Budget, to compromise the Healthcare Receivables, or to pay any amounts not reflected in the Wind Down Budget without the DIP Lender's prior written approval. |
| **Collection of Healthcare Receivables** | Prior to the Plan Effective Date, the Responsible Officer will oversee the collection of the Healthcare Receivables and will employ employees of Billit Accounting & Information Technology LLC ("Billit") for such purposes, subject to the Wind Down Budget.  From and after the Plan Effective Date, the Plan Administrator shall be responsible for overseeing collections of the Healthcare Receivables, and the Plan Administrator shall have absolute discretion to reduce Billit staffing as he deems appropriate.  After payment of the DIP Loan, the Plan Administrator, in consultation with the Responsible Officer, shall have discretion to at any time elect to cease collection activities, engage a third party (including RCA or its affiliates) to collect the Healthcare Receivables, or sell or assign the remaining Healthcare Receivables at such time and on such terms as he determines is in the best interests of creditors, in each case subject to Oversight Committee approval.   To the extent RCA collects any Healthcare Receivables, RCA will be caused to remit proceeds thereof and copies of all information or reporting related to RCA's collection of said receivables to the Plan Administrator.  For the avoidance of doubt, any authority granted to the Debtors or Plan Administrator in respect of the collection of Healthcare Receivables shall include the right to oversee any disputes with RCA regarding the allocation or true-up of any collections of Healthcare Receivables. Nothing contained herein or in the Plan shall limit the right of the Debtors or Plan Administrator to enforce the Debtors' rights as against RCA, all of which rights are expressly preserved. |
| **Other** | |
| **Releases** | The Plan shall contain full releases from liability to the fullest extent permitted by applicable law in favor of the Landlord Group and each of their current and former officers, directors, principals, members, professionals, advisors, accountants, attorneys, investment bankers, consultants, employees, agents, and other representatives (the "Landlord Release Parties") by the Debtors and each of their current and former officers, directors, principals, members, professionals, advisors, accountants, attorneys, investment bankers, consultants, |

7

|  | employees, agents, and other representatives ("Debtor Release Parties") and the Committee and the Committee's members and advisors (the "Committee Parties") from and any and all claims or causes of action. The Landlord Group will provide mutual releases to each of the Debtor Release Parties and the Committee Parties; provided, however, that the Landlord Group's release of claims against Israel Sherman and Samuel Sherman provided in the Settlement Agreement shall not occur prior to the date provided in the Settlement Agreement. The Debtor Release Parties, which for the avoidance of doubt include Israel Sherman and Samuel Sherman, the DIP Lender and the Committee Parties shall be the subject of exculpation provisions and shall receive full releases from the Plan Administrator, Responsible Officer, the Debtors and the Debtors' estates. |
|---|---|
| **Automatic Stay** | The automatic stay shall remain in place post-Plan Effective Date pursuant to Bankruptcy Code section 362(c). |
| **Plan Effective Date** | Unless otherwise agreed by the Debtors, the Landlord Group and the Committee, the Plan will be structured to become effective as soon as reasonably practicable after the Confirmation Date. |

IN WITNESS WHEREOF, the Parties have executed this Term Sheet as of the date first written above.

**DEBTORS**:

**ABSOLUT FACILITIES MANAGEMENT, LLC**

**ABSOLUT CENTER FOR NURSING AND REHABILITATION AT AURORA PARK, LLC**

**ABSOLUT AT ORCHARD BROOKE, LLC**

**ABSOLUT CENTER FOR NURSING AND REHABILITATION AT ORCHARD PARK, LLC**

**ABSOLUT CENTER FOR NURSING AND REHABILITATION AT ALLEGANY, LLC**

**ABSOLUT CENTER FOR NURSING AND REHABILITATION AT THREE RIVERS, LLC**

**ABSOLUT CENTER FOR NURSING AND REHABILITATION AT GASPORT, LLC**

**ABSOLUT NURSING AND REHABILITATION CENTER OF WESTFIELD, LLC**

By*/s/ Michael Wyse*_____
Name: Michael Wyse_____
Title: Chief Restructuring Officer_____

**ABS DIP, LLC**

By:_____
Name:_____
Title:_____




**LANDLORDS:**

**292 MAIN STREET, LLC**

**6060 ARMOR ROAD, LLC**

**2178 N. FIFTH STREET, LLC**

**101 CREEKSIDE DRIVE, LLC**

**4540 LINCOLN DRIVE, LLC**

**26 CASS STREET, LLC**

By:_____
Name:_____
Title:_____




**OFFICIAL COMMITTEE OF UNSECURED CREDITORS:**


By:_____
Name:_____
Title:_____

Case 8-19-76260-ast    Doc 446-1    Filed 02/26/20    Entered 02/26/20 19:08:06

**ABS DIP, LLC**

By: _____
Name: _____
Title: _____


**LANDLORDS:**

**292 MAIN STREET, LLC**

**6060 ARMOR ROAD, LLC**

**2178 N. FIFTH STREET, LLC**

**101 CREEKSIDE DRIVE, LLC**

**4540 LINCOLN DRIVE, LLC**

**26 CASS STREET, LLC**

By: _[signature]_
Name: IRA SMEDRA
Title: MANAGER


**OFFICIAL COMMITTEE OF UNSECURED CREDITORS:**

By: _____
Name: _____
Title: _____

9

**ABS DIP, LLC**

By:_____
Name:_____
Title:_____


**LANDLORDS:**

**292 MAIN STREET, LLC**

**6060 ARMOR ROAD, LLC**

**2178 N. FIFTH STREET, LLC**

**101 CREEKSIDE DRIVE, LLC**

**4540 LINCOLN DRIVE, LLC**

**26 CASS STREET, LLC**

By:_____
Name:_____
Title:_____


**OFFICIAL COMMITTEE OF UNSECURED CREDITORS:**

By: /s/ Isaac Newman
Isaac Newman, Chief Operating Officer of
DentServ Dental Services, P.C.
Chairperson of the Committee

1

# SCHEDULE 1

*DRAFT and Subject to Change*
*For Discussion Purposes Only*

**AFM**
Transition Budget

| | March | April | May | June | July | August | TOTAL |
|---|---:|---:|---:|---:|---:|---:|---:|
| **Operations** | | | | | | | |
| Wages | $ 97,567 | $ 92,260 | $ 56,038 | $ 70,047 | $ 56,038 | $ 56,038 | $ 427,987 |
| Benefits | 19,513 | 18,452 | 11,208 | 14,009 | 11,208 | 11,208 | 85,597 |
| Contracted Service (CFO) | 27,200 | 34,000 | 27,200 | - | - | - | 88,400 |
| Postage and Freight | 442 | 442 | 442 | 442 | 442 | 442 | 2,652 |
| Supplies | 842 | 842 | 842 | 842 | 842 | 842 | 5,052 |
| Purchased Services | 493 | 493 | 493 | 493 | 493 | 493 | 2,958 |
| Audit Fee | - | - | 7,200 | - | - | - | 7,200 |
| Phone | 987 | 987 | 987 | 987 | 987 | 987 | 5,922 |
| Insurance | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 45,000 |
| Office Lease | 10,730 | 21,460 | - | - | - | - | 32,190 |
| Other Direct | 127 | 127 | 127 | 127 | 127 | 127 | 762 |
| | | | | | | | |
| **Profesional / Plan Related** | | | | | | | |
| WKL | 25,000 | 25,000 | 25,000 | 10,000 | 10,000 | 10,000 | 105,000 |
| WALLC | 15,000 | 15,000 | 15,000 | - | - | - | 45,000 |
| Plan Administrator | 20,000 | 25,000 | 20,000 | 32,500 | 30,000 | 30,000 | 157,500 |
| Administrator Trust | 250,000 | - | - | - | - | - | 250,000 |
| Prime Clerk | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 90,000 |
| Amini | 25,000 | 25,000 | 25,000 | - | - | - | 75,000 |
| UST Fees | - | 200,000 | - | - | - | - | 200,000 |
| Contingency | - | - | 60,000 | - | - | - | 60,000 |
| | $ 515,402 | $ 481,563 | $ 272,036 | $ 151,947 | $ 132,636 | $ 132,636 | $ 1,686,221 |