## **EXHIBIT 2**

**Declaration of Michael Wyse**

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>ABSOLUT FACILITIES MANAGEMENT, LLC, et al.,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 19-76260-ast<br>Case No. 19-76263-ast<br>Case No. 19-76267-ast<br>Case No. 19-76268-ast<br>Case No. 19-76269-ast<br>Case No. 19-76270-ast<br>Case No. 19-76271-ast<br>Case No. 19-76272-ast<br><br>(Jointly Administered) |

## DECLARATION OF MICHAEL WYSE

I, Michael Wyse, hereby declare:

1.          I am the Chief Restructuring Officer of the Debtors.  This declaration was prepared to accompany the Disclosure Statement for the Joint Chapter 11 Plan for the Debtors proposed by the Official Committee of Unsecured Creditors (as amended, the "Plan"), and to provide additional color as to the nature and collectability of the Debtors' healthcare receivables.  This declaration also contains a liquidation analysis, as contemplated by Bankruptcy Code section 1129(a)(7).

**Healthcare Receivables; Plan Waterfall**

2.          I anticipate that the principal source of recovery for all creditors under the Plan will be the Debtors' accounts receivable on account of services rendered to residents of their skilled nursing and assisted living facilities, prior to the effective date of that certain Administrative

---

[1] The Debtors are: Absolut Facilities Management, LLC; Absolut Center for Nursing and Rehabilitation at Allegany, LLC; Absolut Center for Nursing and Rehabilitation at Aurora Park, LLC ("Aurora Park"); Absolut Center for Nursing and Rehabilitation at Gasport, LLC; Absolut at Orchard Brooke, LLC; Absolut Center for Nursing and Rehabilitation at Orchard Park, LLC ("Orchard Park"); Absolut Center for Nursing and Rehabilitation at Three Rivers, LLC; and Absolut Center for Nursing and Rehabilitation at Westfield, LLC.

services and Consulting Agreement, dated as of January 30, 2020, between the Debtors other than

Orchard Park, on the one hand, and RCA Healthcare Management, LLC and affiliates, on the other

("Healthcare Receivables").

3.      Generally speaking, the Healthcare Receivables fall into one of the following

categories:

      (a) those covered by third party insurance, a health maintenance organization (HMO), or other long term care plan ("Insurance");

      (b) those covered by Medicaid;

      (c) those attributable to persons who applied for Medicaid but have not yet been approved ("Medicaid Pending");

      (d) those covered under a managed long-term care Medicaid plan;

      (e) those covered by Medicare;

      (f) those covered by a U.S. Department of Veterans Affairs benefit program, including hospice care;

      (g) those attributable to persons who have been denied Medicaid benefits, and for which the patient is individually liable ("Private Pay"); and

      (h) those for which collections attorneys have been engaged ("Attorney").

4.      Annexed hereto as Schedule 1 is a table identifying the dollar amount attributable

to each of the foregoing categories, at each of the Debtors' facilities and in the aggregate of the

subject Healthcare Receivables as of February 29, 2020.

5.      Generally speaking, the Debtors' collection history from government payors and

Insurance has been strong and consistent.  Based on historic collection rates, I expect the Debtors

to collect approximately 90% of Healthcare Receivables attributable to Medicare, Medicaid and

Insurance within the next 9 months.

6.      The Debtors' collection history in respect of Healthcare Receivables labeled Private

Pay and Attorney has been less reliable.  Nevertheless, based on historic collection rates, I expect

the Debtors to collect approximately 50% of such Healthcare Receivables within the next 9 months.

7.       One of the contributors to the Debtors' bankruptcy filings was the delay in converting Medicaid Pending applicants to Medicaid.  During the lag between the time of the application and the granting of benefits, the Debtors' facilities continue to provide all necessary and appropriate services to the applicable residents, while incurring the full costs of those services.  However, the Debtors receive no reimbursement until the application has been approved.  In particular, Erie County is quite troublesome with regards to timely approval.  Unfortunately, the Debtors' two largest facilities (as of the date of the bankruptcy filings)—Aurora Park and Orchard Park—both are in Erie County.  While the Debtors have closed Orchard Park, the Debtors still are owed substantial sums arising from their care obligations at Orchard Park and still await substantial reimbursement.

8.       As of February 29, 2020 there was total of 270 Medicaid Pending Cases open with a total dollar value of over $7MM.  Of those cases, approximately 200, worth nearly $6MM, relate to Orchard Park and Aurora Park.  These applications are at different stages of their life cycle.  The Debtors have historically converted 90% of these applications, but some of them have taken 2-3 years to do such.

9.       After 9 months of the collections process it is estimated that approximately $5.8 million of receivables will still be outstanding.  Determination of how best to realize value in respect of those unpaid receivables has not been made.  For purposes of my analysis I have assumed that the remaining balances would be sold for 10% of their face value.

10.       Based upon the foregoing, it is estimated that the Debtors will likely collect not less than $13 million on account of their Healthcare Receivables over the next 9 months.  The primary risk is not the amount that will be collected but the time it takes to collect those funds.  Risk does

remain with the Medicaid Pending receivables that they will not be collected within the anticipated timeframe.  Ultimately, the timing of the collection of the Medicaid Pending receivables is largely out of the Debtors' hands, as any delays are predominantly caused by processing delays at the county level.

11.    Based upon current collections assumptions, assuming the Plan is confirmed, the Debtors believe there will be sufficient funds to pay, in full, the pre-petition Secured Lender, DIP Lender, Allowed Administrative and Priority Claims.  The Debtors further anticipate that there will be some recovery to unsecured creditors as well, though the amount is difficult to predict.

**Liquidation Analysis**

12.    A true liquidation would be difficult, there is no such thing as shutting the lights off and locking the doors.  The Debtors have hundreds of residents that need to be cared for, and the Debtors have initiated a sale process that may be disrupted by the conversion of the Debtors' cases to chapter 7.  In the case of a chapter 7, the Debtors anticipate that collections of Healthcare Receivables would be negatively impacted.  Likewise, the additional costs of chapter 7 and the potential loss of the benefit of the sale, along with the assumption of the Debtors' ongoing operating costs, would reduce recoveries to creditors such that they may only just clear the prepetition secured lender.

13.    I understand that under the "best interests of creditors" test set forth in section 1129(a)(7) of the Bankruptcy Code, the Bankruptcy Court may not confirm a plan of reorganization unless the plan provides each holder of an allowed claim or interest that does not otherwise vote in favor of the plan with property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code. To demonstrate that the Plan satisfies the best interests

of creditors test, the Debtors, with the assistance of their advisors, have prepared the hypothetical liquidation analysis described herein (the "Liquidation Analysis") annexed as Schedule 2.

14.    The Liquidation Analysis sets forth an estimated range of recovery values for each Class of Claims and Interests upon disposition of assets pursuant to a hypothetical chapter 7 liquidation.  Holders of impaired claims and interests would receive a lower (or no) recovery in a hypothetical liquidation than they would under the Plan.  Accordingly, and as set forth in greater detail below, the Debtors believe that the Plan satisfies the "best interests of creditors" test set forth in section 1129(a)(7) of the Bankruptcy Code.

15.    The Liquidation Analysis represents an estimate of recovery values based upon a hypothetical liquidation of the Debtors' estates if the Debtors' current chapter 11 cases were converted to cases under chapter 7 of the Bankruptcy Code on February 29, 2020 (the "Liquidation Date") and a chapter 7 trustee (the "Trustee") was appointed to convert all assets into cash.  In this hypothetical scenario, the Trustee would satisfy claims by converting all of the assets of the Debtors into cash. The cash amount (the "Gross Proceeds") that would be available for satisfaction of Allowed Claims and Interests would consist of the net proceeds resulting from the collection of accounts receivables and certain other assets, augmented by the cash held by the Liquidating Entities at the time of the commencement of the liquidation activities.

16.    The Liquidation Analysis assumes that Gross Proceeds would be distributed in accordance with sections 726 and 1129(b) of the Bankruptcy Code.  The Liquidation Analysis has been prepared assuming that the Debtors' current chapter 11 cases convert to chapter 7 on the Liquidation Date.

17.    The preparation of a liquidation analysis, such as the Liquidation Analysis, is an uncertain process involving the use of estimates and assumptions that, although considered reasonable by management as and when made based on management's current expectations and

beliefs, are inherently subject to business, economic and competitive risks, uncertainties and contingencies, most of which are difficult to predict and many of which are beyond the control of the Debtors or any ultimate Trustee. The values stated herein have not been subject to any review, compilation or audit by any independent accounting firm. In addition, various liquidation decisions upon which certain assumptions are based are subject to change. As a result, the actual amount of claims against the Debtors' estates could vary significantly from the estimates stated herein, depending on the nature and amount of claims asserted during the pendency of the chapter 7 case. Similarly, the value of the Debtors' assets in a liquidation scenario is uncertain and could vary significantly form the values set forth in the Liquidation analysis.  ACCORDINGLY, NEITHER THE DEBTORS NOR THEIR ADVISORS MAKE ANY REPRESENTATION OR WARRANTY THAT THE ACTUAL RESULTS OF A LIQUIDATION OF THE DEBTORS WOULD OR WOULD NOT, IN WHOLE OR IN PART, APPROXIMATE THE ASSUMPTIONS REPRESENTED HEREIN. THE ACTUAL LIQUIDATION VALUE OF THE DEBTORS IS SPECULATIVE AND RESULTS COULD VARY MATERIALLY FROM ESTIMATES PROVIDED HEREIN.

18.    I am prepared to testify concerning the foregoing, and to provide additional details of my analysis and conclusions.  In this regard, I reserve the right to modify, supplement, expand and update this Declaration.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on March 23, 2020

/s/ Michael S. Wyse
Michael Wyse
Chief Restructuring Officer

## <u>SCHEDULE 1</u>

**Healthcare Receivables**

|  | All Facilities | |
|---|---|---|
|  | Balance | |
| Insurance | $ | 1,379,484 |
| Medicaid |  | 993,236 |
| Pending |  | 7,671,098 |
| MLTC |  | 1,282,810 |
| Medicare |  | 700,527 |
| VA/HOS |  | 156,295 |
| Private |  | 5,619,379 |
| Attorney | $ | 1,708,552 |
| Total | $ | 19,511,380 |

**<u>SCHEDULE 2</u>**

**Liquidation Analysis**

|  | Assumptions | | 9-months Recovery | |
|---|---|---|---|---|
|  | Low | Mid / Base | Low | High |
| **Assets** | | | | |
| Cash on hand | 100% | 100% | $ 561,893 | $ 561,893 |
| Avoidance Actions | 10% | 20% | 166,259 | 332,518 |
| PP&E | 0% | 0% | - | - |
| Escrows - LL | 0% | 100% | - | - |
| Security Deposits - LL | 0% | 0% | - | - |
| Other | 0% | 100% | - | - |
| Receivables (net of reserves) | 50% | 75% | 6,837,230 | 10,255,846 |
| Post 270 day AR | 80% | 100% | 462,472 | 578,091 |
| Insurance refunds | | | | |
| Prepaids | | | | |
| Sale Proceeds | | | - | - |
| IP | | | | |
| Total Assets Available for Distribution | | | $ 8,027,854 | $ 11,728,346 |
| | | | | |
| **First Lien Repayment** | | | | |
| HUD | $ 2,750,101 | | (2,750,101) | (2,750,101) |
| non-HUD | $ 701,527 | | (701,527) | (701,527) |
| Legal Expenses | $ 76,078 | | (76,078) | (76,078) |
| Interest (2 months) | $ 57,527 | | (57,527) | (57,527) |
| | | | | |
| Available for Distribution to ABS DIP | | | $ 4,442,621 | $ 8,143,113 |
| | | | | |
| ABS DIP | $ 2,000,000 | | (2,000,000) | (2,000,000) |
| | | | | |
| Available for Distribution to Capital Funding / HUD | | | $ 2,442,621 | $ 6,143,113 |
| | | | | |
| Capital Funding / HUD | $ - | | - | - |
| | | | | |
| Available for Distribution to cover Wind-Down Costs | | | $ 2,442,621 | $ 6,143,113 |
| | | | | |
| **Wind-down Costs** | | | | |
| Transition Budget | | | | |
| 3/14/2020 thru 5/31/2020 | $ 2,667,177 | | (2,667,177) | (2,667,177) |
| 6/1/2020 thru 8/30/2020 | $ 495,689 | | (495,689) | (495,689) |
| 9/1/2020 thru 11/30/2020 | $ 247,844 | | (247,844) | (247,844) |
| Other | $ 100,000 | | (100,000) | (100,000) |
| | | | | |
| Available for Distribution to cover Chapter 7 Trustee Expenses | | | $ (1,068,089) | $ 2,632,403 |
| | | | | |
| Chapter 7 Trustee Fees | | | (264,086) | (375,100) |
| | | | | |
| Available for Distribution to cover Other Admin Expenses | | | $ (1,332,175) | $ 2,257,303 |
| | | | | |
| **Admin Expenses** | | | | |
| Professionals | $ 3,536,900 | | (3,536,900) | (3,536,900) |
| Other | $ 100,000 | | (100,000) | (100,000) |
| Landlord Claim | $ 1,000,000 | | (1,000,000) | (1,000,000) |
| | | | | |
| Available for Distribution to Priority Unsecured Claims | | | $ (5,969,075) | $ (2,379,597) |

|  | | Assumptions | | 9-months Recovery | |
|---|---|---|---|---|---|
|  | | Low | Mid / Base | Low | High |
| **Priority Unsecured Claims** | | | | | |
| Payroll Taxes | $ 917,553 | | | $ (917,553) | $ (917,553) |
| NYS Medicaid | $ 1,559,242 | | | $ (1,559,242) | $ (1,559,242) |
| | | | | | |
| Available for Distribution to GUC** | | | | $ (8,445,869) | $ (4,856,392) |
| | | | | | |
| **General Unsecured Claims** | | | | | |
| From DIP | $ 50,000 | | | | |
| | | | | | |
| ***GUC Recovery*** | | | | $ - | $ - |