**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>ABSOLUT FACILITIES MANAGEMENT, LLC, et al.,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 19-76260-ast<br>Case No. 19-76263-ast<br>Case No. 19-76267-ast<br>Case No. 19-76268-ast<br>Case No. 19-76269-ast<br>Case No. 19-76270-ast<br>Case No. 19-76271-ast<br>Case No. 19-76272-ast<br><br>(Jointly Administered) |

## SUPPLEMENTAL DECLARATION OF MICHAEL WYSE

I, Michael Wyse, hereby declare:

1.       I am the Chief Restructuring Officer of the Debtors. This supplemental declaration (this "Declaration") was prepared in support of confirmation of the *Official Committee of Unsecured Creditors' Third Amended Joint Chapter 11 Plan* (as amended, the "Plan"). This Declaration supplements the declaration (the "Original Declaration") attached to the *Second Amended Disclosure Statement To Accompany Official Committee Of Unsecured Creditors' Second Amended Joint Chapter 11 Plan* [Dkt. No. 517-2].[2]

**Releases**

2.       The Plan is the result of months of arm's length negotiations among the Debtors, the Landlord Group, the Committee and other key constituents. As a result of these extensive

---

[1] The Debtors are: Absolut Facilities Management, LLC; Absolut Center for Nursing and Rehabilitation at Allegany, LLC; Absolut Center for Nursing and Rehabilitation at Aurora Park, LLC; Absolut Center for Nursing and Rehabilitation at Gasport, LLC; Absolut at Orchard Brooke, LLC; Absolut Center for Nursing and Rehabilitation at Orchard Park, LLC ("Orchard Park"); Absolut Center for Nursing and Rehabilitation at Three Rivers, LLC; and Absolut Center for Nursing and Rehabilitation at Westfield, LLC.

[2] Capitalized terms used but not defined in this Declaration shall have the meanings ascribed to such terms in the Original Declaration.

negotiations, the Plan embodies a resolution of prepetition and postpetition claims and controversies related to the Debtors and the restructuring. To effectuate this global settlement, the Plan includes mutual, consensual, and customary releases of claims held by the Debtors and claims held by certain parties in interest as well as exculpatory provisions relating to postpetition conduct in connection with the Debtors' restructuring. This global settlement is critical to bring closure to the Debtors and all parties in interest. As discussed below, these provisions were the product of extensive good faith, arm's length negotiations, were a material inducement for parties to consent to and support the terms of the Plan and the comprehensive settlement embodied therein, and they are supported by the Debtors and their key stakeholders, including the Committee and the Landlord Group.

3. The releases granted by the Debtors under the Plan are in the best interests of the Debtors' estates. First, the Debtor releases were integral to the settlement embodied in the Plan, which paved the way for a consensual resolution to these contentious cases, the preservation of hundreds of jobs and the continuity of care during this time of grave economic uncertainty and stress on the nation's healthcare system. Absent the Debtor releases contained in the Plan, the settlement embodied in the Plan would not have been possible. Second, the amount that could be recovered in litigation with respect to claims the Debtors may have against the Released Parties, if any, is speculative, while the costs associated with litigating those claims and the continuing costs of litigation arising in these bankruptcy cases absent a consensual confirmation of the Plan would be definite and crippling to the Debtors and their estates. Resolving those claims through the Plan in order to achieve a consensual emergence from bankruptcy is in the estates' best interests. Third, the Debtors' creditors overwhelmingly support and have voted in favor of the Plan. Finally, the Plan, including the contours of the releases granted by the Debtors, was heavily negotiated by sophisticated entities that were represented by able counsel and financial advisors.

The result is a compromise that reflects the give-and-take of a true arm's-length negotiation process.

4. The exculpation provision, as well, represents an integral piece of the overall settlement embodied by the Plan and was the product of months of arm's length negotiations among the key stakeholders. Unlike a third party release, which the Plan does not contain, the exculpation provision does not affect the liability of third parties *per se*, but rather sets a standard of care in hypothetical future litigation against the Released Parties for acts arising out of the Debtors' restructuring. The exculpation provision is narrowly tailored to relate to the Debtors' bankruptcy cases and excludes from its protections claims arising from fraud, willful misconduct, or gross negligence. This provision serves the vital purpose of providing protection to those parties who served as fiduciaries and otherwise played key roles in these cases and in formulating the consensual Plan. Finally, no party has objected to the exculpation provision, and the Plan as a whole, which includes the exculpation provision, has been overwhelmingly accepted by the Debtors' creditors.

**Healthcare Receivables; Plan Waterfall**

5. The Original Declaration contained certain assumptions regarding the collection of the Debtors' Healthcare Receivables. Since the date of the Original Declaration, the Debtors' collection of the Healthcare Receivables has been consistent with those assumptions, despite the uncertainty and disruption caused by the COVID-19 pandemic. While there is concern that the pandemic may cause already slow processing times on Medicaid Pending and certain other types of Healthcare Receivables to be even slower, the experience to date has been consistent with the pre-pandemic projections. Moreover, to the extent the timing of collection is ultimately affected by the pandemic, the ultimate collections of the Healthcare Receivables should not be.

6.     Since the date of the Original Declaration, I have worked with Bill Lenhart (the future Responsible Officer), the Debtors, Ron Winters (the future Plan Administrator), the Landlord Group, the DIP Lender, the Committee and the acquirer of the Debtors' assets to refine the transition budget attached to the Disclosure Statement as Schedule 1 (the "Transition Budget"). As a result of those refinements, the timing of the payment of certain administrative expense claims has been adjusted. In addition, certain additional administrative expenses that are anticipated to be owed but were not provided for in the initial Transition Budget have been added.

7.     I have also refined the waterfall analysis (the "Waterfall") on which the Disclosure Statement's recovery projections are based, including to take into account the modifications to the Transition Budget described above. Notwithstanding the addition of the additional items to the Transition Budget discussed above, based upon current collections assumptions, assuming the Plan is promptly confirmed, the Debtors believe there will be sufficient funds to pay, in full, the pre-petition Secured Lender, DIP Lender, Allowed Administrative and Priority Claims. The Debtors further anticipate that there will be some recovery to unsecured creditors as well. The projected amount of those recoveries – while difficult to predict and in the best case minimal – will not be materially altered by the modifications described herein to the Transition Budget and the Waterfall.

8.     I am prepared to testify concerning the foregoing, and to provide additional details of my analysis and conclusions. In this regard, I reserve the right to modify, supplement, expand and update this Declaration.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on April 30, 2020

/s/ Michael S. Wyse
Michael Wyse
Chief Restructuring Officer