Jeffrey Chubak
AMINI LLC
131 West 35th Street
12th Floor
New York, NY 10001
(212) 490-4700
jchubak@aminillc.com
*Attorneys for Ronald Winters Solely in his*
*Capacity as Plan Administrator*

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| | ) Case No. 19-76260 (AST) |
| Absolut Facilities Management, LLC, *et al.*, | ) |
| | ) (Substantively Consolidated) |
| Debtors.[1] | ) |
| | ) (Jointly Administered) |

**APPLICATION ON CONSENT IN FURTHERANCE OF ASSIGNMENT OF**
**SALE AGREEMENTS TO CALVADO CARE FROM RCA HEALTHCARE**

Ronald Winters, solely in his capacity as Plan Administrator (the "Plan Administrator" or "Winters") under the Chapter 11 Plan of debtor Absolut Facilities Management, LLC ("AFM") and its affiliated debtors (together, the "Debtors"), and through his undersigned counsel, hereby moves for an order, in the form attached as **Exhibit A**, in furtherance of the assignment of the Asset Purchase Agreement, dated as of January 30, 2020 [Docket No. 460, Exhibit C] (the "APA"), the Administrative Services Agreement, dated as of the same date [Docket No. 460, Exhibit D] (the "ASA") and all related and ancillary agreements (collectively with the APA and the ASA, the "Sale Agreements") between Debtors and RCA Healthcare Management, LLC

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are: Absolut Facilities Management, LLC (1412); Absolut Center for Nursing and Rehabilitation at Allegany, LLC (7875); Absolut Center for Nursing and Rehabilitation at Aurora Park, LLC (8266); Absolut Center for Nursing and Rehabilitation at Gasport, LLC (8080); Absolut at Orchard Brooke, LLC (1641); Absolut Center for Nursing and Rehabilitation at Orchard Park, LLC (8300); Absolut Center for Nursing and Rehabilitation at Three Rivers, LLC (8133); and Absolut Center for Nursing and Rehabilitation at Westfield, LLC (7924).

("RCA") to Calvado Care ("Calvado"), memorialized in the *Services Transfer Agreement* dated March 5, 2026 (the "STA"), and in support states:

**PRELIMINARY STATEMENT**

1.    At the March 11, 2026 status conference, counsel for the Plan Administrator updated the Court about RCA's progress towards satisfying the closing conditions contained in the Sale Agreements from January 2020.  As explained in the *Pre-Status Conference Report* [Docket No. 780], RCA pivoted to assigning the Sale Agreements to Calvado.  RCA's assignment to Calvado is subject to the consent of (a) the non-debtor Facilities (each owned 45% by Sherman, 54% by AFM and 1% by Samuel Sherman) and (b) AFM (100% owned by Sherman but subject to an irrevocable proxy granted to the Plan Administrator), a post-confirmation debtor.[2]

2.    In consultation with various stakeholders, the Plan Administrator concluded (a) the operating companies that are the subject of the assignments are no longer debtors since entry of the Final Decree in June 2020; (b) the Sale Agreements and Plan documents empower the parties to assign agreements out-of-court; and (c) the Irrevocable Proxy [Docket No. 566-4] ("Irrevocable Proxy") granted the Plan Administrator a role in the governance of AFM.  The Plan Administrator concluded that his approval was needed in order for AFM to consent to assignment but that the parties could agree to assignment without the additional cost of motion practice.

3.    The Plan Administrator evaluated the terms of the STA and discussed with the Oversight Committee, the Landlord Group, RCA, Calvado, Mr. William Lenhart, Responsible Officer ("Lenhart"), and Mr. Israel Sherman ("Sherman").  The Plan Administrator provides no opinion on Calvado's capabilities or its likelihood of obtaining CHOW approval, but has

---

[2] See **Exhibit C** attached hereto which is a chart of debtors and ownership.

concluded that the assignment transaction is appropriate since RCA has not made material progress towards CHOW approval, a condition to closing of the sale and eventual bankruptcy case closure.

4.     This Application provides the rationale and basis for the Plan Administrator's authority to consent to the assignment transaction which is premised on the (i) Sale Agreements, (ii) Sale Order, (iii) Plan, (iv) Plan Administrator Agreement [Docket No. 566-2] (the "Plan Administrator Agreement"), and (v) Irrevocable Proxy (each of these documents collectively referred to herein as the "Material Agreements").

5.     As set forth at the March 11, 2026 status conference, the Plan Administrator files this Application in conformity with those instructions given by the Court and requests made by the Office of the United States Trustee.  For the reasons set forth herein, the Plan Administrator respectfully requests an order of this Court confirming the Plan Administrator's consent at **Exhibit B** is an appropriate exercise of his discretion and was performed in furtherance of his duties.

## **BACKGROUND**

**I.     The Debtors' Entry Into Chapter 11.**

6.     By way of background, the Debtors commenced these Chapter 11 Cases on September 10, 2019.  AFM was the original lead debtor but since July 2020, the other debtors' cases have been closed and so AFM's case is the sole remaining open one under which the Plan Administrator administers the Plan and is required to do so until the sale closes (which is dependent on CHOW approval).  Although Sherman owns 100% of the equity of AFM, his control over AFM is subject to an Irrevocable Proxy issued in favor of the Plan Administrator at the time of the sale and Plan.  The Irrevocable Proxy remains in place until Sale Closing, the Chapter 11 Cases are dismissed, and Debtors dissolved.

**II.    The Debtors' Sale and Reorganization.**

7.    During the Chapter 11 Cases, the Debtors engaged in a sale and marketing process for substantially all of the Debtors' assets (the "Assets"). The Debtors determined RCA was the only qualified bidder for the Assets, and was selected the successful bidder. On January 30, 2020, the Debtors and RCA executed the APA and ASA to memorialize the terms of the sale of the Debtors' Assets (the "Sale"). The APA contemplated that the Debtors would sell their Assets to separate special purpose entities ("SPEs") formed by RCA pursuant to New York State Public Health Law. Each SPE would be required to seek licenses to operate as a skilled nursing facility through a change of ownership, or "CHOW" process—which entails applications for (i) a Certificate of Need ("CON") from DOH and (ii) a Transfer of Physical Assets from HUD. Closing of the Sale (the "Sale Effective Date") set out in the APA was contingent on RCA receiving DOH and HUD approval for the SPEs through the CHOW process. *See* APA § 6. The ASA provided that, during the period in which the SPEs awaited regulatory approval, each of the Operating Debtors[3], or "Established Operators" would continue operating the facilities, and the SPEs would serve in a consulting capacity for the Established Operators. *See* ASA at 2. The ASA went effective March 1, 2020, and the term of the ASA continues until the Sale closes.

8.    On February 10, 2020, the Court entered an *Order Authorizing (I) Sale of Substantially All of the Debtors' Assets to RCA Healthcare Management, LLC, Free and Clear of Liens, Claims and Interests (Except for Assumed Liabilities) and (II) Assumption and Assignment of Contracts* [Docket No. 446] (the "Sale Order").

9.    On March 16, 2020, the Official Committee of Unsecured Creditors (the "Committee") filed its proposed joint chapter 11 plan, which was subsequently amended and

---

[3]    Defined in the ASA as Allegany, Aurora Park, Gasport, Orchard Brooke, Three Rivers and Westfield, each as defined in **Exhibit C**.

confirmed as the *Official Committee of Unsecured Creditors' Third Amended Joint Chapter 11 Plan* [Docket No. 560] (the "Plan").  The Plan conditions the dissolution of each Debtor on the occurrence of the Sale Effective Date.  *See* Plan Art. 4.10 ("As soon as practicable after the Sale Effective Date and entry of a final decree closing the Chapter 11 Case of a Debtor. . . .").  The Plan further provides that the Sale Effective Date cannot occur until all governmental and third-party approvals and consents contemplated by the APA are granted unconditionally and in full force and effect.  *See* Plan Art. 11.3.  The Plan provides for the appointment of Lenhart as the Responsible Officer and Winters as Plan Administrator, and provides for the creation of an Oversight Committee.  *See* Plan Arts. 4.6-4.8.  On May 18, 2020, the Court entered an order confirming the Plan.  *See* Docket No. 583.  At the time of Plan confirmation, the Parties anticipated that RCA would obtain the requisite regulatory approvals, and the Sale would close, within a matter of months—consistent with the typical CHOW process at that time.  The Plan Effective Date was May 20, 2020.  On July 14, 2020, the Court entered an order closing the chapter 11 cases of all Debtors except for AFM effective as of June 30, 2020.  *See* Docket No. 645.

10.     A key contingency to permit these cases to close has not yet occurred.  The Plan requires the occurrence of the "Sale Effective Date" before the Debtors can file certificates of dissolution.  *See* Plan Art. 4.10.  The Sale Effective Date cannot occur until the Sale occurs, namely, that the sale of the Debtors' skilled nursing facilities (collectively, the "Facilities"), as approved by the Sale Order has closed and CHOW approval granted.  *Id.* Art. 11.3.

### III.     Regulatory Hurdles and Calvado.

11.     RCA applied for Certificates of Need for the Facilities, however, those submissions never cleared regulatory hurdles.  The impact of the COVID-19 pandemic on the regulatory approval processes with DOH and HUD accounts for some of the delay.  In the years that followed,

issues arose with the compliance history of some of RCA's principals at skilled nursing facilities unrelated to the Facilities.[4]

12. At various points during the pendency of its application to DOH, RCA met with stakeholders about its progress towards Approvals. Through the assignment, RCA acknowledges that enabling a new Purchaser to take over from RCA is in the best interest of residents, their safety, the institution's long-term stability, and the objective of obtaining sale closing. The Plan Administrator has concluded that replacing RCA is reasonable and appropriate.

13. At this juncture, the Plan Administrator, Oversight Committee and Landlord (collectively, the "Parties") have consulted with RCA and cooperated to pursue an alternative course of action with a new operator committed to the goal of expeditiously pursuing the required regulatory approvals (the "Approvals") from DOH and HUD. *See* APA § 6.

**III.    RCA Agreement with Calvado.**

14. Calvado Care was formed by Joel Fried and Wolf Green. Mr. Fried and Mr. Green have ownership interests in the operator of three skilled nursing facilities in New York State, in or near Rochester: Elm Manor Nursing and Rehabilitation, The Brook at High Falls Nursing and Rehabilitation, and Wedgewood Rehab and Nursing Center. The Landlord introduced Calvado to RCA on approximately October 29, 2025.

15. On March 5, 2026, RCA reached a deal with Calvado, by which RCA would assign the Sale Agreements to Calvado. The assignment transaction is memorialized in the STA, which provides, among other things, that:

---

[4]    The Office of United States Trustee asked for a description of any notable events at the Facilities since 2020: first, a $6,000 penalty for an infection control violation when infected COVID patients were allowed to eat communally; and second, an elopement by a patient for which DOH did not require a plan of correction, however, a penalty determination is pending.

- The transfer of the Sale Agreements will occur on May 1, 2026, subject to regulatory approvals and satisfaction of certain closing conditions (the "Transfer Effective Date");

- Included in the transfer are operational responsibilities, certain contracts, applicable and assignable contracts, and personal property used in administrative/consulting services related to operation of the Facilities (the "Services");

- RCA may perform Services in the interim during the transition from RCA to Calvado to ensure continuity of Services;

- The transfer set out in the STA is conditioned on Calvado's receipt of all required governmental and licensing approvals;

- RCA and Calvado will address the transition or rehiring of employees at the Facilities;

- Accounts receivable will be bifurcated between the pre-transfer and post-transfer periods; and

- RCA will fund an escrow of $500,000 to cover any out-of-pocket costs or losses of Calvado related to tort claims arising before the Transfer Effective Date.

16. The STA contemplates that Calvado will take over from RCA while leaving the day-to-day status quo at the facilities uninterrupted, and the core terms of the transaction set forth in the Sale Agreements unchanged.

17. In addition to the STA, the Landlord agreed to sell the properties to an affiliate of Calvado. The obligation to close on this transaction arises when Calvado's CON application is approved. The terms of the real estate transaction are confidential because it does not involve property of the estate.

**REQUESTED RELIEF**

18. The Plan Administrator is current with all operating reports and payment of quarterly fees. The Oversight Committee meets regularly to consult with the Plan Administrator. The conditions precedent to sale closing have not yet been satisfied because RCA has not received Approvals. The Plan Administrator's authority to grant or withhold his consent to the assignment by RCA to Calvado is set forth in the Material Agreements. The Plan Administrator believes his

consent to the assignment is a valid exercise of his discretion and in furtherance of his duties. By this Application, the Plan Administrator seeks an order of this Court confirming the same.

## BASIS FOR RELIEF REQUESTED

19. The source of Plan Administrator's power is set forth throughout the Material Agreements and in relevant part at:

| | |
|---|---|
| Sale Order at 1. | "Buyer" is defined as "RCA Healthcare Management, LLC. . . (together with its designees, successors and permitted assigns. . .)" |
| Sale Order ¶ 6. | Provides that the Sale Order, the APA, the ASA and other Transaction Documents shall be binding in all respects upon, among other parties, "all non-Debtor parties to the Assumed Contracts, successors and assigns of the Buyer." |
| ASA section 9.05 | Provides neither Party (RCA or the Debtors) may "assign its interest in, subcontract, or delegate the performance of its obligations under this agreement without obtaining the prior written consent of the other party which shall not be unreasonably withheld or delayed." |
| APA section 15.9 | Provides RCA can assign the APA with the Seller's prior written consent, but must execute a new assignment and assumption agreement "in a form acceptable to counsel for Seller, which shall bind the assignee to all of the terms and provisions of this agreement as if the assignee were the original signatory." |
| Plan Art. 4.2 | Provides "[f]rom and after the Plan Effective Date, each Debtor shall be reorganized and shall conduct the business of ensuring that the Sale is consummated, including satisfaction of the operational obligations provided under the ASA." |
| Plan Art. 4.3 | Provides "upon the Plan Effective Date all property of the Debtors' Estates of any type or nature shall vest in the Debtors. . ." and "[e]xcept as otherwise provided in this Plan, on and after the Plan Effective Date the Debtors may use, sell, lease, or abandon their property without the need for prior approval of the Court." |
| Plan Art. 4.6(a) | Provides on the Plan Effective Date, Winters ". . . shall succeed to such powers as would have been applicable to the Debtors' members, managers, and officers, except as set forth in Section 4.8." |
| Plan Art. 4.6(b) | Provides ". . . all property vesting in the Debtors pursuant to Section 4.3 shall be managed by the Plan Administrator, and shall be held in the name of the Debtors free and clear . . . except as otherwise provided. . ." in the Plan and elsewhere. |
| Plan Art. 4.6(e) | Provides the Plan Administrator ". . . shall have all of the rights and powers of a trustee under sections 704 and 1106 of the Bankruptcy Code, including the right to . . . take all actions and execute all agreements, instruments, and other documents necessary to implement this Plan and the Plan |

| | |
|---|---|
| | Administrator Agreement; _provided_, _however_, the Responsible Officer shall have consultation rights in respect of the foregoing. . . ." |
| Plan Art. 4.8(a) | Provides "From and after the Plan Effective Date, through the Sale Effective Date, Israel Sherman shall remain an officer of each Debtor, and William Lenhart shall remain an officer of each of the Debtors ("_Responsible Officer_," and together with Israel Sherman, the "_Officers_"). The Officers shall have ultimate decision-making authority for the Debtors for all matters not expressly delegated to the Plan Administrator pursuant to this Plan or the Plan Administrator Agreement, including for the avoidance of doubt the exclusive right to object to and settle or otherwise compromise all Tort Claims; _provided_, _however_, decision-making authority with respect to matters regarding the provision of healthcare services shall be reserved for Israel Sherman unless such matter involves a related-party transaction in which case the Responsible Officer shall have authority. Notwithstanding the foregoing, Israel Sherman's responsibilities as Officer shall also include fulfilling all duties required of him by the Settlement Agreement, including without limitation in connection with the transfer of the Debtors' skilled nursing and assisted living facilities pursuant to the Purchase Agreement and the CHOW Process." |
| Plan Administrator Agreement ¶ 2(b)(vi) | Provides Winters will "support the Debtors' fulfillment of obligations under the Purchase Agreement. . . ." Paragraph 2(b) concludes saying "[t]o the extent required by the Plan and as otherwise appropriate in the Plan Administrator's business judgment, the Plan Administrator will consult in good faith with the Debtors' Officers through the Sale Effective Date in connection with his performance of the foregoing activities." |
| Plan Art. 4.8(d) | Provides Sherman will grant an irrevocable proxy granting Winters "sole voting power with respect to his membership interests in AFM through the Sale Effective Date. . . ." |
| Irrevocable Proxy | Provides "The Irrevocable Proxy shall include the right to sign Member's [Sherman] name (as sole member of the Company) to any consent, certificate or other document relating to the Company that applicable law may permit or require, to cause the Member's Interests to be voted in accordance with. . ." among other things, "all purposes in furtherance of the Plan Administrator's powers and authority as set forth in the Plan. . . ." |

20. The representative of the debtor-sellers with legal capacity to execute the consent on their behalf is a matter of corporate authority and the Material Agreements. Each operating facility emerged from Chapter 11, received a Final Decree, and are no longer subject to Bankruptcy Court oversight. On the Plan Effective Date, the Plan Administrator was provided full power of substitution as Sherman's proxy to vote his membership interest in AFM for all purposes in furtherance of the Plan Administrator's powers and authority as set forth in the Plan. The

Irrevocable Proxy indicates Winters has the requisite authority to consent to assignment after good faith consultation with Sherman and Lenhart. Following the Plan Effective Date, transactions involving debtors property can occur without Bankruptcy Court approval (*See* Plan 4.3). Notably, the Irrevocable Proxy would not affect Sherman's direct equity stake of approximately 45% in each of the Facilities (each of the Operator's bankruptcy cases were closed and final decrees entered).

21. RCA has not received requisite Approvals for the Facilities. The passage of time has not brought the Parties closer to an approved CHOW. Without a CHOW-approved operator, the Sale cannot close. In connection with this Application, the Plan Administrator has executed a written consent, attached hereto as **Exhibit B**, approving the assignment to Calvado.

## NOTICE

22. Notice of this Application has been provided by CM/ECF to all parties that have entered appearances in these cases, and by first class mail to counsel for RCA, Calvado, HUD and the Office of the United States Trustee.

## CONCLUSION

WHEREFORE, the Plan Administrator respectfully requests that the Court grant this Application and grant such other, further and different relief as this Court deems just and proper.

*[Remainder of page intentionally left blank]*

Dated: New York, New York
     April 1, 2026

AMINI LLC

/s/ Jeffrey Chubak
Jeffrey Chubak
131 West 35th Street
12th Floor
New York, NY 10001
(212) 490-4700
jchubak@aminillc.com
*Attorneys for Ronald Winters Solely in his*
*Capacity as Plan Administrator*

**No Objection:**

/s/ David Fryman
David Fryman, Esq.
Fryman P.C.
10 East Merrick Road, Ste. 304
Valley Stream, NY 11580
*Counsel to Israel Sherman, Officer*

/s/ William K. Lenhart
William K. Lenhart, solely in his capacity as Responsible Officer

Michael Farbenblum, Manager of RCA Healthcare Management LLC

Simcha Buff, Esq.
Buff & Co.
101 East Park Ave., Suite 267
Long Beach, NY 11561
*Counsel to Calvado Care*

/s/ George Angelich
George Angelich, Esq.
ArentFox Schiff LLP
1301 Avenue of the Americas
New York, NY 100019
*Counsel to Landlord Group*